UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
*(Electronically Filed)*

| | | |
|---|---|---|
| THOMAS E. PEREZ, Secretary of Labor, | ) | |
| United States Department of Labor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.  3:13-CV-00935-DJH |
| | ) | |
| OFF DUTY POLICE SERVICES, INC., | ) | |
| DARRELL SPURGEON, and BONNIE | ) | |
| SPURGEON, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendants, Off Duty Police Services, Inc., Darrell Spurgeon and Bonnie Spurgeon (collectively referred to as "Defendants"), submit the within Response in Opposition to the Motion for Summary Judgment filed by Plaintiff, Thomas E. Perez, Secretary of Labor, United States Department of Labor ("Plaintiff").

## INTRODUCTION

Plaintiff's Motion is based solely on the testimony of only seven of the 76 individuals listed on Exhibit A of Plaintiff's Complaint.[1]  Contrary to Plaintiff's assertions, there are genuine issues of material fact that are very much disputed.  Indeed, Plaintiff completely ignores much of the testimony of record, including Mr. Spurgeon's testimony and the testimony of other individuals listed on Exhibit A to Plaintiff's Complaint.  For reasons that follow, Plaintiff's Motion for Summary Judgment should be denied.

---

[1] Interestingly, these individuals are the same individuals who initiated the Department of Labor's investigation of Defendants' business practices, and are involved in a state lawsuit regarding similar claims of misclassification.

## FACTUAL BACKGROUND

As the Court is aware, Off Duty Police Services, Inc. ("ODPS") is a business that provides traffic safety, security and other services to its customers in the Louisville, Kentucky area. [Deposition Testimony of Darrell Spurgeon, pp. 88-89 attached at Exhibit 1 (hereafter "Mr. Spurgeon Depo. at __")]. Defendant, Darrell Spurgeon and his wife, Bonnie Gail Spurgeon, are the Vice President and President, respectively. [Mr. Spurgeon Depo. at pp. 9; 28]. ODPS contracts with various customers throughout the Louisville area to provide a variety of services. [*Id.* at p. 30]. Essentially, customers contact ODPS requesting specific services from traffic safety, security patrol, security detail, background checks to EMT/Paramedic services. [*Id.* at p. 32]. As a part of these contracts, each customer sets out the rate of pay it is willing to pay for the service requested (*e.g.,* per hour or per project), the qualifications for the job (*e.g.,* sworn officer, marked car, armed, etc.), and instructions for the requested service. [*Id.* at pp. 30; 32; 154; 158-59]. In an effort to facilitate its customers' needs, ODPS contracts with numerous independent contractors, such as those listed in Exhibit A of the Complaint, to provide the requested services. [*Id.* at pp. 32-33]. ODPS does not and has not employed any of the individuals listed in Exhibit A to the Complaint. [*Id.* at p. 35].

Nearly all of the contractors providing services for ODPS, approximately 98%, are sworn police officers that work full-time in this capacity. [*Id.* at pp. 75; 132]. The remaining two percent of the contractors are certified traffic control officers ("TCOs") who are almost all employed in another full-time position. [*Id.* at p. 132; Deposition Testimony of Ronald Cheak at pp. 9-10 attached at Exhibit 2 (hereafter "Cheak Depo. at p. ___); Affidavit of Barry Wilding at ¶ 1 attached at Exhibit 3 (hereafter "Wilding Aff. at ¶__"); Affidavit of Tim Gaddis at ¶ 1 attached at Exhibit 4 (hereafter "Gaddis Aff. at ¶__"); Affidavit of Thomas Barker at ¶ 1 attached at

Exhibit 5 (hereafter "Barker Aff. at ¶___"); Affidavit of Daniel Richardson at ¶ 1 attached at Exhibit 6 (hereafter "Richardson Aff. at ¶__")].  Nearly all of the contractors providing services for ODPS' customers provide services on a part-time basis for supplemental income.  [Mr. Spurgeon Depo. at p. 132*; Wilding Aff. at ¶ 2; Richardson Aff. ¶ 2; Gaddis Aff. at ¶ 2; Barker Aff. at ¶ 2; Affidavit of Delmas Reynolds at ¶ 2 attached at Exhibit 7 (hereafter "Reynolds Aff. at ¶__"); Affidavit of Matthew Roederer at ¶ 2 attached at Exhibit 8 (hereafter "Roederer Aff. at ¶ __"); Affidavit of Roberto Grider at ¶ 2 attached at Exhibit 9 (hereafter "Grider Aff. at ¶ __")].[2] A handful of these contractors have provided services for several years, however, much of that service has been on an intermittent basis depending on the individuals' availability and desire for supplemental income.  [Mr. Spurgeon Depo. at p. 35; Deposition Testimony of Azell Jackson at p. 6 attached at Exhibit 10 (hereafter "Jackson Depo. at p. ___"); Affidavit of Gregory Hunt at ¶ 1 attached at Exhibit 11 (hereafter "Hunt Aff. at ¶__"); Reynolds Aff. at ¶ 1; Barker Aff. at ¶ 1].

After receiving a job opportunity from its customer, ODPS contacts several contractors who meet the qualifications of the customer's needs (*i.e.*, sworn police officer, female, African American, armed, marked car, etc.).   [Mr. Spurgeon Depo. at pp. 30; 99-100].[3]   These contractors respond either by accepting or rejecting the job opportunity depending on their personal schedules, preference for the type of work or client.  [*Id.* at pp. 33; 48; 54; 62; Deposition Testimony of Thomas David at p. 30 attached at Exhibit 12 (hereafter "David Depo. at p. ___"); Jackson Depo. at p. 49; Wilding Aff. at ¶ 4; Richardson Aff. at ¶ 3; Gaddis Aff. at ¶ 3; Hunt Aff. at ¶ 2; Reynolds Aff. at ¶ 3; Roederer Aff. at ¶ 3; Grider Aff. at ¶ 3; Barker Aff. at ¶ 3].   The rejection of any given job opportunity in no way impacts their ability to obtain

---

[2] Despite the inartful characterization of "scheduling," Mr. Spurgeon testified that several individuals, including Frank Medeiros, in addition to himself, will contact contractors when opportunities become available to them and are compensated based on the number of hours that are secured.  [Mr. Spurgeon Depo. at p. 21].

[3] In some occasions, customers may make a special request to have a certain independent contractor for a job based on their positive past experience with this individual.

opportunities in the future.  [Mr. Spurgeon Depo. at pp. 203-04; David Depo. at pp. 29-31; 56-57; Cheak Depo. at pp. 14-15; 36; Jackson Depo. at pp. 40-41; Wilding Aff. at ¶ 4; Richardson Aff. at ¶ 3; Gaddis Aff. at ¶ 3; Hunt Aff. at ¶ 2; Reynolds Aff. at ¶ 3; Roederer Aff. at ¶ 3; Grider Aff. at ¶ 3; Barker Aff. at ¶ 3].

If a contractor accepts the job opportunity, ODPS provides the location of the job site, a time to report as specified by the customer, and the customer's contact person.  [Mr. Spurgeon Depo. at p. 33].   Upon arrival to the job site, the contractor approaches the customer representative about the customer's preference and need for the traffic patrol and safety setup or security setup.  [*Id*. at p. 99; David Depo. at p. 11; Wilding Aff. at ¶ 9; Richardson Aff. at ¶ 8; Gaddis Aff. at ¶ 7; Hunt Aff. at ¶ 7; Reynolds Aff. at ¶ 8; Roederer Aff. at ¶ 8; Grider Aff. at ¶ 10; Barker Aff. at ¶ 8].   Contractors are responsible for assessing the situation and use their experience and training to determine whether the requested setup is safe.  [David Depo. at pp. 15-16; Wilding Aff. at ¶ 9; Richardson Aff. at ¶ 8; Gaddis Aff. at ¶ 7; Hunt Aff. at ¶ 7; Reynolds Aff. at ¶ 8; Roederer Aff. at ¶ 8; Grider Aff. at ¶ 10; Barker Aff. at ¶ 8].   No one from ODPS provides any guidance or instruction on how to perform the customer's requested job.  [Mr. Spurgeon Depo. at pp. 99-100; 132; Deposition Testimony of Frank Medeiros at p. 17 attached at Exhibit 13 (hereafter "Medeiros Depo. at p. __"); Deposition Testimony of Bonnie Gail Spurgeon at p. 20 attached at Exhibit 14 (hereafter "Ms. Spurgeon Depo. at p. __")].   The customer representative directs the contractor on what services it has requested and if they disagree with the technical aspects of work, it is the responsibility of the contractor to resolve the issue with the customer.  [Mr. Spurgeon Depo. at p. 132; David Depo. at pp. 12; 14-15; Jackson Depo. at pp. 46-48; Cheak Depo. at p. 39; Wilding Aff. at ¶ 10;  Richardson Aff. at ¶ 9; Hunt Aff. at ¶ 8; Reynolds Aff. at ¶ 9; Roederer Aff. at ¶ 9; Grider Aff. at ¶ 11].   Indeed, contractors

can (and several have) refuse to perform services if the customer's instructions are inconsistent with their opinions as to safety based on their training and experience.  [Wilding Aff. at ¶ 10; Roederer Aff. at ¶ 9;].  No one with ODPS or acting on its behalf appears at the job site to review, evaluate and ensure that the independent contractors are adhering to the customer's requests.  [Mr. Spurgeon Depo. at pp.132-33; David Depo. at p. 16; Wilding Aff. at ¶ 12; Richardson Aff. at ¶ 10; Gaddis Aff. at ¶ 8; Hunt Aff. at ¶ 9; Roederer Aff. at ¶ 10; Reynolds Aff. at ¶ 10; Grider Aff. at ¶ 12; Barker Aff. at ¶ 11].

To this end, ODPS does not provide training to any of its contractors.  [Mr. Spurgeon Depo. at pp. 140-41; Cheak Depo. at pp. 18-19; David Depo. at pp. 19-21; Jackson Depo. at pp. 17-18].  The Commonwealth of Kentucky requires all individuals who perform traffic safety and control to be certified which requires attendance in a four-hour training session and the successful completion of a written exam.  [*Id.* at pp. 96-98].  In the past, for business purposes, Mr. Spurgeon has been certified by the state to conduct traffic safety trainings.  [*Id.* at p. 96].  On occasion, Mr. Spurgeon has conducted a training session, in order to maintain his certification, free of charge to ODPS customers and anyone else, including some contractors.  [*Id.*].  These training sessions were not required or provided on a routine basis or as a matter of course.  [*Id.*].  As a result, most of ODPS' contractors have obtained traffic safety training elsewhere.  [*Id.* at pp. 139; 141; Cheak Depo. at p. 19]

ODPS does not provide contractors with equipment.  [*Id.* at p. 159; Gaddis Aff. at ¶ 5; Reynolds Aff. at ¶ 6; Roederer Aff. at ¶ 6; Grider Aff. at 8; Barker Aff. at ¶6].[4]  Contractors are also not required by ODPS to obtain any specific equipment.  [*Id.* at pp. 94; 153].  In order to

---

[4] Mr. Spurgeon testified that on one occasion a contractor made a request to a customer to wear a different uniform due to inclement weather.  The customer required that the contractors continue to wear a logo to appear official on the job site per its contract with ODPS.  Accordingly, Mr. Spurgeon obtained patches with ODPS' emblem and a couple of these contractors sewed them onto their own clothing.  [Mr. Spurgeon Depo. at pp. 159-62].

provide services for some of ODPS' customers, however, a contractor must meet the customer's qualifications which may include having a marked car (or a police-type vehicle), police uniform (or BDUs), police lights or a stop and go sign.  [Mr. Spurgeon Depo. at pp. 94; 161-62; Medeiros Depo. at p. 13; Ms. Spurgeon Depo. at p. 30; Cheak Depo. at p. 48].  To this end, many of the contractors, sworn or unsworn, have purchased their own personal vehicle, typically a police-type car, lights, and other equipment to perform services for ODPS' customers.  [Mr. Spurgeon Depo. at p. 157; Azell Depo. at pp. 30-32; David Depo. at pp. 37-40; Wilding Aff. at ¶ 6; Richardson Aff. at ¶ 5; Gaddis Aff. at ¶ 5; Hunt Aff. at ¶ 4; Reynolds Aff. at ¶ 5; Grider Aff. at ¶ 7; Barker Aff. at ¶ 5].  These contractors also purchase insurance for the vehicle, maintain the vehicle and provide fuel at their own expense.  [Mr. Spurgeon Depo. at p. 150; David Depo. at p. 26; Jackson Depo. at p. 23; Wilding Aff. at ¶ 6; Richardson Aff. at ¶ 5; Gaddis Aff. at ¶ 5; Hunt Aff. at ¶ 4; Reynolds Aff. at ¶ 5; Grider Aff. at ¶ 7; Barker Aff. at ¶ 5].  Despite Plaintiff's assertions, ODPS does not provide insurance coverage for any contractors.  [Mr. Spurgeon Depo. at p. 150; David Depo. at p. 26; Jackson Depo. at p. 23].[5]  ODPS has purchased a rider to insure against liability from potential claims against the Company and its principals, not any of the contractors.  [*Id.*].

ODPS does not discipline contractors or otherwise enforce any ODPS work rules.  [*Id.* at pp. 175; 206; David Depo. at pp. 57-58; Jackson Depo. at p. 41; Wilding Aff. at ¶ 5; Richardson Aff. at ¶ 4; Gaddis Aff. at ¶ 4; Hunt Aff. at ¶ 3; Reynolds Aff. at ¶ 4; Roederer Aff. at ¶4; Grider Aff. at ¶ 4; Barker Aff. at ¶ 4 ].  As indicated above, ODPS' customers dictate the requirements for any given job, including the attire they would like the contractors to wear (*e.g.*, police

---

[5] ODPS' lack of insurance coverage for its contractors is also evidenced by testimony of one contractor who was involved in an accident while at a customer's jobsite.  Ronald Cheak, an individual on Exhibit A, was hit by a car at a job site and has filed a claim against the driver's insurance company.  No workers' compensation claim or other claims have been made relating to ODPS' insurance coverage.  [Cheak Depo. at pp. 11-13]

uniform, BDUs, etc.), equipment to utilize (*e.g.,* marked vehicle, lights, etc.), and instructions to follow (*e.g.,* close down lane of traffic, flag vehicles around job site, patrol lot, etc.).   [*Id.* at pp. 30; 99-100; 173; 175].   Again, despite Plaintiff's assertions, ODPS has never maintained or otherwise enforced any work rules, grooming guidelines or uniform guidelines.   [*Id.* at pp. 173-75].   Any such instructions are dictated by ODPS' customers depending on the job.   [*Id.*; Wilding Aff. at ¶ 12; Richardson Aff. at ¶ 10; Gaddis Aff. at ¶ 8; Hunt Aff. at ¶ 9; Reynolds Aff. at ¶10; Roederer Aff. at ¶ 10; Grider Aff. at ¶ 12; Barker Aff. at ¶ 11].[6]   Based on these facts in the record, it is not only clear that Defendants did not misclassify its contractors, but the record clearly establishes there are several genuine issues of material fact making summary judgment inappropriate.

## ARGUMENT

## I.   DEFENDANTS HAVE ESTABLISHED GENUINE ISSUES OF MATERIAL FACT WITH REGARD TO PLAINTIFF'S CLAIMS OF MISCLASSIFICATION.

Plaintiff's main contention in its Motion for Summary Judgment is "it is clear that Defendants should have treated the individuals in Exhibit A of the Complaint as employees," and thus, such conduct was willful and Defendants should be subject to the Department of Labor's calculation of back wages.   In making these arguments, Plaintiff ignores many disputed facts in the record and makes wide-sweeping legal conclusions.   Plaintiff's Motion is as narrow as the Department of Labor's investigation, as it considers the testimony of only seven of the 76 individuals listed on Exhibit A, the same individuals involved in the limited investigation. Moreover, Plaintiff mischaracterizes Mr. Spurgeon's testimony.   Contrary to Plaintiff's

---

[6] In his deposition, Mr. Spurgeon indicated that he had a website with rules from a client that were posted.  These were not ODPS' rules or policies.  Rather, he posted them on the website as a way to communicate such rules to the applicable contractors.  [Mr. Spurgeon Depo. at p. 190].

assertions, there are several genuine issues of material fact that are disputed by the parties, therefore, summary judgment is inappropriate.

### A.  There Is No FLSA Coverage.

Plaintiff seeks summary judgment on the issue of coverage under the Fair Labor Standards Act ("FLSA") based on the unsupported and disputed basis that the individuals listed on Exhibit A are employees of Defendants.  As outlined below, there are genuine issues of material fact relating to such liability, and thus, summary judgment regarding coverage is likewise inappropriate.

### B.  The Individuals Listed On Exhibit A of the Complaint Are Independent Contractors.

In considering the employment relationship in the context of the FLSA, the Sixth Circuit has considered the following factors:  (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the putative employee and employer; (3) the degree to which an employee's opportunity for profit and loss is determined by the employer; (4) the skill and initiative required in performing the job; (5) the permanency of the relationship; and (6) whether the services rendered are an integral part of the Company's business.  *See, e.g., Donovan v. Brandel*, 736 F.2d 1114 (6th Cir. 1984); *Fegley v. Higgins*, 19 F.3d 1126 (6th Cir. 1994); *see also Imars v. Contractors Mfg. Servs., Inc.*, 165 F.3d 27 (6th Cir. 1998).

Courts have made clear that the issue of employment relationship does not lend itself to a precise test, but is to be determined on a case-by-case basis upon the circumstances of the whole business activity.  *Rutherford v. McComb*, 331 U.S. 722, 730 (1947).  The presence of any individual factor is not dispositive of whether the employee/employer relationship exists.  *Id.* Considering all of these factors on the totality of the circumstances, it is apparent from the record

that the factors not only weigh in favor of an independent contractor relationship, but importantly, there are disputed issues of material fact precluding summary judgment.

### i.     Degree of Control.

Where an alleged employer does not direct the method and manner of performance, supervise day-to-day conduct or dictate the hours of performance, Courts have found a lack of right to control on the part of the purported employer.  *Donovan v. Brandel*, 736 F.2d 1114 (6th Cir. 1984).  Addressing this factor, the Fifth Circuit has found there to be no employer-employee relationship where the purported employer did not control the manner or method of performance, but rather, the customer dictated the procedures and type of equipment required.  *Carrell v. Sunland Construction, Inc.*, 998 F.2d 330 (5th Cir. 1993).

In *Carrell*, though the plaintiffs-welders were assigned a job by the purported employer, upon arrival to the job site the purported employer's customer dictated the specific welding procedures and the type of welding rods required for each construction project.  *Id.* at 332-33. Furthermore, the customer (not the purported-employer) dictated the amount of time to be spent on the project.  *Id.*  Similarly, ODPS makes opportunities available to its contractors, and pursuant to its contract with its customers, the customer dictates the equipment needed for the job, appropriate attire, instructs the contractors as to specific procedures to perform and directs the end of the workday.  [Mr. Spurgeon Depo. at pp. 30; 99-100; 173; 175; Medeiros Depo. at p. 13; Ms. Spurgeon Depo. at p. 30; Cheak Depo. at p. 48; Wilding Aff. at ¶ 12; Richardson Aff. at ¶ 10; Gaddis Aff. at ¶ 8; Hunt Aff. at ¶ 9; Reynolds Aff. at ¶10; Roederer Aff. at ¶ 10; Grider Aff. at ¶ 12; Barker Aff. at ¶ 11].

Also, in *Carrell*, the plaintiff-welders were required by a regulatory agency to be certified prior to performing any welding jobs.  *Carrell*, 998 F.2d at 332-33.  The purported employer did

not make this requirement and was not involved in the testing.  *Id.*  Likewise, ODPS' sworn police officers and TCOs are all required by the Commonwealth of Kentucky (not ODPS) to be trained and certified in traffic safety prior to performing any such service.  [Mr. Spurgeon Depo. at pp. 96-98].

Despite Plaintiff's assertions, the record establishes that the contractors are charged with the responsibility of assessing the requested setup of the customer, consider the potential safety risks based on their training and experience, and if they have disagreements, use their discretion to tell the customer.  [David Depo. at pp. 15-16; Wilding Aff. at ¶ 10;  Richardson Aff. at ¶ 9;  Hunt Aff. at ¶ 8; Reynolds Aff. at ¶ 9; Roederer Aff. at ¶ 9; Grider Aff. at ¶ 11].   If the contractors disagree, then they may leave and on occasion have done so.  [Wilding Aff. at ¶ 10; Roederer Aff. at ¶ 9].  Plaintiff argues that merely having to follow instruction indicates the existence of an employee-employer relationship, regardless if the instructions are provided by the customer.  This assertion is just plain wrong.  Quite tellingly, Plaintiff cites to no authority to support this contention.   To the contrary, courts have found that instructions dictated by a customer and not the purported employer reflect the lack of control.  *See Carrell, supra.*  Indeed, the fact that ODPS' customers dictate the equipment to use and guidelines to perform the job is no more control than a homeowner requesting a painter to use certain brushes or paint his house a certain style or color.  Customer control does not weigh in favor of an employer-employee relationship. *See Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F. Supp. 2d 667, 672-73 (D. Md. 2000), *aff'd sub nom. Chao v. Mid-Atlantic Installation Servs., Inc.*, 16 Fed. Appx. 104 (4th Cir. 2001) ("It is in the nature of a contract that the contractor promises to deliver the performance bargained for by the client.  For example, a builder will build a building according to the specifications of an architect.  That does not make the builder an employee.  A painter will

paint a house the colors dictated by the homeowner.   That does not make the painter an employee.  In short, requiring a contractor to meet the client's technical specifications is not the type of 'control' which bestows 'employee' status on the contractor.").

Furthermore, Plaintiff argues that ODPS controls the contractors because it has instituted other "work rules" on its website.  As indicated in Mr. Spurgeon's testimony, the rules that were formerly posted on the website were guidelines issued by the customer and he was merely passing them along to the contractors.  [Mr. Spurgeon Depo. at pp. 176-77].  The additional "work rules" Plaintiff cites to in its Motion were templates placed on ODPS' website by someone else that Mr. Spurgeon was not aware of and they were not distributed and, most certainly, were never enforced.  [*Id.* at p. 190].[7]  There is absolutely no evidence or testimony in the record that these rules were ever instituted or otherwise enforced.  These have no bearing on the right to control analysis as the actual degree of control acted upon is controlling in the Court's analysis.  *See Usery v. Pilgrim Equip. Co.,* 527 F.2d 1308, 1312 (5th Cir. 1976) ("The controlling economic realities are reflected by the way one actually acts.")

Finally, in support of its Motion, Plaintiff relies upon two unpersuasive cases, *Secretary v. IDPS*, 819 F. Supp. 2d 740, 750 (N.D. Ill. 2011) and *Schultz v. Capital Intern. Sec., Inc.*, 466 F.3d 298 (4th Cir. 2006).  As an initial matter, neither of these cases are binding on this Court, but more importantly the facts are highly distinguishable to the matter at hand.  In *IDPS*, the court found that the employer exerted control over security guards because it created <u>and</u> distributed a memorandum detailing how to perform their jobs.  *IDPS*, 819 F. Supp. 2d at 750 (emphasis added).  The employer held numerous meetings on how to perform the job and it closely monitored compliance with frequent uniform and equipment checks.  *Id.*  Additionally,

---

[7] As indicated above, Mr. Spurgeon or anyone at ODPS never instituted or otherwise enforced a uniform requirement or grooming policy.  [Mr. Spurgeon Depo. at pp. 173-75].  Any requirements of this nature were directives of ODPS' customers.  [*Id.*]

the security guards did not report to the client, but rather received all instruction from the employer. *Id.* Likewise in *Schultz*, the employer issued and enforced an eight-page standard operating procedure which dictated the precise manner in which to carry out job duties. *Schultz*, 466 F.3d at 307. The employer also closely monitored the security guards' performance with monthly audits in which the employer would discipline and remove security guards if they were out of compliance. *Id.* at 301-02. In these cases, the facts were undisputed that the guards did not determine the manner and method of how to perform their jobs as the defendant failed to provide any factual evidence to undermine control.

Here, however, the record is replete with evidence undermining Defendants' purported control. Indeed, there is testimony that Defendants do not provide instruction on how to perform their jobs, discipline the contractors, supervise or evaluate performance. [Mr. Spurgeon Depo. at p. 132; David Depo. at pp. 12; 14-15; Jackson Depo. at pp. 46-48; Cheak Depo. at p. 39]. Neither Mr. Spurgeon nor anyone acting on behalf of ODPS appears at its customer job sites to supervise or evaluate the contractors' performance. [*Id.* at pp. 30; 99-100; 173; Wilding Aff. at ¶ 12; Richardson Aff. at ¶ 10; Gaddis Aff. at ¶ 8; Hunt Aff. at ¶ 9; Roederer Aff. at ¶ 10; Reynolds Aff. at ¶ 10; Grider Aff. at ¶ 12; Barker Aff. at ¶ 11]. There is no evidence that ODPS has ever instituted or enforced any work rules or other procedures. [Mr. Spurgeon Depo. at p. 190]. ODPS does not discipline contractors. [*Id.* at p. 206]. Furthermore, there is evidence that contractors can hire assistants or, if need be, find someone to fill in for them. [*Id.* at p. 144; Barker Aff. at ¶ 9]. Most importantly, it is undisputed that the contractors report directly to ODPS' customers on how to perform the job, and are required to deal directly with the customer if there is a dispute as to the technical aspect of the work performed. [Mr. Spurgeon Depo. at p. 132; David Depo. at pp. 12; 14-15; Jackson Depo. at pp. 46-48; Cheak Depo. at p. 39; Wilding

Aff. at ¶ 10;  Richardson Aff. at ¶ 9; Hunt Aff. at ¶ 8; Reynolds Aff. at ¶ 9; Roederer Aff. at ¶ 9; Grider Aff. at ¶ 11].   Considering the facts in the record, this factor weighs in favor of an independent contractor relationship.

### ii.   Investment in Equipment and Materials.

As outlined above, the record clearly establishes that ODPS' contractors make significant investment in materials and equipment to enable them to provide services for ODPS' customer. Interestingly, Plaintiff makes the unsupported contention that this factor is "not particularly useful in this analysis."   It can only be assumed that this assertion has been made because the facts in the record do not support Plaintiff's conclusion.

In analyzing this factor, the Fifth Circuit in *Carrell* found significant investment in equipment where the plaintiff-welders supplied their own trucks, welding machines and tools averaging nearly $15,000.  *Carrell*, 998 F.2d at 333.  The plaintiff-welders also assumed all costs associated with operating, repairing and maintaining this equipment including insurance.  *Id*. Though the purported employer supplied minor equipment, including blades for grinders and some equipment to assist in welding, it did not supply any essential equipment or tool to perform the welders' jobs, and thus, the court found that the relative investment of the workers outweighed the purported employers.  *Id*.

In the present matter, similar to *Carrell*, the record is undisputed that Defendants do not supply the contractors with equipment essential to perform their jobs.  [Mr. Spurgeon Depo. at p. 159].  Moreover, Defendants do not require contractors to obtain any specific equipment.  [*Id*. at pp. 94; 153].  Rather, the contractors often purchase their own police-type vehicle, lights, stop and go sign and other equipment in order to provide services to ODPS' customers.  [*Id*. at pp. 94; 161-62; Wilding Aff. at ¶ 6; Richardson Aff. at ¶ 5; Gaddis Aff. at ¶ 5; Hunt Aff. at ¶ 4;

Reynolds Aff. at ¶ 5; Grider Aff. at ¶ 7; Barker Aff. at ¶ 5].[8]  The contractors also purchase their own insurance for the vehicles, pay for gas to and from a job site and are responsible for the upkeep and maintenance of their vehicle and other equipment.  [Mr. Spurgeon Depo. at p. 150; David Depo. at p. 26; Jackson Depo. at p. 23; Wilding Aff. at ¶ 6; Richardson Aff. at ¶ 5; Gaddis Aff. at ¶ 5; Hunt Aff. at ¶ 4; Reynolds Aff. at ¶ 5; Grider Aff. at ¶ 7; Barker Aff. at ¶ 5].

Akin to the *Carrell* plaintiffs' unsuccessful argument, Plaintiff attempts to undermine the contractors' significant investment by asserting that ODPS supplied a few contractors with patches.  To add context for the Court, several contractors, including the initiating Complainant in the initial underlying investigation, asked ODPS' customer if he and other contractors could wear short-sleeved shirts on the job because of the inclement weather.  [Mr. Spurgeon Depo. at pp. 159-62].[9]  The customer agreed, but requested pursuant to its contract with ODPS that the contractors wear some official attire to maintain the appearance of authority while on the job site.  [*Id.*].  These contractors approached Mr. Spurgeon and requested patches to adhere to their shirts.  [*Id.*].  On one occasion, Mr. Spurgeon supplied a couple of contractors with a few patches.  [*Id.*].  The contractors then put them on their own clothing and proceeded to provide services to ODPS' customer.  [*Id.*]  This single instance of providing a non-essential material does not even begin to outweigh the significant investment nearly all contractors have made in purchasing, maintaining and insuring vehicles, lights and other equipment.

Plaintiff further attempts to argue that selling equipment to contractors weighs in favor of its conclusion of an employee-employer relationship.  This assertion is not only unsupported, it is

---

[8] Plaintiff makes the baseless assertion that the contractors do not supply any specialized service, and thus, do not need to obtain any specialized tools.  This could not be further from the truth.  The record clearly establishes that depending on the services provided, the contractors may need to obtain certain equipment if they desired to perform services for a particular ODPS customer.
As clarification for the Court, "police-type" vehicles have been described by Mr. Spurgeon as commonly used police vehicles such as a Crown Victoria.  [Mr. Spurgeon Depo. at pp. 155-56]
[9] Notably, this contractor asked the customer, not ODPS for permission.

flawed.  Even though Defendants did on occasion sell equipment to some of its contractors, it remains unchanged that the contractors still had to make the investment in purchasing the materials.  Whether the contractors bought the materials from Defendants or a third party has no impact on the contractors' investment or otherwise weighs in favor of an employee-employer relationship.

Again, Plaintiff relies upon *IDPS* and *Schulz* to support its Motion, however, the facts are distinguishable.  In *IDPS*, the employer provided vehicles, gas, car insurance, and cell phones for the security guards.  *IDPS*, 819 F. Supp. 2d at 17.  The employer also paid for the security guards' licenses and provided liability insurance.  *Id.*  Similarly in *Schultz*, the employer provided the security guards with handguns, radios, holsters, business cards, first aid kits, and lapel pins.  *Schultz*, 466 F.3d at 308.  In these cases, the facts were undisputed that the employer provided the majority of the equipment essential to perform the job.  *Id.*  Here, however, there is no such evidence.  Contractors purchase their own vehicle, lights, stop and go signs, vests, insurance, and fuel and are responsible for obtaining their own training and certification to provide traffic safety in Kentucky.  ODPS' contractors have made significant investments in materials and equipment, and thus, this factor weighs in favor of an independent contractor status.

### iii.    Opportunity for Profit or Loss.

Where remuneration increases by successful performance of a job, courts have found this weighs in favor of an independent contractor relationship.  *See Donovan*, 736 F.2d at 1119.  Equally, the independent contractor relationship has been found where there is a possibility of loss on the part of the contractor.  *Id.*  Plaintiff makes the conclusory argument that because most of the contractors were paid at an hourly rate there is no opportunity for profit or loss.  This

assertion is baseless. As an initial matter, not all job opportunities were paid on an hourly rate, and at that, such jobs were not always the same rate of pay. [Mr. Spurgeon Depo. at pp. 63-64; 74-75; Cheak Depo. at p. 18; David Depo. at p. 19]. Many contractors accepted job opportunities on a flat-rate or a project basis, meaning that depending on their efficiency and the customer's needs, the contractor could make more money. [*Id.*].

Moreover, being paid on an hourly basis is not a dispositive factor in this analysis. *See Carrell*. In *Carrell*, despite being paid hourly, the record reflected that the plaintiff-welders had the opportunity to make more profit if they were able to control their own costs. *Carrell*, 998 F.2d at 334. The plaintiff-welders treated themselves as independent contractors for tax purposes and deducted the costs of welding materials and equipment as business expenses. *Id.* Because the welders could impact their profits based on keeping their own costs down, the court found that here was the opportunity for profit or loss. *Id.* Similarly, ODPS' contractors have the opportunity to make more or less profit depending on the job opportunities they accept. Not all jobs pay the same rate. There are prevailing wage jobs and jobs during peak times that offer a higher hourly rate. [Mr. Spurgeon Depo. at pp. 74-75; Cheak Depo. at p. 18; Wilding Aff. at ¶8; Richardson Aff. at ¶ 7; Hunt Aff. at ¶ 6; Reynolds Aff. at ¶ 7; Roederer Aff. at ¶ 7; Grider Aff. at ¶ 9; Barker Aff. at ¶ 7]. There are also flat-rate jobs. [Mr. Spurgeon Depo. at pp. 63-64]. As indicated above, the contractors were responsible for paying for their own equipment, vehicle, maintenance, fuel and other expenses and deduct these as business expenses. [David Depo. at p. 65; Wilding Aff. at ¶ 6; Richardson Aff. at ¶ 5; Gaddis Aff. at ¶ 5; Hunt Aff. at ¶ 4; Roederer Aff. at ¶ 5; Reynolds Aff. at ¶5; Grider Aff. at ¶ 7; Barker Aff. at ¶ 5]. Therefore, the contractors' opportunity for profit or loss is dependent on their ability to obtain higher rate jobs

and keep the cost of equipment, travel and other expenses lower.[10]  Based on the evidence in the record, this factor weighs in favor of an independent contractor status.

### iv.   Degree of Skill and Initiative.

The degree of skill required to perform services for ODPS' customers is clearly disputed. In its Motion, Plaintiff argues that there is no skill required to perform traffic safety work.[11] Plaintiff, however, does not support this assertion with any evidence in the record.  When considering this factor, the courts have made clear that the skill required must be evaluated with reference to the task being performed.  *Donovan*, 736 F.2d at 1118.

Traffic safety work is only a snapshot of the work provided to ODPS' customers.  [Mr. Spurgeon Depo. pp. 31-33].  ODPS' contractors provide a wide-variety of services, which require a broad range of skills.  [*Id.*].  There are numerous types of job opportunities and skills required to provide services for ODPS' customers, including, but not limited to, being a sworn officer with jurisdiction in the Louisville/Jefferson County Metro area or obtaining and maintaining a concealed carry license.  [*Id.* at pp. 21; 154; 158-59; David Depo. at pp.19-20]. Notwithstanding this high degree of skill required for these jobs, even the job opportunities for traffic control have a high level of requisite skill level and experience which enables contractors to work independently without ODPS' direction or training.  [Mr. Spurgeon Depo. at p. 141; 143; David Depo. at pp. 19-20].  All such training must be obtained prior to providing services for ODPS' customers.  [*Id.*]

Furthermore, there is evidence in the record that each traffic safety officer, including sworn police officers, must be certified by the Commonwealth of Kentucky to provide these

---

[10] Indeed, there is evidence that contractors will drive across town to perform services on a job, and often times, these jobs get canceled as a result inclement weather.  [Jackson Depo. at p. 49; David Depo. at p. 65].  Contractors are not reimbursed for this or any other mileage expense.  [*Id.*].  These costs contribute to the contractors overall opportunity for profit.

[11] Again, Plaintiff cites only the testimony of seven of the 76 individuals on Exhibit A to support its argument.

services.  [*Id.* at pp. 96-98].[12]  Similar to the plaintiff-welders in *Carrell*, a third-party evaluates and certifies the skills of ODPS' contractors with regard to becoming a certified traffic control officer.  These facts demonstrate that a specialized skill and training are required to perform services for ODPS' customers.

### v.      Permanency of the Relationship.

Plaintiff argues that merely because some of ODPS' contractors have provided services to ODPS' customers for several years, an employee-employer relationship exists.  This assertion is narrow and conclusory.  Indeed, the Sixth Circuit has held that workers returning each year "is no more indicative of the employment relationship than when a businessman repeatedly uses the same subcontractors due to satisfaction with past performance."  *Donovan*, 736 F.2d at 1117.

In *Donovan*, nearly 50% of migrant workers returned to the purported employer each year, however, several of them held full-time jobs elsewhere and considered their jobs as migrant workers to be opportunities for supplementing their income.  *Id.*  Based on this evidence, the Sixth Circuit found that the record supported the conclusion that the annual return to the purported employer was a product of a "mutually satisfactory arrangement rather than a permanent relationship between them."  *Id.*  Moreover, in *Carrell*, the Fifth Circuit found a lack of permanency where none of the plaintiff-welders worked for the purported employer exclusively.  *Carrell*, 998 F.2d at 332.

Similar to this matter, though some of ODPS' contractors have provided services for several years, such service has been on an intermittent basis whenever their schedule allows for it and they want to supplement their income.  [Mr. Spurgeon Depo. at p. 35; Wilding Aff. at ¶ 2; Richardson Aff. ¶ 2; Gaddis Aff. at ¶ 2; Barker Aff. at ¶ 2; Reynolds Aff. at ¶ 2; Roederer Aff. at

---

[12] Notably, Plaintiff cites to a Maryland District Court case where the Court denied summary judgment because it found that it was a factual question as to whether traffic control officers was a skilled trade, it did not determine that such a trade lacked the requisite level of skill.

¶ 2; Grider Aff. at ¶ 2].  The vast majority of the individuals listed on Exhibit A of the Plaintiff's Complaint only provide services to ODPS' customer to supplement their income in addition to holding a full-time job elsewhere.  [Mr. Spurgeon Depo. at pp. 75; 132].  Even the individuals that Plaintiff relies upon making this argument have not had an exclusive relationship with ODPS. [Mr. Spurgeon Depo. at pp. 109-10]. [13]  Ronald Stallings, the initiating Complainant in the Department of Labor's investigation, provided services on an intermittent basis while also maintaining his own business and working for other businesses.  [*Id.* pp. 142-43].  Despite the Plaintiff's assertions, it is not common for contractors to rely on OPDS as their sole source of income.  [*Id.* at pp. 75; 132; Wilding Aff. at ¶ 2; Richardson Aff. ¶ 2; Gaddis Aff. at ¶ 2; Barker Aff. at ¶ 2; Reynolds Aff. at ¶ 2; Roederer Aff. at ¶ 2; Grider Aff. at ¶ 2].[14]  The few who have, like Ronald Stallings, made failed attempts at pursuing other independent ventures.

Furthermore, the facts in this matter are highly distinguishable to the facts in *IDPS* and *Schultz*.  In *IDPS*, the employer maintained a hierarchical system of titles similar to a police department (officer, sergeants, lieutenants, commanders, captain, and chief) which gave the security guards incentives to remain with the Company for an extended period of time so they could advance within the Company.  *IIDPS*, 819 F. Supp. 2d at 752.  Likewise, in *Schultz*, the employer provided the security guards with paid vacation and sick days in addition to keeping them on the same job assignment for multiple years.  *Schultz*, 466 F.3d at 309.  Here, however, there is no evidence that ODPS provided any contractors with special titles or job benefits to remain with ODPS.  Moreover, the record is replete with evidence that the majority, if not all, of

---

[13] Though ODPS' contractors have executed a non-compete, this restrictive covenant is narrowly tailored and restricts them from soliciting and providing services to ODPS' customers for a period of one year.  It does not prevent the contractors from providing similar services to non-customers or working for another business.  Indeed, several of the individuals listed on Exhibit A have their own businesses providing similar services.  [Cheak Depo. at pp.9-10; Jackson Depo. at pp. 9, 19-22].

[14] In making this flawed claim, Plaintiff relies solely on the testimony of only seven of the 76 individuals listed in Exhibit A and completely ignores the other evidence in the record.

the contractors worked in another job while providing services for ODPS' customers.   This factor weighs in heavily in favor of an independent contractor status.

### vi.   Integral Part of Business.

As evident by Mr. Spurgeon's testimony, ODPS facilitates the needs of its customers, be it traffic safety, security, background checks, safety patrol, etc.   ODPS takes and applies the needs of its customers and finds someone to provide these services.   This is the essence of the business – facilitating the needs of its customers.   [Mr. Spurgeon Depo. at p. 112-13].   Plaintiff argues that ODPS merely provides traffic safety services and that the individuals on Exhibit A are therefore integral to the business.   Again, this argument is too narrow.   ODPS provides a wide-range of services, and though the individuals listed in Exhibit A assist in this regard, by no means would their absence result in a loss of the business.   Accordingly, this factor weighs in favor of independent contractor status.

### C. The Economic Reality Weighs In Favor of An Independent Contractor Status.

In considering the direction in which the economic reality weighs in status cases, the Sixth Circuit has relied upon the central question of the workers' economic dependence upon the business for which he is laboring.   *Donovan*, 736 F.2d at 1119.   In *Donovan*, the Court considered the fact that the workers did not work exclusively for the purported employer and they could easily perform similar work at other farms should the necessity arise.   *Id.*   Likewise, the Court in *Carrell* found the lack of exclusivity as key in considering the plaintiff-welders' status.   *Carrell*, 998 F.2d at 334.   Notably, the Court in *Carrell* also considered the fact that the workers were classified as independent contractors and acted accordingly.   *Id*.

Though there are facts that point in both directions, as there are in all status cases, the record weighs heavily in favor of a lack of economic dependence in this matter.   As in *Carrell*

and *Donovan*, ODPS' contractors are not restricted to providing services solely for ODPS.  [Mr. Spurgeon Depo. at pp. 52-53].  Indeed, most, if not all, at some point have worked for another business or maintained their own business.  [*Id.* at 75; 132; Wilding Aff. at ¶ 1-2; Richardson Aff. ¶ 2; Gaddis Aff. at ¶ 2; Barker Aff. at ¶ 2; Reynolds Aff. at ¶ 2; Roederer Aff. at ¶ 2; Grider Aff. at ¶ 2]].  All of the contractors consider themselves as self-employed for tax purposes, invest in significant equipment, and make business deductions accordingly.  [*Id.* at p. 48-49; David Depo. at pp. 63-65; Wilding Aff. at ¶ 6; Richardson Aff. at ¶ 5; Gaddis Aff. at ¶ 5; Hunt Aff. at ¶ 4; Roederer Aff. at ¶ 5; Reynolds Aff. at ¶5; Grider Aff. at ¶ 7; Barker Aff. at ¶ 5].  Contractors work as little or as much as they want depending on their schedules, their need to supplement their income or even their preference for certain work or customers.  [Mr. Spurgeon Depo. at pp. 33; 48; 54; 62; David Depo. at. p. 30; Jackson Depo. at p. 49; Wilding Aff. at ¶ 4; Richardson Aff. at ¶ 3; Gaddis Aff. at ¶ 3; Hunt Aff. at ¶ 2; Reynolds Aff. at ¶ 3; Roederer Aff. at ¶ 3; Grider Aff. at ¶ 3; Barker Aff. at ¶ 3].  It is clear, based on these facts and the facts outlined above, the individuals listed on Exhibit A are in business for themselves and have very little, if any, economic dependence on ODPS.

## II. THERE IS NO VIOLATION OF THE FLSA, LET ALONE, A WILFULL VIOLATION.

First and foremost, as described-above, Defendants did not violate the FLSA.  Even, assuming *arguendo*, this Court were to find liability on the part of Defendants, there is no basis for a finding of willfulness.  The Supreme Court has established that a violation is willful if the defendant either knew his or her conduct violated the FLSA or showed reckless disregard for whether his or her actions complied with the act.  *McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 133 (1988).  This standard, however, requires more than mere negligence.  *Id.*  Courts have found willfulness where the employer was aware of specific FLSA requirements from earlier

Department of Labor investigations or direct information from an administrative agency when it has either misclassified employees as exempt or failed to compensate them correctly. *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 967 (owner had actual knowledge of Act's requirements from earlier violation in which he previously agreed to pay back wages and promised future compliance). Reckless disregard or guilty knowledge has also been shown by repeated violations; the destruction, falsification or withholding of records. *Martin v. Deiriggi*, 985 F.2d 129, 136 (4th Cir. 1992). Conversely, Courts have held that violations were non-willful when employers made efforts to keep up with the requirements of the FLSA, but failed to do so because of mistaken interpretations of law. *Halferty v. Pulse Drug Co.*, 826 F.2d 2, 3-4 (5th Cir. 1987) (finding of willfulness not warranted where employer consulted with attorney and examined DOL bulletin).

There is no evidence that would lead this Court to a finding that Defendants' conduct was in willful violation of the FLSA. Indeed, Plaintiff has presented no facts to support its assertion. Defendants were not subject to a previous Department of Labor investigation where they were put on notice that they were in violation of the FLSA, promised compliance, and then continued to violate the statute.

Plaintiff argues Defendants are not insulated because Mr. Spurgeon had a "casual" conversation with an attorney about the classification of ODPS' contractors. The depth of Mr. Spurgeon's communications with an attorney or the failure to do so at all, has no bearing on the analysis of whether Defendants willfully disregarded the law. Negligence or failure to seek legal advice may be acting unreasonable, but such conduct is not a willful violation of the FLSA. *See Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 355 (5th Cir. 1990); *Mireles v. Frio Foods*, 899 F.2d 1407, 1416 (5th Cir. 1990) (affirming a finding that violation was not willful as failure to

seek legal advice, negligence and acting unreasonably are not knowing or reckless disregard for the law).  Plaintiff further argues that Defendants' conduct was willful because all contractors were classified as independent contractors and were required sign an independent contractor agreement.  It, however, cites to no case law that support this contention.[15]  Merely establishing the relationship with the contractors does not lend itself to actual knowledge or reckless disregard for the law.  There is no evidence in the record that Defendants had any doubts as to the legality of the relationship status between ODPS and its contractors.   As such, it is inappropriate for the Court to grant summary judgment as to the willfulness of Defendants' conduct.

### III. PLAINTIFF'S CALCULATION OF BACK PAY IS ERRONEOUS.

Again, Defendants did not violate the FLSA and deny that the individuals listed on Exhibit A are entitled to any back pay.  Furthermore, even assuming *arguendo*, Defendants are liable for back pay, there are genuine issues of material fact relating to Plaintiff's back pay calculations which precludes summary judgment on this issue.

Defendants have submitted its Answers to Plaintiff's Second Set of Interrogatories which outline their calculations, assuming liability is present, to be a total of $57,569.08, if willfulness is found, and $43,813.84, if not.   [Defendants' Answers to Secretary's Second Set of Interrogatories attached at Exhibit 15].  Plaintiff asserts the individuals in Exhibit A are entitled to $164,322.39.  This figure, however, was calculated by dividing the typical rate of pay of $15 and $20 per hour by the check amount for each individual.  These calculations are erroneous as they fail to take into account the circumstances where the contractor was paid at a higher hourly

---

[15] Plaintiff cites to *McLaughlin v. Stineco, Inc.*, 697 F. Supp. 436, 477 n. 16 (M.D. Fla. 1988) to support this notion, however, this case is completely different than the case at hand.  Indeed, the Defendants in the *Stineco* matter were on notice of their violation after meeting with the Department of Labor and continued to violate the Act.  There are no similar facts to support this assertion.

rate for a prevailing wage job or a special event job.  [Mr. Spurgeon Depo. at pp. 74-75].  The calculations also ignore the payments made to contractors for project based compensation.  [*Id.*] Summary judgment on the damages calculation is inappropriate as there are genuine issues of material fact as to the accuracy of the calculations.

### IV. DEFENDANTS ACTED IN GOOD FAITH.

Notwithstanding the lack of liability on the part of Defendants, assuming *arguendo*, that the Court finds the Defendants to be liable for the misclassification of the individuals listed on Exhibit A of the Complaint, there is no basis for liquidated damages as Defendants acted in good faith compliance with the FLSA.

The court may, at its discretion, refuse to award liquidated damages if the employer shows that he acted in good faith and that he had reasonable grounds for believing that he was not violating the Act.  *Dole v. Elliot Travel & Tours, Inc.*, 942 F.2d 962, 967 (6th Cir. 1991). Courts have found good faith where the employer had reasonable grounds to believe his act or omission was not in violation of the FLSA.  *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 312 (7th Cir. 1986).  A decision made above board and justified in public is more likely to satisfy the test.  *Id*.  An employer's willingness to state and defend a ground suggests a colorable foundation for a good faith defense as double damages are designed to compensate for concealed violations.  *Id*.

Since its formation, ODPS has always characterized its contractors as independent contractors.  [Mr. Spurgeon Depo. at p. 35].  Mr. Spurgeon made the decision to do so on the advice of counsel and discussions with his CPA.  [*Id.* at pp. 36-37].  In doing so, ODPS' contractors have executed independent contractor agreements outlining their roles.  [*Id.* at p. 49]. ODPS issues IRS Forms 1099 to the contractors and the contractors treat any income from ODPS as self-employment and taken business expense deductions accordingly.  [*Id.*].  Again,

despite Plaintiff's assertions, ODPS has never provided any insurance for any independent contractors.  [*Id.* at p. 150].  The record is replete with evidence that Defendants acted in good faith to comply with the requirements of the FLSA.  Indeed, Defendants sought advice of counsel in making the decision to classify the contractors as independent contractors.  [*Id.* at pp. 36-37].  Further, Mr. Spurgeon testified he believes he is in compliance with the requirements of the FLSA based on the advice sought.  [*Id.* at p. 43].  These are objectively and subjectively reasonable grounds for Defendants' actions.

Plaintiff arrives at the incongruent conclusion that Defendants continue to be in violation of the FLSA, and thus, such conduct necessitates injunctive relief.  Contrary to Plaintiffs assertions, Mr. Spurgeon and the undersigned counsel met with the DOL Investigator, Christopher Binda, at which time Mr. Binda asked Mr. Spurgeon to comply with the FLSA.  [*Id.* at pp. 50-51; 78-79].  At the advice of counsel and as a result of Mr. Binda's threat to issue an injunction, Mr. Spurgeon agreed to no longer provide work opportunities for the contractors which would result in more than 40 hours worked in any given week.  [*Id.*].  Also at this time, Mr. Binda requested that ODPS pay back wages to the individuals listed on Exhibit A based on his calculation, however, Defendants indicated their disagreement with Mr. Binda's assumption of liability and unsupported back pay calculations.  [*Id.*].[16]  Plaintiff makes sweeping (and baseless) conclusions by arguing because Mr. Spurgeon agreed to future compliance by not allowing any contractor work more than 40 hours in any given week and he testified that none have been paid overtime, ODPS continues to violate the FLSA.  Plaintiff points to no evidence that any contractors have worked more than 40 hours in a given week, and therefore, assuming they are employees, would be entitled to any overtime pay.  To the contrary, Mr. Spurgeon has

---

[16] Contrary to Mr. Binda's assertions, Mr. Spurgeon did not state he would "take his chances in Court."  Mr. Spurgeon indicated his future compliance and stated his disagreement with Mr. Binda's assumption of liability and back pay calculations.

indicated he has not given any contractors opportunities that would enable them to work more than 40 hours a week.  Summary judgment on the issue of liquidated damages is inappropriate as Defendants acted in good faith compliance.

## CONCLUSION

Based on the foregoing, there are numerous genuine issues of material fact that exist that makes summary judgment on liability and damages in this matter inappropriate.  Accordingly, Defendants respectfully request that this Court deny Plaintiff's Motion.  This litigation ensues from an investigation limited largely to an unrepresentative small group of individuals who, having established competing businesses, possessed neither the skill sets nor the initiative to reach beyond making themselves regularly available to meet the demands of ODPS' customers. As previously set forth in this Memorandum, neither the regularity of services performed nor the absence of wherewithal to do anything else of financial consequence in their respective favor renders ODPS' engagement of hundreds of independent contractors as employees for purposes of the FLSA.

Respectfully submitted,

*/s/ Emily N. Litzinger*
Raymond C. Haley III
Emily N. Litzinger
Fisher & Phillips LLP
220 West Main Street, Suite 2000
Louisville, KY  40202
Phone:  (502) 561-3990
Fax:  (502) 561-3991
E-mail:  rhaley@laborlawyers.com
E-mail:  elitzinger@laborlawyers.com

COUNSEL FOR DEFENDANTS

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 2, 2015, I electronically filed the foregoing with the clerk of the court by using the CM/ECF System, which arranges for electronic service to the following:

M. Patricia Smith
Solicitor of Labor
BPR No. 371708

Stanley E. Keen
Regional Solicitor
BPR No. 410642

Theresa Ball
Associate Regional Solicitor
BPR No. 002526

Thomas A. Grooms
Attorney
BPR No. 005843

Matt S. Shepherd
Attorney

Office of the Solicitor
U.S. Department of Labor
618 Church Street, Suite 230
Nashville, Tennessee 37219-2440
Phone:  (615) 781-5330 Ext. 223
Fax No.:  (615) 781-5321
Email:  nash.fedcourt@dol.gov
Email:  Grooms.Thomas@dol.gov

U.S. DEPARTMENT OF LABOR
ATTORNEYS FOR THE PLAINTIFF

*/s/ Emily N. Litzinger*
COUNSEL FOR DEFENDANTS