1          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF KENTUCKY
2              LOUISVILLE DIVISION

3

THOMAS E. PEREZ, Secretary    )  Case No. 3:13CV-935-DJH
4  of Labor, United States     )
   Department of Labor,        )
5                              )
          Plaintiff,           )
6                              )
VS.                            )
7                              )
OFF DUTY POLICE SERVICES,      )
8  INC., DARRELL SPURGEON, and  )
BONNIE SPURGEON,               )
9                              )  July 21, 2015
          Defendants.          )  Louisville, Kentucky
10

11        ****************************************

12                     VOLUME 1
             TRANSCRIPT OF BENCH TRIAL
13          BEFORE HONORABLE DAVID J. HALE
              UNITED STATES DISTRICT JUDGE
14

          ****************************************
15

16  APPEARANCES:

17  For Plaintiff:          Matt S. Shepherd
                            Neil A. Morholt
18                          Thomas A. Grooms
                            U.S. Department of Labor
19                          Office of the Solicitor
                            618 Church Street
20                          Suite 230
                            Nashville, Tennessee 37219
21

22
                       Alan W. Wernecke, RMR, CRR
23                     Official Court Reporter
                        232 U.S. Courthouse
24                   Louisville, Kentucky 40202
                         502-625-3779
25  Proceedings recorded by mechanical stenography, transcript
    produced by computer.

```
1    APPEARANCES (Continued):

2    For Defendants:        Raymond C. Haley, III
                            Emily N. Litzinger
3                           Fisher & Phillips, LLP
                            220 W. Main Street
4                           Suite 2000
                            Louisville, Kentucky 40202
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Begin proceedings in open court at 9:49 a.m.)

2               DEPUTY CLERK:  3:13CV-935, *Perez v. Off Duty Police*

3     *Services*.

4               THE COURT:  Good morning.  Everybody ready to begin

5     the trial?  Mr. Shepherd?

6               MR. SHEPHERD:  Plaintiffs are ready, Judge.

7               MR. HALEY:  Defendants are ready, Your Honor.

8               THE COURT:  All right.  Let's begin with opening

9     statements.  As you begin, let me just for the record ask if the

10    parties intend to invoke the rule on separation of witnesses.

11              MR. HALEY:  We do, Your Honor.

12              THE COURT:  Okay.  Are we aware of any witnesses in

13    the courtroom that need to be asked to leave?

14              MR. HALEY:  I don't know who they all are.

15              THE COURT:  Okay.

16              MR. SHEPHERD:  Mr. Medieros is in the courtroom, and

17    we intend to call him as a witness.  Frank Medieros.

18              MR. HALEY:  Yes.  He's in the yellow shirt, Your

19    Honor.

20              THE COURT:  Yes, sir.  The parties intend to call you

21    as a witness, and so we would ask that you step out until it's

22    your turn to testify.  Mr. Medieros, once you have testified,

23    you are welcome to stay in the courtroom unless you are subject

24    to recall.  This is a rule that treats all witnesses fairly so

25    that they don't hear other testimony in advance of their own.

1     Go ahead.

2          MR. SHEPHERD:  Judge, this is a Fair Labor Standards

3     Act misclassification case.  The case was brought by the United

4     States Department of Labor on behalf of approximately 70

5     security guards and traffic control officers that work here in

6     Louisville, Kentucky.  The security guards and traffic control

7     officers work for the corporate defendant, Off Duty Police

8     Services, Incorporated.

9          The main issue in this case is whether those security

10    guards and traffic control officers are employees or whether

11    they are more properly classified as independent contractors.

12    This matters because the FLSA requires employees to be paid

13    overtime.

14         The case began in 2011.  The Department of Labor's Wage and

15    Hour Division conducted an investigation into the pay practices

16    of Off Duty Police Services, or ODPS.  The company has been

17    around for about 15 years, and the company was started by

18    Mr. Spurgeon.  95 percent of what ODPS does is security and

19    traffic control.  ODPS's security guards work at businesses

20    around town, basically guarding locations, making sure people

21    don't come on-site to vandalize property and that sort of thing.

22    The traffic control officers direct traffic.  They are

23    dispatched with construction crews or road crews typically, and

24    they direct traffic around the location in the road where the

25    work is being performed.

1    ODPS sends the employees to these businesses to work.  At

2    the end of the week, ODPS pays these employees for the work that

3    was performed.  Some of the workers that ODPS sends out are

4    police officers, some of them are jailers, some of them are

5    constables, and some of them are firefighters.  They are working

6    off-duty for supplemental income.  Some of the employees are

7    full-time employees that aren't associated with any fire

8    department or police department, and they work strictly for

9    ODPS.

10   During the investigation, workers were interviewed,

11   documents were reviewed.  The department ultimately concluded

12   that the workers were misclassified.  They also concluded that

13   accurate records were not kept showing the amount of hours that

14   these individuals were working and the amount of overtime that

15   they were being paid.  Back wages were calculated, and the Wage

16   and Hour Division attempted to resolve the case, but those

17   efforts were unsuccessful.

18   Ultimately, the department was forced to file this lawsuit

19   in September of 2013.  At this point we are seeking back wages

20   and liquidated damages on behalf of 69 workers.  We are also

21   seeking injunctive relief.  We are essentially asking the Court

22   to order the defendants to comply with the Fair Labor Standards

23   Act going forward.

24   During the trial, we plan to call 10 or 11 of the

25   employees, the individuals who worked as the security guards and

1    traffic control officers.  They will testify regarding the rules

2    that they were required to follow at ODPS.  They will testify

3    about uniform requirements.  They will testify about personal

4    grooming requirements.  And they will testify about some of the

5    things that might happen to them if they broke any of the

6    rules.

7         The workers will also testify about the skills that are

8    required to do the job.  They will explain that they weren't

9    able to increase profits through business management because

10   they were generally paid by the hour.  They will testify about

11   the length of time that they worked for ODPS.  Most of the guys,

12   I believe, will testify that they worked for ODPS for several

13   years.

14        Judge, this is an overtime case.  All these witnesses are

15   going to testify that they worked for ODPS for significant

16   amounts of time.

17        The Court will then hear from Frank Medieros.  Mr. Medieros

18   is an individual who supervised many of these workers.

19   Mr. Medieros, I anticipate, will admit that he supervised

20   workers.  He will also admit that he spends about 20 percent of

21   his time scheduling workers for ODPS.  But despite the

22   management functions, the supervisory functions, and despite the

23   scheduling functions, Mr. Medieros will testify that he has been

24   classified as an independent contractor.  He's always been

25   classified as an independent contractor of ODPS.

1    The Court will then hear from Bonnie Spurgeon.  Mrs.

2    Spurgeon is the president of ODPS, and she handles the payroll

3    for the company.

4    Next, we anticipate calling Mr. Spurgeon.  Mr. Spurgeon runs

5    the business.  Mr. Spurgeon, I anticipate, will admit that all

6    the workers who have ever worked for ODPS have been classified

7    as independent contractors.  He will also admit that the workers

8    were not paid overtime.  I also expect that he will admit

9    several facts that tend to show that the workers were

10   misclassified.

11   First, he should admit that workers worked for ODPS for

12   extended periods of time.  Next, he should admit that it does

13   not require any type of specialized skill to work for ODPS.

14   Third, he should admit that workers were expected to follow

15   rules, at least indirectly.  And perhaps most importantly,

16   Judge, Mr. Spurgeon should admit that the individuals classified

17   as independent contractors performed the very services that ODPS

18   was contracted to perform.

19   Mr. Spurgeon will testify that other than himself and his

20   wife, ODPS has never had an individual classified as an

21   employee.  For all practical purposes, ODPS is a business

22   without any employees.

23   After Mr. Spurgeon testifies, we plan to call the Wage and

24   Hour investigator, Christopher Binda.  Mr. Binda will testify

25   briefly regarding the investigation that he conducted, and he

1    will also explain how he calculated back wages for the affected

2    employees.

3        After the Court has heard all this evidence, we will request

4    that the Court award back wages and liquidated damages and also

5    order the defendants to comply with the FLSA, that is, to pay

6    overtime as we move forward.  We appreciate the Court hearing

7    our case.

8            THE COURT:  Thank you.

9        Mr. Haley.

10           MR. HALEY:  May it please the Court, counsel.  I'll be

11    brief and to the point.  Our case will be, and the evidence will

12    establish, that ODPS is engaged in the business of recruiting

13    and providing qualified safety and security personnel to a

14    variety of clients in and around the greater Louisville area and

15    sometimes beyond.  That's the part of the operation at issue

16    here.

17        It must be said that ODPS provides a much wider range of

18    safety and security services to its clients, including safety

19    barriers and barricades, personal as well as -- personal

20    security as well as scanners for events, that sort of thing, as

21    they are required, security at shareholders meetings, for

22    instance.  In any event, we will prove that contrary to the

23    Government's witnesses, persons qualified to perform services

24    for clients of ODPS are free to accept or reject opportunities

25    as they see fit and limited in performing services elsewhere

1   only in that they may not do so with respect to clients of ODPS.

2   All are free, and many do, in fact, perform services for others

3   other than ODPS of a similar nature.

4       As far as training is concerned, it may be characterized as

5   unskilled, but many licensed and sworn police officers provide

6   those services requiring the use -- well, at least the presence

7   of a firearm.  For our traffic control officers, that's simply

8   not the case, but even the traffic control officers have been

9   certified by the State of Kentucky.  It's not a requirement by

10  ODPS.  It's a requirement of the State of Kentucky.  If you are

11  going to do this sort of work, you have to be certified by the

12  state.

13      You are going to hear that the training was conducted by

14  Mr. Spurgeon and Mr. Medieros, who is not in the room.  That's

15  true.  Mr. Spurgeon and Mr. Medieros conduct sessions

16  periodically for all comers, including firefighters, constables,

17  and those who seek to perform services on behalf of clients of

18  ODPS, they are invited to attend as well.  Part of the reason

19  for that is that in order to retain your certification as a

20  trainer, which both Mr. Medieros and Mr. Spurgeon are, you have

21  to train twice a year.  So we open it up to everyone.

22      What you are going to hear here is from a very small group

23  of over 1,500 who from time to time periodically perform these

24  services on behalf of ODPS.  That small group chose, perhaps

25  because of an inability or unwillingness to engage in any other

1    form of pursuit of compensation, to make it a full-time pursuit.

2    That's its own form of entrepreneurism as far as we are

3    concerned.

4        As far as rules are concerned, the rules are set forth by

5    the customers of ODPS as to what's expected of its independent

6    contractors.  The requirement of a police-style vehicle with

7    proper lights, those sorts of things that you will hear, those

8    were imposed by the customer for purposes of the services to be

9    performed.  More importantly, nothing was provided to the

10   independent contractors for purposes of performing these

11   services.

12       I expect that you will hear testimony from some of these

13   folks that they were given certain things.  We have records, and

14   shared those records, that indicate that's not the case.  Every

15   contractor was responsible for providing his or her own

16   equipment, and not all of them were required to have a vehicle

17   with the appropriate lights.  There are services that could be

18   performed outside of traffic control should someone choose to do

19   that, and many do.  We will tell you that the work is sporadic,

20   don't know how much or when it's going to come up.

21       As a consequence of that -- and there are some projects that

22   are longer than others.  You may recall in this community, and

23   there will be testimony to this effect, that LG&E replaced a

24   major gas pipeline following a similar pipeline problem up in

25   Indianapolis following an explosion.  That pipeline provided

much opportunity for traffic control for independent contractors

of ODPS.  That was performed by a contractor of Louisville Gas &

Electric Company called Miller Pipeline.

How do folks get the opportunity to perform services at

ODPS?  We believe all of them but a very select few who are at

the center of this dispute will tell you that they get

contacted with opportunities to perform services that they are

free to accept or reject on the basis of whatever selection or

rejection criteria they use.  You will hear evidence that

there are certain jobs that pay more, prevailing wage jobs.

Interestingly, a lot of folks don't like -- and you will hear

from some -- don't like the prevailing wage jobs because it

involves road paving in hot weather, standing out doing traffic.

So they reject it on that basis.  Others, on the other hand,

pursue it on that basis.

We have certain call-out work.  A water line break for the

water company, traffic control is necessary.  The contract with

the water company requires us to respond within one hour.  We

begin calling people when that happens to see if they are

willing and available to take the assignment.

What you are going to hear from the witnesses for the

Government are the individuals who accepted an assignment to,

say, Miller Pipeline for an extended period of time, did that

during the week, and begged, in many cases pleaded, for

additional hours to be found for them somewhere, and that was

```
 1   accomplished.
 2       You are going to hear from the chief complainant in this
 3   case, who I'm not supposed to know now but for the "C" beside
 4   his name in a list that was provided us, Ron Stallings, that he
 5   had all kinds of personal financial problems.  And in connection
 6   with that, Mr. Spurgeon did what he could to find as much work
 7   for him as possible.  But it was not required that he work any
 8   of it at all.
 9       You'll hear from people who left the organization to go work
10   for other competitors and who have come back without
11   consequence.  You will hear from individuals who, while
12   performing services for ODPS customers, clients, performed
13   services for competitors and also go out and do their own thing,
14   as they put it.
15       This is not the case that it has been represented up to this
16   particular point in time, no offense to the Government and I
17   don't mean to cast aspersion on them, but the individuals that
18   started this that have provided most of the information in
19   connection with this are a very small group of a much broader
20   group whose experience is much different than their own.
21       Finally, you might ask why are we seeing this now?  Why
22   after years of service as independent contractors did this
23   bubble to the surface and we, all of a sudden, have a contention
24   that there's misclassification?  Well, without a jury -- with a
25   jury, I would leave it as a little bit of intrigue.  Two of the
```

1    individuals who are principals in this started their own

2    competing business and used this proceeding, this claim, before

3    the Department of Labor to steal the customers of ODPS.  We will

4    present proof of that.

5        We believe that in view of all of this, you will find that

6    in terms of independent contractor versus employee status, that

7    the facts clearly under the *Silk* case support the notion that

8    these individuals are free to do their own thing, they have done

9    their own thing, many others do, and this whole scenario --

10   well, we would ask you just to take with a grain of salt the

11   testimony that you hear from some of these individuals who

12   believe that it was akin to have to work every hour that's ever

13   provided to me or something bad is going to happen to me.

14   That's what you are going to hear from certain of these

15   individuals.

16       We would ask you to keep an open mind until we get to

17   present our proof, and we look forward to completing this case.

18   Thank you.

19           THE COURT:  You are ready to begin with your first

20   witness, Mr. Shepherd?

21           MR. SHEPHERD:  Yes, sir.  May I address the Court

22   before I call my first witness?

23           THE COURT:  Certainly.

24           MR. SHEPHERD:  As I was walking out in the hall, I

25   noticed a couple of the individuals that we subpoenaed are

1    wearing shorts.  As they were being served, I should have let

2    them know that that wasn't appropriate.  I failed to do that.

3    That being said, I just wanted the Court to know.  I apologize

4    on behalf of them.  Next time I'll make sure to let them know

5    when subpoenas are being passed out what appropriate attire

6    is.

7            THE COURT:  I think that's fine.  It's best not to be

8    that casual when appearing in court, and so we will make a note

9    of that going forward.

10           MR. SHEPHERD:  Yes, sir.

11           THE COURT:  Okay.

12           MR. SHEPHERD:  Judge, we would call Booker Polin.  If

13   I might step out in the hall.

14       (BOOKER T. POLIN, JR., called by plaintiff, sworn.)

15                       DIRECT EXAMINATION

16   BY MR. SHEPHERD:

17   Q.  Can you please state your name, sir?

18   A.  My name is Booker T. Polin, Jr.

19   Q.  Mr. Polin, at some point in time did you work for ODPS, or

20   Off Duty Police Services?

21   A.  Yes, I did.

22   Q.  When did you start working for ODPS?

23   A.  It was shortly after I retired.  I think it was probably

24   going into '05.

25   Q.  About --

1   A.   Probably January of '05, if I can think, somewhere in there.

2   Q.   You indicated that you retired.  It's my understanding that

3   you worked for 20 some years with the Louisville Police

4   Department?

5   A.   Well, I'm a retiree.  I worked for Louisville Metro.  I

6   retired in 2004, which was the old Jefferson County Police

7   Department.

8   Q.   And how many years did you have with the Louisville Metro

9   Police Department?

10  A.   Well, I actually had eight years for them, and I had 14

11  previous years from Bardstown Police Department, which added up

12  to be 22 years of service.

13  Q.   Yes, sir.  When did you stop working for ODPS?

14  A.   I'm not exactly sure, but I'm saying probably maybe four

15  years ago.  I'm not sure on the date.

16  Q.   Somewhere around 2010, 2011?

17  A.   Maybe.  I'm not real sure on that.

18  Q.   So in any event, you worked for ODPS for five or six years,

19  approximately?

20  A.   Yes.

21  Q.   Okay.  And during this period of time that you worked for

22  ODPS, did you work for any other companies?

23  A.   No.

24  Q.   So is it fair to say that during the period of time you

25  worked for ODPS, your sole source of income was from ODPS?

1    A.  Yes, other than my retirement.  Of course, I drew that.

2    Only physical job I had was working for ODPS at the time, yes.

3    Q.  Can you estimate about how many hours a week you worked for

4    ODPS?

5    A.  It averaged probably around 48 on average, somewhere along

6    in there, sometimes 50.  It all depends.  At times a little more

7    than that.  It all depends.

8    Q.  Were these hours pretty consistent the entire time you

9    worked for the company?

10   A.  Pretty much.

11   Q.  And were you ever paid overtime?

12   A.  No.

13   Q.  Mr. Polin, what exactly did you do for ODPS?

14   A.  What I did, I provided traffic control for the companies

15   like Miller Pipeline.

16   Q.  Physically, what does this entail?  What does it take to

17   provide this traffic control?

18   A.  It consists of like flagging traffic.  Like when the

19   equipment or their equipment or vehicle is in the roadway, my

20   job was to make sure vehicles got around their equipment

21   safely.  So I had a stop-and-go sign primarily to flag traffic.

22   Q.  Okay.  You would stop traffic?

23   A.  Yes.

24   Q.  And then let it go?

25   A.  Exactly.

Polin - Direct                                                    17

1    Q.  What percentage of your work with ODPS was traffic control

2    as opposed to the -- did you do any security work?

3    A.  Every now and then I may -- yes, I have done some, you know.

4    He may need me to do a night job.  I think one time I did a job

5    at Pegasus, one time did security there, but I have done some

6    security, but it wasn't that often.  Most of the time that

7    occurred maybe on a weekend or something like that.

8    Q.  What percentage of your work at ODPS was traffic control as

9    opposed to --

10   A.  I would say probably -- I would say 97 percent maybe.

11   Q.  Was traffic control?

12   A.  I would say primarily, yes.

13   Q.  Okay.  And this --

14          THE COURT:  Did I hear you right?  Did you say 97

15   percent?

16          THE WITNESS:  I would say 97 percent maybe, yes, sir.

17          THE COURT:  Thank you.

18   Q.  When you were doing the security work, what did that work

19   entail?  What did you do physically to do that work?

20   A.  Basically what I would do probably is patrol a business,

21   make sure that the business was secure when it was closed, you

22   know, checking doors, you know, vehicles, suspicious vehicles on

23   the lot, primarily just to protect the business, you know, when

24   it was closed.

25   Q.  Okay.  Did you ever receive any type -- did you ever receive

1   any type of training when you were working for ODPS?

2   A.   Of course, we was required to do the -- have the state

3   training for flagger control.

4   Q.   Who provided that training?

5   A.   Say again, please.

6   Q.   Who provided that training?

7   A.   Off Duty Police Services.

8   Q.   Did Mr. Spurgeon?

9   A.   Yes, sir.   Darrell, yeah.

10  Q.   What about Mr. Medieros?   Did he ever provide any of the

11  training?

12  A.   I think he assisted in a class there.

13  Q.   While you were working for ODPS, did you have a supervisor?

14  A.   Yes.

15  Q.   And who was that?

16  A.   Frank Medieros.

17  Q.   And how did he supervise your work?

18  A.   Well, sometimes he would come on the job to check, you know,

19  to see if everything was set up properly and stuff.   And he

20  also would contact us on the job and stuff like that, different

21  jobs.

22  Q.   While you were working for ODPS, were you ever required to

23  send reports to either Mr. Spurgeon or Mr. Medieros?

24  A.   What do you mean?   Can you explain that in detail?

25  Q.   Yes, sir.   Any type of activity reports or any other type of

1    reports reporting as to what was going on at the job site.

2    A.   Let me see.  I don't recall right off the top of my head

3    anything like that.  I don't think we actually had to do a

4    report, as I recall.  I know it's been a little time since I

5    worked, but I don't recall any kind of report or anything like

6    that.

7    Q.   Were you ever required to text or send your start times and

8    stop times to either Mr. Spurgeon or Mr. Medieros?

9    A.   Yes.  We had to send in our -- I can't think of the name of

10   it.  We had to send in a time sheet thing with our times and

11   stuff on it.

12   Q.   Would you send that in to Mr. Spurgeon?

13   A.   Yes.  I think it was -- some people mailed theirs.  I think

14   I actually faxed mine in at the end of the week.

15   Q.   Were you paid by the hour at ODPS?

16   A.   Yes.

17   Q.   Were you always paid by the hour?

18   A.   Yes.

19   Q.   And do you mind me asking how much money you were paid by

20   the hour?

21   A.   $15.

22   Q.   $15 an hour?

23   A.   Yes.

24   Q.   And who set that pay rate?

25   A.   I assume Darrell Spurgeon, Mr. Spurgeon.

1    Q.   Did you ever try to negotiate that rate with Mr. Spurgeon?

2    A.   Well, I tell you what.  I can recall one time him and I had

3    a conversation.  I asked about a raise.  He said -- we just went

4    on back and forth about a raise.  He said, "What did you say?

5    Hey."  I said, Yeah, Darrell, a raise."  He said, "Hey."  And

6    then we went on, and then I hung it up.  I did inquire about a

7    raise, but we kind of blowed it off.  It wasn't no big deal.

8    But I did.

9    Q.   Before coming to work at ODPS, did Mr. Spurgeon or anyone

10   else affiliated with the company inform you that you would be

11   classified as an independent contractor?

12   A.   I don't know if I heard -- say it again, please.

13   Q.   Before coming to work for ODPS, did anybody tell you that

14   you would be classified as an independent contractor?

15   A.   Yes, I think it was mentioned.

16   Q.   And were you required to sign what was known as an

17   independent contractor agreement?

18   A.   You know, over the years it's been a few forms.  I think I

19   signed it.  I do believe I did.  I'm not sure.  But I know it

20   was something we had to sign.

21   Q.   And were you required to sign this agreement?

22   A.   I think so, because I think it was one point that -- I

23   don't know if that was that particular form, but I'm pretty sure

24   it was if you didn't sign it, I don't think you would receive

25   your check.  I think I'm right on that.  So I did sign it, I

1    think.

2    Q.  If we can bring up the independent contractor agreement,

3    please.

4        Mr. Polin, if this works right, a document should pop up on

5    your screen.  If you will, take a look at that document as it

6    scrolls across the screen.  Can you tell me if that's the

7    document -- let's stop right there.  This is page -- what's been

8    marked as page D_611.  Is that your signature, Mr. Polin?

9    A.  Yes, it is.

10   Q.  If we can scroll to the beginning of that document.

11       While they are trying to get that pulled up, let me ask you

12   a couple of other questions.  Before coming to work at ODPS, did

13   you have to buy any equipment or supplies?

14   A.  Yes, my uniform.

15   Q.  Okay.  What was your uniform?

16   A.  It consisted of the slacks, the pants, and the shirt.

17   Q.  And who told you about the uniform?

18   A.  I'm sure Mr. Spurgeon told us exactly what we needed to

19   wear.

20   Q.  What did you need to wear?  What type of slacks and shirt?

21   A.  Like a BDU, the cargo pockets, and the short-sleeve shirts.

22   In the wintertime, the long sleeves.

23   Q.  Okay.  Did you have to buy a vehicle?

24   A.  Yes.

25   Q.  Okay.  Did you have to buy any particular type of vehicle?

Polin - Direct                                                  22

1    A.   I think the requirement was a Ford Crown Victoria.

2    Q.   Who told you about this requirement?

3    A.   Mr. Spurgeon.

4    Q.   Okay.  What about stop-and-go paddles?  Did you have to buy

5    any stop-and-go paddles?

6    A.   I think I got my own, but I think he provided.  I think

7    at one point I did -- I think I bought the first one.  One time

8    I was at his house, and I ended up getting one, but I think he

9    did at the time provide them if you didn't have them.

10   Q.   Other than what you just told me about, can you think of

11   anything else you had to buy?

12   A.   I think that's about it really that I can think of.  I think

13   that's about it.

14   Q.   How much did all this stuff cost?  Do you recall?

15   A.   I would say -- I don't know.  I would say a pair of slacks

16   probably -- I don't know.  Just a guess off the top of my head,

17   probably 30, 40 bucks.  A shirt, maybe 25, 26 maybe.  Maybe a

18   little under a hundred.  Maybe a hundred dollars maybe.

19   Q.   What about the vehicle?  How much did it cost to buy the

20   vehicle?

21   A.   Well, on average you are looking at maybe about 2,000 maybe.

22   It all depends, you know, where you get it, you know, the

23   condition or whatever.

24   Q.   So you had to spend about $2,500, $3,000 to purchase that

25   much equipment?

1   A.   Probably roughly in that neighborhood maybe.

2   Q.   Now, this vehicle, did you ever drive this vehicle while you

3   weren't working for ODPS?

4   A.   You know, a lot of guys did, but I never did.  I considered

5   it as a work vehicle.  Most of the time if I wasn't working, it

6   would stay in my driveway.

7   Q.   If you wanted to, could you --

8   A.   Yes.  It was my vehicle, and I provided the insurance for

9   it.  If I wanted to use it for my personal use, I could do

10   that.

11   Q.   You indicated that you saw other people use the vehicle?

12   A.   I know some people used it as their personal vehicle because

13   it was their vehicle.  They paid for it.

14   Q.   During the time that you worked for ODPS, did they provide

15   you with any type of equipment or supplies?

16   A.   I think the jacket, I think.  And I think I got a hoodie

17   with the patches and stuff on it.

18   Q.   Okay.  Was this equipment deducted out of your paycheck?

19   A.   I don't think I had to pay for mine.  I really don't think I

20   recall paying for mine.

21          MR. SHEPHERD:  Your Honor, may I approach?

22          THE COURT:  Yes.

23   Q.   I would like to show you a copy of a document that's been

24   marked Exhibit Number 14.  That document consists of five

25   pictures.

1   A.   Uh-huh.

2   Q.   Can you identify what is shown in each of those pictures

3   starting with the top picture on page 1?

4   A.   Okay.  That's the traffic vest.

5            THE COURT:  Mr. Shepherd, I appreciate that you are

6   laying the foundation, but since we don't have a jury, you are

7   welcome to go ahead and put that on the monitor.  That might be

8   a little more efficient.

9   Q.   You indicated, Mr. Polin, that this top picture was the

10  traffic vest?

11  A.   Yeah.  That's the logo on one of the vests.

12  Q.   What's the bottom picture on page 1?

13  A.   That's the patches that go on the shirts and the jackets.

14  Q.   Okay.  What about the top picture on page 2?

15  A.   That is the patch that also goes on the shirt.

16  Q.   That would go on the front part of the shirt?

17  A.   Yes.

18  Q.   What about the bottom picture on page 2?

19  A.   That's a cap.

20  Q.   And what about the top -- the only picture on page 3?

21  A.   That's the same as the other patch there.  I don't know.

22  Q.   Did you see workers who were performing services for ODPS

23  wearing the patches, the hats, the vests that are shown in these

24  pictures?

25  A.   The patches, it's what I had on my shirt, this one, and a

 1    lot of times I bought my own vest, but I have had a vest before,

 2    you know, with that -- with his logo.  But these are the patches

 3    that was on my uniform.

 4          MR. SHEPHERD:  Judge, we would offer what's been

 5    marked as Exhibit Number 14 as our first exhibit.

 6          MR. HALEY:  No objection.

 7          THE COURT:  That will be deemed admitted.

 8      (Plaintiff's Exhibit 14 admitted in evidence.)

 9    Q.  Mr. Polin, you indicated that you were required to wear a

10    uniform.  I believe you testified that Darrell Spurgeon talked

11    to you about the uniform or told you about the uniform

12    requirements?

13    A.  Yes, just the requirement for everyone to wear.

14    Q.  What about grooming requirements?  Were there any personal

15    grooming requirements at ODPS?

16    A.  Well, you know, he wanted you to look presentable, you know,

17    the hair and facial hair.

18    Q.  Okay.  I noticed that today you are wearing a beard.

19    A.  Right.

20    Q.  Was a beard permitted while you worked at ODPS?

21    A.  I don't think he wanted it.

22    Q.  Okay.  Were you allowed to wear a beard while you worked for

23    ODPS?

24    A.  Yes, I did.  I think I kind of got special privileges,

25    needless to say.

1   Q.  Were other workers told that they could not have facial

2   hair?

3   A.  From what I understand.

4   Q.  Mr. Polin, did you ever have occasion to go on the ODPS

5   website?

6   A.  Yes.  The website was there for us to access for forms and

7   stuff like that if we needed it.

8           MR. SHEPHERD:  Your Honor, may I approach?

9           THE COURT:  Yes.

10  Q.  I want to show you a document that's been marked Exhibit

11  Number 12.  Can you tell me if you ever saw that document on the

12  ODPS website?

13  A.  I don't -- I'm not sure.  We had log-in information that we

14  could log in on the website, and we could access different

15  stuff, but I'm not sure on this.  I really don't know for sure.

16  Q.  Regardless of whether you've seen that particular document,

17  can you look through and read those rules that are shown on the

18  document and tell me if those are the rules that were instituted

19  at ODPS?

20          MR. HALEY:  Your Honor, I object.  The foundation

21  between whether or not those were the rules and hasn't seen the

22  document is a connecting of the dots that goes too far afield.

23  No foundation for the question -- answer to the question.

24          THE COURT:  Well, I agree he's not laid the foundation

25  to have the document admitted at this point, but I think he can

1    ask him if the rules are consistent with his memory.

2            MR. HALEY:   Thank you.

3    A.   This is consistent to what is required of us.

4    Q.   Okay.  Who were those rules communicated to you by?   In

5    other words, who told you about those rules?

6    A.   You know, Mr. Spurgeon apparently, but as far as this here,

7    I can't say if I have actually seen this particular document,

8    but like I say, I'm aware what is required of us in this right

9    here, but I don't know if I have actually seen this or not.  You

10   know, I don't know if I had -- I don't know for sure if it was

11   communicated with us, but I'm sure at one point that I probably

12   did get this form, but I'm not sure.

13   Q.   I understand.  While you were working for ODPS, did you guys

14   ever have meetings where the employees would come -- or your

15   co-workers would come and maybe Mr. Spurgeon or Mr. Medieros

16   would talk to you guys?

17   A.   Yes.  We have had a couple of -- a few meetings, yes.

18   Q.   Would Mr. Spurgeon attend these meetings?

19   A.   Yes.

20   Q.   Would Mr. Medieros attend these meetings?

21   A.   Who?

22   Q.   Mr. Medieros.

23   A.   Yes, sir.

24   Q.   What types of things would be discussed at these meetings?

25   A.   Just basic stuff.  Nothing in particular that I can recall.

1   It's been so long since we had one.  I guess we talked about, I

2   guess, setups and stuff, you know, just basic stuff.  Nothing in

3   particular that I can recall.  It's been a while.

4   Q.  I understand.  Setups, like how you should set up your work

5   location?

6   A.  Yes, and stuff like that.  I'll be honest with you, I really

7   don't remember exactly all the stuff that was actually at the

8   meeting because it's been a while.

9   Q.  I believe you indicated that you would occasionally log on

10  to the ODPS website?

11  A.  Yes.  Yes, we all have passwords.

12  Q.  Did you ever work for LG&E, one of ODPS's customers?

13  A.  Yes.  Yes, I worked with -- I worked with Miller Pipeline,

14  which is a subcontractor for LG&E.

15          MR. SHEPHERD:  Your Honor, may I approach?

16          THE COURT:  Yes.

17  Q.  Mr. Polin, I would like to show you another document that's

18  been marked as Exhibit Number 13.  This is a three-page document

19  that appears to be a screen shot of the ODPS website.  Did you

20  ever see those rules or duties or responsibilities posted on the

21  ODPS website?

22  A.  Yes, it looks familiar.

23          MR. SHEPHERD:  Judge, at this point we would offer

24  into evidence what's been marked as Exhibit Number 13.

25          MR. HALEY:  No objection.

1           THE COURT:  Deemed admitted.

2       (Plaintiff's Exhibit 13 admitted in evidence.)

3   Q.  Mr. Polin, was it common to log on to the website and see

4   information posted on the website?

5   A.  Yes, like the announcements and stuff.  I'm not sure -- I'm

6   thinking -- seems like I might have received e-mails.  I tell

7   you what.  It's been so long ago, I can't remember.  On some

8   stuff we would get e-mails, I think.  Whatever you missed, I

9   think you could go on the website and pick up, you know,

10  announcements or stuff like that.

11          THE COURT:  I'm sorry to interrupt.  Could you clarify

12  whether this is a public website or whether Mr. Polin would log

13  into a secure portion of the site?

14  Q.  Mr. Polin, was this a website that anyone could just go to

15  on your personal computer?

16  A.  No.  You had to be an employee.

17  Q.  I'm sorry?

18  A.  Employee website.

19  Q.  How would the employees log on to the website?  Were

20  employees required to log on to the website?

21  A.  Yes, because, you know, you created a password and stuff

22  like that.  Yeah.

23  Q.  And once you had the password, could you log on to the

24  website?

25  A.  Yes.

1    Q.  And is that where you would see these announcements?

2    A.  Basically, when I say "a password," it wasn't a special

3    password.  You created your own password.  You just had to

4    create, you know, what you needed to do to get access to the

5    website.

6    Q.  Okay.  You indicated that you have seen announcements on the

7    website and that you may have also gotten some e-mails.  What

8    type of information would be communicated to you via the

9    announcements in the e-mails?

10   A.  Well, you know, if there was a problem with employees doing

11   stuff or not doing something, you know, it would be like special

12   attention.  For instance, if he had a report of maybe guys

13   sitting in their car, there might be a special announcement,

14   "Guys, remember to stay out of your vehicles," or whatever,

15   something similar to that.

16   Q.  Did you ever work at Showcase Cinemas -- work security

17   detail at Showcase Cinemas?

18   A.  Just a couple of times.  It wasn't really one of my jobs.  I

19   don't want to get this mixed up with -- because I also worked

20   for Darrell prior to ODPS.  I think I may have done some

21   Showcase Cinemas work then.  I don't want to get it mixed up.  I

22   do recall working a couple of times, not very many times.

23   Q.  Okay.  While you were working for ODPS, how would you get

24   your job assignments?

25   A.  Probably -- most likely, probably someone maybe couldn't do

1    it that week or something and they needed someone to fill in

2    maybe.  That's been a long time since I did that.  I'm assuming

3    that's probably how I got it.

4    Q.  You indicated that -- would they contact you when they

5    needed you to work?  Can you explain that to me?

6    A.  Yes.  He would contact me maybe by phone or something, ask

7    me if I wanted to work at Showcase Cinemas or whatever.

8    Q.  Okay.  Did you ever do any long-term assignments while you

9    were working for ODPS?

10   A.  What do you mean?  Just a particular job?

11   Q.  Yes, sir.

12   A.  Yes.  Well, I basically worked with Miller Pipeline just

13   about every day.  It was just a primary job up till the work got

14   slow later on and then I was called to different jobs, you know

15   what I'm saying.  Primarily my job was at Miller Pipeline for

16   several years, so I knew every day where I was going.

17   Q.  Who gave you this assignment to work with Miller Pipeline?

18   A.  Well, initially I think Darrell did, but after that any

19   changes -- Mr. Medieros would notify me if there was any

20   changes.

21   Q.  Can you tell me about how long you worked with Miller

22   Pipeline?

23   A.  Let me see.  I would say probably four or five years.  I'm

24   not really sure.

25   Q.  Were you assigned to a particular crew?

1    A.   I was assigned to one particular guy because he always

2    requested me.   I stayed with him.

3    Q.   Okay.   You would just go with him wherever he was?

4    A.   Yes, I stayed with that one guy.

5    Q.   Okay.   At some point in time I believe you indicated that

6    you stopped working for Miller and that you would get

7    assignments from Mr. Medieros?

8    A.   Yes.   I was on, I guess you would consider maybe whatever is

9    available, like a rotation or whatever, because that particular

10   job was not available.

11   Q.   Okay.   And can you explain to me how you would be contacted

12   about a particular job?

13   A.   Okay.   Towards the end, I think we was getting text messages

14   in reference to a job, if I can recall.

15   Q.   Would this be a text message from Mr. Medieros?

16   A.   Mr. Medieros, yeah, to what job to go to the next day.

17   Q.   And would anybody else be included on these text messages?

18   A.   Yeah.   If it was a two-man job or whatever, he would be -- I

19   guess he would text him.   I don't remember it being a group text

20   or not or if it was individual, but usually, you know, whoever

21   was with me, he probably got a text, too.

22   Q.   And would the text message instruct you to go to a

23   particular location?

24   A.   Location, uh-huh.

25   Q.   And would it tell you what time to be there?

1    A.   The time to be there and everything, right.

2    Q.   What about at the end of the day?  How would you know when

3    you could leave work at the end of the day?

4    A.   Let me see how we did that.  I don't know if we texted our

5    time -- ending time or not.  I'm not sure.  To be honest with

6    you, I really -- I'm not sure.

7    Q.   If something unexpected happened while you were working and

8    so you had to leave early, what would you do?

9    A.   I would call Mr. Medieros.

10   Q.   Okay.  And would he send relief for you?

11   A.   Yes.

12   Q.   If you agreed to work a particular job and something came up

13   where you couldn't work the shift, could you call one of your

14   co-workers and ask them to work the shift for you?  In other

15   words, could you swap shifts with somebody?

16   A.   Usually I would -- if I couldn't make it, I would have to

17   call Frank or Darrell.  Most of the time it was Frank, or

18   Darrell.

19   Q.   And why did you call Mr. Medieros or Mr. Spurgeon in these

20   situations?

21   A.   Why would I call them?

22   Q.   Yes, sir.

23   A.   Well, if I couldn't make it, I would have to call and let

24   them know so they can get a replacement for the job.

25   Q.   If you didn't want to work a particular job or didn't want

1   to take a particular assignment, could you refuse to work the

2   assignment?

3   A.  I could just call Frank and tell him, "I'm not going to be

4   in tomorrow," or whatever.

5   Q.  Would any negative consequences flow from you declining to

6   do the job?

7   A.  I have never had none.

8   Q.  Have you ever known any negative consequences to happen to

9   your co-workers?

10  A.  I've had one guy in particular, I think Greg Hunt -- I don't

11  know -- he said he got in time-out.

12          MR. HALEY:  Objection, Your Honor.  This is hearsay.

13          THE COURT:  We want to avoid that if we can,

14  Mr. Shepherd.

15  Q.  Mr. Polin, if we can, don't tell me about who told you

16  something, but do you know -- you just mentioned the term

17  "time-out."

18  A.  Yes.

19  Q.  Do you know if any of your co-workers were ever put in

20  what's referred to as time-out?

21  A.  I've heard a few, maybe one in particular.

22  Q.  And would this be Mr. Hunt?

23  A.  Yes, sir.

24          MR. HALEY:  Same objection, Your Honor, but I know you

25  can sort through it.

1              THE COURT:  Yes.

2       Mr. Shepherd, why don't you clarify for the record if he has

3    independent knowledge of that or if that's something Mr. Hunt

4    told him.

5    Q.  Mr. Polin, do you have any reason to know whether Mr. Hunt

6    was put in time-out other than what he told you?

7    A.  Just what he told me.  That's it.  That's it.

8              THE COURT:  Your objection is noted.  We will exclude

9    consideration of that hearsay testimony.  Thank you.

10   Q.  Mr. Polin, were you ever disciplined or reprimanded by

11   Mr. Medieros or Mr. Spurgeon?

12   A.  Not that I can recall.

13   Q.  And do you know of anyone who was disciplined or reprimanded

14   by Mr. Medieros or Mr. Spurgeon?

15   A.  Just from talk, hearsay.  I don't know for sure, you know.

16   Q.  Were you ever working on a job where someone was sent home

17   from the job?

18   A.  No, sir.  Not that I can recall, no.

19   Q.  At the end of the work week, were you required to submit

20   some sort of documentation to ODPS?

21   A.  I'm sorry.  Say it again.

22   Q.  At the end of the work week, were you required to submit

23   some sort of documentation to ODPS?

24   A.  Oh, yes.  I can't think -- I was trying to say that while

25   ago.  I can't think --

1    Q.   Are they called invoices?

2    A.   Invoices, that's it.  That's right.

3    Q.   What would be put on these invoices?

4    A.   It would be the times and, of course, equals your hours

5    totaled up and -- it's been so long -- I guess the other

6    information for us, the job, the company you worked for, you

7    know.

8    Q.   And at some point in time did you have to start submitting

9    invoices to ODPS?

10   A.   Yes.  It was a certain point, yeah.

11   Q.   And who told you about this new requirement?

12   A.   I don't recall if it was Medieros or Spurgeon.  The

13   information came from one of the two.

14   Q.   You indicated that the time you worked would be listed on

15   these invoices?

16   A.   Yes.

17   Q.   Okay.  And how would you submit the invoices to ODPS?

18   A.   I faxed mine from the house.

19   Q.   Okay.  Did you ever work a job that got canceled or rained

20   out and there was a minimum hourly rate that the job would pay?

21   A.   Yes.

22   Q.   In these situations would the invoices list the hours worked

23   as the minimum?

24   A.   Yeah.  I would put down -- like if it was on a Monday, for

25   instance, put "rained out," maybe two hours or whatever.

1    Q.  In reality, you may only work 15 minutes, but the invoice

2    would list two hours' worth of work?

3    A.  I think that's the way it goes, yeah.

4    Q.  And after ODPS got this invoice form, would they send you a

5    check?

6    A.  The check -- how did they send the check?

7    Q.  Yes, sir.  Would they pay you?

8    A.  Yes, they paid me.  Right.

9    Q.  Were you always paid by ODPS?

10   A.  Yes, sir.

11   Q.  Were you ever paid time and a half for the hours that you

12   worked over 40 hours in a work week?

13   A.  I didn't quite hear that.

14   Q.  Were you ever paid time and a half?

15   A.  Never.

16   Q.  While you were working for ODPS, did you have a corporation

17   or a limited liability company set up for yourself?

18   A.  Say it again, please.  I'm sorry.

19   Q.  Did you ever have a corporation or a limited liability

20   company set up for yourself?

21   A.  No, I didn't.

22   Q.  Did you ever have a business license?

23   A.  Say again.

24   Q.  Did you ever have a business license?

25   A.  No, sir.

1    Q.  Did you ever advertise so you could get work from other

2    companies besides ODPS?

3    A.  Oh, no.  No, sir.

4    Q.  Did you have a website set up for yourself?

5    A.  No, sir.

6    Q.  Did you maintain an office or some type of staff to assist

7    you?

8    A.  No, sir.

9    Q.  And did you purchase business liability insurance for

10   yourself?

11   A.  No, sir.

12   Q.  And did you maintain any type of worker's compensation

13   insurance?

14   A.  No, sir.

15   Q.  Thank you for answering my questions, Mr. Polin.

16           THE COURT:  Mr. Haley.

17                      CROSS-EXAMINATION

18   BY MR. HALEY:

19   Q.  Good morning, Mr. Polin.  How are you?

20   A.  Morning, sir.  How are you doing?

21   Q.  Let's clear up a few things, if we could.  You have

22   performed services on behalf of ODPS since 2002, correct?

23   A.  Since when?

24   Q.  2002.

25   A.  Well, I guess I was probably sworn in 2002, but ODPS didn't

Polin - Cross                                                    39

```
 1    start till after I retired.  I was a sworn officer when I worked

 2    with him in 2002.

 3    Q.  But you began to perform services for customers of ODPS --

 4    A.  Yes, sir.

 5    Q.  -- as early as 2002?

 6    A.  Somewhere in there.

 7    Q.  That is in order to earn some supplemental income, right?

 8    A.  Yes, sir.

 9    Q.  And you no longer became a sworn officer -- I think you said

10    you retired in 2004 from the police department?

11    A.  Yes, sir.

12    Q.  During the period of time that you performed services for

13    customers of ODPS but were still a sworn police officer, do you

14    remember working more than 40 hours in a week?

15    A.  More than 40?

16    Q.  Yeah.  Yes.  I'm sorry.  I sound like one of my kids.

17    A.  Most of the time it was over 40.

18    Q.  While you were a police officer?  That's what I am asking.

19    A.  Yes.  Because I worked third shift, and after I worked third

20    shift, I would go out on a job, and I would work from the

21    time -- from 8 or 9 to maybe 3 or 4.

22    Q.  I'm looking at a report of hours, and this is a document

23    that's been furnished to the other side.  We will introduce it

24    into evidence with the proper foundation.  But let me ask you if

25    this sounds right.  It's marked D_8339.  I look at your first
```

1   check from ODPS, 5-24, 2002, five hours.

2   A.   Five hours?

3   Q.   The next week, three hours; the next week, 13 hours; the

4   next week, 13 and a half.  Does that help refresh your

5   recollection as to how many hours you worked?

6   A.   It really don't sound correct.  I don't know if his company

7   was named ODPS back then because I was referring to '04 to '05

8   when I first started at ODPS after I retired.  That's what I am

9   talking about.

10   Q.   I don't mean to be confusing.  A moment ago you told me

11   while you were still a sworn police officer, prior to your

12   retirement, you were performing services for customers of ODPS?

13   A.   Exactly.

14   Q.   Is that correct?

15   A.   Yes.

16   Q.   And during that period of time, do you recall working fewer

17   hours than 40?  You tell me that you don't, even though I've

18   given you some numbers.  I don't expect you to necessarily

19   remember what happened in 2002.  I'm trying to refresh your

20   recollection.

21   A.   I understand.

22   Q.   Okay.  Now, while you were working as a full-time police

23   officer working third shift at whatever hours you were

24   performing services for ODPS, you didn't need any equipment; you

25   had it all as a police officer, right?

1    A.   I'm sorry.  What was the last part?

2    Q.   You didn't need any traffic control equipment while you were

3    working as a police officer, correct, because you got that

4    through the police department?

5    A.   Back then, yes.  We had our own stop-and-go sign back then.

6    Q.   Your own stop-and-go signs, your own vests, and you had

7    flares if you needed them?

8    A.   Right.

9    Q.   Did you have to pay extra to take your police cruiser home?

10   A.   Not at the time, I didn't.

11   Q.   Not at the time.  That happened later, though, didn't it?

12   A.   Well, I lived out of town anyway.  I never took my cruiser

13   home.  I still lived in Bardstown, but I had access to it as

14   long as I was in the county.

15   Q.   Jefferson County?

16   A.   Yes.

17   Q.   And did you use that police cruiser for purposes of

18   performing whatever traffic control duties you did on the side

19   for ODPS back in the pre-retirement day?

20   A.   Yes.

21   Q.   Isn't it true that after you retired in 2004, you were

22   looking for something to do to earn a little more money?

23   A.   Yes, sir.

24   Q.   And you were no longer a sworn officer, correct?

25   A.   After 2004, I was no longer a sworn officer.

Polin - Cross                                                    42

1   Q.  While you were a sworn officer, you were paid $20 an hour

2   for your services, correct?

3   A.  That's correct.

4   Q.  After you were no longer a sworn officer, you were paid $15

5   an hour, correct?

6   A.  That is correct.

7           THE COURT:  Let me hit the pause button for one second

8   and ask for both of you to try not to talk over each other.

9   Alan has to get down everything that everybody says.

10      Mr. Polin, if you can wait till Mr. Haley finishes his

11  questions before you answer, and, Mr. Haley, if you can wait

12  till he's finished talking before you ask your next question,

13  that will help.

14          MR. HALEY:  Certainly, sir.

15          THE WITNESS:  Yes, sir.

16  Q.  Now, I'm looking at some compensation information that has

17  been produced in this case marked D_8341 through D_8343.  Again,

18  we will introduce it appropriately.  It shows that in the

19  week -- well, the check issue date of October 6th, 2006, you

20  were paid for -- on October 6th, 2006, you were paid for

21  services between September 24th and September 30th for 44 hours.

22  Does that make sense, 44 and a half hours?  Does that sound

23  about right to you, or do you know?

24      That's a terrible question.  I could ask you each week.  I'm

25  sorry.  It shows a deduction of $60 for a jacket and a hat.  Do

Polin - Cross                                                    43

1    you remember having a deduction from your pay for the value of a

2    jacket and a hat?

3    A.   I don't remember.

4    Q.   Well, you testified earlier that you thought it was given to

5    you.  Are you sure it was given to you?

6    A.   I know for a fact, and I can tell you the exact location I

7    was -- when I worked for ODPS and we were right off of Frankfort

8    Avenue, I received a hoodie jacket.  Frank brought it to me, and

9    I didn't pay nothing for it.  I also received a jacket that I

10   didn't pay nothing for.  I know that for a fact.

11   Q.   I see another deduction for a jacket in January of 2009 --

12   A.   Okay.

13   Q.   -- for $60.  How many jackets did you have to have?

14   A.   I don't know.  I mean --

15   Q.   Do you remember having to pay for the postage to have your

16   compensation sent to your home?  Did Mr. Spurgeon require you to

17   pay for postage to have your check sent to your home?

18   A.   That sounds familiar.  Seems like something with the

19   postage.  I don't remember exactly, but that does sound

20   familiar.

21   Q.   Okay.

22   A.   It does.

23   Q.   Now, just to clear this up, the last time that you performed

24   services for any customers of ODPS was in October 2013, wasn't

25   it?

Polin - Cross                                                    44

```
 1    A.  To be honest with you, I'm not exactly sure.

 2    Q.  Let me see if I can refresh your recollection.  It had

 3    nothing to do with traffic control.

 4    A.  Okay.

 5    Q.  Do you remember being on a squad that was escorting Apple

 6    products from New York?

 7    A.  You're absolutely right.  I forgot about that.

 8    Q.  You -- I'm sorry.  Were you in a vehicle following a truck

 9    full of Apple products?

10    A.  You are absolutely right.  I forgot about that one.  That's

11    true.

12    Q.  Was that October 2013?

13    A.  I don't remember the exact date.  I did do that.  You are

14    absolutely right.

15    Q.  And did you quit performing traffic control duties a few

16    months earlier, say, in June?

17    A.  I think I had already quit traffic control, I think, and

18    then he called me for this special detail.  I think that's the

19    way it was.  It's been a while.

20    Q.  So Mr. Spurgeon called you for this special traffic -- this

21    special escort even after you quit doing work for him?

22    A.  I think I had -- if my recollection is correct, I do believe

23    I was not doing it because I think my car was down, and I was

24    not --

25    Q.  Weren't you -- I'm sorry.
```

1    A.  Say again, sir.

2    Q.  Weren't you performing services for a competitor called

3    KTPS, Kentuckiana Traffic and Patrol --

4    A.  I hadn't been working for a while.

5    Q.  -- in July of 2013?

6    A.  Like I said -- you mentioned about the escort I had totally

7    forgot.  I do remember doing that.  I think I had not been

8    working because I think my car was down for a while.  I hadn't

9    been doing anything.  I don't know exactly the time frame or the

10   exact date when I actually stopped.

11   Q.  Let's talk about your car being down.  Let's go to that.

12   When your car is down, you can't work, right?

13   A.  Well, you can't do traffic.

14   Q.  You can't do traffic.  That's right.  You can't do traffic

15   if your car is down.  Who is responsible for maintaining your

16   car?

17   A.  It's me.

18   Q.  Who pays for the upkeep, repairs, maintenance?

19   A.  I do.

20   Q.  Do you have any estimate -- you talked about a couple

21   thousand dollars.  What did you pay for your Crown Vic?

22   A.  I paid around two grand probably.

23   Q.  And you insured it?

24   A.  Say again, sir.

25   Q.  You insured it?

Polin - Cross                                                46

1   A.   Sure.  The car was insured, yes.  Yes, sir.

2   Q.   And you were the insured operator for the car, right?

3   A.   Absolutely.

4   Q.   And you had to put lights on it?  We didn't talk about the

5   lights.

6   A.   That's another thing.  I paid for the lights.

7   Q.   And where did you buy the lights?

8   A.   You know, I think I got mine off of eBay, I believe.  Some

9   of them I did.

10  Q.   Who installed those lights for you?

11  A.   I did myself.

12  Q.   Were they amber and white?

13  A.   Mine was all amber.

14  Q.   You were all amber.  That's because blue lights or red

15  lights can only be emergency vehicles of government agencies,

16  right?  Red lights can only be the fire department, and blue

17  lights can only be police, right?

18  A.   That's why I stayed with amber.

19  Q.   Okay.  And the lights had to be on the front and the back?

20  A.   Yes, sir.

21  Q.   So that traffic would see you coming and going?

22  A.   Yes, sir.

23  Q.   Did you ever have a relay or anything burn out on your

24  lights?

25  A.   I don't recall.  I don't recall anything.

1    Q.   Okay.  Did you ever have to perform any repair on your

2    lights?

3    A.   I think I had something go wrong with one of the wires I had

4    to redo.

5    Q.   And you had to redo it yourself?

6    A.   I did it myself, yes, sir.

7    Q.   Miller Pipeline.  How did you first find out about the

8    opportunity to perform services for Miller Pipeline through

9    ODPS?

10   A.   I found out through Darrell, through him.

11   Q.   And at the time you weren't performing traffic duties for

12   Miller Pipeline, right?

13   A.   Well, I think how I ended up with this particular guy is

14   when I was on the police department --

15   Q.   We will get into that.  I just want to find out how you

16   found out about the --

17   A.   I found out --

18   Q.   -- possibility to work at Miller Pipeline.

19   A.   I found out through the company.

20   Q.   What company?

21   A.   Through Darrell's company.

22   Q.   And what did he tell you?

23   A.   Say again.

24   Q.   What did he tell you?

25   A.   Well, it was -- I got with Miller Pipeline because this

1   particular guy that worked at Miller Pipeline requested me

2   because I worked with him before, and due to the fact that, you

3   know, he requested me all the time, so I ended up working with

4   him all the time.

5   Q.  You had a relationship with the foreman on one of the crews,

6   right?

7   A.  Exactly.

8   Q.  And he asked specifically for you?

9   A.  Right.

10  Q.  And Miller Pipeline is an LG&E contractor, right?

11  A.  That is correct.

12  Q.  And they were replacing a good bit of gas line mains,

13  weren't they?

14  A.  Yes, sir.

15  Q.  And that was shortly -- do you remember when we had the big

16  explosion up in Indianapolis?  Is that what prompted repairs

17  down here, or do you know?

18  A.  I don't know anything about that, sir.

19  Q.  Okay.  And, in fact, your relationship with the foreman on

20  the crew whose name I know here, Darrell Myers --

21  A.  Correct.

22  Q.  -- goes way back?

23  A.  Way back.

24  Q.  Way back to when you were a police officer?

25  A.  Yes, sir.

1   Q.   And he requested you every day?

2   A.   Yes, sir.

3   Q.   And he told you when quitting time was every day, right?

4   A.   Yes.  Usually when the crew left, we left, yeah.

5   Q.   And he would tell you what time to come back in the morning,

6   right?

7   A.   He specifically didn't tell me.  I just knew what time that

8   they started.

9   Q.   Because you had been with them so long, you just showed up

10  every day?

11  A.   Right.

12  Q.   Did you ever have a day where work was canceled, we are

13  going to shut down on Thursday this week instead of Friday?  Did

14  you ever have something like that happen where you worked four

15  days instead of five?

16  A.   Well, you know, if they took off for a holiday or something

17  like that, I wouldn't work with them.

18  Q.   I mean, a short week.  Ignoring the holiday, just a short

19  week.

20  A.   I don't recall anything where they would shut down where I

21  didn't work.

22  Q.   You can't think of anything -- I'm not asking you if you

23  think anything that did.  I'm asking if it ever happened in

24  three years.

25  A.   I don't recall.

1   Q.  What about you are working, it's snowing, it's going to be a

2   miserable day tomorrow, we are not going to show up.  Who would

3   tell you that?  Did that ever happen?

4   A.  We have had like rain-outs and snows and stuff like that,

5   right.

6   Q.  And you would shut down the job?

7   A.  Yes.

8   Q.  Who made the call?

9   A.  Actually, who made the call on the job shutting down would

10  be the LG&E inspector to shut down.

11  Q.  The LG&E inspector --

12  A.  Inspector.

13  Q.  -- who Miller Pipeline is a contractor to?

14  A.  Absolutely.

15  Q.  Darrell didn't shut the job down?

16  A.  Oh, no.

17  Q.  Frank didn't shut the job down?

18  A.  No.

19  Q.  In those circumstances were you told when to come back, when

20  you are going to report again?

21  A.  When I report again?  I don't -- I think I would hear from

22  maybe Frank, or somebody would say, "Hey, you can start back to

23  work again tomorrow.  You can go back."

24  Q.  Do you remember -- how would you describe your relationship

25  that you developed with Darrell Myers?  Pretty good one?

1    A.   Darrell Myers?

2    Q.   Yes.

3    A.   Oh, at the time, yeah.

4    Q.   Do you remember a specific time where your car was broken

5    down and Mr. Myers allowed you to bring your personal nonlit,

6    non-Crown Vic vehicle to the site?

7    A.   That's not acceptable.  That never happened.

8    Q.   That never happened?

9    A.   No, not for --

10   Q.   What happened when your vehicle was broken down?  You

11   couldn't work?

12   A.   Well, it's -- I think I went through this before.  The

13   vehicle was broke, and I was trying to decide if I was going to

14   come back to buy another vehicle, so I decided just to not do

15   it.  It's not the fact that I couldn't get it fixed.  I just

16   decided -- I'm sorry.  Go ahead.

17   Q.   I have been cautioned once.  Please.

18   A.   I don't remember what I was actually saying.  Anyway, when I

19   keep saying that the vehicle was broke down, I was trying to

20   end -- pretty much was going to end my work.  I knew the car was

21   going down.  I said, "Well, you know what?  I think I'm just

22   going to totally retire."

23   Q.   I see only one period of time of an extended nature in your

24   entire history of having checks issued to you by ODPS where you

25   didn't work, and that was in 2004, September 2004 through the

1    end of November 2004.  Do you remember that period of time?

2    A.  Yes.  That was probably after I retired.  I think I took a

3    little time off.  After I retired in August of 2004, I just

4    decided I wasn't going to do nothing, and that's what I did

5    until -- I don't know how I got started back.  I don't know.

6    Q.  Even though you weren't available for services for ODPS for

7    some extended period of time, as soon as you came back, they

8    found work for you, right?

9    A.  Yeah.  Like I said, I took off by choice.

10   Q.  I think you mentioned that you logged on to the website, the

11   ODPS website, while you were at work.  Did you do it while you

12   were at work?

13   A.  No, no, no.

14   Q.  Then I misunderstood.

15   A.  No.  It was something I always done at home, if I was going

16   to log on it to look and see if there was any announcements or

17   anything.

18   Q.  Okay.  Do you have Exhibit 13 in front of you still?  The

19   first page, it looks to me like the first paragraph is you got

20   to let us know how many hours you work so we can pay you.  Would

21   you agree with that?

22            THE COURT:  I think he's got a different --

23   A.  You said 13 or 12?

24   Q.  13.  This one.

25   A.  I'm sorry.  I got you.

1   Q.  Sorry.  I apologize.  The first one is get your invoices in,

2   right, so we can pay you, correct?  That's what the first

3   paragraph is there.  I'm paraphrasing.  That doesn't have

4   anything to do with other than getting your time in so you can

5   get paid, right?

6   A.  Right.

7   Q.  I want you to look at the rest of it, though, the rest of

8   those rules.  Look at the very first -- the very bottom line

9   there.  "Duties and Responsibilities for Officers Working

10  Traffic for LG&E-KU Detail."  Miller Pipeline was part of that

11  LG&E-KU detail, wasn't it, as a contractor at LG&E?

12  A.  Yes.

13  Q.  Is it your understanding that these are the requirements

14  that LG&E had for ODPS, that LG&E said, "This is what we want

15  your guys to do"?

16  A.  Yes, pretty much, I guess.

17  Q.  Okay.  And were they explained to you that way, that this is

18  what the contract requires, this is what LG&E expects of

19  everybody working on their contract?

20  A.  Apparently.  This information is passed down from -- Darrell

21  knows what the -- Darrell passed down the information down to

22  us, you know, from LG&E.

23  Q.  I'm not sure I understand your answer.  Was that a yes?

24  A.  Okay.  I'm sorry.  It sounds like that LG&E is contacting us

25  telling us that's what they require.  LG&E directly didn't

1    inform us.  It comes from Mr. Spurgeon.

2    Q.  That's right.  Darrell has the contract?

3    A.  Yes.  Then he passes down the requirements that they have,

4    right.

5    Q.  You understood these to be LG&E requirements passed down to

6    you through Darrell?

7    A.  Well, I guess, but I don't know.

8    Q.  Do you know or not?  Don't just agree with me because it's

9    easy.

10   A.  No, I'm not trying to disagree with you.

11   Q.  No, agree.

12   A.  Well, I guess --

13   Q.  Do you know or not?

14   A.  Let me back up.  These duties are given to Darrell, what is

15   required of us, and they are passed down from Mr. Spurgeon to

16   us.

17   Q.  Perfect.  Thank you.  You said it better than I could ask

18   the questions.

19       You say you had meetings from time to time about basic

20   stuff, and that was with Frank and sometimes Darrell.  How many

21   meetings like that happened?

22   A.  How often?

23   Q.  How many?

24   A.  Oh, I think -- I know of one in particular.

25   Q.  When was it and where was it, to the best of your

1   recollection?  The where is probably easier than the when.

2   A.  Where was the meeting?

3   Q.  Yeah.

4   A.  The last one I can recall, I think it might have been at his

5   house in the basement, I think.

6   Q.  Okay.

7   A.  I think.  I'm not sure.  It's been so long.

8   Q.  Whose house?  Darrell's?

9   A.  Yes, sir, Mr. Spurgeon's house.

10  Q.  Do you remember what it was about?

11  A.  No, not anything in particular.  You know, just basic stuff.

12  I can't -- it's been so long, I don't know in particular what

13  it's about.  I really don't know.  I'm sure it was talking about

14  safety and some of the stuff, you know, that's required or

15  whatever.  I really don't know in particular.  It's been so

16  long.

17  Q.  Well, you've been to Darrell's house, right?

18  A.  Yes, sir.

19  Q.  Have you seen the office that he has there for purposes of

20  running the company?

21  A.  I've not seen the office.

22  Q.  Okay.  You said that you usually -- when you couldn't be on

23  the Miller Pipeline crew -- and I say that loosely, I'm not

24  trying to suggest anything -- but when you reported to the

25  Miller Pipeline crew for traffic services, you said that usually

1    if you couldn't be there or something came up, that you would

2    call Frank and Frank would find somebody to replace you?

3    A.   That's correct.

4    Q.   Did you ever find somebody to replace you without contacting

5    Frank?

6    A.   I would have to contact him.  I mean --

7    Q.   Didn't the foreman on that crew, Darrell Myers, say, "It's

8    okay, go ahead on out; we got somebody here that can do it while

9    you are gone"?

10   A.   No, that didn't ever happen.

11   Q.   Never happened?

12   A.   As far as I know, it didn't.  If I am going to leave, you

13   know, there has to be a traffic guy here.  I mean, it was just

14   the protocol.  If I was going to leave, I would call Frank or

15   Darrell or whatever.

16   Q.   Some of the crews of our contractors have qualified traffic

17   control folks, don't they?

18   A.   I'm not sure what they qualify.  I don't know.

19   Q.   Do you have a traffic control certification card in your

20   wallet?

21   A.   I don't carry it in my wallet.

22   Q.   Do you have a traffic control certification card?

23   A.   Yes, sir.

24   Q.   You have to renew it every two years, right?

25   A.   Yes.

Polin - Cross                                                    57

```
 1   Q.  If you left services with ODPS in 2013, you've renewed it,

 2   haven't you?

 3   A.  Yes.  I got a new card, yes.

 4   Q.  How did you renew it?

 5   A.  I renewed it through the company that I worked for.

 6   Q.  KTPS?

 7   A.  Say again.

 8   Q.  KTPS?

 9   A.  Yes, sir.

10   Q.  You renewed it through them.  Did they provide you with the

11   training?

12   A.  Yes, sir.

13   Q.  So somebody out there is a trainer as well?

14   A.  Yes, sir.  It's an online thing that we do.

15   Q.  Now, in your current job at KTPS, they provide you with a

16   vehicle, don't they?

17   A.  I'm sorry.  Say again.

18          MR. SHEPHERD:  Object.

19   Q.  They provide you with a vehicle?

20          MR. SHEPHERD:  I object to this line of testimony.  I

21   think it's outside the scope.

22          THE COURT:  Why don't we approach.

23      (Bench conference on the record.)

24          MR. SHEPHERD:  I think we are fixing to get into what

25   he currently does for the competitor.  I don't think that's
```

1   relevant to this lawsuit.

2           MR. HALEY:  It's only part and parcel of what we are

3   going to hear from Mr. Stallings and maybe Mr. Brown, if he

4   comes.  They started their businesses before they filed this

5   action, and then they went to work for themselves.  They are

6   involved in other litigation.  You'll hear about that, too.

7           THE COURT:  When you say "they filed this action,"

8   what do you mean exactly?

9           MR. HALEY:  Mr. Stallings brought the complaint to the

10  Department of Labor.  That's what I mean.

11          THE COURT:  Okay.  Look, if you want to distinguish

12  the nature of his work now with the nature of his work

13  previously, I think that's okay.

14          MR. HALEY:  That's what I am trying to do.

15          THE COURT:  But you are not going to get very far

16  beyond that anyway.  I think you've both probably gotten about

17  as much as you can get out of this witness.

18          MR. HALEY:  I'm not trying to vindicate the other case

19  here.  I just want to show there are differences.

20          THE COURT:  He might not be the best witness for you

21  to do that if you have got the principal coming in later.  But

22  if you want to take a few minutes and have him testify about a

23  couple of differences, that's --

24          MR. HALEY:  I have just two more questions.  With the

25  answer, it might develop into more.

 1              THE COURT:  Okay.

 2         (End of bench conference.)

 3    Q.   Question number 1:  At KTPS, working for them, you are

 4    provided with a company vehicle, are you not?

 5    A.   Yes, sir.

 6    Q.   And you made a decision to work for KTPS because you get to

 7    work closer to home down in Bardstown, right?

 8    A.   One of the reasons.

 9    Q.   It's what you testified to in a deposition prior to coming

10    here today, isn't it?  Remember when you were in my office, and

11    the Government asked you questions and you answered?  Didn't you

12    say you wanted to be closer to home?

13    A.   I don't recall me saying that exactly, but that was one of

14    the reasons.  It was one of the reasons.

15              MR. HALEY:  Okay.  That's all I have.  Thank you.

16              THE COURT:  Any redirect, Mr. Shepherd?

17              MR. SHEPHERD:  I have one question, Judge.

18                        REDIRECT EXAMINATION

19    BY MR. SHEPHERD:

20    Q.   Mr. Polin, you indicated that you provided insurance for

21    your vehicle that you used while working for ODPS?

22    A.   Yes, sir.

23    Q.   Okay.  And was that insurance provided by the same company

24    that provided your personal vehicle insurance?

25    A.   Yes.

 1   Q.   Okay.  Did you just add the work car on to your personal

 2   policy?

 3   A.   Yes.

 4   Q.   Thank you, sir.

 5            THE COURT:  Is that all for this witness?

 6            MR. HALEY:  Yes.

 7            THE COURT:  May he be excused?  He's not subject to

 8   recall?

 9            MR. SHEPHERD:  Yes, sir.

10            THE COURT:  Thank you for your appearance here this

11   morning.  You are excused.

12      We are going to take about a five-minute break at this

13   point.

14      (Recess at 11:16 a.m. until 11:30 a.m.)

15            THE COURT:  Call your next witness, Mr. Shepherd.

16            MR. SHEPHERD:  Judge, we would call Gregory Brock

17   Pittman.

18      (GREGORY BROCK PITTMAN, called by plaintiff, sworn.)

19            THE COURT:  Mr. Shepherd, you want to retrieve your

20   previously-used exhibits?

21            MR. SHEPHERD:  Yes, sir.

22                      DIRECT EXAMINATION

23   BY MR. SHEPHERD:

24   Q.   Can you please state your name, sir?

25   A.   Gregory Pittman.

```
 1   Q.   And do you go by Brock?

 2   A.   Yes.   That's my middle name.

 3   Q.   Okay.   Mr. Pittman, at some point in time did you work for

 4   Off Duty Police Services, or ODPS?

 5   A.   Yes.

 6   Q.   And when did you start working for ODPS?

 7   A.   '06, '07, somewhere back then.

 8   Q.   And when did you stop working for ODPS?

 9   A.   Approximately three and a half years ago.

10   Q.   So that would be about 2012?

11   A.   Yeah, I would think so.

12   Q.   So if I am doing my math correctly, you worked for about

13   five or six years?

14   A.   Yes.

15   Q.   During this period, did you work for any other companies?

16   A.   No.

17   Q.   So during the period of time that you worked for ODPS, your

18   sole source of income was from ODPS?

19   A.   Yes.

20   Q.   Can you estimate about how many hours a week you worked for

21   ODPS?

22   A.   It would vary on the job.

23   Q.   Did you ever work over 40 hours a week?

24   A.   Yes.

25   Q.   And were you ever paid overtime?
```

1    A.   No.

2    Q.   What did you do for ODPS?

3    A.   Traffic control.

4    Q.   Did you ever do any security work?

5    A.   No.  Yes, I guess I did at the Sam Swope dealership.  That

6    would be considered security.

7    Q.   Okay.  Let's talk about the traffic control first.  What did

8    you physically do to do this traffic control job?

9    A.   We would set up in a work zone, usually one person in front,

10   one person in back, and direct cars around.

11   Q.   Okay.  Anything else?

12   A.   We would set the cones up for the crews and whatever they

13   usually needed.

14   Q.   Okay.  What about the security work?  I believe you

15   indicated you worked for the Swope Auto Group?

16   A.   Yes.  We would work at Swope Auto Group, most times always

17   at night.  We did some hotels when they were being built.

18   Q.   Okay.  And what did the security work entail?

19   A.   Usually we just watched the perimeter of the place so no

20   one bothered anything, like at the hotels.  And at the car lot,

21   we would drive around and make sure nobody bothered the cars or

22   anything.

23   Q.   Okay.  What percentage of your work at ODPS was the traffic

24   control as opposed to the security work?

25   A.   We did traffic pretty much during the day, and then we would

1   do the security work during the night.  The night work would

2   vary.

3   Q.  Would you say the majority of your work was traffic as

4   opposed to security?

5   A.  Yes.

6   Q.  Okay.

7   A.  Definitely.

8   Q.  Did you ever receive any type of training while you were

9   working for ODPS?

10  A.  The only training I received was when I first started, Frank

11  Medieros worked with me for about three days showing me what to

12  do as far as holding my sign, directing people around.

13  Q.  Okay.  And this would have been in 2006, 2007?

14  A.  Yes, when I first started.

15  Q.  Prior to coming to work for ODPS, did you ever work as a

16  police officer or sheriff's deputy?

17  A.  No.

18  Q.  Prior to coming to work for ODPS, did you have any

19  experience working as a security guard?

20  A.  No.

21  Q.  Prior to coming to work at ODPS, did you have any experience

22  working as a traffic control officer?

23  A.  No.

24  Q.  With no experience, how did you learn to do the job at

25  ODPS?

1    A.   Learned as we went.

2    Q.   Just on-the-job training?

3    A.   I guess you could say it that way, yeah.

4    Q.   Was that all through ODPS?

5    A.   Yes.

6    Q.   You indicated that Mr. Medieros went out with you the first

7    couple of days?

8    A.   Yes.

9    Q.   Did he stay with you the entire time?

10   A.   Yes, usually working in tandem.  There's two of you.  Him

11   and I worked together.

12   Q.   How long did he stay with you?

13   A.   For the whole day, however long we worked that day.

14   Q.   Okay.  Were you guys doing traffic control?

15   A.   Yes.

16   Q.   Okay.  What about the security work?  How did you learn how

17   to do that security work?

18   A.   There was no training.

19   Q.   Okay.  How did you learn how to do the job?  Physically, how

20   did you know what to do when you went out there?

21   A.   I guess we showed up and watched for problems.  That was

22   it.

23   Q.   Do you feel like you were able to do the job satisfactorily?

24   A.   Sure.  Common sense.

25   Q.   While you were working for ODPS, did you have a supervisor?

1    A.  Yes.

2    Q.  And who was that?

3    A.  Frank Medieros.

4    Q.  How did Mr. Medieros supervise your work?

5    A.  He came out on the job site later in my career with them and

6    would check on us.  But that was probably within the last six

7    months or maybe a year, and it was not very often.

8    Q.  While you were working for ODPS, were you ever required to

9    send any type of reports to either Mr. Medieros or to Mr.

10   Spurgeon?

11   A.  Only call in at night what time we got done working.  The

12   only reports I really ever had to send in was I worked a job

13   doing undercover work at the *Courier-Journal*, and I had to send

14   a nightly report of what I did that day and what I heard and

15   what I learned.

16   Q.  Okay.  And this undercover work, you were working at the

17   *Courier-Journal* through ODPS?

18   A.  Yes.

19   Q.  And who would you send your reports to?

20   A.  To Mr. Spurgeon.

21   Q.  That's Darrell Spurgeon?

22   A.  Yes.

23   Q.  How were you paid at ODPS?

24   A.  Biweekly.

25   Q.  That was a bad question.  Were you paid by the hour?

1    A.   I was paid by the hour.

2    Q.   Were you always paid by the hour?

3    A.   Yes.

4    Q.   How much, if you don't mind me asking?

5    A.   $15 an hour.

6    Q.   Who set the pay rate?

7    A.   Mr. Spurgeon.

8    Q.   Did you ever try to negotiate that rate with Mr. Spurgeon?

9    A.   Yes.

10   Q.   Tell me about that.

11   A.   Couple of times I would ask him about having a raise, and he

12   said "no," but a few times he would call me and tell me I was

13   going to get a raise, and then I never did.

14   Q.   Before coming to work at ODPS, were you informed that you

15   would be classified as an independent contractor?

16   A.   Yes.

17   Q.   And were you required to sign what's referred to as an

18   independent contractor agreement or asked to sign an independent

19   contractor agreement?

20   A.   I don't recall about in the beginning, but near the end of

21   my employment with them, we were asked to sign something.

22   Q.   Mr. Pittman, hopefully if this works correctly, what's going

23   to pop up on the screen in front of you is a document that's

24   been labeled D_589.  Let me ask you first, is that your

25   handwriting on the first page of the document?

1    A.  I don't see anything.  Yes.

2    Q.  Can we scan down to the last page?  One more.  Is that

3    your handwriting on what's labeled "Subcontractor Information

4    Form"?

5    A.  Yes.

6    Q.  Okay.  Were you asked to sign this document?

7    A.  I was told to sign the document or I would not receive any

8    paycheck.

9    Q.  Okay.  And did you sign the document?

10   A.  No, I did not.

11   Q.  If you can, take a look at the third page of the document.

12   It's been marked D_591.  Is that your signature on D_591?

13   A.  No, it is not.

14   Q.  Mr. Pittman, when you filled this form out, did you make any

15   notations on the form that would tend to show that you thought

16   it was a joke or that you weren't taking this seriously?

17   A.  I did.

18   Q.  If we can flip down to what's labeled "Subcontractor

19   Information Form," under "Gender and Race," there are some

20   euphemisms there for maybe a tough guy, et cetera.  Do you see

21   that?

22   A.  Yes, I did that.

23   Q.  Was that you just joking around?

24   A.  Yes, it was.

25   Q.  After you filled out this document but didn't sign it, what

1    did you do with the document?

2    A.   I gave it to Frank Medieros.

3    Q.   Okay.  Before coming to work at ODPS, were you required to

4    buy any equipment or supplies?

5    A.   I was told I would have to drive a Crown Vic with lights in

6    the car.

7    Q.   Did you purchase a Crown Vic with lights?

8    A.   Yes, I did.

9    Q.   Did you have to buy anything else?

10   A.   We had to buy a uniform, BDUs, blue.

11   Q.   Okay.  Who told you about the vehicle requirement and the

12   uniform requirement?

13   A.   Mr. Spurgeon.

14   Q.   That would be Darrell Spurgeon?

15   A.   Yes.

16   Q.   How much did all this stuff cost, the uniform and the

17   vehicles?

18   A.   I think I paid around 1,500 for my first car.  Uniforms were

19   about 80 for a shirt and a pair of pants.  And I had to buy

20   black shoes and a few other things.

21   Q.   Okay.  So total cost, we would say under three or $4,000?

22   A.   Yes.  In the beginning, yes.

23   Q.   Did you ever drive the vehicle that you purchased for work

24   at ODPS while you were off work?  Did you ever take the vehicle

25   to the grocery store?

1    A.   Yes.

2    Q.   And did you do that on a regular occasion?

3    A.   Yes.

4    Q.   During the time that you worked for ODPS, did they provide

5    you with any equipment or supplies?

6    A.   Yes.  They provided me with a stop-slow paddle, which we

7    used in directing traffic.

8    Q.   Anything else?

9    A.   Sometimes he would give us shirts.  We got some neon yellow

10   shirts he gave us one time.  Sometimes our winter jackets, which

11   were neon yellow, he gave me a couple of them.  I think I paid

12   for my first one, but the second one he gave me.

13          MR. SHEPHERD:  Your Honor, may I approach?

14          THE COURT:  Yes.

15   Q.   I want to show you a couple of pictures on what's been

16   received as Exhibit Number 14.  There are some patches shown on

17   those pictures.  Were you ever provided with any of those

18   patches?

19   A.   Yes.

20   Q.   Who gave you those patches?

21   A.   In the beginning, Darrell Spurgeon; and then when they

22   changed to the patch in this picture, Frank Medieros.

23   Q.   You indicated that while you were working for ODPS you were

24   required to wear a uniform?

25   A.   Yes.

1    Q.   Who told you about the uniform requirements?

2    A.   Darrell Spurgeon.

3    Q.   You indicated that you were required to wear blue BDUs?

4    A.   Yes.

5    Q.   "BDU," is that an acronym for "battle dress uniform"?

6    A.   Yes, it is.

7    Q.   Like military-style?

8    A.   Yes.

9    Q.   Did Mr. Spurgeon or Mr. Medieros ever talk to you about the

10   uniform that you were required to wear?

11   A.   Only that I had to wear it.

12   Q.   Okay.  What about personal grooming requirements?  Were you

13   ever told about any personal grooming requirements?

14   A.   Yes.  We were not allowed to have any facial hair except a

15   mustache.

16   Q.   Who told you about that?

17   A.   Darrell Spurgeon.

18           MR. SHEPHERD:  Your Honor, may I approach?

19           THE COURT:  Yes.

20   Q.   Mr. Pittman, I would like to show you the document that's

21   been marked as Exhibit Number 12.  Did you ever have occasion to

22   go on to the ODPS website?

23   A.   Yes, I have.

24   Q.   And did you ever log on to the website?

25   A.   Yes, I did.

1    Q.  And have you ever seen that document on the ODPS website?

2    A.  Yes, I have.

3          MR. SHEPHERD:  Judge, we would move for admission of

4    what's been marked as Government Exhibit 12.

5          MR. HALEY:  No objection.  We will deal with it.

6          THE COURT:  It will be admitted.

7      (Plaintiff's Exhibit 12 admitted in evidence.)

8    Q.  Mr. Pittman, is that document -- do you recall where on the

9    ODPS website you found that document?

10   A.  I couldn't say for sure.  It's been a while since I had to

11   get on there.  But yes, there were several documents on there.

12   Some things we would have to download.

13   Q.  Have you had a chance to take a look at the rules that are

14   listed on that document?

15   A.  Yes.

16   Q.  Are those rules or guidelines that are listed on that

17   document consistent with what was told was required of you while

18   working for ODPS?

19   A.  Yes.

20   Q.  Just to be clear, who told you about those requirements,

21   those work rules?

22   A.  Darrell Spurgeon and Frank Medieros, both.

23   Q.  While you were working for ODPS, did you guys ever have

24   meetings?

25   A.  Have?

1    Q.   Meetings.

2    A.   Yes.

3    Q.   Who would attend those meetings?

4    A.   The first one I can remember having we had at Mr. Spurgeon's

5    house in his basement, and it was the nonsworn police officers

6    that did traffic work for him.

7    Q.   Your co-workers were present?

8    A.   Yes.

9    Q.   And Mr. Spurgeon was present?

10   A.   Yes.

11   Q.   And was Mr. Medieros present?

12   A.   I don't remember if he was there or not.

13   Q.   What types of things were communicated to you guys at these

14   meetings?

15   A.   I believe he actually handed out jackets at that meeting,

16   and we talked about what we were supposed to do.

17   Q.   Okay.  You indicated that that's the first one you recall.

18   Do you recall other meetings that you guys had?

19   A.   Frank Medieros had us all meet at Louisville Pizza one night

20   to go over -- I don't remember exactly what we talked about --

21   to go over certain items, and then we had a training class.  The

22   state required us to be certified for flaggers, and Mr. Spurgeon

23   and Mr. Medieros put the class on and taught.

24   Q.   How long did the training last?

25   A.   I think we were there about an hour.

1          MR. SHEPHERD:  Your Honor, may I approach?

2          THE COURT:  Yes.

3    Q.  I would like to show you a document that's been received as

4    Exhibit Number 13.  This appears to be a screen shot from the

5    ODPS website.  Did you ever work any of the LG&E-KU details?

6    A.  Yes, I worked with LG&E.

7    Q.  And do you recall having an occasion to log on to the

8    website and seeing this announcement posted?

9    A.  Yes, I recall seeing it.

10   Q.  While you were working for ODPS, how would you get your job

11   assignments?

12   A.  Typically, I would get a phone call the night before, either

13   from Mr. Spurgeon most of the time in the beginning of my

14   employment, and then later on by Mr. Medieros, and told where to

15   show up and what time.

16   Q.  When they would call you, would they offer you the

17   opportunity to work, or would they tell you where to go?

18   A.  They would just tell me where I'm going.

19   Q.  You indicated that you would be told what time you should

20   show up?

21   A.  Yes.

22   Q.  How would you know what time you could leave for the day?

23   A.  Typically, the job, depending on who I was with, was either

24   an eight or 10-hour job, so at the end of that time period.

25   Sometimes Darrell or Frank would tell me what time to start in

1   the beginning.  Sometimes the crew I would work with, what time

2   they ended that day is what time we quit.

3   Q.  You would just stop working when the crew stopped working?

4   A.  Pretty much, yes.

5   Q.  Because there would be no need to direct traffic if they

6   weren't working?

7   A.  Correct.  Typically, unless you got a rain-out day, it was a

8   set time.

9   Q.  Were you ever assigned to stay with a particular crew or

10  stay at a particular location for an extended period of time?

11  A.  Yes.

12  Q.  Can you tell me about that?

13  A.  Sometimes with mainly the Miller crews, Darrell would call

14  and tell me to stay with them till further notice.  Sometimes I

15  was with them six months, nine months, even a year plus with the

16  same guys.

17  Q.  And while you were staying with this particular crew, would

18  you just work the hours that they would work?

19  A.  Yes.

20  Q.  Okay.  Was that a set schedule?

21  A.  Most of the time, yes.

22  Q.  And what was that schedule?  What time would they typically

23  start, and what time would they typically end?

24  A.  It's been a while.  I believe Miller started around 7:30 in

25  the morning, and they were working -- I think we were putting

1  like 10 and a half hour days in and eight and a half on a Friday

2  was kind of typical.

3  Q.  If something unexpected happened while you were working and

4  you had to leave early, what would you do?

5  A.  I would have to call Darrell and tell him that something has

6  come up and I have to go, and he would send someone to replace

7  me if it happened.

8  Q.  Did you ever have occasion to do that?

9  A.  No, I did not.

10  Q.  If you agreed to work a particular job and something came up

11  where you couldn't work the shift, could you swap the shift with

12  one of your co-workers?

13  A.  No, I could not.

14  Q.  And how do you know that?

15  A.  Because Darrell told me I have to do the job and that I

16  can't have someone work for me.

17  Q.  If you didn't want to work a particular job, could you

18  refuse to work the assignment?

19  A.  Yes.

20  Q.  And did you ever do that?

21  A.  I'm sure I did, but I cannot recall.

22  Q.  Did anything negative happen to you --

23  A.  No, it did not.

24  Q.  -- when you refused to work?

25  A.  No.

1    Q.  Do you know of any negative consequences flowing to any of

2    your co-workers when they refused to work a job?

3    A.  Yes.

4    Q.  And tell me about that.

5    A.  A lot of workers, if they refused, they then would not get

6    work maybe later on that week or the very next --

7            MR. HALEY:  Objection.  There's no foundation for

8    this.  A lot of workers, if they refused, they wouldn't get work

9    later in the week.  That's too ambiguous for me to

10   cross-examine.

11           THE COURT:  Well, I don't know about that, but is

12   there a foundation here, Mr. Shepherd?

13           MR. SHEPHERD:  I can follow up, Judge.

14   Q.  You indicated that some workers wouldn't get work.  How do

15   you know the workers wouldn't get work?

16   A.  We all knew each other.  We all talked amongst each other.

17   If someone, say, got in trouble, they may not get work, if

18   Darrell didn't like the way they did something.

19   Q.  Let me ask you this, Mr. Pittman:  Prior to coming to work

20   for ODPS, did you know Mr. Spurgeon?

21   A.  Yes.

22   Q.  Did you have a personal relationship with him?

23   A.  I would say so, yes.

24   Q.  Have you ever witnessed an occasion where a worker was sent

25   home from a job?

1    A.   Yes.

2    Q.   And can you tell me about that?

3    A.   I believe we were working on Palatka for the water company,

4    and Frank Medieros called me and asked me what my partner at the

5    other end was wearing.   I described him as wearing khaki shorts

6    and a T-shirt.

7    Q.   Was that consistent with what was required at ODPS?

8    A.   No, it was not.

9    Q.   And what did Mr. Medieros do?

10   A.   He came to the job site and relieved him.

11   Q.   He sent him home?

12   A.   Yes.

13   Q.   And can you recall about when that was?   Do you remember

14   what year that was?

15   A.   No.

16   Q.   Can you recall any other situations where a worker was sent

17   home from a job?

18   A.   Not that I can think of that they were sent home.

19   Q.   At ODPS, was there any sort of requirements regarding facial

20   hair?

21   A.   Yes.

22   Q.   I believe you indicated that there was some rules regarding

23   a beard or mustache?

24   A.   Mustache is all we could have on our face.

25   Q.   What about a goatee?   Could you have a goatee?

1    A.  No, you could not have one.

2    Q.  Did you ever get in trouble for having a goatee?

3    A.  Yes, I did.

4    Q.  Tell me about that.

5    A.  Well, we had one employee that always had a beard.  Nothing

6    was really ever said.  I figured I would grow me one.  Frank

7    Medieros showed up on the job site and told me I needed to shave

8    it off.

9    Q.  Okay.  At the end of the work week, were you required to

10   submit some type of documentation or invoice to ODPS?

11   A.  No, I was not.

12   Q.  Okay.  That was never required of you?

13   A.  No.

14   Q.  How did you get your work times?

15   A.  We sent our times in every evening we got off work,

16   typically a text or a phone call.

17   Q.  So you worked up until 2012?

18   A.  I believe that is correct.

19   Q.  And you never submitted an invoice?

20   A.  No.

21   Q.  All your work times were communicated via phone calls or

22   text messages?

23   A.  Yes.

24   Q.  After you would communicate your work times to ODPS, would

25   you be paid for the work that you did?

1    A.   Yes.

2    Q.   Okay.  Whom would those paychecks come from?

3    A.   Off Duty Police Services.

4    Q.   Were you always paid from ODPS?

5    A.   Yes.

6    Q.   While you were working for ODPS, did you have a corporation

7    or a limited liability company set up for yourself?

8    A.   No.

9    Q.   Did you have a business license?

10   A.   No.

11   Q.   Did you advertise so you could get work from other companies

12   besides ODPS?

13   A.   No.

14   Q.   Did you have a website set up for yourself?

15   A.   No.

16   Q.   Did you maintain any type of an office?

17   A.   No.

18   Q.   Or what about a staff to assist you with your job?

19   A.   No.

20   Q.   Did you purchase any type of business liability insurance?

21   A.   No.

22   Q.   Did you purchase any type of worker's compensation

23   insurance?

24   A.   No.

25   Q.   I appreciate you answering my questions.

1                    CROSS-EXAMINATION

2    BY MR. HALEY:

3    Q.   Mr. Pittman, Ray Haley.  It's nice to see you again.

4         Didn't you begin to perform services for ODPS in the fall of

5    2005?

6    A.   Like I said, I wasn't for sure what year I started.  That

7    could be right.

8    Q.   Does that sound about right?

9    A.   Could be.  I would have to look at my records to see.

10   Q.   Let me ask you, you previously had a printing business,

11   correct?

12   A.   Correct.

13   Q.   And that printing business was not doing very well

14   economically, correct?

15   A.   I don't see what that has to do with the case and my

16   personal business.

17   Q.   If you will let me ask a question, I perhaps will clarify it

18   for everybody, including you.  It was not doing very well, was

19   it?

20   A.   I wouldn't say that.

21   Q.   Well, you came to Darrell looking for extra income

22   explaining that your printing business was not doing very well,

23   right?

24   A.   No.  He came to me.

25   Q.   He came to you?

1    A.   Yes.

2    Q.   I'm looking at your hours of work for 2005, and for

3    reference purposes we will introduce it through somebody that

4    can lay a foundation.  Would it be accurate to say for the

5    majority of 2005 you worked less than -- performed services less

6    than 20 hours a week most of the time?

7    A.   For who?

8    Q.   For customers of ODPS.

9    A.   When I first started working for Darrell, yes, I worked

10   probably one night a week.

11   Q.   When did your printing company close?

12   A.   I'm not exactly for sure, sir.

13   Q.   Was it about that time that you sought additional hours from

14   ODPS on behalf of his clients to replace the income that you

15   lost from your printing company?

16   A.   When we decided to shut my printing company down, he asked

17   me if I would come on full-time.

18   Q.   Okay.  And you agreed to do it?

19   A.   Yes.

20   Q.   Did you continue to look for other business opportunities

21   during the period of time that you were working for ODPS

22   following the closing of the printing company?

23   A.   No.

24   Q.   Didn't look for anything?

25   A.   No.

1    Q.   Satisfied with $15 an hour?

2    A.   Sure.

3    Q.   Now, I'm looking at your hours, and they seem to have varied

4    widely.  Would you agree with that?  We will introduce the

5    evidence later.  It looks like some weeks you had 14, another

6    week you would have 49, and I'm just picking days at random.

7    Another week you would have 54.  Here's a week where you had six

8    up in 2007.  Does that sound right to you, that they would vary

9    widely like that?

10   A.   Without my information in front of me, I could not answer

11   that question.

12   Q.   But you worked it.  You were there.

13   A.   That's right.  I have every day documented.

14   Q.   I'm sorry?

15   A.   I have every day documented.

16   Q.   You have every day documented?

17   A.   Uh-huh.

18   Q.   Okay.  Have you reviewed that -- those documents before you

19   came here to testify today?

20   A.   No.

21   Q.   So when I asked you a question about whether or not, for

22   example, in early 2011 -- let's say April 2011, your hours were

23   37 and a half, 49, 43, 33, you would have no idea whether or not

24   that's accurate, right?

25   A.   That is correct.

1    Q.  Are you saying that the document -- the independent

2    contractor agreement that was demonstrated by the Government --

3    exhibit whatever it was, I think it's in front of you -- is the

4    first one you ever signed?

5    A.  I don't really recall.

6    Q.  Did you sign one earlier?

7    A.  I don't recall.

8    Q.  Would you deny that you signed one earlier?

9    A.  If I don't recall, I can't deny it.

10   Q.  Were you doing the smart aleck remarks previously to this

11   last one?

12   A.  I don't understand.

13   Q.  The smart aleck remarks -- I'm talking about your "bad ass"

14   and whatever it is you wrote on the document.

15   A.  I was being humorous.

16   Q.  Were you humorous on the prior documents that you signed?

17   A.  I don't recall.

18   Q.  In late 2011 when you executed the last agreement and put

19   your remarks being humorous on the one, you were in the process

20   of leaving ODPS, weren't you?

21   A.  I don't believe so.

22   Q.  Didn't you go to work for Kentuckiana Traffic and Patrol

23   right after that?

24   A.  No, it wasn't right after that.  I guess it depends on your

25   definition of "right after."

1    Q.  Let me say that the last time you performed services for

2    ODPS was in March of 2012, right?

3    A.  I guess so.

4    Q.  Do you know?

5    A.  No, I do not.

6    Q.  And did you know before the end of the year 2011 that you

7    were leaving and going to join in with KTPS?

8    A.  End of the year?

9    Q.  Yes.

10   A.  Till March?  No.

11   Q.  When did you decide to leave and go to KTPS?

12   A.  I do not recall the exact day or time.

13   Q.  Did you know that Merle Brown had started KTPS as a business

14   in September 2011?

15   A.  No.

16   Q.  Did you know who Merle Brown was?

17   A.  I do.

18   Q.  Did you know who he was then?

19   A.  Yes.

20   Q.  Had you worked on jobs with him?

21   A.  Yes.

22   Q.  Had it ever come up?

23   A.  No.

24   Q.  I'm curious.  You had many hours or many weeks within which

25   you worked more than 40 hours.  I'll withdraw the question.

1       Do you know what your earnings have been at KTPS since you

2    left ODPS?

3            MR. SHEPHERD:  Objection.  Relevance, Judge.

4            MR. HALEY:  It goes to the issue, Judge, of plan and

5    design.

6            THE COURT:  If you would approach, please.

7       (Bench conference on the record.)

8            THE COURT:  Your objection?

9            MR. SHEPHERD:  I just don't think -- I understand that

10   they are going to -- there may be some claim that this is

11   retaliatory.  Regardless if that is true or not, whether the

12   complaint was retaliatory, the issue in this case is whether

13   these employees were misclassified.  That's it.  It doesn't

14   matter -- it doesn't make any difference as to the motivation

15   behind the complaint.  The issue in the case is just about their

16   classification.

17           MR. HALEY:  It goes to the credibility of each of

18   these witnesses with an underlying motive to basically, as you

19   will hear later, put my guy out of business to feather their own

20   nests.  In connection with this, all you're going to hear from

21   are people who left ODPS and went to KTPS.  You are going to

22   hear from the ODPS folks additionally.  I think I'm making

23   inroads with these witnesses.  Nevertheless, I think it's very

24   important for you to recognize the difference.

25           THE COURT:  Well, I'm going to overrule the objection,

1   but in large part because there's not a jury here and so we

2   don't risk jury confusion on this issue.  I'm confident I can

3   sort out what is relevant from what is not.  I do think that if

4   every single witness that the department puts on is either

5   currently, or after their service with ODPS, at KTPS, then I

6   think your point will have been made.

7          MR. HALEY:  I will limit it to those questions at that

8   point, Your Honor.  Thank you.

9      (End of bench conference.)

10         THE COURT:  Objection is overruled subject to the

11  limitations we discussed.

12  Q.  I want to make sure I have the right Pittman.  Gregory.  By

13  the way, you have a brother who used to perform services at

14  ODPS, too, right?

15  A.  Correct.

16  Q.  His name is Johnnie?

17  A.  Yes.

18  Q.  And Johnnie now works for KTPS, too, right?

19  A.  Yes.

20  Q.  Now, is it accurate that in 2012 you earned in excess of

21  $22,000 working for KTPS?

22  A.  Without the information in front of me, I couldn't answer

23  that.

24  Q.  Do you deny it?

25  A.  I made money working there.  I don't know the amount.

1    Q.  How does $29,000 sound for 2013?

2    A.  Without it in front of me, I cannot confirm or deny an exact

3    number.

4    Q.  Do you do your own taxes?

5    A.  I do.  No, as a matter of fact, I don't.  I prepare them and

6    give them to an accountant.

7    Q.  Do you recall that your W-2s had these amounts on them for

8    those years?

9    A.  An approximation.  You are giving me exact numbers.  I do

10   not know.

11   Q.  Did you derive income from any other source in 2012 other

12   than the carry-over ODPS and then KTPS, and then 2013 when you

13   didn't work for ODPS?  Any other income?

14   A.  As far as what?

15   Q.  Earning anything, doing anything.

16   A.  No.

17   Q.  Are you still in the business of going to gun shows and

18   selling guns with your brother?

19   A.  No, never was --

20   Q.  Don't do that anymore?

21   A.  No.

22   Q.  Did you do that while performing services for customers of

23   ODPS?

24   A.  No.

25   Q.  Did you do that during the period of time that you were

1    engaged by ODPS to perform services for its customers?  Let me

2    put it that way.

3    A.   No.

4    Q.   Not on off days or anything like that?

5    A.   You will need to reask me that question in terms I can

6    understand.  You said did I do it at work?

7    Q.   I didn't say "while at work."  While performing --

8    A.   You said did I do --

9    Q.   I rephrased the question.

10   A.   Okay.

11   Q.   During the period of time that you were engaged by ODPS to

12   perform services for its customers and outside of work, were you

13   engaged in selling guns at gun shows?

14   A.   As a hobby.

15   Q.   As a hobby.  And did that ever interfere with your ability

16   to accept an assignment?

17   A.   No.

18   Q.   And you have never -- but you have refused to accept

19   assignments in the past?

20   A.   Probably, but I don't recall.

21   Q.   And you have never suffered a retaliatory action of any

22   kind?

23   A.   I have not.

24   Q.   And you have been engaged in activities other than traffic

25   control?  For instance, did you have a special assignment over

 1    the Oaks and Derby in 2011?

 2    A.   I believe I worked on an LG&E substation.  We sat on that.

 3    Q.   That was security?

 4    A.   I assume so, yeah.

 5    Q.   And you were paid more than $15 an hour for that, weren't

 6    you?

 7    A.   Yes.

 8    Q.   Did you have an opportunity to accept or reject that

 9    assignment?

10    A.   I guess I could have said "no."

11    Q.   I don't believe I have any more, sir.  Thank you.

12           THE COURT:  Mr. Shepherd, redirect?

13           MR. SHEPHERD:  No further questions.

14           THE COURT:  Before I excuse you, I have just a

15    question or two.  So you all will want to listen, and if you

16    have follow-up to mine, that would be perfectly fine.

17        The exhibit that you were shown earlier by Mr. Shepherd --

18    Mr. Shepherd, I'm referring to the contractor agreement.

19           MR. SHEPHERD:  Yes, sir.

20           THE COURT:  What exhibit number is that?

21           MR. SHEPHERD:  It's been marked as Exhibit 19.

22           THE COURT:  Not yet admitted.

23           MR. SHEPHERD:  I believe we have got an agreement to

24    admit it at the end of the proof.

25           THE COURT:  That's fine.  That's Exhibit 19.

```
 1              MR. SHEPHERD:  Yes, sir.

 2              THE COURT:  The one where you described your remarks

 3    as humorous.  I want to make sure that I understand your

 4    testimony.  So that's the point of me asking the question as

 5    opposed to the lawyers.  Did I understand correctly that your

 6    testimony was that that signature on that agreement was not

 7    placed there by you?

 8              THE WITNESS:  Yes, that is correct.

 9              THE COURT:  And can you tell me why you did not sign

10    the agreement?

11              THE WITNESS:  At that time I didn't feel like I should

12    have to sign anything.

13              THE COURT:  Why?

14              THE WITNESS:  We were supposedly independent

15    contractors.  I had learned a little more about independent

16    contractors by search on the website.  I shouldn't have to sign

17    anything if I was truly an independent contractor.  So I didn't

18    sign it.

19              THE COURT:  Thank you.  Either of you have a

20    follow-up?

21              MR. SHEPHERD:  I do have one question.

22                        REDIRECT EXAMINATION

23    BY MR. SHEPHERD:

24    Q.  Mr. Pittman, did you review that independent contractor

25    agreement when you were asked to sign it?
```

1    A.   Yes.

2    Q.   And did you see that it had a noncompete clause in the

3    agreement?

4    A.   It was something like that, non-something, yes.

5    Q.   And did that noncompete or nonsolicitation clause, did that

6    play any part in your decision not to sign the contract?

7    A.   Yes, I would say so.  I felt like I should have the right to

8    work for who I want to.

9             MR. SHEPHERD:  Thank you.

10            MR. HALEY:  I must.

11                       RECROSS-EXAMINATION

12   BY MR. HALEY:

13   Q.   What do you remember you were prohibited from doing

14   according to that noncompete clause?

15   A.   I wouldn't be able to work for someone else.  I don't

16   remember the exact wording.  It's been a while since I read it.

17   Q.   So in response to Mr. Shepherd's question, it was

18   restrictive, but you don't know how restrictive.  Is that what

19   you are telling me?

20   A.   I felt like if I signed it, I couldn't work for someone

21   else.  I didn't want to sign it.

22   Q.   Did you read it?

23   A.   Yes, I read it.

24   Q.   Didn't it say you couldn't work for customers of ODPS only?

25   A.   I don't recall.

1    Q.   Take a minute to look at it.

2    A.   It's not there.

3    Q.   It's not in front of you?  I thought the Government handed

4    you a copy of it.

5    A.   It was on the monitor.

6    Q.   I'm sorry?

7    A.   It was on the monitor.

8    Q.   Would you throw it up again, please?  I'm sorry to ask you

9    to do my work for me.  The second page.

10        Look at the nonsolicitation agreement there, Mr. Pittman.

11   A.   Okay.

12   Q.   Just ODPS customers, right, that you have come into contact

13   with in the course of your employment?  Other than that, you can

14   work for anybody, right?

15   A.   It does kind of seem to sound that way, yes.

16   Q.   You signed a similar noncompete agreement at KTPS?

17   A.   I know I signed something.  I don't recall what it is.

18   Q.   You signed something, but you don't know what it is?

19   A.   It's not in front of me to read.

20        MR. HALEY:  Thank you.  I don't have any more

21   questions.

22        THE COURT:  Mr. Shepherd?

23        MR. SHEPHERD:  No, Judge.

24        THE COURT:  Thank you, Mr. Pittman.  You are excused.

25        This witness is not subject to recall, correct?

 1              MR. SHEPHERD:  No, sir.

 2              THE COURT:  It is 12:15.  We are going to take a brief

 3    lunch break.  Let's plan to restart with your next witness at

 4    1:00.

 5              MR. SHEPHERD:  Yes, sir.

 6              THE COURT:  Thank you.

 7         (Recess at 12:14 p.m. until 1:13 p.m.)

 8              THE COURT:  Are you ready for your next witness,

 9    Mr. Shepherd?

10              MR. SHEPHERD:  Yes, sir.  Judge, we would call Craig

11    Pittman.

12         (JOHNNIE CRAIG PITTMAN, called by plaintiff, sworn.)

13                         DIRECT EXAMINATION

14    BY MR. SHEPHERD:

15    Q.  Can you please state your name, sir?

16    A.  Full name?

17    Q.  Yes, sir.

18    A.  Johnnie Craig Pittman.

19    Q.  Mr. Pittman, are you Brock Pittman's brother?

20    A.  Yes, sir, I am.

21    Q.  Mr. Pittman, at some point in time did you work for Off Duty

22    Police Services, Inc., or ODPS?

23    A.  Yes, I did.

24    Q.  And when did you start working for ODPS, approximately?

25    A.  Let's see.  I would say seven years ago probably.

1    Q.   That would take us to about 2008 -- 2007, 2008?

2    A.   Yeah.

3    Q.   And when did you stop working for ODPS?

4    A.   December -- let's see.  I want to say December of 2012.

5    Q.   So you worked for ODPS, give or take, five or six years?

6    A.   Five on and off.  I took a leave of absence at one point in

7    time.

8    Q.   Do you mind me asking why you took the leave of absence?

9    A.   I was married to my last wife, was working a lot of hours,

10   didn't know the marriage was going downhill.

11   Q.   Personal issues?

12   A.   Yeah, personal.

13   Q.   During the period of time that you worked for ODPS, did you

14   work for any other companies?

15   A.   No.

16   Q.   Okay.  So during the approximate five-year period that you

17   worked for ODPS, you received your sole source of income from

18   ODPS?

19   A.   Yes.

20   Q.   Can you estimate about how many hours a week you worked for

21   ODPS?

22   A.   40, depending on the week.  It's hard to say.

23   Q.   Did you ever work over 40 hours a week?

24   A.   Oh, yes.

25   Q.   And were you ever paid overtime?

1    A.   No.

2    Q.   What did you do for ODPS?

3    A.   Traffic control, security.

4    Q.   Let's talk about the traffic control first.  What does that

5    type of work entail?

6    A.   Flagging, you know, taking care of just -- you know, making

7    sure the traffic flows properly in the work zone.

8    Q.   What about the security work?  What does that work entail?

9    A.   Typically just making sure nobody bothers anything at the

10   different locations.

11   Q.   Prior to coming to work for ODPS, did you ever work as a

12   police officer or sheriff's deputy?

13   A.   No.

14   Q.   Prior to coming to work at ODPS, did you have any experience

15   working as a security guard?

16   A.   No.

17   Q.   Prior to coming to work for ODPS, did you have any

18   experience in traffic control?

19   A.   No.

20   Q.   With no experience, how did you learn to do the job?

21   A.   Was typically trained by whoever you worked with at that

22   job.

23   Q.   Would that be somebody with ODPS?

24   A.   Yes.

25   Q.   Do you recall who trained you how to do the job?

1    A.   My brother did.

2    Q.   That would be Mr. Brock Pittman?

3    A.   Correct.

4    Q.   Okay.  Did Mr. Brock Pittman go out with you to the job site

5    the first day?

6    A.   Yes, we worked together.

7    Q.   How long did he stay with you?

8    A.   About two weeks.

9    Q.   After that two-week period, did you feel comfortable

10   working?

11   A.   Oh, yes.

12   Q.   While you were working for ODPS, did you have a supervisor?

13   A.   Yes.

14   Q.   And who was that?

15   A.   I'm having a mental block.  Frank -- I can't think of his

16   last name.

17   Q.   Medieros?

18   A.   Yeah, Medieros.

19   Q.   And how did Mr. Medieros supervise your work?

20   A.   From time to time he would show up to make sure we were

21   doing our job properly.

22   Q.   Would that be out at the job site where you worked?

23   A.   Correct.

24   Q.   Is that yes?

25   A.   Yes.

1   Q.  While you were working for ODPS, were you ever required to

2   send any type of reports to Mr. Medieros?

3   A.  Not that I am aware of.

4   Q.  What about invoices?  Did you ever send invoices?

5   A.  No, I did not.

6   Q.  How did you let them know -- when I say "them," I'm talking

7   about ODPS.  How did you let the people at ODPS know what hours

8   you were working?

9   A.  We would call in the time.

10  Q.  Okay.  You would call.  Who would you call?

11  A.  Typically, Darrell Spurgeon.

12  Q.  Would you do this on a daily basis?

13  A.  Yes.

14  Q.  Okay.  You would call him and say you worked seven hours or

15  eight hours or whatever the case may be?

16  A.  We will give the start and finish time, correct.

17  Q.  Okay.  While you were at ODPS, were you paid by the hour?

18  A.  Yes.

19  Q.  Were you always paid by the hour?

20  A.  Yes.

21  Q.  Do you mind me asking how much money you were paid by the

22  hour?

23  A.  $15.

24  Q.  Who set that rate?

25  A.  The company did.

1    Q.   Would that be Darrell Spurgeon?

2    A.   Well, the company, yes.

3    Q.   The company being ODPS?

4    A.   Correct.

5    Q.   Okay.  Did you ever try to negotiate the pay rate with

6    Mr. Spurgeon or Mr. Medieros?

7    A.   No.

8    Q.   Before coming to work at ODPS, were you told that you would

9    be classified as an independent contractor?

10   A.   Yes.

11   Q.   And at some point in time were you required to sign what's

12   referred to as an independent contractor agreement?

13   A.   Yes.

14   Q.   Okay.  Did you sign that agreement?

15   A.   Yes, I did.

16   Q.   Before coming to work for ODPS, were you required to buy any

17   equipment or supplies?

18   A.   We had to have a Crown Vic police car, or just a Crown Vic.

19   It didn't have to be a police car.  And our clothing that we

20   wore.

21   Q.   Okay.

22   A.   Uniform.

23   Q.   Anything else?

24   A.   That's it.

25   Q.   Okay.  And who told you about the need for the Crown Vic and

1  the uniform?

2  A.  Off Duty Police Services.

3  Q.  Would that be a specific person with ODPS?

4  A.  At the time it was Darrell, yes.

5  Q.  Can you recall how much money you spent on the Crown Vic?

6  A.  I would say like $2,500.

7  Q.  Did you outfit it with lights?

8  A.  Yes.

9  Q.  Was that extra?

10  A.  Yes.

11  Q.  Okay.  Can you tell me about how much money you spent on the

12  lights?

13  A.  About $500.

14  Q.  What about the clothing?  How much money did you spend on

15  that?

16  A.  Oh, probably a couple hundred bucks.

17  Q.  We are talking about $3,500?

18  A.  Roughly, yes.

19  Q.  And did you buy that equipment just so that you could work

20  at ODPS?

21  A.  Yes.

22  Q.  This vehicle you bought, did you buy a Crown Vic?

23  A.  Yes.

24  Q.  Did you ever drive the vehicle on personal errands?

25  A.  Oh, yes.

1    Q.  Take it to the mall or the grocery store?

2    A.  Yes.

3    Q.  During the time that you worked for ODPS, did they provide

4    you with any equipment or supplies?

5    A.  A stop paddle, and I think that was it.

6    Q.  Did they ever provide you with any patches to put on your

7    uniform?

8    A.  Yes.

9    Q.  And did those patches have the ODPS logo embroidered on the

10   patch?

11   A.  Yes, they did.

12        MR. SHEPHERD:  Your Honor, may I approach?

13        THE COURT:  Yes.

14   Q.  Mr. Pittman, I would like to show you what's been received

15   into evidence as Plaintiff's Exhibit Number 14.  Can you flip

16   through this document and tell me if those are some of the

17   patches that were given to you?

18   A.  They are all correct, yes.

19   Q.  And did you see other workers wearing those patches as

20   well?

21   A.  Yes.

22   Q.  You indicated that you were required to wear a uniform.

23   First, what exactly were you required to wear?

24   A.  Blue BDU pants, a blue BDU top, and, you know, dark-colored

25   shoes.

1    Q.   Okay.  Who told you about the uniform requirements?

2    A.   Off Duty Police Services.

3    Q.   Would that be Mr. Spurgeon?

4    A.   Yes, that's correct.

5    Q.   And what about personal grooming?  Were there any personal

6    grooming requirements at ODPS?

7    A.   Pretty much military, you know, no facial hair with the

8    exception of a mustache, no exposed chest hair or anything like

9    that, you know, clean-cut.

10   Q.   Who communicated those rules to you?

11   A.   Actually, I think it was in some of the paperwork I signed.

12   Q.   Okay.  Did you ever have occasion to go into the ODPS

13   website?

14   A.   Not a lot.  I'm not a real computer person.  At some point

15   in time we had to log on to check things, like new

16   announcements.

17   Q.   Did you ever see announcements posted on the website?

18   A.   Yes.

19   Q.   You indicated that it may have been in some of the paperwork

20   that you were required to sign?

21   A.   Uh-huh.

22   Q.   Were you ever given paperwork with rules or regulations that

23   you were expected to follow?

24   A.   Guidelines.

25   Q.   Okay.  And who passed out those guidelines to you?

1    A.   Whenever you were employed, you got that in your packet.

2    Q.   Okay.

3    A.   I say "packet."  It was given to me.

4    Q.   Was that given to you by Mr. Spurgeon?

5    A.   Yes.

6    Q.   While you were working for ODPS, did you guys ever have any

7    sort of meetings?

8    A.   Yes.

9    Q.   Did you attend those meetings?

10   A.   Yes.

11   Q.   Who else attended those meetings?

12   A.   Mr. Spurgeon and Frank Medieros and anybody that worked for

13   the company.

14   Q.   Okay.  What types of things were discussed at these

15   meetings?

16   A.   One was to teach us, you know, the flagging stuff.

17   Q.   This was like a flagging class?

18   A.   Exactly.

19   Q.   How long did that flagging class take?

20   A.   Probably about an hour.

21   Q.   What other sort of meetings did you attend?

22   A.   That was pretty much it really.

23   Q.   Okay.  While you were working for ODPS, how did you get your

24   job assignments?

25   A.   Mr. Spurgeon would either call us -- would call us and give

1   it to us.

2   Q.  Did you ever experience that Mr. Spurgeon would call you

3   personally?

4   A.  Oh, yeah.

5   Q.  What would he tell you?

6   A.  Just where I was working at.

7   Q.  Okay.

8   A.  When I had to be there.

9   Q.  Okay.  And would he physically call you like on your cell

10  phone, or would he communicate with you via e-mail or text

11  messages?

12  A.  On the cell phone.

13  Q.  Okay.  You indicated that he would tell you what time to

14  show up?

15  A.  Yes.

16  Q.  And he would indicate where you should show up?

17  A.  Yes.

18  Q.  How did you know when you could go home for the day?

19  A.  Typically, whenever we were working, if it was with a crew,

20  they would -- you know, the time they finished, or it could be a

21  set schedule if you were doing security, you know, till a

22  certain time.

23  Q.  Did you have one of these set schedules while you were doing

24  security?

25  A.  Not really, nothing permanent.

1    Q.  Your work with ODPS, was the majority of it traffic control?

2    A.  Yes.

3    Q.  Can you give me a rough percentage?

4    A.  80 percent.

5    Q.  Okay.  Were you ever assigned to stay with a particular crew

6    for an extended period of time?

7    A.  Yes.

8    Q.  What crew was that?

9    A.  It was the Miller Pipeline crew.

10   Q.  How long did you stay with that particular crew?

11   A.  Four, five months.

12   Q.  And who gave you that job assignment?

13   A.  Mr. Spurgeon.

14   Q.  And can you explain to me how he communicated to you that

15   you were to stay with this crew?

16   A.  Just told me.

17   Q.  He said, "You need to stay with this crew"?

18   A.  Correct.

19   Q.  Okay.  And I assume since you were staying with that crew,

20   he wouldn't then call you every day?

21   A.  No, not typically, unless something changed.

22   Q.  Okay.  During that five-month period, did anything change?

23   A.  No, not really.

24   Q.  Okay.  So you just stayed with that crew for five months?

25   A.  Right.

1    Q.  If something unexpected happened while you were working and

2    you needed to leave early, what would you do?

3    A.  Would have to call and get a replacement for me.

4    Q.  And how do you know you were required to do that?

5    A.  That was just protocol really.

6    Q.  If you were assigned to work a particular job and something

7    came up where you couldn't work the shift, could you call

8    somebody else and swap shifts?

9    A.  No, I could not do that.  I would have to call Off Duty and

10   explain why I couldn't do that.

11   Q.  How do you know that you couldn't swap shifts?

12   A.  Just couldn't.

13   Q.  Did anybody ever tell you that you couldn't do that?

14   A.  No.

15   Q.  It's just a belief that you had?

16   A.  Right.

17   Q.  If you didn't want to work a particular job, could you

18   refuse the assignment?

19   A.  I could, but I never did.

20   Q.  And why not?

21   A.  I wanted to work, needed the money.

22   Q.  Okay.  While you were working for ODPS, were you ever told

23   either by Mr. Spurgeon or Mr. Medieros to leave the location

24   where you were working and to go somewhere else?

25   A.  No.

1   Q.  While you were working for ODPS, did you ever work with a

2   partner?

3   A.  Yes.

4   Q.  And do you know if they were ever instructed to leave the

5   location they were working and go somewhere else?

6   A.  Not before the job had expired.

7   Q.  Okay.  What do you mean by that?

8   A.  The finishing time of the job.

9   Q.  Okay.  Did you ever experience an occasion where the job

10  finished and then you were told to go somewhere else?

11  A.  Yes, I have done that.

12  Q.  And can you tell me about that?  How would it work?

13  A.  Just something would come up, whether it be an emergency or,

14  you know, whatever was needed and needed someone to fill the

15  position.  If you got the call, you could go.  You didn't have

16  to go, but, you know, like I said, typically it's all about the

17  money.

18  Q.  These emergencies that would pop up, would that be like a

19  busted water main?

20  A.  Or a hit telephone pole, things of that nature.

21  Q.  I assume this sort of stuff would happen sometimes at 2:00

22  in the morning?

23  A.  Oh, yes.

24  Q.  And you would get a telephone call?

25  A.  Yes.

1   Q.  Is that pretty common for you to get those telephone calls

2   during your time with ODPS?

3   A.  Yes and no.  I mean, I had my fair share.

4   Q.  While you were working for ODPS, were you ever disciplined

5   or reprimanded?

6   A.  No.

7   Q.  Do you know of any of your co-workers who were disciplined

8   or reprimanded?

9   A.  Not to my knowledge.

10  Q.  At the end of the work week -- strike that.  I believe you

11  indicated previously that you never submitted an invoice to

12  ODPS?

13  A.  No.

14  Q.  Okay.  You just would text or call in your start and stop

15  times?

16  A.  Correct.

17  Q.  And at the end of the work week, I assume you would get a

18  check?

19  A.  Yes.

20  Q.  And who was that check from?

21  A.  Off Duty Police Services.

22  Q.  Was it always from ODPS?

23  A.  Yes.

24  Q.  Prior to coming to work for ODPS, did you set up a

25  corporation or a limited liability company for yourself?

1    A.   No.

2    Q.   Did you ever have a business license?

3    A.   In my name personally or just a business license?

4    Q.   Let me ask a better question.  Did you ever have a business

5    license because of your employment or your work with ODPS?

6    A.   No.

7    Q.   I believe you had a printing business?

8    A.   Yes, I did.

9    Q.   Did you have a business license to do that job?

10   A.   Correct.

11   Q.   While you were working for ODPS, did you ever advertise so

12   you could get work from other companies?

13   A.   No.

14   Q.   Did you ever have a website set up for yourself?

15   A.   No.

16   Q.   Did you ever maintain an office or an employee, some type of

17   staff to assist you --

18   A.   No.

19   Q.   -- with security work or traffic control work?

20   A.   No.

21   Q.   Did you ever purchase any type of business liability

22   insurance?

23   A.   No.

24   Q.   And did you ever maintain any type of worker's compensation

25   insurance?

1   A.   No.

2   Q.   Have you ever heard Darrell Spurgeon use the term

3   "time-out"?  Have you ever heard him say that word or that term,

4   "time-out"?

5   A.   I've heard it used by people in the working organization,

6   yes.

7   Q.   And how long have you known Mr. Spurgeon?

8   A.   25 years plus.

9   Q.   I appreciate you answering my questions, Mr. Pittman.

10  A.   Thank you.

11          THE COURT:  Mr. Haley.

12          MR. HALEY:  Thank you.

13                  CROSS-EXAMINATION

14  BY MR. HALEY:

15  Q.   Mr. Pittman, during the course of the investigation into the

16  complaint that we are hearing here today, did you give a

17  statement to Mr. Binda?

18  A.   No, sir.

19  Q.   Okay.  Your hours performing services for clients of ODPS

20  varied greatly, didn't they, from week to week, month to month?

21  A.   Yes, sir, they did.

22  Q.   We talked about ordinarily 40, sometimes more than 40, and

23  sometimes they were as little as 10 or even less; is that

24  correct?

25  A.   Not really.  I mean, I -- I guess you can go back and

1   reflect.  I would have to look at my stuff myself.  Maybe some

2   weeks it was low, but pretty much it was mainly 40.

3   Q.  Well, let's go back to the very beginning --

4   A.  Okay.

5   Q.  -- when you first started performing services for ODPS.  Do

6   you have records as to your hours?

7   A.  Yes, I have every hour documented.

8   Q.  Has anybody asked you to provide them with that document in

9   connection with this?

10  A.  No, sir.

11  Q.  But looking when you first started, does October 2007 sound

12  about right?

13  A.  Yes, it does.

14  Q.  And you started out pretty much full-time at that time?

15  A.  Correct.

16  Q.  But there were lulls, weren't there?  For instance, do you

17  remember having a slow week around Thanksgiving?

18  A.  I take a week off, the week right before Thanksgiving, every

19  year.

20  Q.  Okay.  And when you took that week off, who did you tell you

21  were going to take a week off?

22  A.  Mr. Spurgeon.

23  Q.  And there was no repercussion, was there?

24  A.  No, sir.

25  Q.  That was your decision to take off?

1    A.   Correct.

2    Q.   Have you taken off other periods of time while associated

3    with ODPS to perform services for its customers?  I'm not trying

4    to trick you.  Mr. Shepherd says, "work," and I'm saying it

5    differently on purpose.  Did you take other periods of time off

6    when you were performing services for customers of ODPS?

7    A.   Yes.

8    Q.   For personal reasons?

9    A.   Vacation.

10   Q.   Never any repercussions?

11   A.   No, sir.

12   Q.   And the leave of absence that you took was for how long a

13   period of time?

14   A.   It was a minimum of nine months, maybe a little longer.

15   Q.   Nine months?

16   A.   Yes.

17   Q.   No repercussions following that nine-month leave of absence?

18   A.   No, sir.

19   Q.   Did you perform any services at all during that nine-month

20   period?

21   A.   Yes, I did.  I worked as a salesperson for a friend of mine

22   who owns a printing business.

23   Q.   So you went to work in a different capacity during that

24   period of time?

25   A.   Yes.

1    Q.  Okay.  Now, we have already talked to your brother.  Did

2    your association with ODPS begin as a part of your friendship

3    with Darrell when the printing business was getting ready to

4    close?

5    A.  My brother actually started before I did.  It was about nine

6    months or so before I decided -- I actually approached Darrell

7    about the work.

8    Q.  You actually approached him?

9    A.  Correct.

10   Q.  Did he explain when you approached him that independent

11   contractor, dollar amount, no taxes, that sort of thing?

12   A.  Yes.

13   Q.  Was that satisfactory to you?

14   A.  Yes, sir.

15   Q.  And you knew that the type of services that ODPS from time

16   to time provides to customers vary widely?

17   A.  Yes.

18   Q.  For instance, there's a contract with the water company when

19   there's a main break.  It's a minimum of four hours, and you get

20   premium pay for showing up, right?

21   A.  Correct.

22   Q.  And that's a minimum of four hours with an expectation that

23   you show up within an hour of the time that you are called,

24   correct?

25   A.  I never actually worked a water company job.

1    Q.   Okay.

2    A.   I really -- I can't answer that.

3    Q.   I'm sorry.  I thought that you had.

4    A.   No, sir.

5    Q.   Because I think you mentioned that you get a call in the

6    middle of the night.  Are there other circumstances that will

7    cause you to get a call in the middle of the night?

8    A.   The other gentleman mentioned the water company and water

9    mains.  I was talking about hit telephone poles in the middle of

10   the night.  That was more of what I had to do.

11   Q.   And that would be part of the LG&E-KU contract, right?

12   A.   Or Bell South, correct.

13   Q.   Or Bell South?

14   A.   Correct.

15   Q.   If it's LG&E and KU, it could be, what, Pike Electric or any

16   of their LG&E-KU contractors, right?

17   A.   Yes.

18   Q.   Now, let's talk about your assignment, as you called it, to

19   Miller Pipeline.  Weren't you offered the opportunity to go to

20   that assignment?

21   A.   Yes.  I could have turned it down.

22   Q.   You could have turned it down.  Once you got there, you

23   developed a relationship with the crew such that they asked for

24   you every day?

25   A.   Correct.

1   Q.  And on occasion would you be directed by the Miller Pipeline

2   people to take your flagging to another location where they were

3   doing work?

4   A.  No.

5   Q.  Another crew?

6   A.  No.

7   Q.  That never happened?

8   A.  No.

9   Q.  So you stayed with this crew the whole time?

10  A.  Yes.

11  Q.  I haven't asked anybody else this because it's kind of -- I

12  think it's obvious.  Receiving a 1099, did you pay taxes on

13  that?

14  A.  I did every year except the last year.  I got paid because I

15  was going through a divorce.

16  Q.  I understand.  Every year except the last year, you declared

17  it as self-employment income?

18  A.  Yes.

19  Q.  Did you deduct your expenses associated with your vehicle

20  and mileage to and from job sites?

21  A.  Yes.

22  Q.  When you were on a Miller Pipeline job site, who told you

23  what to do when you were there?

24  A.  Typically the foreman of the Miller crew.

25  Q.  Take it a little bit further.  What did you guys do for

J. Pittman - Cross                                              115

1    lunch?  Would you shut down the job and everybody go to lunch at

2    the same time?

3    A.  Sometimes that would happen, and other times if there was

4    equipment in the road, we would have to stay with the equipment.

5    Q.  You would have to stay.  You'll have to pardon me for asking

6    this, but what if you had to relieve yourself?

7    A.  That's a good point.  As you well know, the older you get,

8    the tougher it is.

9    Q.  Believe me, I know, sir.

10   A.  Typically, you could probably get one of the Miller people

11   to take your spot so you could go.

12   Q.  And that's what you would do?

13   A.  Yes.

14   Q.  And they would accommodate your request --

15   A.  Yes.

16   Q.  -- based upon your relationship with that crew?

17   A.  Yes.

18   Q.  Your understanding of the flagging class that you referred

19   to -- the flagging class you referred to, let me direct your

20   attention to that.  It's your understanding the state requires

21   you to have that training and certification, right?

22   A.  Yes.

23   Q.  And when you went to that class, there were folks there

24   other than ODPS contractors?  The Government would call them

25   something else.  I mean, were there firefighters there?

1    A.   No.

2    Q.   Were there contractor reps there?

3    A.   No.

4    Q.   Just ODPS folks?

5    A.   Yes.

6    Q.   How many were there?

7    A.   25.

8    Q.   Was this out at the constable's office on Dixie Highway?

9    A.   No.  I was not on board with the company when that one

10   happened.

11   Q.   Okay.  How many at most -- to the extent that you know,

12   traffic control officers who were nonsworn police officers or

13   something like that, constables, jailers, whatever, how many of

14   them were there at the time that you were performing services?

15   A.   I'm just guessing, 30.

16   Q.   Okay.  Has that number -- did it fluctuate up and down

17   during the period of time that you worked there?

18   A.   It may have.  I'm really not that aware if it did or

19   didn't.

20   Q.   I appreciate your candor.  Are you performing -- I'm asking

21   this question of everybody.  I don't mean anything by it other

22   than to show that we have had a kind of a transition here.

23   Where do you perform those services now?

24   A.   Kentuckiana Traffic and Patrol.

25   Q.   Are you considered an employee by KTPS?

1    A.   Yes, I am.

2    Q.   Do you have a fixed assignment, or do you have to get an

3    assignment on a daily basis?

4    A.   It's kind of fixed.  I strictly work with one entity, but

5    they may change me there once I'm at the job.

6    Q.   Do you have to call in every morning to see where you are

7    supposed to be?

8    A.   No.

9    Q.   Do you have a vehicle provided by KTPS?

10   A.   No.

11   Q.   So you are still using the vehicle that you used at ODPS for

12   purposes of doing the flagging work?

13   A.   It's a different vehicle, but it's a newer vehicle.

14   Q.   Did you buy another vehicle?

15   A.   Correct.

16   Q.   Are you depreciating that vehicle?

17   A.   Yes.

18   Q.   Are you paid with a W-2?

19   A.   Yes.

20   Q.   Okay.  I'm probably close.  I'm sorry.  You say that you

21   would see Frank out on the job site periodically?  Frank

22   Medieros?

23   A.   Yes.

24   Q.   How frequently did you see him?

25   A.   Two or three times a week sometimes.  Sometimes maybe once a

1    week.  There wasn't any consistency to it.

2    Q.  Are you aware that -- perhaps this wasn't shared with you,

3    and I'm going to ask you.  If you think I'm nuts, then you can

4    tell me as much, and I will not be offended.  Wasn't there an

5    initiative by LG&E to have a safety inspection once a month of

6    all of the crews, everything going on out there?  Do you know

7    anything about that?

8    A.  I really think that happened after I left.

9    Q.  Okay.

10   A.  I'm not aware of that.

11   Q.  Frank would often -- I'm sorry.  I didn't mean to cut you

12   off.

13   A.  That's okay.

14   Q.  Frank would often work these jobs himself, wouldn't he?

15   A.  Yes.

16   Q.  And would you see him more frequently when he was working at

17   a job in the vicinity where you were working?

18   A.  Yes.

19   Q.  In fact, he would walk down during the day just to say "hi,"

20   wouldn't he?

21   A.  Yes, probably on lunch.

22   Q.  I want to keep going, but I'm going to stop.  Thank you,

23   sir.

24   A.  Thank you.

25               THE COURT:  Redirect?

1          MR. SHEPHERD:  Briefly, Judge.

2                    REDIRECT EXAMINATION

3    BY MR. SHEPHERD:

4    Q.  Mr. Pittman, you testified that while you were out on the

5    Miller Pipeline job, you were required to do what the foreman

6    told you to do?

7    A.  As far as where we were working at, not to actually do my

8    job.  I knew how to do my job.

9    Q.  Okay.  Did you receive any instructions from that foreman as

10   to how to do your job?

11   A.  No.

12   Q.  Thank you, sir.

13                    RECROSS-EXAMINATION

14   BY MR. HALEY:

15   Q.  At the risk of beating the horse, pardon me, they would tell

16   you where to move when they moved their equipment?  As the job

17   moved on, you would get to a corner you would have to

18   reposition?

19   A.  Pretty much.  You would know what to do.

20   Q.  And you know what to do, but he would tell you when?

21   A.  Correct.

22   Q.  And he would tell you when it's lunchtime?

23   A.  Correct.

24   Q.  And he would provide you with relief for breaks?

25   A.  Correct.

1   Q.  And we are talking about the foreman of the Miller Pipeline

2   crew?

3   A.  Yes, sir.

4   Q.  Thank you.

5           THE COURT:  May this witness be excused?

6           MR. SHEPHERD:  Thank you.

7           THE COURT:  Thank you very much.

8           MR. SHEPHERD:  Judge, we would call Stephen Newman.

9       (STEPHEN NEWMAN, called by plaintiff, sworn.)

10                      DIRECT EXAMINATION

11  BY MR. SHEPHERD:

12  Q.  Can you please state your name, sir?

13  A.  Stephen Newman.

14  Q.  Mr. Newman, are you a law enforcement officer?

15  A.  Yes, sir.

16  Q.  And where are you currently employed?

17  A.  Bullitt County Jail.

18  Q.  Are you a sheriff's deputy?

19  A.  Deputy jailer, sir.

20  Q.  How long have you worked at the Bullitt County Jail?

21  A.  Just almost close to four years.

22  Q.  Okay.  At some point in time did you work for Off Duty

23  Police Services, Inc., or ODPS?

24  A.  Yes, sir, I did.

25  Q.  And when did you start working for ODPS?

1   A.   I would say between '07 and '08.

2   Q.   That would be 2007 or 2008?

3   A.   Yes, sir.

4   Q.   When did you stop working for ODPS?

5   A.   I stopped for a brief period of probably a year and then

6   went back.

7   Q.   Okay.  Are you currently working for ODPS?

8   A.   No, sir, I'm not.

9   Q.   When is the last job you worked?

10  A.   Probably a year ago.

11  Q.   So that would be about 2014?

12  A.   Yes, sir.

13  Q.   If I am doing the math right, you worked for about five or

14  six years?

15  A.   Yes, sir.

16  Q.   And during this period, was all your off-duty work through

17  ODPS?

18  A.   Yes.

19  Q.   Okay.  You didn't work for any other off-duty security-type

20  companies?

21  A.   Yes, I did do maybe one or two jobs.

22  Q.   Okay.  Through what company or for what company?

23  A.   CSS Security Services, I believe.  It was Mr. Aubrey.

24  Q.   Okay.

25  A.   I'm not really sure.  It was probably one or two jobs.  It

1   was a while ago.

2   Q.   And what percentage of your off-duty work was from ODPS as

3   opposed to maybe this other company?

4   A.   A lot more.  80 percent, 85.

5   Q.   Can you estimate about how many hours a week you worked for

6   ODPS?

7              THE COURT:  Mr. Shepherd, just so that I am following

8   this testimony, can you clarify, Mr. Newman, were you a deputy

9   jailer in that '07-'08 time frame?

10             THE WITNESS:  No, sir, I was not.

11             THE COURT:  Could you clarify the overlap for the

12  record?

13             MR. SHEPHERD:  Sure.

14  Q.   When you started working for ODPS in 2007, 2008, were you a

15  sworn law enforcement officer?

16  A.   I was not at the time.

17  Q.   At what point did you start working for the jail or the

18  police department?

19  A.   Between 2010 and 2011.

20  Q.   Okay.

21  A.   The beginning of 2011, I believe.

22  Q.   During the period of time when you started working for ODPS

23  and when you got on with the jail, were you working for ODPS

24  full-time?

25  A.   Yes, sir, I was.

1    Q.   Were you working for anybody else during that period?

2    A.   No, I was not at that time.

3    Q.   During that period of 2007, 2008 to 2010, 2011, your sole

4    source of income was through ODPS?

5    A.   It was.

6    Q.   And then in 2010 or 2011, you got the job with the jail?

7    A.   Yes, sir.

8    Q.   And you have been working up until we sit here today?

9    A.   Yes, sir, part-time.

10   Q.   Okay.  You do some off-duty work for ODPS?

11   A.   Yes.  I was working for them -- the jail schedule, my

12   schedule is Wednesday, Thursday, Sunday on second shift, 4 to

13   midnight.  Monday through Friday, I was still continuing to work

14   for them daily --

15   Q.   Okay.

16   A.   -- when I was at the jail for quite a while.

17   Q.   And you did one or two jobs through --

18   A.   Another company that's probably -- I think that was last

19   year.

20   Q.   Okay.  Last year you did one or two jobs through this other

21   company?

22   A.   Yes.

23   Q.   What was that company called?

24   A.   I believe it was CSS Security.

25   Q.   Were you doing security work for them?

1    A.   Yes.   It was just security detail for a Walmart, I believe.

2    Q.   Okay.   What did you do for ODPS?   Physically, what did you

3    do?

4    A.   Traffic control.

5    Q.   Did you ever do any security work for ODPS?

6    A.   Yes, sir, I did.

7    Q.   Can you tell me about what was required to do the traffic

8    control job?

9    A.   You had to have a Crown Vic.   You had to have lights, wear

10   an ODPS uniform.

11   Q.   Let me back up.   Before we start talking about the

12   equipment, can you tell me about physically what would you do at

13   the location while you were working as a traffic control

14   officer?

15   A.   We had to set up signs and cones and stuff -- not set up

16   signs.   I apologize.   That's if the crew asks us to.   We pull up

17   to a job site, set up cones, turn our lights on, and direct

18   traffic control with a stop-and-slow sign.

19   Q.   Is that turning the lights on in your car?

20   A.   Yes.

21   Q.   What about the security work?   What would you do physically

22   while you were doing that job?

23   A.   Pretty much just sitting in a Crown Victoria just doing

24   security detail.   It could have been an apartment or something.

25   Q.   Just kind of making sure nothing goes on that shouldn't?

1    A.   Yes, sir.

2    Q.   What percentage of your work was the traffic control as

3    opposed to the security?

4    A.   Like 90 percent.

5    Q.   90 percent traffic control?

6    A.   Yeah.  It was a lot more traffic control than security.

7    Q.   Did you ever receive any type of training while you were

8    working for ODPS?

9    A.   Just on-the-job training by Frank Medieros.

10   Q.   Okay.

11   A.   How to do the job.

12   Q.   Okay.  And is this when you first started working for the

13   company?

14   A.   Yes.

15   Q.   I take it before you came to work for ODPS, you were not a

16   sworn law enforcement officer?

17   A.   No, I was not at the time, sir.

18   Q.   Prior to coming to work for ODPS, did you have any

19   experience working as a security guard?

20   A.   No, sir.

21   Q.   Did you have any experience in traffic control?

22   A.   No.

23   Q.   When you came on with the company, can you tell me about the

24   training that Mr. Medieros provided?

25   A.   It was basically he shadowed me.  He told me that was his

1    job, was to train us and show us how to provide proper setups

2    for the jobs for whatever contractor we were working for and

3    where to -- when to turn on our lights, what we had to wear,

4    what shoes, you know, typical stuff.

5    Q.   How long did Mr. Medieros shadow you?

6    A.   I think -- it was a long time ago, but I believe it was

7    probably a week.

8    Q.   Okay.  And did you feel comfortable doing the job by

9    yourself after that week?

10   A.   Pretty comfortable.

11   Q.   We are talking about the traffic control, right?

12   A.   Yes.

13   Q.   What about the security work?  How did you learn how to do

14   that job?

15   A.   I didn't.  I just -- he had called me for security detail at

16   some apartments.  The first time I did a security detail was off

17   Cane Run Road somewhere, and he told me I was just basically

18   sitting there making sure nothing happened to the property, and

19   it was a 12 to 8 detail.

20   Q.   Did you complete that detail?

21   A.   Yes.

22   Q.   And did you perform satisfactorily, to your knowledge?

23   A.   Yes, sir.

24   Q.   While you were working for ODPS, did you have a supervisor?

25   A.   Mr. Medieros claimed he was our supervisor.  He would tell

Newman - Direct                                                127

1   me constantly that he was a supervisor for ODPS.

2   Q.   Okay.  And was he always your supervisor?

3   A.   Yes.

4   Q.   How did Mr. Medieros supervise your work?

5   A.   There was periods where he would show up to jobs and -- like

6   I had a goatee one time.  He got on me pretty rough and said

7   that I couldn't have a goatee, I had to be clean-shaved, that I

8   wasn't wearing an ODPS jacket, that I needed to be wearing an

9   ODPS jacket that was provided through them, and I was wearing a

10  reflective vest and it wasn't the proper vest for the

11  contractor, that it wasn't a 3M -- not a 3M, but there's like

12  different type of vests that reflect better, I'm assuming.  It

13  was in the wintertime.  There was a few other instances where he

14  would show up and survey the jobs and make sure we were set up

15  properly.

16  Q.   So while you were out in the field working, Mr. Medieros

17  would periodically come by?

18  A.   Yes.

19  Q.   Did you ever send reports or invoices to Mr. Medieros or

20  Mr. Spurgeon?

21  A.   Yes.

22  Q.   When did that start?

23  A.   When I worked security detail off Cane Run Road, we had to

24  do progress reports for the customer, and then we had to -- we

25  were texting times, and then we started billing invoices to Off

1    Duty Police Services.

2    Q.   Let's talk about those progress reports first.

3    A.   Okay.

4    Q.   What would be on one of these progress reports?

5    A.   It's a long time ago.  From what I remember when I worked

6    the apartments, it was an abandoned -- well, an apartment

7    complex that I believe was getting repaired that I was on for

8    quite a while.  The progress reports would be like building 1,

9    building 2, and building 3, that everything was secure.  We had

10   to do it so often to where the customer knew that we were

11   showing progress that we were watching their property.

12   Q.   And would you send these progress reports to Mr. Spurgeon?

13   A.   Yes.

14   Q.   If I can put a document on the screen.

15        Mr. Newman, I'll show you what's been marked as D_2232.  It

16   appears to be a progress report or an activity report that a

17   Mr. Joe Castellano filled out.  Is this the type of progress

18   report that you would send to Mr. Spurgeon?

19   A.   No, it is not.

20   Q.   Okay.  How did the report differ that you were sending in

21   from this report that's shown on the screen?

22   A.   Ours were on the employee log-in on the website.  We had to

23   get on the website and we had to go to a log-in.

24   Q.   Is this the ODPS website?

25   A.   Yes.  We had to go in and log in, and we would click on

1    "activity log."  When you clicked on "activity log," you would

2    put your reports -- it would have -- I believe it would have a

3    section to click on to where you would report, and it would send

4    it to ODPS --

5    Q.  Okay.

6    A.  -- for the customer.

7    Q.  Have you ever seen this form before?

8    A.  No, sir.

9    Q.  Okay.  Did you ever text your start times and your end times

10   to Mr. Spurgeon or Mr. Medieros?

11   A.  Yes, sir, I did.

12   Q.  At some point did that change and you started submitting

13   invoices?

14   A.  Yes, sir.

15   Q.  When did that change?  Can you recall?

16   A.  I would guess around -- I'm not really certain.  It could

17   have been between 2011 and 2013.  I'm not a hundred percent

18   sure.

19   Q.  Was it after the Department of Labor started its

20   investigation?

21   A.  Yes, it was.

22   Q.  Were you always paid by the hour at ODPS?

23   A.  Yes, sir.

24   Q.  And how much were you paid by the hour?

25   A.  I was paid 15 an hour when I was a TCO.  When I became

1   sworn, he started paying me 20.

2   Q.   "TCO," does that stand for "traffic control officer"?

3   A.   Yes, sir.

4   Q.   And who set that pay rate?

5   A.   That's what Darrell Spurgeon with ODPS did.

6   Q.   Okay.  Before coming to work at ODPS, did Mr. Spurgeon tell

7   you that you would be classified as an independent contractor?

8   A.   No.

9   Q.   Did you know that you would be classified as an independent

10  contractor before starting with the company?

11  A.   No.  Not before starting, no.

12  Q.   When did you find out?

13  A.   When we got the contract we had to sign.

14  Q.   Okay.  Would that be the independent contractor agreement?

15  A.   Yes, sir.

16  Q.   And were you required to sign that agreement?

17  A.   Yes, or we couldn't work.

18  Q.   Who told you that?

19  A.   Mr. Spurgeon and Ms. Suzanne.

20  Q.   Who is Suzanne?

21  A.   She does the payroll.

22  Q.   Okay.

23  A.   They sent me a letter saying if it wasn't signed and sent

24  back, then I couldn't work, I believe.  I'm not a hundred

25  percent sure.  I've received numerous things attached to my

1   check when I did work for them.

2   Q.  What types of things would typically be attached to your

3   check?

4   A.  It was memos, like changing pay or what needed to be sent in

5   or different things.  I'm not a hundred percent sure.

6   Q.  Before coming to work at ODPS in 2007 and 2008, did you have

7   to buy any equipment or supplies?

8   A.  Yes, I did.

9   Q.  What did you have to buy?

10  A.  We had to buy our own Crown Vic.  They required us to have a

11  Crown Vic to work.  I had to buy a Crown Vic.  You had to buy

12  lights, uniforms.  He provided the patches, and we had to buy

13  jackets and stop signs.  He would take the payment out of our

14  checks for that, anything with his logo.

15  Q.  About how much did you spend to buy all this equipment?

16  A.  LED lights are expensive.  It ranges in the thousands of

17  dollars.  You could buy two lights, and they could be $300.  I

18  didn't have a lot of smarts then on where to buy a decent

19  light.

20  Q.  Do you recall how much you paid for your Crown Vic?

21  A.  It was probably around $3,500 or $4,000.

22  Q.  And the lights were maybe another thousand?

23  A.  Probably.

24  Q.  And what about the uniform and the stop-and-go paddles?

25  A.  Standard -- like the uniforms, we bought our pants.  He

1    would tell us to go down to Siegel's -- or Frank Medieros, he

2    told me to go Siegel's and pick up uniform pants and tops.

3    Q.  Is that a store in Louisville?

4    A.  I don't know if they are still open.  That's who Metro

5    Police used to go through.  We were required to buy navy blue.

6    I think the pants were like $34, and the shirt was probably --

7    it was a BDU top.  We had to wear BDUs.

8    Q.  Is it fair to say that you bought all this stuff -- was it

9    under $5,000?

10   A.  No.  It was probably close because we had to buy a certain

11   type of boots, uniforms, and then we had to have the patches

12   sewed on ourselves.

13   Q.  So around $5,000?

14   A.  Probably.

15   Q.  Okay.  Who told you that you were required to buy all these

16   things?

17   A.  ODPS did.

18   Q.  Who with ODPS?

19   A.  Darrell Spurgeon did.

20   Q.  Did you ever drive your Crown Vic when you weren't working

21   for ODPS?

22   A.  Yes, sir.

23   Q.  Did you ever take it to the mall or the grocery store?

24   A.  Yes, sir.

25   Q.  During the time that you worked for ODPS, I believe you

Newman - Direct                                          133

```
 1   testified that they provided you with some equipment, but they
 2   deducted -- they charged you for it, in other words?
 3   A.  Yes, sir.
 4   Q.  What was that equipment that they provided?
 5   A.  It was just their -- the reflective jacket, the stop paddle,
 6   and if we had polo shirts that we got through Mr. Spurgeon, it
 7   would be deducted out of the check.
 8   Q.  Did all this stuff have the ODPS logo embroidered on it?
 9   A.  Yes.
10   Q.  Is that yes?
11   A.  Yes, sir, it did.
12   Q.  Bring up on the screen Exhibit Number 14.
13       Mr. Newman, if you can take a look at those pictures on
14   Exhibit 14.  Are these some of the patches that you were
15   provided?
16   A.  Yes, sir.
17   Q.  Were you ever provided a copy of that yellow reflective vest
18   shown on page 1?
19   A.  I'm sorry?
20   Q.  Were you ever provided with a copy of one of those yellow
21   vests?
22   A.  Did I get one of those vests?
23   Q.  Yes, sir.
24   A.  Yes, I still have one.
25   Q.  Are these the patches that you embroidered on your uniform?
```

1    A.  Yes, sir.

2    Q.  We talked about a uniform a little bit.  How do you know

3    that you were required to wear this uniform?

4    A.  He told -- Mr. Spurgeon told me that we had to wear ODPS,

5    his uniforms, and so did Mr. Medieros when I started.

6    Q.  You indicated that you got into some trouble, if you will,

7    about having a goatee?

8    A.  Yes.

9    Q.  That was by Mr. Medieros?

10   A.  Yes, sir.

11   Q.  Were there any rules related to personal grooming, facial

12   hair?

13   A.  I never seen anything written, but I was told through

14   Mr. Spurgeon and Mr. Medieros that we could not -- if we had

15   facial hair, it had to be clean, but we could not have a goatee.

16   We could only have a mustache.

17   Q.  While you were working for ODPS, did you ever attend

18   meetings with your co-workers?

19   A.  I guess just off -- not working?

20   Q.  Not work-related?

21   A.  Is that what you are asking?

22   Q.  I'm asking about work-related meetings.  Did you ever attend

23   a meeting where Mr. Spurgeon or Mr. Medieros spoke to the

24   employees?

25   A.  Yes.

1    Q.  About how many of these meetings did you attend?

2    A.  It was probably only three.

3    Q.  About three?

4    A.  Yes, sir.

5    Q.  And what was communicated to the workers at these meetings?

6    A.  About performance with the contractors, LG&E, Pike Electric,

7    Miller, and other different things, and also traffic control

8    certification.

9    Q.  Okay.  You said "performance with the contractors."  What do

10   you mean by that?

11   A.  As far as I'm guessing -- it's been a long time ago -- Mr.

12   Medieros and them would stand up and mention about LG&E, about

13   setups, about how we needed to make sure we were on the ball

14   with things, and stuff like that.  There was quite a few of us

15   in the meetings.

16   Q.  Okay.  Did you ever work for the LG&E -- work on an LG&E

17   detail?

18   A.  Yes, sir, I did.

19   Q.  And I believe you testified that you have logged on to the

20   website before?

21   A.  Yes.

22   Q.  If you can, take a look at what's been received as Exhibit

23   Number 13.  Mr. Newman, did you ever have occasion to log on to

24   the ODPS website and see announcements posted on the website?

25   A.  Yes, sir.

Newman - Direct                                                    136

1    Q.  If you can, scan down and read some of the rules or duties

2    or responsibilities, if you will, that's listed on this

3    document.  Be out of your vehicles at all times, wear a uniform,

4    wear a traffic vest, utilize stop-slow signs, utilize emergency

5    equipment, utilize flares, report on time, maintain a

6    professional attitude.  Were those the types of things that were

7    communicated to you about working for the LG&E details?

8    A.  Yes, sir.

9    Q.  And did you ever -- can you ever recall seeing this

10   particular announcement?

11   A.  Yes, I have.

12   Q.  You've seen this particular one?

13   A.  Yes.  It's been a long time.

14   Q.  Was it posted on the website for a period of time?

15   A.  Yes, it was.

16   Q.  Okay.  While you were working for ODPS, how would you get

17   your job assignments?

18   A.  Through a phone call.

19   Q.  Who would call you?

20   A.  Darrell Spurgeon or Frank Medieros.  It just depended.

21   Q.  What would they tell you when they called you?

22   A.  They would call me and tell me the job location, the start

23   time, and I would say "okay" and be there the next day.

24   Q.  Okay.  How would you know when you could leave for the day?

25   A.  When the crew told us we could.

Newman - Direct                                                137

1   Q.   Okay.  So they told you where to go, and they told you what

2   time to be there?

3   A.   Yes, sir.

4   Q.   Were you ever assigned to stay with a particular crew for

5   more than one day?

6   A.   Yes, I was.

7   Q.   Tell me about that.

8   A.   Me and Brock Pittman were on a crew together, I'm not

9   absolutely sure how long, but I'm almost positive it was more

10  than a year, could have been two years.  It was a Miller

11  Pipeline crew, a contractor for LG&E.

12  Q.   Who gave you that job assignment to stay with that crew?

13  A.   Mr. Spurgeon called me and told me to stay with the crew

14  until further notice.

15  Q.   Did you do that?

16  A.   Yes, sir, I did.

17  Q.   If something unexpected happened while you were working for

18  ODPS and you had to leave, what would you do?

19  A.   We were told to contact Darrell Spurgeon or Frank Medieros.

20  Q.   Who told you that?

21  A.   Darrell Spurgeon.

22  Q.   Did you ever have to do that?

23  A.   Yes, I have.

24  Q.   And did you ever get any type of pushback from Mr. Medieros

25  or Mr. Spurgeon?

1    A.  They would just -- when we called, they would tell us they

2    would get relief as soon as they could.

3    Q.  If you agreed to work a particular job and something came up

4    where you couldn't work the shift, could you swap the shift with

5    another one of your co-workers?

6    A.  If Darrell approved it, yes.

7    Q.  What about if Darrell didn't approve it?

8    A.  No.

9    Q.  Was this communicated to you that you needed prior approval

10   to swap shifts?

11   A.  No, that wasn't.  I never tried it.  Through a rumor, I

12   never would have tried that.

13   Q.  Okay.  If you didn't want a particular job or didn't want to

14   work a particular assignment, could you turn down the work?

15   A.  Yes, you could, but I never would turn down the work.

16   Q.  And why is that?

17   A.  Because there was times where if you would turn down the

18   work, I would not work.

19   Q.  Okay.  And did that ever happen to you?

20   A.  Yes, it did.

21   Q.  Tell me about that.

22   A.  I -- there was a couple of occasions, one where I went to

23   Florida one year with my family, and I came back, and he had

24   told me -- Mr. Spurgeon told me, "Are you familiar with

25   baseball?"  I said, "Yes, sir."  He said, "One strike, two

1    strikes, three, you're out."  I didn't work for two and a half

2    weeks when I came back.  And he said, "Next time don't do that.

3    When I call you for work" -- he said, "People are asking for

4    work.  I call them for work, and they don't want the work."  I

5    said, "It's not that.  I just went on vacation with my

6    family."

7    Q.  Can you recall any other times where something negative

8    might have happened to you for refusing a job?

9    A.  It happened on a couple of occasions.

10   Q.  How would you know it's happening to you?  How would you

11   know?

12   A.  I would turn down a job, and I wouldn't get a call for a

13   week.  That's with Frank Medieros especially.

14   Q.  Is that atypical to not get a call for a week?

15   A.  What do you mean?

16   Q.  In other words, would there be a period of six weeks where

17   you would get three or four calls a week, and then you would

18   turn down a job, and you wouldn't get a call for a week?

19   A.  Yes.  I never would turn down the jobs because like

20   everybody else, I was trying to feed me and my son.

21   Q.  Have you ever heard the term "time-out"?

22   A.  Yes, I have.

23   Q.  Is this what you are referring to?

24   A.  Yes, sir.

25   Q.  As you sit here today, do you believe that you were put in

1   time-out?

2   A.  Yes.

3   Q.  While you were working for ODPS, were you ever instructed to

4   leave a job that you were working to go work at another

5   location?

6   A.  Yes.  When I done security, there was a couple of times, but

7   one of the -- a couple of times I remember is when I was doing

8   security at certain apartments doing the report logs, I worked

9   12 to 8 in the morning.  There was times where Pike Electric was

10  doing a job right down the road, and he would call me at 7,

11  7:30, and say, "Start time is 8:30.  Can you go work a job?"  He

12  said, "I need you to go over to the job."  I said, "Okay, I'll

13  go there at 8:30.  That's fine."

14  Q.  Is that Mr. Spurgeon who would contact you?

15  A.  Yes.

16  Q.  You indicated that you worked with Mr. Pittman for a while,

17  Mr. Brock Pittman?

18  A.  Yes.

19  Q.  Did you ever work with anybody else while you were working

20  for ODPS?

21  A.  I did, but when we were with that particular crew, not for a

22  while.  I worked with him only.  If he took off a day, he would

23  have someone fill in for him.

24  Q.  Okay.  Have you ever been working with another worker --

25  another ODPS worker and seen them taken off the job for whatever

1   reason?

2   A.   Like take off work?

3   Q.   Maybe instructed to leave the job they were working and go

4   somewhere else.

5   A.   Yes, I have.

6   Q.   Okay.  Was that just a staffing issue that they needed them

7   to work somewhere else, or was it for disciplinary reasons?

8   A.   That's what I was told, that they needed someone to go --

9   they needed to fill another job.

10  Q.   Okay.  This would be somebody with ODPS?

11  A.   Yes.  I have been pulled from jobs before to go to other

12  ones.

13  Q.   Okay.  Tell me about that.  Who would call you?

14  A.   Darrell would call me and say, "I need you to go to another

15  location," and I would say, "Okay."  He would give me the

16  address, and I would go.

17  Q.   You would pack up and take your car and go to the other

18  location?

19  A.   Yes, sir.

20  Q.   Was that common?

21  A.   Not all the time, I mean, because I don't know how many

22  people was working.  With me it was -- it did happen a few

23  times.

24  Q.   Okay.  You indicated that at some point in time after the

25  Department of Labor investigation, you guys started submitting

1    invoices to ODPS?

2    A.   Yes, sir.

3    Q.   What sort of information was on these invoices?

4    A.   Time, location of job, how many hours worked, and I believe

5    on the sites the LG&E inspectors were making us sign hour sheets

6    when it first started, and we were trying to refuse to sign, but

7    they told us if we refused, we wouldn't work.

8    Q.   This was the LG&E people?

9    A.   Yes, LG&E was telling us that.

10   Q.   Did you ever work a job that had a minimum hourly charge, if

11   you will?

12   A.   No.

13   Q.   In other words, did you ever work for a job where, say, it

14   rained out and you would get paid for two hours just for showing

15   up?

16   A.   Oh, yes.

17   Q.   In those instances -- did that ever happen to you?

18   A.   Yes.  We would work a job, it would get rained out, and we

19   would get paid either two or four hours.

20   Q.   In those instances would the invoice show two or four

21   hours?

22   A.   We would put "canceled" or -- whatever Mr. Spurgeon and ODPS

23   required us to do we would put in the box.

24   Q.   The invoice would show two or four hours?

25   A.   Yes, sir.

1  Q.  You wouldn't have actually worked two or hour fours.  That

2  was just the minimum charge?

3  A.  That's what we were told to put.

4  Q.  I understand.

5  A.  Yes, sir.  That's what we were told to put.  That's what we

6  put.

7  Q.  After you would submit your invoices, or before the

8  invoices, if you would call in your time, would you receive a

9  check?

10  A.  Yes, sir.

11  Q.  And was the check from ODPS?

12  A.  Yes, sir.

13  Q.  About how many hours a week did you work for ODPS?

14  A.  That time those Miller crews, normally they did 10-hour

15  days, and for a while they worked every other Saturday.  It

16  could have varied 50 to 70 hours.

17  Q.  Were you ever paid overtime for your work at ODPS?

18  A.  No, sir.

19  Q.  Were you always classified as an independent contractor?

20  A.  That's what we were paid, yes.

21  Q.  Before you started working for ODPS, did you ever set up a

22  corporation or limited liability company for yourself?

23  A.  No, sir.

24  Q.  Did you obtain a business license?

25  A.  No, sir.

1   Q.   While you were working for ODPS, did you ever advertise so

2   you could get work from other companies besides ODPS?

3   A.   No, sir.

4   Q.   Did you ever set up a website for yourself?

5   A.   No, sir.

6   Q.   Did you ever maintain an office?

7   A.   No, sir.

8   Q.   Did you ever hire any staff to assist you?

9   A.   No, sir.

10  Q.   Did you ever purchase business liability insurance for

11  yourself?

12  A.   No, sir.

13  Q.   What about worker's compensation insurance?

14  A.   No, sir.

15  Q.   Was your automobile insured --

16  A.   Yes, sir.

17  Q.   -- that you used on the job?

18  A.   Yes, sir.

19  Q.   And was it insured through your personal family auto

20  policy?

21  A.   Yes, sir.

22  Q.   Thank you for answering my questions.

23          THE COURT:  Mr. Haley, before you begin, I need to

24  take about a five-minute break for another piece of court

25  business, if we can just hold in place.

1        The witness is welcome to step down.  Please don't discuss

2    your testimony with anyone.  You remain under oath.  When we

3    come back, Mr. Haley will have a chance to ask you some

4    questions.

5        (Recess at 2:17 p.m. until 2:33 p.m.)

6            MR. HALEY:  May I, Your Honor?

7            THE COURT:  Yes, please.

8                         CROSS-EXAMINATION

9    BY MR. HALEY:

10   Q.  Mr. Newman, I'm going to have to ask you right out the box,

11   did you, in connection with the Department of Labor's

12   investigation into a charge of unpaid overtime, give a statement

13   to the Government in this case?  Did you provide a statement

14   that you signed for Mr. Binda?

15   A.  No, sir.

16   Q.  Then how is it that you know when the investigation began?

17   A.  I was told through another officer.

18   Q.  By whom?

19   A.  Well, I was also told by Frank Medieros.

20   Q.  You say you were told by someone in the office and by Frank

21   Medieros?

22   A.  No, sir, officer.  James Ashley had mentioned --

23   Q.  Who had?  James Ashley?

24   A.  Had mentioned --

25   Q.  When was this vacation you took with your family?

1   A.  I'm not absolutely certain.

2   Q.  Summer?

3   A.  Yes, sir.

4   Q.  What year?

5   A.  I believe it was either -- it was probably 2010.

6   Q.  2010.  How much work do you think you missed?

7   A.  Pardon me?

8   Q.  How much work do you think you missed?

9   A.  Probably -- I believe it was about two weeks.

10  Q.  Two weeks in the summer of 2010?

11  A.  I'm pretty sure.  I'm not a hundred percent.

12  Q.  June to August?  It might have been earlier, it might have

13  been later?  Do you have any idea?

14  A.  It's been a long time ago, sir.

15  Q.  The reason I ask is that I show -- and we will get this into

16  evidence later, and it's document D_8314 -- that from June

17  through the end of the summer, 27 and a half hours, 16 hours,

18  and then you remember working at a party at Mr. Spurgeon's house

19  for a birthday for his daughter, Brooke?

20  A.  Yes, I do.

21  Q.  You got paid for that, didn't you?

22  A.  Yes, sir.

23  Q.  And then we have really four checks for 6-17:  Brooke's

24  party, Louisville Paving, Louisville Paving.  One of them was

25  for a shortage.  6-24, 12 and a half hours; 7-1, 42 hours; 7-8,

1  46 hours.  7-15, you got two checks, one 5.5 for Kelsey

2  Construction.  Do you remember working for them?

3  A.  No, sir.

4  Q.  You don't.  And then 16 hours TCO.  I'm into July.  I see a

5  check 7-22 for 69 hours; 7-29, 25 hours; and then another one

6  7-29 for 29 hours; then 8-5, 20 hours; 8-5, four hours for a

7  different customer; 8-12, 15; 8-12, 39, Kelsey and then another

8  customer; 8-19, 66; 8-26, a prevailing wage adjustment; 8-26, 58

9  hours compensated.  Now we are into September.

10      When is the time-out or the first strike, given those

11  records, sir?

12  A.  Sir, it could have not been that year, but I was off.

13  Q.  We will have to go through every year?  You want to go

14  through 2011?

15  A.  You could.  I'm not sure.

16  Q.  2011, 2009?

17  A.  You could go through 2009 or 2011 because I'm not sure, but

18  I was off.

19  Q.  Well, in 2009 you weren't working for ODPS, were you?

20  A.  No, sir.

21  Q.  It couldn't have been 2009, could it?

22  A.  It could be 2011.  I'm not sure, sir.

23  Q.  You don't have any idea, do you?

24  A.  I would have to look and see, sir.

25  Q.  Do you have records that you could look at?

Newman - Cross                                                    148

1   A.  Possibly.  I could look at statements -- see if I can look

2   at statements and see if they have them that far.

3   Q.  Whose statements?  Yours?

4   A.  My bank statements from when I went to Panama City Beach,

5   Florida, sir.

6   Q.  Let's talk about your vehicle.  Let's talk about this

7   apartment situation.  You hired yourself out for security at an

8   apartment complex, correct, not through ODPS?

9   A.  No.  What do you mean, sir?

10  Q.  I'm sorry?

11  A.  What are you -- what do you mean?

12  Q.  Didn't you provide security services at an apartment complex

13  to the complex directly, not through ODPS?

14  A.  No, sir.

15  Q.  It's all been through ODPS?

16  A.  Yes, sir.

17  Q.  Even the time you got arrested?  Were you working for ODPS

18  at the apartment complex then?

19          MR. SHEPHERD:  Objection, Judge.

20          THE COURT:  Approach, please.

21     (Bench conference on the record.)

22          MR. HALEY:  I'm trying to jog his memory.  He didn't

23  work for ODPS at an apartment complex.

24          MR. SHEPHERD:  Judge, an arrest is never admissible.

25  Simply a charge of being arrested, that's never admissible.

1            MR. HALEY:  For impersonating a police officer, he was

2    put in handcuffs.  I'm just trying to jog his memory.

3            THE COURT:  It's not really a question of

4    admissibility, is it?  If we are trying to figure out the

5    question of whether his prior testimony on a certain job was a

6    job with ODPS, that would be relevant, would it not?

7            MR. SHEPHERD:  It would.

8            MR. HALEY:  That's all I'm trying to do, Your Honor.

9            THE COURT:  I'm not going to -- I can tell you that

10   the fact that he's arrested or not, unless there's evidence that

11   follows it of a conviction on a crime that involves dishonesty

12   or moral turpitude, I'm not going to hold that against him in

13   weighing his testimony.  But I think it is a fair question to

14   find out whether, in fact, he did work for ODPS or obtained his

15   work through ODPS for this discrete job.  If you can get there

16   without referencing his arrest, that would be preferable, but

17   that's -- I think that's an appropriate line for now.  If it

18   goes too far afield, object again.

19           MR. SHEPHERD:  Yes, sir.

20       (End of bench conference.)

21   Q.  You'll have to forgive me for a moment.  I can't quite read

22   the note I received.

23       Were you ever engaged outside of the ODPS relationship to

24   patrol an apartment complex?  Did you get free rent for your

25   agreement to do that?

1   A.   I applied as a security officer, if that's what you are

2   asking, for a courtesy security spot that they was hiring.  I

3   was an employee for Autumn Run.

4   Q.   You did that on your own; it was not through ODPS?

5   A.   No, sir.

6   Q.   That was what I was trying to get at.  I'm sorry I brought

7   up the matter, just trying to jog your memory.

8   A.   Yes, sir.

9   Q.   You received a 1099 each year that you performed services

10  for ODPS from ODPS, correct?

11  A.   Yes, sir.

12  Q.   And you paid taxes on it?

13  A.   Yes, sir.

14  Q.   You considered it to be self-employment income, correct?

15  A.   Yes, sir.

16  Q.   Do you prepare your own taxes, or do you have a tax advisor?

17  A.   I have a tax advisor, sir.

18  Q.   Did you provide your tax advisor with businesses expenses

19  associated with your vehicle and your mileage and that sort of

20  thing?

21  A.   Yes, sir.

22  Q.   So you took advantage of the deductions that you would get

23  for purposes of using that vehicle in a trade or business,

24  right?

25  A.   Yes, sir.

Newman - Cross                                                        151

```
 1            MR. SHEPHERD:  Judge, I object to this line of

 2   questioning on relevance grounds.

 3            THE COURT:  Overruled.

 4   Q.  Now, did you use that vehicle when you were patrolling the

 5   apartment complex that you just mentioned?

 6   A.  No, sir.

 7   Q.  You had another vehicle?

 8   A.  No, sir.

 9   Q.  Did you do it on foot?

10   A.  Yes, sir.

11   Q.  Did you use it at KTPS?

12   A.  I no longer have that vehicle.

13   Q.  You have a new vehicle?

14   A.  Yes, sir.

15   Q.  Different vehicle?

16   A.  Yes, sir.

17   Q.  Configured to do the same thing?

18   A.  Yes, sir.

19   Q.  With lights?

20   A.  Yes, sir.

21   Q.  And you worked for a while for KTPS and became disenchanted,

22   right?  You called Darrell and said, "I want to come back"?  You

23   did, didn't you?

24   A.  No, sir.

25   Q.  You came back and did service for Darrell after you left,
```

1    didn't you?

2    A.   Yes, sir.

3    Q.   And after you came back and worked for ODPS customers, why

4    did you go back to KTPS the next time?

5    A.   Because beforehand Darrell used to tell us that we could not

6    work for no one else but ODPS, and we didn't or we wouldn't work

7    or he would fire us.  So I went to KTPS, started working.  I had

8    a period where I was off.  I called Mr. Medieros.  I didn't

9    speak with Mr. Spurgeon.  I talked to him.  He said, "I have

10   work."  I did have a text with Darrell, and Darrell called me at

11   that point in time and said, "You can work for whoever you want.

12   I have work.  If you would like to work, I'll give you some

13   jobs."

14   Q.   And you can work for anybody you want.  That's always been

15   the case at ODPS, right?

16   A.   No, sir.

17   Q.   You just can't work directly for customers of ODPS, right?

18   A.   No, sir.

19   Q.   Did you ever read the independent contractor agreement that

20   you signed?

21   A.   I probably did when I did sign it, yes, sir.

22   Q.   And doesn't it say that you just can't work for customers

23   and clients of ODPS?

24   A.   I don't remember, sir.

25   Q.   You know other folks who have worked for multiple companies

Newman - Cross                                                      153

1    at the same time, don't you?

2    A.  At the time I was working, no, sir.

3    Q.  Have you talked to anybody about it?

4    A.  Not that I know of.

5    Q.  Do you know Merle Brown?

6    A.  Yes, sir.

7    Q.  Didn't he tell you that if you continued to work for ODPS

8    that you would never work for him again?

9          MR. SHEPHERD:  Objection.  Hearsay.

10   A.  I had called Mr. Spurgeon and told him I had talked with

11   Merle, and I told Merle that I needed hours.  Merle was not

12   upset.  He thought I had left him to go back to work with

13   Darrell, and I told him, "If you work me, I will come back."  I

14   asked Darrell, I said, "You don't care now like you did before.

15   I will work for both of you."  And I was working for both of

16   them for a little while, and then Merle started working me

17   more.

18   Q.  So you are working more --

19   A.  Yes, sir.

20   Q.  -- for Merle?

21   A.  Yes, sir.  So I quit working for ODPS.

22   Q.  The report that you saw from security that -- we had to do

23   reports.  You know every customer where we do security work,

24   every customer for whom we do security work, has different

25   requirements as to reports that have to be made, right?

1    A.   I don't know.

2    Q.   You don't know.  You do know that you had to do a report

3    when you worked security?

4    A.   That apartment, yes.  For that one, yes.  I never worked

5    anything else.  We were only told what jobs we worked.

6    Q.   I'm sorry.  You've answered my question.

7    A.   Sorry.

8    Q.   Once you became a sworn officer -- what is it now, a deputy

9    jailer?

10   A.   Yes, sir.

11   Q.   Part-time deputy jailer?  You don't wear ODPS insignia after

12   that, do you?  You wear your jailer uniform?

13   A.   Yes, sir.

14   Q.   And you wear it in the context of performing services for

15   KTPS now, right?

16   A.   Yes.

17   Q.   Because you are not allowed as a sworn law enforcement

18   officer of any kind to wear somebody else's uniform; is that

19   correct?

20   A.   I've never asked that question, sir.

21   Q.   Okay.  When you say that Frank Medieros came out to the job

22   site and gave you a hard time about your goatee, did he send you

23   home?

24   A.   No, sir.

25   Q.   He told you to straighten up, right?

1   A.  Yes, sir.

2   Q.  Do you know whether or not he got a call from the customer

3   as to your appearance?

4   A.  No, sir.

5   Q.  You don't know if that's true or not?

6   A.  No, sir.  He told me he did, but I don't know, sir.

7   Q.  I'm sorry.  What did you say?

8   A.  He told me he did, but I don't know if he did, sir.

9   Q.  He told you he did?

10  A.  Yes.

11  Q.  He said, "I'm here because I got a customer complaint and

12  you need to" -- it wasn't just your goatee, right?  It was your

13  overall attire?

14  A.  No, sir.  It was just the goatee.

15  Q.  Wasn't the shorts?

16  A.  No.

17  Q.  Okay.  Were you wearing shorts?

18  A.  No, sir, not -- I don't remember.

19  Q.  When you were first, quote, trained where Frank, you said,

20  shadowed you for a week, do you remember that?

21  A.  Yes, sir.

22  Q.  The two of you were working on the same job, same crew, same

23  contractor, right?

24  A.  Yes, sir.

25  Q.  So two people working the same job.  He was keeping an eye

1    out for you, right?

2    A.  He was beside me showing me how to flag.

3    Q.  Well, you are at one end of the job site and he's at the

4    other, right?

5    A.  For the start of it -- it was so long ago, I'm not sure, but

6    we was eventually.  I'm sure we had to be.

7    Q.  He may have set up your cones before he went to the other

8    end, but when you've got two people on a crew, they are working

9    at opposite ends of the construction site, correct?

10   A.  Depending on --

11   Q.  Somebody has to say "stop" and the other person has to say

12   "slow"?

13   A.  Sometimes they would need us in the road just to watch

14   vehicles coming out, sir.

15   Q.  All right.  You received different rates for different work

16   while you worked at ODPS -- for customers of ODPS, didn't you?

17   A.  Yes, sir.

18   Q.  I'm sorry?

19   A.  Yes, sir.

20   Q.  What did you get paid as a TCO?

21   A.  $15 an hour.

22   Q.  What did you get paid for the security details?

23   A.  $15 an hour.

24   Q.  And did you get more prevailing wage jobs?

25   A.  Yes, sir.

1    Q.  Did you get more in connection with peak times like Derby or

2    Christmas?

3    A.  No, sir.

4    Q.  Can you think of any other special rate that you may have

5    earned beyond prevailing wage or the $15 that you have mentioned

6    for security and TCO work?

7    A.  Nothing other than when I became sworn, sir.

8    Q.  I want to talk about your first assignment, for lack of a

9    better term, the term that we keep bandying about here.  You got

10   a call from, was it Darrell Spurgeon or Frank Medieros, for your

11   first opportunity to perform services?

12   A.  I believe it was Darrell Spurgeon, and Frank contacted me to

13   tell me where to go.

14   Q.  And in terms of that, it was like, "We have got this out

15   here; are you interested"?

16   A.  They just called me and gave me a job.  He told me Frank

17   would contact me.

18   Q.  Was it right after that you approached ODPS for purposes of

19   finding work?

20   A.  Yes, it was right after.

21   Q.  And they tell you more than just where to go and what time,

22   don't they?  They tell you who to report to once you get there?

23   A.  Yes.  I believe they would sometimes tell you a foreman.

24   Q.  And you had this project for several months, but you've been

25   posted, for lack of a better term, to a number of other clients

1   over the course of your engagement by ODPS, have you not?

2   A.  Pardon me?

3   Q.  You have been given the opportunity to work with other

4   clients under different circumstances?

5   A.  To where I could work for him and someone else?

6   Q.  Yes.

7   A.  At that time, no, I wasn't.

8   Q.  Not when you were working with Miller, I understand that,

9   except for the time that you talked about being pulled for a

10  security thing.  You did two things that day, right?

11  A.  Yes, sir.  Same company, yes, sir.

12  Q.  I'm talking about over the course of the period of time that

13  you are performing services, whether they are traffic control or

14  security, doesn't matter for my question, you've had an

15  opportunity to work for other customers of ODPS, not just Miller

16  Pipeline, right?

17  A.  Oh, yes, sir.

18  Q.  And when those opportunities arise, you get a call asking

19  you if you are available, right?

20  A.  Not until -- that started later on after working with them

21  for a while.

22  Q.  What are you talking about?  When?  When is later on?

23  A.  I'm not certain, sir.  He would call and give us an address.

24  Q.  Everybody else who has testified has talked about being

25  given the opportunity.  Why are you special?

1   A.  I don't know, sir.

2   Q.  I don't either.  I don't have any more questions.  Thank

3   you.

4          THE COURT:  Redirect, Mr. Shepherd?  Before you

5   redirect, would you approach just briefly?

6      (Bench conference on the record.)

7          THE COURT:  I didn't give you a ruling on your

8   objection.  I wanted to kind of see how far he went after that.

9   My ruling would have sustained your objection, but he curtailed

10  the question.  I think it took care of itself.  I wanted to let

11  you know that in case you wanted to revisit that for purposes of

12  your redirect.

13         MR. SHEPHERD:  Yes, sir.

14     (End of bench conference.)

15                    REDIRECT EXAMINATION

16  BY MR. SHEPHERD:

17  Q.  Mr. Newman, I believe you testified when we were talking

18  that you -- you may be incorrect about this, and I want to clear

19  this up -- that you think you started working for ODPS in 2007

20  or 2008.  Is that accurate?

21  A.  I would have to see the dates of when I started because the

22  brief period where I didn't work for them, I did have an

23  incident where I did get arrested, not working for Darrell, and

24  I was told by the officer there that I was fired.  Later on, a

25  year or so later, I got called back by Dave Whitlock telling me

1  to call Darrell to start back working for him.

2  Q.  Okay.  So if I understand your testimony correctly, you are

3  not exactly sure when you started working for ODPS?

4  A.  No, sir, because -- it was before that because in 2008 I did

5  have an incident.

6  Q.  Okay.  Mr. Haley asked you some questions about the incident

7  where you went to Florida.  I'll ask you again, just to make

8  sure, are you sure that happened?

9  A.  Yes, sir.  It was between a week to two weeks, and I would

10  have to check my pay.  I'm pretty sure -- it's been a long time

11  ago, but I might have that on my computer.  I don't know if I

12  could check records or what I could do.

13  Q.  You testified also that you worked for this apartment

14  complex providing security services?

15  A.  Yes, sir.

16  Q.  Did you live at that apartment complex?

17  A.  Yes, sir.

18  Q.  Okay.  Did you get a discount on your rent if you would

19  patrol, if you will, every so often?

20  A.  They paid me per hour.  I don't know what the amount was per

21  hour, but they took the rent money out of my checks.

22  Q.  Okay.  Did you get a W-2 from that company at the end of the

23  year?

24  A.  Yes, sir.

25  Q.  So you were classified as an employee?

1   A.   Yes, sir.

2   Q.   And do you recall when this was that you were doing the work

3   for the apartment complex?

4   A.   I'm not sure.  I would have to look.

5   Q.   Can you give me an approximation?  Was it anywhere from 2010

6   to 2013?

7   A.   It was before that.

8   Q.   It was before 2010?

9   A.   Probably 2008 to 2010.

10  Q.   It was before you got the job at the jail?

11  A.   Yes, sir.

12  Q.   You also testified in response to one of Mr. Haley's

13  questions that Mr. Spurgeon told you you couldn't work for any

14  other companies; is that correct?

15  A.   Yes, sir.

16  Q.   When did he tell you this?

17  A.   I couldn't give you a specific date.  It was a while ago, a

18  while back.

19  Q.   Can you recall any of the circumstances around him telling

20  you this?  Do you recall where you were?  Was anybody with you?

21  What caused him to make this statement to you?

22  A.   It was we couldn't work for a competitor.

23  Q.   Okay.

24  A.   I don't remember exactly when it was.  It's been a long time

25  ago.

1            MR. SHEPHERD:  Thank you, sir.

2                    RECROSS-EXAMINATION

3    BY MR. HALEY:

4    Q.  And yet after you went to work for a competitor, KTPS, for

5    an extended period of time, you were welcomed back by Mr.

6    Spurgeon and ODPS, correct?

7    A.  Yes, sir.

8    Q.  Thanks.

9            THE COURT:  Mr. Shepherd, may this witness be excused?

10           MR. SHEPHERD:  Yes, sir.

11           THE COURT:  You are excused.  Thank you.

12      Would you all approach again, please?

13      (Bench conference on the record.)

14           THE COURT:  Maybe this is the point at which it seems

15   appropriate.  Is there a sweet spot here in the testimony that

16   we are getting from these witnesses where we can stipulate on

17   some things so you don't have to plow the same ground over and

18   over and over?  Can we stipulate about purchasing Crown Vics out

19   of their own funds?  Can we -- the uniforms, the personal

20   grooming policy, assignments received from Spurgeon or Medieros,

21   that's consistent testimony I've heard from each of your

22   witnesses thus far.  I'm wondering if there is room here for a

23   stipulation that would allow us to shorten some of the testimony

24   so that we simply don't get cumulative and repeat it.

25           MR. SHEPHERD:  Sure.

1          MR. HALEY:  Well, I think that's fine.  I'm going to

2    cross within the scope of direct.  I don't believe that we have

3    to ask every witness.  I do know that there is more to come

4    apart from what we have heard so far, but not necessarily on

5    those points.

6          THE COURT:  I would expect that.  But that is my point

7    here.  Unless you tell me that you expect to hear different

8    testimony regarding a car that Mr. Spurgeon provided for one of

9    these folks or a different uniform policy for someone or a

10   different grooming policy for someone, those basic things that

11   the department has now established, they don't even seem to be

12   all that important to you all.

13         MR. HALEY:  They are not.

14         THE COURT:  If there is a stipulation to be had that

15   we can formulate here and put in the record that would allow

16   Mr. Shepherd to avoid asking those repetitive questions of each

17   of his witnesses going forward, it would save us significant

18   time and it would avoid us introducing cumulative evidence.  If

19   you tell me that you can't live with that because you expect

20   something different, than that's fine.

21         MR. HALEY:  I really don't expect anything different.

22   The TCO policy thing that we can't find that anybody ever

23   signed, and it's not markedly inconsistent from what we posted

24   for LG&E-KU, the only outstanding issue with respect to that as

25   far as I'm concerned is that it came from LG&E-KU.  This is what

```
 1    we have to do.  But that will be through our witnesses.  I don't
 2    know if that hinders Mr. Shepherd in his presentation of the
 3    case.
 4             THE COURT:  When you say "the TCO policy," what are
 5    you talking about?
 6             MR. HALEY:  There was the one document that calls for
 7    a signature at the bottom where we have a series of pages, and
 8    we don't have one of those signed by anybody.  Frankly, we think
 9    it was a work in progress, and it's been described, but that
10    requires further evidence.  I'm talking about the --
11             THE COURT:  What does "TCO" stand for?
12             MR. HALEY:  Traffic control officer.
13             THE COURT:  Okay.  Is there some disagreement as to
14    whether that was actually adopted or communicated?
15             MR. HALEY:  Yes.
16             THE COURT:  That's fine.  We will exclude that from
17    any -- but is there any disagreement about the uniform policy
18    and the Crown Vic policy?
19             MR. HALEY:  No.  He required all of it.  There's no
20    question about it.  I think the only issue is where did it
21    emanate.  Our evidence will be that it came from LG&E, that they
22    are requiring us to do that.
23             THE COURT:  To have the Crown Vic?
24             MR. HALEY:  Yeah, a police-type vehicle.
25             THE COURT:  Okay.  So those policies did not come then
```

1    from ODPS?

2           MR. HALEY:  They were embracing instructions that

3    we -- contractual terms and/or instructions as we go forward

4    from KU and LG&E for purposes of making sure our guys looked

5    official on their job sites.

6           THE COURT:  All right.  I'm not going to press the

7    issue then if it's part of your position that that was not a

8    company -- a defendant policy, that was a reaction to a policy

9    of an entity you are doing business with.

10          MR. HALEY:  I have asked several witnesses, and they

11   have affirmed that they understood these to be the requirements

12   of LG&E being passed along to them.  But I don't know that

13   Mr. Shepherd is ready to stipulate to that.

14          THE COURT:  All right.  We will just continue as is.

15   Perhaps we could get through those questions a little more

16   quickly, given that the Court now understands all of that

17   background, and you really don't need to flesh all of that out

18   for each witness.

19          MR. SHEPHERD:  Yes, sir.

20          THE COURT:  I think the same would be true on your

21   side of the equation.

22          MR. HALEY:  Thank you.

23      (End of bench conference.)

24          THE COURT:  Call your next witness.

25          MR. SHEPHERD:  Judge, we would call Merle Brown.

```
 1            (MERLE BROWN, called by plaintiff, sworn.)
 2                        DIRECT EXAMINATION
 3     BY MR. SHEPHERD:
 4     Q.  Can you please state your name, sir?
 5     A.  Merle Brown.
 6     Q.  Mr. Brown, at some point in time did you work for ODPS?
 7     A.  Yes, sir.
 8     Q.  And do you recall when you started working for ODPS?
 9     A.  I think it was October of '07.
10     Q.  Okay.  And how long did you work for ODPS?
11     A.  Till January of 2012.
12     Q.  So you worked for ODPS for approximately five years?
13     A.  Four, I guess.  October to January.  About four.
14     Q.  During the period of time that you worked for ODPS, did you
15     work for any other companies?
16     A.  No.
17     Q.  So from 2007 to January of 2012, your sole source of income
18     was from ODPS?
19     A.  Yes.
20     Q.  Can you estimate about how many hours a week you worked for
21     ODPS?
22     A.  It varied.  Sometimes 40, sometimes 80.  There were certain
23     times I worked over a hundred.
24     Q.  You worked 80 and a hundred hours a week sometimes?
25     A.  A couple of times, yes.
```

1    Q.  And were you ever paid overtime?

2    A.  No, sir.

3    Q.  What did you do for ODPS?

4    A.  Security and flagging.

5    Q.  Would the flagging also be known as traffic control?

6    A.  Yes, sir.

7    Q.  And can you give me an estimate of the time you spent

8    flagging as opposed to the security work?

9    A.  Probably 90 percent flagging.

10   Q.  Okay.  What did the flagging work entail?  What did you

11   physically do while at the job site?

12   A.  Set cones up, set the work site up, figure out what they

13   were doing, and then flag traffic around for construction

14   companies.

15   Q.  Okay.  What about the security work?  What did you do --

16   what did that work entail physically?

17   A.  Security, we just -- you would show up at a site and just

18   make sure that everything was safe, locked up, or patrol the

19   lots.

20   Q.  Have you ever worked as a sheriff's deputy or a police

21   officer?

22   A.  No.

23   Q.  So all your work for ODPS was unsworn work?

24   A.  Yes, sir.

25   Q.  Prior to coming to work for ODPS, did you have any

1    experience working as a security guard?

2    A.  No, sir.

3    Q.  What about as a traffic control officer?

4    A.  No, sir.

5    Q.  Did you have any experience directing traffic?

6    A.  No, sir.

7    Q.  With no experience, how did you learn to do the job?

8    A.  When I was hired, I just -- whoever I worked with, met us up

9    at one side, put us with people, and they would kind of train

10   you as you go along.

11   Q.  Who put you with people to train you?

12   A.  Either Mr. Spurgeon or Frank.

13   Q.  Would that be Frank Medieros?

14   A.  Yes, sir.

15   Q.  While you were working at ODPS, did you have a supervisor?

16   A.  Yes, sir.

17   Q.  And who was this?

18   A.  Frank Medieros was the supervisor, and we dealt with him and

19   Mr. Spurgeon.

20   Q.  And what did Mr. Medieros do to supervise your work?

21   A.  He would schedule, tell us where to go.

22   Q.  Would Mr. Medieros ever come by the job site and check on

23   you?

24   A.  Once in a while.

25   Q.  What about Mr. Spurgeon?  Did Mr. Spurgeon ever come by and

1    check on you?

2    A.  Just a couple of times.  Over the whole time I was there, I

3    saw him a couple of times come out.

4    Q.  Were you paid by the hour at ODPS?

5    A.  Yes, sir.

6    Q.  And were you always paid an hourly rate?

7    A.  Yes, sir.

8    Q.  How much did you make an hour?

9    A.  15.

10   Q.  Who set this pay rate?

11   A.  That's what -- they did, ODPS.

12   Q.  Did you ever attend the ODPS traffic control training

13   class?

14   A.  Yes.  There was a class to get our flag certificate.

15   Q.  Who taught that class?

16   A.  Mr. Spurgeon.

17   Q.  How long did the class last?

18   A.  Couple of hours, two or three hours.

19   Q.  Who else attended the class?

20   A.  There was other -- as far as ODPS, different employees, and

21   Mr. Medieros was there.

22   Q.  Were there anybody -- did anybody attend that was not

23   affiliated with ODPS, to your knowledge?

24   A.  No.

25   Q.  Is that no, no one else attended that was not affiliated

1    with ODPS?

2    A.   Not that I know of.  Everybody was affiliated with ODPS.

3    Q.   Okay.  Before coming to work at ODPS, did Mr. Spurgeon or

4    anybody at ODPS tell you that you would be classified as an

5    independent contractor?

6    A.   Before?

7    Q.   Yes, sir.

8    A.   When the job was offered, they just told us it was -- I

9    wasn't really familiar with it, but it was all 1099 work.

10   Q.   Were you classified as an independent contractor the entire

11   time you worked for ODPS?

12   A.   Yes, sir.

13   Q.   Before coming to work at ODPS, did you have to buy any

14   equipment or supplies?

15   A.   I had to buy a car, lights, and uniform.

16   Q.   And about how much did all this stuff cost?

17   A.   Somewhere probably -- $3,500 probably.

18   Q.   Okay.  You indicated that you had to buy a car?

19   A.   Yes, sir.

20   Q.   Was it a Crown Vic?

21   A.   Yes.

22   Q.   Was that communicated to you by Mr. Spurgeon?

23   A.   Yes.  We had to have a Crown Vic.

24   Q.   You also indicated that you were required to buy a uniform?

25   A.   Yes, sir.

1    Q.   Did Mr. Spurgeon tell you about the uniform requirements?

2    A.   Yes, sir.

3    Q.   This vehicle that you purchased, did you use it on personal

4    business?

5    A.   Yes, sir.

6    Q.   Drive it to the mall or the grocery store?

7    A.   Yes, sir.

8    Q.   During the time that you worked for ODPS, did they provide

9    you with any equipment or supplies?

10   A.   To start off with, I was given a vest and stop-and-slow

11   sign.  I think that was it.

12   Q.   Did this stuff have the ODPS logo on it?

13   A.   Yes, sir.  Well, the vest did.

14   Q.   The vest did, but not the stop-and-slow sign?

15   A.   Not the stop-and-slow sign.  There was a coat, traffic coat,

16   also.

17   Q.   I'm sorry?

18   A.   A traffic coat, safety coat.

19   Q.   Did it have the logo -- ODPS logo embroidered on it?

20   A.   Yes, sir.

21   Q.   You told me about the uniform requirements.  What about

22   personal grooming?  Were there any personal grooming

23   requirements at ODPS?

24   A.   I got in trouble a couple of times because I had a goatee.

25   I had to shave off the goatee.

1    Q.  Can you tell me about that?

2    A.  Mr. Medieros showed up.  We had worked together on a site.

3    I had a goatee.  I was told that if I didn't shave the goatee, I

4    couldn't come back to work.

5    Q.  Were you working an LG&E detail?

6    A.  I don't know what that was that day.

7    Q.  And did you, in fact, shave your goatee in response to

8    Mr. Medieros's request?

9    A.  Yes, sir.

10   Q.  You indicated that Mr. Spurgeon told you that you needed to

11   buy a Crown Vic.  Did he tell you anything particular about the

12   Crown Vic that you were required to buy?

13   A.  Just had to be a '98 or newer at the time.

14   Q.  Was he that specific?

15   A.  Yes, sir.

16   Q.  While you were working for ODPS, did you guys ever have

17   meetings?

18   A.  The only meeting that I recall is when we did the flagging.

19   There was another meeting, too.  I forgot.  We had a meeting

20   over on Dixie Highway one time.

21   Q.  Okay.  Can you tell me about this meeting?

22   A.  Just to go over things, safety, what we were supposed to do,

23   what our jobs were out there.

24   Q.  Were any rules or regulations discussed at these meetings?

25   A.  It's been such a long time, I don't remember the exact

1    things that were done at that meeting.

2    Q.  Were other ODPS employees there at this meeting?

3    A.  Yes, sir.

4    Q.  When you were working for ODPS, did you ever have occasion

5    to go to the ODPS website?

6    A.  Couple of times.

7    Q.  Okay.  Did you ever log in to this website?

8    A.  We had a log-in.  I didn't do it a lot.  There were a couple

9    of times we were told to go there to look at new things that

10   came up.

11   Q.  Did you ever see any announcements posted on the website?

12   A.  I saw different -- most of the stuff was for like police

13   officers.  He had jobs listed for police officers on there.

14   Q.  What about rules and regulations?

15   A.  It was all listed on there, the rules and regulations.

16   Q.  Was there a link on the website?

17   A.  It was different links.  I was only on there a couple of

18   times.  I didn't get on there very often.

19   Q.  While you were working for ODPS, how would you get your job

20   assignments?

21   A.  Either Mr. Medieros would call us or Mr. Spurgeon.

22   Q.  Okay.  And tell me about this.  When they would call you,

23   what would they tell you?

24   A.  They would tell you, "Go to" -- I'm going to make up a

25   street -- "5500 Preston Highway at 9:00 with AT&T."

1    Q.  Would they -- when would they typically call you and give

2    you the assignment?

3    A.  If it wasn't an emergency call, it would be like the night

4    before.  They would call you and say, "I need you there."

5    Sometimes the jobs were permanent.  They would say, "Stay there

6    until we tell you differently."  Or they would tell you, "Go

7    there tomorrow at 9:00," and we would go there.

8    Q.  Did you ever have one of these permanent jobs where you

9    stayed there for a long period of time?

10   A.  Yes, sir.

11   Q.  Tell me about that.

12   A.  I worked with Miller Pipeline mostly through the time that I

13   worked there.

14   Q.  How long did you stay with the Miller Pipeline crew?

15   A.  Probably there close to three years.

16   Q.  Okay.  Who gave you that assignment to stay with that crew?

17   A.  Mr. Medieros.

18   Q.  Okay.  While you were with the Miller Pipeline crew, would

19   you ever get any call-outs for emergencies?

20   A.  Yes, sir.

21   Q.  Tell me about those.  First, what would -- what emergency

22   would require a traffic control officer?

23   A.  Either like a drunk driver hit a pole or a lightning storm.

24   I also did -- I worked security a lot of times at night, too.

25   Q.  Who would call you when one of those emergency-type

1   situations would arise?

2   A.  Either Mr. Medieros or Mr. Spurgeon.

3   Q.  Okay.  And what would they tell you when one of these

4   emergencies would arise?

5   A.  They would call and say, "There's a downed power line.  We

6   need you there as soon as possible."

7   Q.  Okay.  Would you get some of these calls late at night or

8   early in the morning?

9   A.  Yes, sir.

10  Q.  Sometimes in the middle of the night?

11  A.  Yes, sir.

12  Q.  When they would call you with one of these assignments, you

13  indicated that they would tell you the location where you needed

14  to go.  What about the time you were supposed to be there?

15  A.  Yeah.  They would call and say, "We need you right there."

16  Because usually on an emergency situation, they would need you

17  there.  They would say, "You got half an hour, 45 minutes.

18  Please get there as soon as you can."

19  Q.  Did you ever have a set schedule with ODPS?

20  A.  Only when I worked with like Miller.  They would work from 7

21  to 5 when I was with them.

22  Q.  So this was this three-year period you told me?

23  A.  Yes, sir.

24  Q.  If something unexpected happened while you were working and

25  you had to leave the job site, what would you do?

1    A.  You would have to call either Mr. Spurgeon or Mr. Medieros

2    and tell them you had an emergency.

3    Q.  How do you know that you were required to do that?

4    A.  That's what we were told to do.

5    Q.  By whom?

6    A.  By Mr. Spurgeon and Mr. Medieros.

7    Q.  If you agreed to work a particular job and something came up

8    where you couldn't work the shift, could you switch shifts with

9    a co-worker?

10   A.  No.  That was definitely a no.  You would always have to

11   call either Mr. Spurgeon or Mr. Medieros.

12   Q.  And how do you know that you couldn't swap shifts?

13   A.  We were told -- there is a certain time I actually even

14   couldn't find a place, and I called somebody else to get

15   directions, and Mr. Medieros say, "No, you call me and I'll give

16   you the right directions."  We are not supposed to call other

17   people.  There's no switching.  There was times where I said, "I

18   can't work today.  Can somebody work for me?"  That's happened

19   in the past.  Mr. Medieros said they set the schedule.

20   Q.  If you didn't want to work a particular job, or say you got

21   a call-out at 2 in the morning, could you tell them you weren't

22   going to do it?

23   A.  You could say that.  You could tell them that you couldn't

24   work it.

25   Q.  Did you ever do that?

Brown - Direct                                                    177

1    A.   Yes.  Not many.  I worked -- most every time they called, I

2    would work.

3    Q.   Did anything negative happen to you as a result of you

4    turning down the job?

5    A.   They didn't like it when you turned it down.  If there

6    were -- sometimes if it would happen more than once or so, they

7    would get upset about it, and you might not get a job the next

8    day or so.

9    Q.   And who is "they"?

10   A.   Mr. Medieros.

11   Q.   Okay.  While you were working for ODPS, were you ever

12   instructed to leave a job that you were working to report to

13   another location?

14   A.   There's been times where there was like a gas leak or

15   something, and they would call if we were working with a company

16   and they would say, "Can you break away because this is an

17   emergency?"  That did happen.

18   Q.   Who would make those telephone calls?

19   A.   Either Mr. Spurgeon or Mr. Medieros.

20   Q.   While you were working for ODPS, were you ever disciplined

21   or reprimanded?

22   A.   The beard incident.

23   Q.   And what happened to you as a result of the beard incident?

24   A.   I was told to shave the beard or not come back.

25   Q.   Okay.  Were you ever put in time-out, or did you ever get

Brown - Direct                                                178

1   any days off work for anything you did?

2   A.  I tell you, I think -- I worked a lot of hours.  I worked

3   for them whenever I could.  That didn't come about.  Like I

4   said, there were certain times you couldn't work, and they would

5   be very upset about it.  But I worked -- usually when they

6   called, I would work.

7   Q.  Did you ever submit an invoice to ODPS?

8   A.  There at the very end they were doing invoices where you

9   would have to fax them in to them.

10  Q.  Do you know what caused them to start using the invoices?

11  A.  No, I don't.

12  Q.  Where did you get the invoice from?

13  A.  At one time there was a little flyer I do believe on the

14  website that we used.

15  Q.  Like a PDF?

16  A.  Yes.

17  Q.  And you could fill it out?

18  A.  I do believe so.

19  Q.  You indicated towards the end there.  You stopped working

20  in June of 2012.  Was it sometime maybe the 2011, 2012 time

21  frame?

22  A.  It seemed like it was the last six months maybe.  It wasn't

23  long.

24  Q.  Prior to the invoices being submitted, how would you inform

25  Mr. Spurgeon or Mr. Medieros the hours that you worked?

Brown - Direct                                                          179

1    A.  You would just text in your time when you are done.

2    Q.  You would text it to?

3    A.  To Mr. Medieros.

4    Q.  While you were working for ODPS or prior to coming to work

5    at ODPS, did you have a corporation or a limited liability

6    company set up for yourself?

7    A.  Before I worked there, no.

8    Q.  Is that no?

9    A.  No, sir.

10   Q.  Did you have a business license?

11   A.  No, sir.

12   Q.  While you were working for ODPS, did you advertise so you

13   could get work for other companies besides ODPS?

14   A.  No, sir.

15   Q.  Did you have a website set up for yourself?

16   A.  No, sir.

17   Q.  Did you maintain an office or staff to assist you with your

18   work --

19   A.  No, sir.

20   Q.  -- at ODPS?  Did you purchase business liability insurance

21   for yourself?

22   A.  No, sir.

23   Q.  Did you maintain any type of worker's compensation

24   insurance?

25   A.  No, sir.

1    Q.  Has Darrell Spurgeon or ODPS brought a legal action against

2    you or filed a counterclaim against you alleging a violation of

3    a noncompete clause?

4    A.  Yes, sir.

5    Q.  Okay.  Where was that action filed?

6    A.  I guess in Louisville.

7    Q.  Was it filed in state court?

8    A.  I think so, yes, sir.

9    Q.  Is it still pending?

10   A.  Yes, sir.

11   Q.  And is the nature of that action -- or in that action did

12   they allege that you violated a noncompete clause that you

13   signed in conjunction with your affiliation or employment with

14   ODPS?

15   A.  Yes, sir.

16   Q.  Okay.  Thank you for answering my questions.

17   A.  Thank you.

18                           CROSS-EXAMINATION

19   BY MR. HALEY:

20   Q.  Let's deal with this lawsuit first since the door is opened.

21   You immediately, upon leaving your relationship with ODPS,

22   started a new business, right?

23   A.  My wife started a business.

24   Q.  You are the organizer of that business, according to the

25   filing with the Secretary of State, correct?

Brown - Cross                                                    181

1    A.  I am the organizer, yes, sir.

2    Q.  And your wife knows absolutely nothing whatsoever about

3    flagging because she has never done it, has she?

4    A.  No, she has never done that.

5    Q.  She is relying upon you to run the business, correct?

6    A.  She is a very smart woman, yes.

7    Q.  She is relying upon you to run the business, at least in

8    terms of operational, right?

9    A.  She takes care of all the paperwork.  I manage the

10   employees, yes, sir.

11   Q.  So the answer to my question is "yes"?

12   A.  She --

13   Q.  Let's talk about this.  Darrell wrote a letter to LG&E --

14   I'm sorry -- to AT&T telling them that your solicitation of them

15   was in violation of a restrictive covenant because you had done

16   work for them, right?

17   A.  Yes, sir.

18   Q.  And you immediately filed suit.  You filed a lawsuit

19   claiming fraud and defamation, correct?

20   A.  Yes, sir.

21   Q.  And then you found out that your fraud and defamation claims

22   were -- at least through the advice of counsel were not going to

23   be successful because when you said that you hadn't signed the

24   independent contractor agreement, that turned out to be false,

25   right?

1    A.   Yes, sir.

2    Q.   So what you did then was amend your complaint to make the

3    same allegations you've made here, unpaid overtime, as well as

4    Kentucky meal and rest break statute violations, right?

5    A.   That is what we are going on, yes.

6    Q.   That's where you are right now?

7    A.   Yes, sir.

8    Q.   Whereas our action is to enforce the noncompete -- and

9    that's all kind of been put on hold because we have pushed with

10   this one first, right?

11   A.   It's not been on hold because of us.

12   Q.   I just wanted to make sure that everybody understood that

13   the first lawsuit filed was by you.  Now, you did sign a

14   restrictive covenant; you did sign an independent contractor

15   agreement, didn't you?

16   A.   I signed the piece of paper that he had for us to sign, yes,

17   sir.

18   Q.   And you recognized that as an independent contractor --

19   don't play dumb, please -- you recognized it as an independent

20   contractor agreement?

21   A.   Yes.

22   Q.   And, in fact, you signed several over your career, didn't

23   you, while performing services for ODPS?

24   A.   I believe it was one, maybe two, yes, sir.

25   Q.   Well, now, in the litigation we have shown you at least two

Brown - Cross                                                    183

1   when you claimed that one that you didn't sign that was actually

2   signed by your wife, right?

3   A.   Yes, sir.

4   Q.   We showed you another one that was signed by you two years

5   preceding that, right?

6   A.   That's what I said.  I think I signed one or two, sir.

7   Q.   So it's at least two.  In connection with having signed that

8   independent contractor agreement, you understood that you were

9   going to be paid as an independent contractor, and this started

10  what, back in 2008?

11  A.   Yes, sir.

12  Q.   2008 is when you signed the first one?

13  A.   2008, 2007, somewhere in that area.

14  Q.   And so you are receiving checks and you are depositing them

15  as they are received, correct?

16  A.   Yes, sir.

17  Q.   You are recognizing that there's no withholding whatsoever,

18  correct?

19  A.   Yes, sir.

20  Q.   And then something changed, didn't it?

21  A.   Yes, sir.

22  Q.   What changed is you formed your own business in

23  September 2011 called Kentuckiana Traffic and Patrol Services,

24  right?

25  A.   I think so.  I think it was in 2011.

Brown - Cross                                                      184

1   Q.  With a view towards going into business in competition with

2   ODPS, correct?

3   A.  Well, there's different competition.  It wasn't just to go

4   against ODPS.

5   Q.  How many cars did you buy?

6   A.  At first, we didn't buy any.  Everybody used their own.

7   Q.  How many do you have now?

8   A.  50.

9   Q.  50 cars.  And those cars are manned by people who perform

10  flagging work out on the highways and byways of the Commonwealth

11  of Kentucky, correct?

12  A.  Yes, sir.

13  Q.  When they are all busy -- and most of the time they are not,

14  are they?

15  A.  They stay pretty busy.

16  Q.  That's what you intended to do from the outset, was to go

17  into business against ODPS, and you solicited -- let me let you

18  answer that question first.

19  A.  We -- my wife started the company to do traffic control and

20  security, yes.

21  Q.  You were the organizer of the company.

22      Let's go ahead and get this out of the way.  I'm sorry.

23  This isn't marked.

24      Let me show you what I would ask the court reporter mark as

25  Exhibit 1.

Brown - Cross                                                    185

1          THE COURT:  We would prefer you to handle marking.

2          MR. HALEY:  Very good.

3          THE COURT:  Do you anticipate using the Elmo?

4          MR. HALEY:  This will be pretty quick.  If you would

5     like me to show it on that, I would be happy to.  I just put a

6     jury to sleep in Paducah about a month ago.  I don't want to

7     take the risk of doing it again.  You are more alert, Your

8     Honor.

9          THE COURT:  I promise you I won't fall asleep,

10    although I will suggest that if you are going to go through more

11    than one document, you might as well get the Elmo fired up.

12    It's a little more efficient ultimately than walking around the

13    room.

14    Q.  Let me direct your attention to that, Mr. Brown.  Do you

15    recognize that document?

16    A.  Yes, sir.

17    Q.  You have, in fact, entered certain information that appears

18    on the Secretary of State website concerning your business that

19    is apparently owned by your wife, correct?

20    A.  Yes.  I signed on as the organizer.

21    Q.  And you are the organizer?

22    A.  Yes, sir.

23    Q.  And you have filed your appropriate annual reports.  And the

24    business was first organized -- can you please tell the Court

25    when that happened?

Brown - Cross                                                    186

1    A.  Where is the date here?  9-30-11.

2    Q.  9-30-11 was approximately four months before you ceased

3    performing services for ODPS, correct?

4    A.  Yes, sir.

5    Q.  And during that period of time, were you engaged in

6    soliciting customers of ODPS?

7    A.  No, sir.

8    Q.  Were you engaged in speaking to crew foremen on jobs that

9    you were working about the possibility of going into business

10   for yourself and doing their work?

11   A.  No, sir.

12   Q.  You just kept it all quiet and just to yourself?

13   A.  Me and my wife.

14   Q.  Didn't say anything to Mr. Stallings about your intentions?

15   A.  No, sir.

16   Q.  So you had nothing to do with his formation of a business

17   about a month later?

18   A.  No, sir.

19   Q.  Okay.  By the way, Mr. Stallings at Urgent Services is your

20   absolute biggest customer, correct?

21   A.  We contract him for flaggers.

22   Q.  He's your absolute biggest customer, isn't he, by far?

23   A.  I can't answer that.  I don't know.  I mean, we --

24   Q.  In 2012 after you first started business, you paid Urgent

25   Services $50,000, didn't you?

1    A.   I'm not -- I do not know.

2    Q.   Well, now, in the other lawsuit you provided your tax

3    records.  Do you remember me asking for those?

4    A.   Okay.

5    Q.   And did you sign off on the provision of those records to

6    me?  Did you confirm that they were true and accurate?

7    A.   Yes, sir.

8    Q.   Do you remember a 1099 to Urgent Services for $50,000 from

9    2012?

10   A.   I do not know the number on that, sir.

11   Q.   Do you remember almost $150,000 to Urgent Services in 2013?

12   A.   I don't know the numbers.

13   Q.   You don't know.  In any event, let's talk about your work.

14   I have a printout here, D_8291 through D_8295.  It shows every

15   check ever written to you by ODPS.  It's annotated by the

16   number of hours.  You never worked a hundred hours in a week for

17   ODPS.

18   A.   There was a week that I worked 110, I do believe.

19   Q.   110.  What week was that?

20   A.   It's been years.  I don't know.  I know that I worked 110

21   hours one week.  It was the longest I ever worked.

22   Q.   Are you sure you weren't working for somebody else at the

23   same time?

24   A.   I'm sure.

25   Q.   Your hours varied widely week-to-week and month-to-month,

Brown - Cross                                                     188

1    didn't they?

2    A.  Yes.

3    Q.  In fact, when you first started performing services, you

4    were rarely above 30 hours -- that's not true.  I take that

5    back.  The documents will speak for themselves when we introduce

6    them.  You started out slow, and then you picked up, I guess.

7    Would that be fair to say?

8    A.  Yes, sir.

9    Q.  Let's talk about the Miller Pipeline job.  You were given

10   the opportunity to select that job for your first assignment,

11   right?

12   A.  I don't know if it was -- it wasn't my first assignment.

13   Q.  You had been given other opportunities before that?

14   A.  Yes, sir.

15   Q.  And that's the way it works, isn't it?  "You available?  We

16   have got this."

17   A.  They call for a job, and then we go to the job, yes, sir.

18   Q.  And they ask if you are available to do it, correct?

19   A.  Well, it was more like they call and say, "I need you here

20   at 9:45," and we would just go.

21   Q.  Okay.  And you would just go.  Except that you have turned

22   down assignments before without longstanding consequence, right?

23   A.  Like I said, I worked whenever they called.

24   Q.  Because you needed the money, right?

25   A.  Yes.

Brown - Cross                                                    189

1    Q.  At the time you first came to work for -- to perform

2    services for ODPS, you were writing mortgages.  You had a

3    company to do that, didn't you?

4    A.  Yes.

5    Q.  You were winding that down, right?

6    A.  Yes.

7    Q.  The economy is going to you-know-where, and nobody is making

8    any money with mortgages?

9    A.  Yes, sir.

10   Q.  You needed something else to do?

11   A.  Yes, sir.

12   Q.  Do you think the amount of hours that you spent servicing

13   customers of ODPS went down in 2010?  I'm just asking for your

14   memory, your recollection, the best of your recollection.

15   A.  I don't think so.  It probably went up.

16   Q.  They probably went up from when?  2009?

17   A.  Yes, sir.

18   Q.  When were you working on the repetitive project with Miller

19   Pipeline, the ongoing project?

20   A.  Up till about the time I left, a little bit before then.

21   Q.  Right up until the very time that you left, you were still

22   on that project?

23   A.  I was on the project about -- until about -- I don't know

24   the exact times, but let's say about a month before I left.

25   Q.  You mentioned that you left in June.  Let me ask you to

Brown - Cross                                                    190

```
 1    think hard about it.  Wasn't it February?
 2    A.  I said January.
 3    Q.  Okay.  I thought I heard June.
 4    A.  I think you might have said June accidentally.  I said
 5    January.
 6    Q.  So if he said June, he was wrong, and you should have
 7    corrected --
 8    A.  I couldn't --
 9    Q.  I'm kidding, Mr. Brown.  We would agree that you left in
10    February?
11    A.  Late January, early February, yes, sir.
12    Q.  Would you disagree with the fact that your last check from
13    ODPS was issued on 2-17, 2012, in the amount of $142.50?
14    A.  That's probably correct.
15    Q.  Probably correct.  Would have been a short week, I guess?
16    A.  Yes, sir.
17    Q.  And you have since advertised your services at KTPS, have
18    you not?
19    A.  What do you mean by advertising my services?
20    Q.  You have printed business cards and placed advertisements on
21    the Internet and handed out circulars and flyers and actually
22    directly solicited business from folks that you know that are in
23    the industry?
24    A.  The only advertising that we have really done is for
25    employees online, and then we have got a website and business
```

```
 1    cards and brochures.
 2    Q.   Okay.  I want to talk about the vehicle that you used to
 3    go -- I think that you said you could use it to go to the
 4    grocery store.  Did you have a separate vehicle before you had
 5    to buy the Crown Vic to service ODPS customers?
 6    A.   Yes, I did.
 7    Q.   Okay.  And you could use that one to go to the grocery
 8    store, too, right?
 9    A.   Yes, sir.
10    Q.   Have you replaced the vehicle that you had for purposes of
11    performing business for ODPS customers?
12    A.   Are you talking about when I first started to replace the
13    vehicle I had before I got the Crown Vic?
14    Q.   Yeah.
15    A.   I sold that vehicle.
16    Q.   You understood that the purpose behind the '98 or newer
17    Crown Vic was to have a police-like vehicle?
18    A.   Yes, sir.
19    Q.   And that was required by LG&E so that you would look
20    official out there on the site?
21    A.   I don't know if it was from them or --
22    Q.   Do you have any reason to dispute that it came from them?
23    Do we have any reason to disbelieve that if the testimony is
24    otherwise?
25    A.   I wouldn't -- if that's what it came down to, yes, sir.
```

Brown - Cross                                                        192

1   Q.  Police vehicles have changed a lot in this community,

2   haven't they?

3   A.  Yes, sir.

4   Q.  The Mustangs frighten me on the Watterson these days.  In

5   any event, do your customers require you to have police-like

6   vehicles?

7   A.  No, sir.

8   Q.  Just vehicles with lights?  You see Explorers, you see all

9   sorts of stuff out there now, right?

10  A.  Yes, sir.

11  Q.  Back in the late -- in 2007, 2008, we didn't have all those

12  different kinds of vehicles as police vehicles, did we?

13  A.  No, sir, mostly just --

14  Q.  Unless you go to Bowling Green, and they have the drug

15  Corvette.  You've been down there and seen that?

16      Now, when you were engaged by ODPS to service its customers,

17  you, of course, paid self-employment tax on the amounts listed

18  in your 1099s, right?

19  A.  Yes, sir.

20  Q.  You received a 1099 every year?

21  A.  Yes, sir.

22  Q.  And you signed a W-9 to indicate -- do you know what a W-9

23  form is?

24  A.  Yes, sir.

25  Q.  And you signed that.  And you deducted your business

1    expenses involved in, what, operating the vehicle, maintaining

2    the vehicle, getting the vehicle to the place of the work?

3    A.  Yes, sir.

4            MR. HALEY:  If I haven't done it, I would move for the

5    admission of Defendants' Exhibit 1.

6            MR. SHEPHERD:  Judge, it's hearsay, but I don't object

7    to it.

8            THE COURT:  Hold on just one second.  Just so I'm

9    clear, you say you don't object to it?

10           MR. SHEPHERD:  I don't object.

11           THE COURT:  It will be admitted.

12       (Defendants' Exhibit 1 admitted in evidence.)

13   Q.  Mr. Newman recently came back to work for you after having

14   spent some time working at ODPS, right?

15   A.  Yes, sir.

16   Q.  Is that correct?

17   A.  Yes, sir.

18   Q.  And he was welcomed back to ODPS after working for you,

19   correct?

20   A.  I don't know about that.  He's been with me since --

21   Q.  He testified recently -- I'm not going to tell you what he

22   said.  Do you know that he had not worked for you for some

23   period of time and was working for ODPS?

24   A.  He told me -- I remember there was an occasion he said he

25   worked an ODPS job.

1   Q.  An ODPS job, just one?  You don't care if he works for other

2   folks, do you?

3   A.  No, sir.

4   Q.  And there's no reason for you to think that there was a

5   problem working for other folks while you were engaged to

6   perform services for ODPS either?

7   A.  I'm sorry?

8   Q.  That was a terrible question.  While you were working for --

9   performing services for customers of ODPS, there was nothing

10  that would prevent you from going out and doing your own thing

11  to provide services elsewhere, was there?

12  A.  I mean, we worked so many hours, I never tried to work

13  anywhere else, or didn't think about it.

14  Q.  Let's assume you wanted to work fewer hours and do something

15  else.  You could have done that?

16  A.  Sure.

17  Q.  The only thing you couldn't have done is go to work for

18  customers of ODPS, right?  That's what your document said, the

19  independent contractor agreement?

20  A.  It said you shouldn't solicit other --

21  Q.  It also said you can't work for them for two years, didn't

22  it?

23  A.  I was --

24  Q.  You want to take a look at it?  It's Exhibit 19.  It's

25  already in.  It's Exhibit 19.  I guess we could fire up the

1    Elmo.  I don't have the paper copy of what you have admitted as

2    19.  This should be 19, which was introduced by the Government

3    in your case.  Do you have Exhibit 19 in front of you?

4              MS. LITZINGER:  It's what's on the CD.

5              MR. HALEY:  It's on the CD.  Would you call it up for

6    me?  Or I can put it on the Elmo, if I can fire it up.

7              THE COURT:  It's working.

8    Q.  Do you have the screen right there, sir?

9    A.  Yes, sir.

10   Q.  Now, this is the one that your wife signed, right?

11   A.  I do believe so, yes, sir.

12   Q.  That's her signature there.  Is there any difference between

13   this particular no-compete clause, for lack of a better term,

14   nonsolicitation clause, and the one that you have your signature

15   on that predates this?

16   A.  I don't think so, sir.  I don't have the other one.  I think

17   they are the same.

18   Q.  It was the same.  So the only restriction that you had in

19   going out and doing your own thing to provide traffic control or

20   security services is that you could not, while working for ODPS,

21   their customers, go out and solicit those customers and perform

22   services for those customers, right?

23   A.  The way I look at this, it looks like it's a nonsolicitation

24   where you are not supposed to solicit customers of ODPS for two

25   years after you leave.

1    Q.  "Solicit or attempt to obtain business from, accept business

2    from, or do business with, or service any customer."  That's

3    more than just solicitation, isn't it?

4    A.  It says "nonsolicitation" on there.  That's the way I read

5    it.  That's the way --

6    Q.  So you don't read any further than "nonsolicitation."

7    That's all that means to you?

8    A.  It looks like a nonsolicitation to me for two years.

9    Q.  You want to go through it again?

10              THE COURT:  No, we are not going to go through it

11   again.  I think you've made your point.

12              MR. HALEY:  Okay.

13   Q.  In your mind you were free to do any work you wanted to

14   anywhere because this was just nonsolicitation, right?

15   A.  Yes, sir.

16   Q.  And you could do it while you were working for ODPS?

17   A.  Well, I never thought about that.

18   Q.  And you never chose to do it?

19   A.  No, I never chose to do it.

20   Q.  In your mind there's no restriction whatsoever on going out

21   and doing your own thing in other places of business?

22   A.  You know, like I said --

23   Q.  I don't have any more questions.  Thank you.

24              THE COURT:  Redirect, Mr. Shepherd?

25              MR. SHEPHERD:  No, sir.

1          THE COURT:  Is this witness free to go?

2          MR. SHEPHERD:  Yes, sir.

3          THE COURT:  He's not subject to recall?

4          MR. HALEY:  He's not.

5          THE COURT:  Thank you.

6       (JAMES W. ASHLEY, called by plaintiff, sworn.)

7                     DIRECT EXAMINATION

8    BY MR. SHEPHERD:

9    Q.  Can you please state your name, sir?

10   A.   James W. Ashley.

11   Q.  And, Mr. Ashley, are you a police officer or a sheriff's

12   deputy?

13   A.   I'm a retired sheriff's deputy, and I'm currently an elected

14   constable in Spencer County District 1.

15   Q.   Is that Spencer County, Kentucky?

16   A.  Yes, sir.

17   Q.  It's my understanding that you have a law enforcement

18   background?

19   A.  Yes, sir.

20   Q.  Can you briefly tell me about your law enforcement

21   background?

22   A.   I spent 10 years with the Jefferson County Sheriff's Reserve

23   Unit.  I spent approximately four and a half years with Metro

24   Corrections here in Jefferson County.  And I spent almost a year

25   with the New Orleans Police Department.

Ashley - Direct                                                198

1    Q.   Okay.  And when were you elected constable out in Spencer
2    County?
3    A.   I took office in January of 2011.
4    Q.   Okay.  And have you served continuously from January of 2011
5    until we sit here today?
6    A.   Yes, sir.
7    Q.   Okay.  At some point in time did you work for Off Duty
8    Police Services, or ODPS?
9    A.   Yes, sir.
10   Q.   When did you start working for ODPS?
11   A.   I believe it was sometime in 2007.
12   Q.   And when did you stop working for ODPS?
13   A.   I'm pretty sure the last one I did was last Derby, 2014.
14   Q.   Okay.
15   A.   I don't believe anything in between there.  If it was, it
16   wasn't very much.
17   Q.   Okay.  So you worked from approximately 2007 to 2014?
18   A.   Yes, sir.
19   Q.   And during this time period, was all your work what's been
20   referred to as sworn work?
21   A.   Yes, sir.
22   Q.   Were you always paid $20 an hour?
23   A.   Yes, sir.
24   Q.   So it's my understanding that you worked for ODPS for about
25   seven years.  During this period, did you do any off-duty work

1   for any other company other than ODPS?

2   A.  Later times I did like jobs for other companies, but it was

3   hit and miss.  It wasn't nothing on a permanent basis like

4   working for ODPS.

5   Q.  What percentage of your off-duty work was with ODPS as

6   opposed to these other companies?

7   A.  I would probably say at least -- at the beginning it was

8   about 80 percent at the time.

9   Q.  Okay.  While you were working for ODPS, can you estimate

10  about how many hours a week you were working?

11  A.  When I first started, I can't give you an exact amount, but

12  I know it was at least -- when I become constable, it was at

13  least 50 hours a week or more.  I don't know the exact amount.

14  Q.  I understand.  During this time period, you also had another

15  full-time job?

16  A.  The constable job was just mainly serving papers and helping

17  out in the county.  It wasn't actually a full-time job, no, sir.

18  Q.  About how many hours a week do you spend doing the constable

19  work?

20  A.  It depends on the paperwork.  I can't give you an exact

21  amount.  I don't know.

22  Q.  It varies?

23  A.  Yes, sir.

24  Q.  What did you do for ODPS?

25  A.  Well, I started out at UPS, and then Darrell found out I had

1    a Crown Vic.  He put me over in traffic.  I started doing mainly

2    traffic thereafter.

3    Q.  At UPS, were you doing security work?

4    A.  Yes, sir.

5    Q.  And then he found out you had a Crown Vic, so you started

6    doing traffic?

7    A.  Yes, sir.

8    Q.  What does the traffic work entail?

9    A.  Mainly setting up jobs for contractors like AT&T, LG&E, you

10   know, when we get there, make sure they are safe.  Our primary

11   goal was to make sure they were safe.

12   Q.  Okay.  Direct the traffic around the work site?

13   A.  Yes, sir.

14   Q.  What about the security work?

15   A.  That was mainly like watching buildings being built.  You

16   were keeping an eye on the equipment, making sure doors remained

17   locked, nobody was getting in the buildings, whatever it

18   entailed at that time.

19   Q.  What percentage of your work was security work and what

20   percentage was traffic control?

21   A.  It just varied depending on the need.

22   Q.  Okay.  Did you do a significant amount of both?

23   A.  Sometimes it would be half and half.  But mostly traffic,

24   yes, sir.

25   Q.  Okay.  Did you ever receive any type of training while you

Ashley - Direct                                                    201

1   were working at ODPS?

2   A.   Just the traffic classes.

3   Q.   How many of those traffic classes?

4   A.   I remember one was online.  I remember I went to another

5   one.  I can't remember where it was at.  I did another one in a

6   classroom setting.

7   Q.   Did Mr. Spurgeon teach that class?

8   A.   I believe so, yes, sir.

9   Q.   What about the online training?

10  A.   That was just sent to us and asked us to complete it for

11  state certification.

12  Q.   Who sent it to you?

13  A.   ODPS.

14  Q.   Other than these two occasions, can you think of any other

15  training?

16  A.   No, sir.

17  Q.   Now, before coming to work at ODPS, you had worked as a

18  police officer?

19  A.   I was a reserve sheriff at the time.  I took over at Metro

20  Corrections in 2006.  So yes, I guess you could say that to a

21  point.

22  Q.   As a reserve sheriff's deputy, did you ever do any traffic

23  control work?

24  A.   Only for the sheriff, what he required.  There was nothing

25  like classified off-duty.

1    Q.   So you knew -- I guess my question is did you know how to do

2    that before you came to work for ODPS?

3    A.   Yes, sir.

4    Q.   While you were working for ODPS, did you have a supervisor?

5    A.   Just talking to Darrell and Frank.  That was the main

6    thing.

7    Q.   Darrell Spurgeon and Frank Medieros?

8    A.   Yes, sir, Darrell Spurgeon.

9    Q.   And did Mr. Spurgeon ever come out to the job site that you

10   were working?

11   A.   I think I seen Darrell maybe -- if I recall, maybe three

12   occasions, and that was about it.

13   Q.   What about Mr. Medieros?

14   A.   It just varied.  Maybe once or twice, three times a month

15   maybe, depending on what was going on.

16   Q.   What were they doing when they would come out?

17   A.   They were just checking on the work site, make sure people

18   showed up like they were supposed to, and the site -- the

19   traffic area was supposed to be set up like it was, or supposed

20   to be.

21   Q.   While you were working for ODPS, were you ever required to

22   send any type of reports in to the company or send any invoices

23   in to the company?

24   A.   Invoices, yes, sir.

25   Q.   Do you recall when that started?

1    A.   No, sir.

2    Q.   Prior to the time when you started sending invoices in, how

3    would you let them know the hours that you were working?

4    A.   Generally, they would know because they would text us for

5    the beginning time, and then when we completed the job and we

6    left the area, we would text them and let them know the job is

7    complete.  So usually like a text message.

8    Q.   Who would you text?

9    A.   Generally whoever had the phone.  I don't know if Darrell

10   had it or Frank had it or what.

11   Q.   Was this the ODPS phone?

12   A.   Yes, sir.

13   Q.   How did you know you were texting the ODPS phone?

14   A.   Because it was the number that was programmed in my phone

15   that was given to me.

16   Q.   Who was it given to you by?

17   A.   Darrell Spurgeon.

18   Q.   Were you always paid by the hour at ODPS?

19   A.   Yes, sir.

20   Q.   And was that always $20 an hour?

21   A.   Yes, sir.

22   Q.   Who set that pay rate?

23   A.   I guess Darrell did.  That's what he would tell you.

24   Q.   Prior to coming to work for ODPS, did you realize that you

25   would be classified as an independent contractor?

Ashley - Direct                                                    204

1    A.  No, sir.

2    Q.  When did you first realize that that was something that --

3    A.  When I got -- I just knew I was getting a check and there

4    was nothing taken out of it, no taxes or nothing, just a

5    straight check.

6    Q.  There was no employment taxes taken out?

7    A.  No, sir.

8    Q.  Were you ever required to sign an independent contractor

9    agreement?

10   A.  I believe there was one I signed in 2008 or something like

11   that.

12   Q.  Okay.  And how did you come to sign this agreement?

13   A.  I was asked to sign it.  I can't remember if it was the one

14   that dealt with UPS or just the one in general.  I can't answer

15   that.  I was handed it and asked to sign it, and I signed it.

16   Q.  Did Mr. Spurgeon ask you to sign it?

17   A.  Yes, sir.

18   Q.  Before coming to work at ODPS, did you have to buy any

19   equipment or supplies?

20   A.  Yes, sir.  I had to provide a car, lights, and other

21   equipment such as like a flashlight, stuff like that.

22   Q.  And can you give me an estimate about how much money you

23   spent to acquire this equipment?

24   A.  No, sir, not off the top of my head.

25   Q.  Was it more or less than $5,000?

1    A.  I would say a lot less, yes, sir.

2    Q.  A lot less?

3    A.  Uh-huh.

4    Q.  Yes?

5    A.  Yes.  I'm sorry.

6    Q.  No problem.  You indicated that you had to purchase a

7    vehicle.  I think you previously told me about that you already

8    had a Crown Vic?

9    A.  Yes, sir.  Well, I had purchased one when I started at UPS,

10   but I've always had one, yes, sir.

11   Q.  Did you just use that vehicle in conjunction with your

12   employment at ODPS?

13   A.  Yes, sir.

14   Q.  And did you ever use this vehicle to make personal errands?

15   A.  Yes, sir.  If I had to, yes, sir.

16   Q.  During the time that you worked for ODPS, did they provide

17   you with any type of equipment or supplies?

18   A.  Only thing I received from Darrell when I worked at UPS was

19   a vest, a jacket, and a pullover with a hoodie on it that had

20   ODPS on it.

21   Q.  It had the ODPS logo on it?

22   A.  Yes, sir.

23   Q.  All your work at ODPS was sworn work.  What type of clothes

24   did you wear while you were working for ODPS?

25   A.  Generally my uniform, whatever department I was working for

Ashley - Direct                                                    206

1    at the time.

2    Q.   Okay.  And how did you know that you were required to wear

3    your department uniform?

4    A.   He asked us to do that, if we were sworn, to wear our

5    uniforms.

6    Q.   Would that be Mr. Spurgeon?

7    A.   Yes, sir, Mr. Spurgeon.

8    Q.   What about grooming requirements?  Were any rules

9    communicated to you about how -- whether you should have a beard

10   or anything else like that?

11   A.   Nothing to me, no, sir.

12   Q.   Did you have occasion to log on to the ODPS website?

13   A.   I believe just a couple of times.  I don't know the exact

14   number.  One was a discrepancy on a check, I believe, and

15   another one is when we took the online course.

16   Q.   Okay.  Did you ever see any of rules or announcements posted

17   on the website?

18   A.   No, sir.

19   Q.   Did you ever do any security work out at Showcase Cinemas?

20   A.   Maybe once or twice, but that's all I remember.

21   Q.   Okay.  While you were working at ODPS, how would you get

22   your job assignments?

23   A.   I would either -- sometimes he would call or text us the job

24   and asked if we wanted to work it and what time it was.

25   Q.   Would that be Mr. Spurgeon?

Ashley - Direct                                                    207

1    A.  Yes, sir, Mr. Spurgeon.

2    Q.  And would he call your cell phone?

3    A.  Yes, sir.  Sometimes he would call my house phone.  Most of

4    the times it was my cell phone.

5    Q.  Did he ever send out e-mail blasts or anything like that to

6    you?

7    A.  No.  Not that I am aware of, no.  Most of mine was text or

8    call.

9    Q.  Would anybody else be on those text messages?

10   A.  Sometimes only if it was required -- another officer was

11   required to go with me.

12   Q.  And what would those text messages -- what would they say?

13   A.  Generally, they would just say are you available for a job

14   at a certain time and certain location, not who it was for or

15   nothing, unless it was a call-out for the water company.

16   Q.  Did you ever do any of the call-outs?

17   A.  Yes, sir.

18   Q.  Were those sometimes in the middle of the night?

19   A.  Oh, yes, sir, several.

20   Q.  And would those text messages or telephone calls inform you

21   of the location of the job?

22   A.  Yes, sir, location.

23   Q.  And would this tell you what time the job started?

24   A.  Yes, sir.

25   Q.  If you accepted one of those assignments and you actually

Ashley - Direct                                                         208

1  went out to the job and something came up and you needed to

2  leave early, what would you do?

3  A.  The process would be if the job was going over, like I had

4  to be at my regular job, I would call Frank or Darrell and say,

5  "I need relief."  There was usually an hour lapse time in

6  between there.

7  Q.  Okay.  And was that ever communicated to you that that was

8  something that you should do?

9  A.  Yes, sir.

10 Q.  By whom?

11 A.  Darrell Spurgeon.

12 Q.  Okay.  What about if you agreed to work a job and something

13 came up?  Could you switch shifts with one of your co-workers?

14 A.  That would depend on Darrell.  We would call him to say,

15 "Hey, this just came up."  And then he would say, "Okay, I'll

16 get somebody else to do it."

17 Q.  Did you ever try to swap shifts and Mr. Spurgeon wouldn't

18 allow the swap?

19 A.  Not that I remember.  It may have happened, but I don't

20 remember.

21 Q.  You indicated that Mr. Spurgeon would offer you these jobs.

22 Did you ever have occasion to say either, "I don't want to," or

23 "I can't do this job"?

24 A.  I just told him I wasn't available.

25 Q.  And did anything -- did any negative consequences flow from

Ashley - Direct                                                209

```
 1   you telling him that you weren't available to do the job?
 2   A.   Sometimes I wouldn't talk to him for at least three days to
 3   a week.
 4   Q.   Was that abnormal for you not to talk to him during this
 5   time period?
 6   A.   Generally, yes, sir.
 7   Q.   Have you ever heard the term "time-out"?
 8   A.   I've heard it mentioned, yes, sir.
 9   Q.   Have you ever been in time-out?
10   A.   Yeah, I guess I could say I've had my share, I guess.
11   Q.   When you were in time-out, would you ever call or text
12   Mr. Spurgeon and request work?
13   A.   I would call and try to talk to him or ask him but never get
14   a response.
15   Q.   And was that abnormal to call or text and not get a
16   response?
17   A.   Sometimes, yes, sir.
18   Q.   Were you put in this time-out more than once?
19   A.   I guess.  I don't know.  I guess.
20   Q.   While you were working for ODPS, did you ever have a
21   corporation or a limited liability company set up for yourself?
22   A.   No, sir.
23   Q.   Did you ever have a business license?
24   A.   No, sir.
25   Q.   Did you ever advertise so you could get work from other
```

1    companies besides ODPS?

2    A.   Just word of mouth in the business.

3    Q.   Tell me about that.

4    A.   Just people we know in the business, call up and say, "Hey,

5    anybody hiring for off-duty?"  And they would say "yea" or

6    "nay."

7    Q.   Did you ever have a website set up for yourself?

8    A.   No, sir.

9    Q.   Did you ever maintain an office or any type of staff to

10   assist you with the work you were doing?

11   A.   No, sir.

12   Q.   Did you ever purchase business liability insurance?

13   A.   No, sir.

14   Q.   Did you ever maintain any type of worker's compensation

15   insurance?

16   A.   No, sir.

17   Q.   I appreciate you answering my questions.

18                           CROSS-EXAMINATION

19   BY MR. HALEY:

20   Q.   Good afternoon.  I'm Ray Haley.  I'm representing ODPS and

21   the Spurgeons.

22       So you were free to perform services of a security or

23   traffic control nature for other companies while you were

24   performing those services for ODPS?

25   A.   Yes, sir.

Ashley - Cross                                                              211

1    Q.  Did you do it frequently?

2    A.  Just occasionally.

3    Q.  Just occasionally.  Whenever you had the opportunity?

4    A.  Whenever something was asked or somebody called.

5    Q.  Just so we can get the dates right -- may I approach, Your

6    Honor?

7            THE COURT:  Yes.

8    Q.  I hand you what I ask be marked as Exhibit 2.  Do you

9    recognize that document, sir?

10   A.  Yes, sir, I do.

11   Q.  Is that your signature appearing on the very last page?

12   A.  Yes, sir.

13   Q.  And was it signed on or about the date indicated on the

14   front page, October 27th, 2008?

15   A.  I assume so, yes, sir.

16           MR. HALEY:  Move the admission of Company Exhibit 2.

17           MR. SHEPHERD:  No objection.

18       (Defendants' Exhibit 2 admitted in evidence.)

19   Q.  Do you have any reason to think that was not the case?

20   A.  No, sir.

21   Q.  I have certain pay records indicating payment of your

22   reports of services rendered, and it appears that your first

23   paycheck from ODPS was issued on November 21st, 2008, for

24   services performed between November 9th and November 15th.  Does

25   that sound right?

1    A.  I can't recall.  I don't have my records in front of me, no,

2    sir.

3    Q.  What records do you have that indicate your compensation?

4    A.  Just my records I have for writing all my information down

5    at home.

6    Q.  Do you have any reason to doubt that you first performed

7    services in November after having signed this document prior to

8    performing services?

9    A.  No, sir.

10   Q.  Okay.  So you were aware that you were an independent

11   contractor before you rendered services to ODPS?

12   A.  Not that I -- really, I guess I didn't pay attention to it

13   at the time, no, sir.

14   Q.  You didn't pay attention to it.  You didn't read it before

15   you signed it?

16   A.  I read some of it.  I didn't go through all of it, no,

17   sir.

18   Q.  You realized when you got your first paycheck in 2008 that

19   you were being paid on an independent contractor basis?

20   A.  I did then, yes, sir.

21   Q.  And did you get paid as an independent contractor on any of

22   these other jobs that you did?

23   A.  Yes, sir.

24   Q.  Are any of them repetitious?

25   A.  One is.  Actually, two of them, yes, sir.

Ashley - Cross                                                        213

1    Q.  Two of them are?

2    A.  Yes, sir.

3    Q.  You get paid the same way, independent contractor?

4    A.  Yes, sir.

5    Q.  Are these security jobs or traffic control jobs?

6    A.  Both.

7    Q.  Both.  And I guess that for -- bad thing to guess.  Pardon

8    me.  Would it be true that for 2008, 2009, 2010, 2011, 2012,

9    2013, and 2014 that you reported your income from ODPS as

10   self-employment income?

11   A.  Yes, sir.

12   Q.  Paid taxes on it accordingly?

13   A.  Yes, sir.

14   Q.  Took deductions as appropriate for business expenses

15   associated with the vehicle cost of getting to and from work,

16   all that stuff?

17   A.  Yes, sir.

18   Q.  And you quit working -- quit performing services for ODPS,

19   it looks like, in May of 2014.  Is that what you recall?

20   A.  I believe so, yes, sir.

21   Q.  And who are you working for now for off-duty purposes?

22   A.  I work for Kentuckiana Traffic and Patrol, and I have a

23   security job I do on my own.

24   Q.  You have a security what?

25   A.  Security job.

Ashley - Cross                                                    214

1    Q.  Of your own?

2    A.  Yes, sir.

3    Q.  Okay.  And how much work do you do in connection with

4    private traffic control or security work compared to what you

5    were doing back in 2014?  More or less?

6    A.  I would probably say -- up to 2014, I would say I do a

7    little bit more now than I did then.

8    Q.  You went into business for yourself, have your own job?

9    A.  Kind of, yes, sir.

10   Q.  And you could have done that at any time you were performing

11   services for ODPS customers, couldn't you?

12   A.  Yes, sir, I guess I could.

13   Q.  I want to talk about the time-out.  I think I might need

14   one.  No.  In terms of this, are you talking about a call-out on

15   an emergency basis that you refused and then you didn't get a

16   call on another one for a while?

17   A.  No, sir.  It was pretty much in general, if he called you

18   and you were in the middle of dinner with your family and you

19   told him "no," you're not available because you were doing

20   something, you wouldn't hear nothing.  The phone would just go

21   dead.

22   Q.  I thought that you had a fairly regular assignment or

23   posting or whatever --

24   A.  Most of them were, yes, sir.

25   Q.  We are referring to a whole bunch of stuff.  We talk about

Ashley - Cross                                                          215

```
 1    assignment.  I talk about posting.  We talk about all sorts of
 2    stuff.  It's ultimately up to the judge to decide.
 3    A.   Right.
 4    Q.   But did you ever feel like you were compelled to perform any
 5    work opportunity that was brought your way by ODPS?
 6    A.   Are you talking about asking if I wanted to work?
 7    Q.   Yes.
 8    A.   Oh, yeah.
 9    Q.   Were you ever given a direct order that you had to perform
10    an assignment --
11    A.   No, sir.
12    Q.   -- by Darrell Spurgeon or Frank Medieros or anybody else?
13    A.   No, sir.
14    Q.   You don't strike me as the kind of guy that would like that
15    anyway.  But that never happened?
16    A.   No, sir.
17    Q.   I don't see a week in here where your hours seem to be
18    significantly reduced.  Can you give me a little --
19    A.   One example would be I had contacted Mr. Spurgeon and told
20    him that I was taking my family to Great Wolf Lodge, and I said
21    I would be gone, I don't remember how many days it was, but in
22    general.  I said I would be gone.  So he calls me, and I'm in
23    the middle of my driving to get there, and he says, "Are you
24    available for work?"  I said, "Darrell, I told you two weeks ago
25    I'm on vacation with my family and I won't be back till this
```

Ashley - Cross                                                         216

1    day."  The phone just went dead.

2    Q.  Well, he's got to get somebody to do the job, right?

3    A.  Right.

4    Q.  He's not going to chitchat with you, would you expect?

5    A.  No.

6    Q.  He's pretty abrupt most of the time when you can't take an

7    assignment.  He hangs up pretty quick, right?

8    A.  Right.

9    Q.  Now, do you remember what kind of posting it was, what kind

10   of --

11   A.  No, sir, I do not remember.

12   Q.  He just asked if you were available, and you said "no," you

13   are on vacation?

14   A.  Yes, sir.

15   Q.  Reasonable to think that he didn't know that you were back?

16   A.  You asked me --

17   Q.  You didn't get work for a few days --

18   A.  I contacted him --

19           COURT REPORTER:  I'm sorry.  I can only take down one

20   person at a time.

21           THE COURT:  It's probably time for a reminder to slow

22   down and not talk over each other.

23   Q.  Did you call him when you got back?

24   A.  Yes, sir.

25   Q.  What did you say?

Ashley - Cross                                                      217

1    A.   I asked him, "Is there any work available?"

2    Q.   What did he tell you?

3    A.   I never heard back from him.

4    Q.   So you didn't really speak to him; you left a message?

5    A.   I texted him, and I left him a message.

6    Q.   Do you know if he was in town?

7    A.   I have no idea.

8    Q.   Okay.  Do you know what kind of assignment it was or what

9    kind of work opportunity it was that he was bringing to your

10   attention?

11   A.   No, sir.

12   Q.   If somebody else accepted it and it was a repeating sort of

13   thing, would you expect them to get thrown off in order to make

14   way for you when you got back?

15   A.   No, sir.

16   Q.   You don't know whether that happened.  Neither do I.

17   A.   I do not.

18   Q.   Is that possible?

19   A.   Yes, sir.

20   Q.   Thank you, sir.

21            THE COURT:  Any redirect?

22            MR. SHEPHERD:  No, sir.

23            THE COURT:  May this witness be finally excused?

24            MR. SHEPHERD:  Yes, sir.

25            THE COURT:  You are free to go.  Thank you.  I think

 1    we have got time for one more.

 2              MR. SHEPHERD:  Call Jason Petra, Judge.

 3              MR. HALEY:  This will be a long one.

 4              MR. SHEPHERD:  Could we tell the other witnesses they

 5    can go ahead and go home for the day and come back tomorrow?

 6    Would you like for us to keep them around?

 7              THE COURT:  Was that a throw-away comment, or was that

 8    an accurate comment when you said that this is going to be a

 9    long one?

10              MR. HALEY:  Mr. Petra is expected to be a long

11    cross-examination.

12              THE COURT:  I think that's reasonable.

13              MR. SHEPHERD:  Okay.  May we be excused to tell the

14    witnesses?

15              THE COURT:  Yes.

16         (JASON PETRA, called by plaintiff, sworn.)

17                        DIRECT EXAMINATION

18    BY MR. SHEPHERD:

19    Q.  Can you please state your name, sir?

20    A.  It's Jason Petra.

21    Q.  Mr. Petra, it's my understanding that you have a law

22    enforcement background?

23    A.  I do.

24    Q.  Can you briefly tell me about that background?

25    A.  I went to the academy in '98, graduated in '99.  I started

Petra - Direct                                                      219

```
 1   out in eastern Kentucky, and then I moved to Louisville the end
 2   of '05, early '06.
 3   Q.  Okay.  And what did you do here in Louisville?  Did you work
 4   for --
 5   A.  I worked for Audubon Park, Strathmoor, and West Buechel.
 6   Q.  Okay.  Are you currently employed by a police department?
 7   A.  No, sir.
 8   Q.  Can you tell me --
 9           THE COURT:  I'm sorry.  I didn't get that answer.
10           THE WITNESS:  No, sir.
11   Q.  Approximately how many years of service do you have in law
12   enforcement?
13   A.  About 15 -- 14, 15, somewheres in that ballpark.
14   Q.  At some point in time did you work for Off Duty Police
15   Services, or ODPS?
16   A.  I did.
17   Q.  When did you start working for ODPS?
18   A.  It would have been about the same time I moved to
19   Louisville.  I don't remember precisely.  It was somewheres --
20   I'm thinking it was the end of '05.
21   Q.  Okay.  And when did you stop working for ODPS?
22   A.  That would have been somewheres around -- somewheres early
23   2012 or so, maybe 2013, somewheres in that ballpark.
24   Q.  During this time period, did you work at any police
25   departments around Louisville?
```

Petra - Direct                                                      220

1    A.   I did.

2    Q.   Okay.  So you did some sworn work for ODPS?

3    A.   Yes.  Probably about half and half, about what I did.

4    Q.   Okay.  When you weren't employed by a police department, you

5    would be what is referred to as an unsworn officer at ODPS?

6    A.   Yeah, traffic control officer.

7    Q.   Okay.  At some point in time in the latter years of your

8    association or affiliation with ODPS, did you just work

9    full-time for the company?

10   A.   Yeah.  There was quite a bit of time where I just -- I

11   worked just for ODPS.

12   Q.   About how long did you work just for ODPS?

13   A.   I would say six years or so, maybe seven, something like

14   that.

15   Q.   Let me back up a little bit.  You worked for ODPS for six or

16   seven years total, correct?

17   A.   No.  It would have been -- I guess it was just that long.

18   When I first came here, it was like '05.  The first year I was

19   also a police officer.  Then from, I guess, the end of '06

20   through 2010, I think that's -- I'm trying to think when I went

21   to Strathmoor.  Maybe it was around '08 or '09.  I spent about

22   two years there.  And then from 2010 to 2012, I wasn't a police

23   officer.

24   Q.   Okay.  During this time period from 2010 to 2012, did you

25   work for ODPS?

1    A.   Yes.

2    Q.   Was your sole source of income through ODPS?

3    A.   Yes.

4    Q.   Okay.  While you were working as a police officer, did you

5    ever do any other off-duty work for any other companies besides

6    ODPS?

7    A.   I don't think I did until I started at West Buechel.  Prior

8    to that, I don't remember -- if I did, it was like a one-time

9    gig or something.  But I don't recall doing anything for anyone

10   else until I worked at West Buechel.

11   Q.   Okay.  Can you give me -- out of your law enforcement

12   career, if you can step back, can you tell me what percentage of

13   your off-duty work was from ODPS as opposed to anybody else?

14   A.   High nineties easy, because pretty much everything -- when I

15   first moved to Louisville -- where I'm from, off-duty was pretty

16   much unheard of.

17   Q.   Where are you from?

18   A.   Eastern Kentucky.  Down there you could work like the

19   football games for the high schools on Friday night.  That would

20   be a couple of hours.  One time there was a gas company that was

21   on strike, and they had us out there guarding a building.  It

22   had instruments in it.  That went on for probably three weeks or

23   a month.  But outside of that, I had never worked off-duty until

24   I moved to Louisville.  I wasn't even familiar -- I didn't know

25   this much was available.

1    When I first moved up here, the guys would tell me to call

2    Darrell, that he was the one that had all the off-duty, most of

3    it.  I hooked up with him pretty much as soon as I started at

4    Audubon Park.  Out here, people would talk other names, but I'm

5    not from Louisville, so I didn't know who anybody was.  And the

6    hours was good.  I was working pretty steady.  I didn't bother

7    to check anywheres else.  Like I said, once I started at West

8    Buechel, I done a few things here and there, you know.  I wasn't

9    working much for Darrell at that point.  But until that time, I

10   don't recall ever doing -- I'm sure there could have been

11   something here and there, like a security job or something, but

12   I don't remember anything off the top of my head.

13   Q.  What did you do physically while you were at ODPS?

14   A.  We did traffic and security.  I also remembered something

15   else.  There was one thing that I did, and I'm not sure how long

16   it lasted.  It seemed like it lasted a little bit over a year.

17   It was through ODPS.  I also worked at a place -- it was a

18   factory -- a warehouse factory called Royal Consumer Products.

19   I got paid by them, but I also got paid by ODPS.  It was like

20   undercover.  They have a lot of internal theft.  So during that

21   time, I actually had another job, but it was directly related.

22   I got it through ODPS.

23   Q.  Okay.  This job at the consumer products place that you just

24   told me about, do you recall when that was?

25   A.  It was between -- somewheres between '06 -- I guess early

1    '07 and probably -- I guess maybe it was between '06 --

2    somewheres between '06 and '08.

3    Q.  You said you got the job through ODPS?

4    A.  Yes.  He had called me and wanted to know -- I was trying to

5    get on a police department.  He said if I could kind of wait on

6    that because they hadn't hired yet anyway.  You know, this gig

7    coming up, you know, was pretty good.  Because I had a police

8    officer background and there was another officer that at the

9    time was just doing traffic only as well, and he put us both

10   undercover there.

11   Q.  Would this be Darrell Spurgeon?

12   A.  Yes.

13   Q.  Okay.  So you went out to this location, and you worked

14   there about a year in 2007?

15   A.  It might have been a little bit over a year.  It was close

16   to a year.  It wouldn't have been drastically longer.

17   Q.  And you indicated that you got paid from the company, but

18   you got paid from ODPS as well?

19   A.  Correct.

20   Q.  Explain that to me.  You got two checks?

21   A.  Yes.

22   Q.  Okay.

23   A.  Because in order -- I guess the owner lived like away from

24   here.  He lived out of state.  It might have been like

25   Connecticut or something.  In order for -- no one there knew who

1    we were except for the general manager of the plant.  In order

2    to make it appear, I guess, legit to all the employees --

3    because they had tried this once before they had said, so

4    everybody was a little gun shy.  So they wanted us to go through

5    and -- they hired through a temp agency.  We had to go in and

6    talk to them and hire in as temps, but it was all set up ahead

7    of time that they was going to hire us.  After we was there like

8    60 days or whatever, they had to either hire us in as full-time

9    or get rid of us.  So they hired us in as full-time.

10   Q.   You actually got a check from the company?

11   A.   Yes.

12   Q.   And at the same time you got a check from ODPS?

13   A.   Yes.  The difference was the company was paying us for doing

14   the company work.

15   Q.   Okay.

16   A.   And ODPS was paying us for the investigation part of the

17   work.

18   Q.   Okay.  Do you recall how much you were being paid from ODPS

19   during this time period?

20   A.   I don't remember precisely, because it changed, because, I

21   guess, initially it was only going to be a short-term job, like

22   a couple of months.  When it extended out and they started

23   renegotiating, it had dropped some.  But we was still getting

24   paid from the company.  But I want to think when it first

25   started, it was like maybe somewheres around 20 to -- I can't

1    remember exactly.  After the fact, I think it dropped to like 18

2    from ODPS.  The other part stayed the same.  And I want to think

3    that was like maybe $10 an hour or something, it wasn't very

4    much, to the company.

5    Q.  You've told me a little bit about the security work that you

6    have done for ODPS.  What about the traffic control work?

7    Physically, what does that type of work entail?

8    A.  We would show up -- it varies based on what company was

9    doing what and the location that we would have to direct traffic

10   around the work zone.  So, say, they was downtown somewhere,

11   like on a street that had two-way traffic, we would actually

12   take one lane up, and we would station someone on either side of

13   it, and then we would have to communicate and stop traffic and

14   let it flow one direction and then stop that traffic and let it

15   flow the opposite direction.

16   Q.  You told me about the undercover job you did in 2007.  Did

17   you ever do any type of security work?

18   A.  Yes.  I worked at a -- I think it was like Sam Swope.  It

19   wasn't the actual car lot.  I don't think I worked there any.

20   It was like a detail shop.  It was still Sam Swope.  It was

21   where they cleaned the cars up and did different things to them.

22   I did that a few times.  And there were a few other various

23   security things, like there was a golf course.  When they were

24   having events, like the booths and everything set up, they would

25   want us to sit out there.  Usually it was night work.  We would

1    do Derby details for the Kentucky Derby.

2    Q.  What would you do on these security jobs when you were

3    sitting out at these various locations?

4    A.  It really varied, depending on what it was.  Some of them

5    just wanted you there just maybe to walk around some and drive

6    around some.  The car place wanted you to count the cars and

7    check the doors and whatnot and then drive around and make sure

8    nobody messed with them, broke in them, things of that nature.

9    A lot of it was about visibility as well.  They wanted you out

10   there and be seen.

11   Q.  Okay.  Did you ever receive any type of training at ODPS or

12   from anyone affiliated with ODPS?

13   A.  Yes.  Not initially.  It was a couple of years into it, I

14   guess, is when the state or whatever started wanting you to be

15   certified flagging.  And then ODPS hosted a class.

16   Q.  Okay.  Did you attend that class?

17   A.  I did.

18   Q.  Did other ODPS contractors or employees attend that class?

19   A.  Yes.  I don't remember how many, but there was quite a few

20   of us.

21   Q.  Did Mr. Spurgeon teach the class?

22   A.  I believe he did, that one.

23   Q.  Did you ever attend any other of these training classes?

24   A.  I did.  The second one, I think he was there, but I can't

25   remember if he taught it or if someone else did.  I know I went

1    to class two times.  And the other time was just like -- we

2    would have to -- they would e-mail us the test, and we would

3    have to fill it out and send it in.

4    Q.  Who would e-mail you the test?

5    A.  ODPS.  I can't remember whether it was Frank Medieros or

6    Darrell, but it would come through the ODPS e-mail.

7    Q.  Did you ever receive any e-mails from Frank Medieros?

8    A.  Again, I can't say who it was.  It seems like -- I think it

9    was just ODPS.  I can't remember what the e-mail address was.

10   I can't say for certain who it was specifically.  I don't

11   recall.

12   Q.  While you were working for ODPS, did you have a supervisor?

13   A.  Yes.

14   Q.  And who was that?

15   A.  Well, Frank generally was the supervisor.  There was another

16   time that we had a supervisor -- another supervisor -- I'm so

17   bad with names.

18   Q.  Herman Harris?

19   A.  Yes.

20   Q.  How long did Mr. Harris supervise your work?

21   A.  It wasn't very long.

22   Q.  What about Mr. Medieros?

23   A.  He was the supervisor for the majority of the time.

24   Q.  How did Mr. Medieros and Mr. Harris supervise your work?

25   A.  Well, Frank would -- sometimes he would come out to the job

1    sites and check on you.  He would call and stuff and check and

2    ask how everything was set up and whatnot.  Sometimes they would

3    actually show up at the job site as well.

4    Q.  Did Mr. Harris ever come by the job site while you were

5    there?

6    A.  He did several times.

7    Q.  Did he ever get on to you for what you were wearing?

8    A.  He did.  I was on a job, I want to say it was LaGrange Road,

9    I think.  It was an AT&T job.  I'm pretty sure it was LaGrange

10   Road.  It was cold and rainy.  The jackets we had was

11   semi-waterproof.  It was like heavy rain.  It wasn't really

12   helping.  So I had my uniform shirt on, but in the trunk I had a

13   black and red parka that was waterproof.  So I put it on over

14   the uniform shirt so I could have the hood up.  I put the yellow

15   jacket back on over top of it.

16       He had -- he was bringing the paperwork around for

17   something.  It was the new time sheets or -- I don't remember

18   what it was he brought around to me that day.  But he said I

19   couldn't wear that.  It wasn't approved uniform attire.  He had

20   called -- I don't remember if he called Frank or Darrell.  One

21   of them called me and told me that wasn't allowed and whatnot.

22   Q.  Did you ever send invoices in to ODPS?

23   A.  I did.

24   Q.  Okay.  At some point in time did you text your start and

25   stop time in to --

1    A.  I did.

2    Q.  Do you recall when that changed?

3    A.  Not really, because initially when I first started, we would

4    just pretty much call when we got done and leave a voicemail if

5    he didn't answer the phone.

6    Q.  Would you call Mr. Spurgeon?

7    A.  Well, it was that phone number, but, you know -- it was

8    either him or Frank that usually had the phone.  Initially, it

9    was always Darrell.  Later on, it was Frank that had the phone

10   more than not.  But then -- I'm not sure exactly when we started

11   doing the log sheet thing, the invoices.

12   Q.  Okay.  When you would do these invoices -- let me back up

13   just a second.  How did you know that they wanted you to submit

14   these invoices?

15   A.  We was told.

16   Q.  By whom?

17   A.  Either Darrell or Frank.  I don't really remember which one

18   it was.

19   Q.  Was this a form that you would fill out?

20   A.  I think they did have paper forms as well.  Someone had sent

21   like a file through your phone, and it was -- it was like a

22   template, like a PDF file or something, that you could go in

23   there and add your jobs, and that way you could just redo it.

24   Q.  Okay.  Do you know who sent that PDF file around?

25   A.  It would have been one of them.  I don't remember.

1    Q.   Darrell or Frank?

2    A.   Yes.

3    Q.   Okay.  Were you always paid by the hour at ODPS?

4    A.   Yes.

5    Q.   When you were a sworn officer, were you generally paid $20

6    an hour?

7    A.   Yes, except for Derby.  Derby details was different.  I

8    think every now and then, like a security job may be a little

9    bit different.  But, you know, 95 percent of the time it was $20

10   an hour.

11   Q.   What about the unsworn work?

12   A.   15.

13   Q.   Was it always $15 an hour?

14   A.   Yes, except the water company, initially, it had been 20,

15   but at some point it went to 25.  It was like a call-out or

16   something.  And then like some of the paving jobs and stuff --

17   initially not, but later on we started getting prevailing wage.

18   Q.   Those jobs would be a little bit more than $15 an hour?

19   A.   Quite a bit more.  It was like $32 or $33 an hour.

20   Q.   Who set the pay rate?

21   A.   Darrell.

22   Q.   And how would you know what job paid what?

23   A.   He would -- initially he would tell you, but obviously -- if

24   it was AT&T, for instance, we knew once he told us $20 an hour

25   job, it was -- we knew that, but when they started texting the

```
 1    jobs, they would actually put $20 an hour, $25 if it was like
 2    for the water company, because it depended on whether it was a
 3    call-out or not.  Pretty much all the other jobs was always 20
 4    unless there was an exception to that.
 5    Q.  Did you ever try to negotiate that rate, say, "I won't do it
 6    for $20, but I'll do it for $30 an hour"?
 7    A.  No.  We was told that's what the pay was.  There really
 8    wasn't any negotiating to it.
 9    Q.  Before coming to work at ODPS, did you realize that you
10    would be classified as an independent contractor?
11    A.  No.
12    Q.  When did you realize that you were being paid as an
13    independent contractor?
14    A.  I don't remember exactly when the conversation took place,
15    because like I said, that would have been late '05, early '06.
16    I'm pretty sure it was late '05.  I had never met Darrell -- it
17    had been -- I had been there for several, several months before
18    I had ever met him, because I just called him up one day because
19    somebody gave me his number.  He's like, you know, tomorrow go
20    to this location, whatever.  But I was working a job on
21    Shelbyville Road with another officer, and he came -- he came by
22    there, and I didn't know who it was at first.  It was kind of
23    funny.  He was in uniform in his police car and was talking to
24    us -- he showed up and started talking to us, which is not
25    uncommon when we are out in marked cars.  Other officers will
```

1    come up and start talking.

2    Q.   Is this Mr. Spurgeon?

3    A.   Yes.   We probably stood there and talked for 15 or 20

4    minutes.   The other officer that I was working with happened to

5    look over and saw his name tag and said, "Are you Darrell?"

6    He's like, "Yeah, I'm Darrell."   I was like, "Good to finally

7    meet you."   It had been several months, probably four or five

8    months, since I started before I had ever actually met him.

9    Q.   Okay.   And at what point did you realize you were being

10   classified as an independent contractor?

11   A.   I'm really not sure because -- I don't think -- back then we

12   didn't have any of the paper that we signed like later on.   I

13   think they just said, "We pay you cash, and you claim your taxes

14   at the end of the year."

15   Q.   Okay.   At some point in time were you asked to sign an

16   independent contractor agreement?

17   A.   Yes, but again, I don't recall exactly because I don't

18   think -- I think it was probably a couple of years of me working

19   for him before that actually started, it seems like.

20   Q.   Were you required to sign that agreement?

21   A.   Yes.   We was told we had to sign it or we couldn't work for

22   him anymore.

23   Q.   Before coming to work at ODPS, did you have to buy any

24   equipment or supplies?

25   A.   Yes, some stuff we did.

1   Q.   Okay.  Tell me about, what did you buy?

2   A.   Like gloves, you know, like stuff to put on your neck or

3   whatever.

4   Q.   What about a car?

5   A.   Initially, I didn't because I worked for the police

6   department and I was allowed to use my cruiser.  But then once I

7   left Audubon, Darrell told me if I wanted to work for him, he

8   could work me as a TCO for $15 an hour, but I would have to buy

9   a Crown Vic.

10  Q.   Did you go out and buy that Crown Vic?

11  A.   I did.

12  Q.   How much did that cost, approximately?

13  A.   Between four and $5,000.  Maybe 46, 4,700.  I don't remember

14  exactly.

15  Q.   Okay.  And did you also buy a uniform?

16  A.   Not specifically for that, because I had already had BDU

17  uniforms that I wore on the police department.  And he had

18  patches, and he gave me the patches to put on my uniform.

19  Q.   Were these patches patches with the ODPS logo?

20  A.   Yes.  I think the initial patches was different than the

21  newer patches.  Yeah, I think the first ones, I don't think they

22  actually said "ODPS."  They may have.  But it said like "traffic

23  officer" or something.  And then after that, he redesigned them

24  or had some new ones made, and it actually said "ODPS."

25  Q.   So is it fair to say you spent about $4,500 or $5,000 to

```
 1   come work for the company?
 2   A.  At that point, yes.
 3   Q.  Okay.  And how long did that -- for lack of a better word,
 4   how long did that get you?  When you spent that $5,000, how long
 5   were you able to work for the company without having to buy
 6   anything else?
 7   A.  Probably two to two and a half years.  And then I ended up
 8   getting another Crown Vic because that one started having a lot
 9   of issues.
10   Q.  You had to buy a new one?
11   A.  Yes.
12   Q.  Okay.  Did Mr. Spurgeon or Mr. Medieros provide you with any
13   equipment or supplies that you used in conjunction with your job
14   at ODPS?
15   A.  Yes.  He gave us the lighted traffic wands and jackets, the
16   wintertime jackets, the fluorescent yellow, the vests, the
17   traffic vests, and he also had like the toboggan, winter hats.
18   Q.  Did you ever get in a traffic accident at ODPS?
19   A.  I actually had two of them.  One of them -- the first one
20   was while I was at Audubon Park.  It was a marked police car.
21   The guy rear ended it and totaled it.
22   Q.  You were working off-duty for ODPS?
23   A.  I was.
24   Q.  And someone hit your police cruiser?
25   A.  Yes.
```

1   Q.  What about the second accident?

2   A.  The second accident, I was over on Grade Lane.  I think it

3   was Louisville Paving.  They was putting in a turn lane for

4   Grade A Auto.  I was in my personal Crown Vic, And a boy come

5   there and about run over me.  I had to drive out of the way, and

6   he hit my car and totaled it.

7   Q.  Were you injured in either of these accidents?

8   A.  The first one, I had minor injuries because I was actually

9   in the vehicle.  The second one, just scratched up from hitting

10  the pavement when I jumped.

11  Q.  Did you file any type of worker's compensation claim as a

12  result?

13  A.  No.  I was told -- he told us he didn't have worker's comp

14  on us.

15  Q.  Who is that?

16  A.  Darrell.

17  Q.  Okay.  We talked a little bit about the uniform requirements

18  at ODPS.  Was it generally this blue BDU-type of uniform that

19  you would wear when you were an unsworn officer?

20  A.  Yes.

21  Q.  And who communicated those uniform requirements to you?

22  A.  Darrell.  He had like a list on the website that told you

23  what you could and couldn't wear and whatnot.

24  Q.  You told me about the time where Mr. Harris got on to you

25  for wearing the red rain jacket.

1   A.   Yes.

2   Q.   Can you think of any other occasions where you were

3   disciplined or reprimanded for being out of uniform?

4   A.   Yeah.  He had said something to me a couple of times for

5   wearing shorts.

6   Q.   Is this Mr. Spurgeon?

7   A.   Yes.

8   Q.   And were shorts not a part of the uniform?

9   A.   No, I guess not.  But like one time, I was actually a

10  police officer, because he even -- he called my chief.  Me and

11  another officer was wearing shorts.  That was part of our

12  uniform.  We were wearing a summer uniform.  But he had called

13  the chief and raised Cain with him about letting us wear it.

14  The chief said, "That's what they are allowed to wear, and they

15  got to come to work after they work for you, so that's what they

16  are wearing."

17  Q.   Were there any type of personal grooming requirements at

18  ODPS?

19  A.   Yes.  I don't remember the exact details.  I think it was

20  something about the length of your hair.  I've always kept my

21  hair short anyway.  There was no facial hair.  I think you could

22  have a mustache, but that was it.

23  Q.   Were you ever disciplined or reprimanded for not complying

24  with these sort of rules?

25  A.   No.  I never really wore a beard or anything.

1    Q.  Did you ever work with Scott Barrow?

2    A.  I did.

3    Q.  Okay.  Did Mr. Barrow ever wear a beard?

4    A.  Goatee.

5    Q.  Did you ever have occasion to work with him when he was

6    disciplined or reprimanded for having a goatee?

7    A.  Yes.

8    Q.  Okay.  Can you tell me about that occasion?

9    A.  I think that was actually the same day of the shorts issue.

10   That's the officer I was working with that day.  And Frank had

11   came by the job site.  I don't know if he came to check on us or

12   there was a specific reason --

13   Q.  You were working that day?

14   A.  Yes.  Me and Scott both were.  We both had on shorts.  Scott

15   had a goatee.  I don't remember the exact outcome of it, but I

16   know that we was got on to, and I'm sure he got time-out for

17   that one.

18   Q.  Okay.  What is that?  What is time-out?

19   A.  If we done something against the rules or got in trouble, we

20   wouldn't get work for a couple of days.  That's something we all

21   called it, was either the Spurgeon penalty box or time-out.

22   Q.  And have you ever been in time-out?

23   A.  More than once.

24   Q.  More than once?

25   A.  Yes, sir.

1    Q.  And how do you know that you were in time-out?

2    A.  There was a few times I would flat-out ask.

3    Q.  I'm sorry?

4    A.  I would ask.

5    Q.  You would ask Mr. Spurgeon?

6    A.  I would be like -- I would either text or call him if I

7    didn't a get a job for a couple of days, and I was like,

8    "I guess I'm in time-out again."

9    Q.  And he would -- would he respond to these inquiries?

10   A.  Normally, he wouldn't.  I couldn't give you specifics on

11   what he said.  There was a text.  Again, I don't know who was

12   answering the text because it was his number.  Like I said,

13   other people had the phone.  I had said something about being in

14   time-out, and they had replied, "No, it's just slow right now,"

15   or something to that effect.

16   Q.  Was this the duty phone that replied?

17   A.  Yes.

18   Q.  Whoever had the duty phone?

19   A.  Yes.

20   Q.  Okay.  Was that a phone that typically Mr. Spurgeon or

21   Mr. Medieros carried?

22   A.  Correct.

23   Q.  While you were working for ODPS, did you ever log on to the

24   company website?

25   A.  I did.

1    Q.  Did you ever see any announcements or rules posted on the

2    website?

3    A.  Yes.

4    Q.  Was this under a particular link, or were they just posted

5    on the log-in screen?

6    A.  I don't recall specifically, but like when you went to the

7    website, there was some of it that was public that anyone could

8    see, and then once you logged in, it brought up a different

9    screen, and it seems like the sexual harassment policy was on

10   that screen and maybe like a drug policy.  I can't remember if

11   it was on that screen or the next screen.

12   Q.  Have you seen a sexual harassment policy and a drug policy

13   on the ODPS website?

14   A.  I have.

15   Q.  Was it your understanding that those policies applied to the

16   workers who performed services for ODPS?

17   A.  Yes.

18   Q.  And why did you make that assumption?

19   A.  I believe they was even worded and even said in the policy

20   that, you know -- I know one of them actually said "Employees of

21   Off Duty Police Services."

22   Q.  You've seen documents that referred to the workers as

23   "employees"?

24   A.  Yes.

25   Q.  And were those documents posted on the website?

1    A.  Yes.

2    Q.  While you were working for ODPS, how would you get your job

3    assignments?

4    A.  Different ways.  They would either call -- initially, like

5    when I first started, I guess it was a lot smaller.  There

6    wasn't as many people working, and it was always a phone call.

7    Then as time progressed, it was more often than not text

8    messages versus a phone call.

9    Q.  Okay.  Would this typically be from the duty phone?

10   A.  Yes.

11   Q.  Okay.  And would you be asked if you could work a particular

12   job, or would you be told to go to a particular job?

13   A.  The text message usually would be like something to the

14   effect of -- you know, it would either say "tomorrow" or give

15   you like the date, like 7-28, 2015, and it will give you the

16   location, time, and the company you are working for.

17   Q.  Say you wanted to do it.  Would you reply to the text

18   message?

19   A.  Yeah.  I think we would say "yeah" or whatever.  I don't

20   remember.  I think it was just pretty much implied that we would

21   work, because, you know, if you turned a job down, you would get

22   a time-out most times.

23   Q.  And you indicated that that's happened to you several

24   times?

25   A.  Oh, yeah.

1  Q.  These assignments that you would get, you indicated that you

2  would be told where to go.  Would you be told what time to show

3  up?

4  A.  Yes.  We always had a start time.

5  Q.  What about a stop time?

6  A.  Most of the time it didn't specify a stop time except the

7  security jobs, because, I guess, he didn't know when the -- like

8  a water company job, for instance, some of those will go

9  multiple days.

10  Q.  Okay.  What about the security jobs?

11  A.  They would have a start and stop time.

12  Q.  They would have both a start and stop time?

13  A.  Yes.

14  Q.  Did you ever do one of these multi-day assignments?

15  A.  Oh, yeah.

16  Q.  More than one?

17  A.  Oh, yeah, quite a bit.

18  Q.  What was the longest period of time you were either assigned

19  to a particular crew or assigned to work at a particular

20  location?

21  A.  I couldn't tell you with any degree of accuracy.  I know I

22  was with a Miller job on Bardstown Road pretty much all summer

23  long one year.  And then some of the paving jobs would be

24  several days to a week long that we will do.  Then I done a

25  water company job that was actually Southern Pipeline putting in

1   water mains, and I was out there for a couple months, I think.

2   Q.   Okay.  Did you ever do one of these security jobs that

3   lasted for multiple days at a time?

4   A.   Yeah.  I worked some apartments over on Cane Run.

5   Q.   When you were doing this job, did you have a set schedule

6   that you would show up every day and leave every day?

7   A.   I did.

8   Q.   Do you recall how long that job lasted?

9   A.   Not exactly.  I mean, again, it would have been several

10  months, maybe five or six months.  I don't remember.

11  Q.   During that several-month period, you would come to work

12  every day at the same time?

13  A.   Uh-huh.

14  Q.   Yes?

15  A.   Yes.

16  Q.   And you would leave every day at the same time?

17  A.   Yes.  The only exception would be like -- at the time they

18  had us there 24/7.  So like if the other guy was a little bit

19  late, I would stay a little bit until they showed up.  But I

20  had, you know, 8 to 4 or whatever time it was.  I had a specific

21  time.

22  Q.   Would this be another ODPS worker that would show up to

23  relieve you?

24  A.   Yes.

25  Q.   Say you were working a job and something came up, a personal

1    emergency or whatever, could you leave the job site?

2    A.   No.  You had to call and get relief.

3    Q.   Okay.  Who would you call?

4    A.   Darrell or Frank.

5    Q.   What about if you agreed to work a job and something came up

6    where you couldn't work that day?  Could you swap shifts?

7    A.   No.  I done that once and got in trouble for that, too.

8    Q.   Tell me about that.

9    A.   I was -- where was we at?  It happened twice.  I guess the

10   first time nobody realized or whatever.  I was working a traffic

11   job or got assigned to a traffic job out in the east end, and

12   the other guy had a job close to Dixie Highway, which is where I

13   live at.  So we just said, "Hey, you work over there, it's

14   closer for you, and I will work over here."  We didn't get the

15   whole day, and we got calls and had to flip-flop back.

16   Q.   Who called you?

17   A.   Darrell or Frank.  I don't know who it would have been.

18   Q.   They told you to go to the job --

19   A.   That we wasn't allowed to switch.

20   Q.   Have you ever heard of a call-out?

21   A.   Yes.

22   Q.   Did you ever go on any of these call-outs?

23   A.   Lots.

24   Q.   Would you get calls in the middle of the night?

25   A.   Yes.

1   Q.  Did you ever refuse to do it?  Get a call at 2:00 in the

2   morning and --

3   A.  Not very often.  I couldn't afford to.

4   Q.  Would Mr. Spurgeon ever call you to work a job and hang up

5   on you if you said you couldn't work it?

6   A.  Oh, yeah, mid-sentence.

7   Q.  I'm sorry?

8   A.  Mid-sentence.  I would be like, "I really can't," click.

9   Q.  You said "mid-sentence"?

10  A.  Correct, mid-sentence.

11  Q.  And did that happen more than once?

12  A.  That was pretty regular as well.  He didn't take no for an

13  answer.

14  Q.  Do you know a Ron Stallings?

15  A.  I do.

16  Q.  Did Ron Stallings ever come out to a job that you were

17  working to fire you?

18  A.  He came to relieve me from a job, yes.

19  Q.  I'm sorry?

20  A.  He came to relieve me.  Darrell had sent him out to relieve

21  me and told me to go home.  He didn't need me no more.  I was

22  fired.

23  Q.  Tell me about this.  Where were you working?

24  A.  Seems like it was out toward Oldham County.  I can't

25  remember.  It was out -- it wasn't like downtown or anywhere.

1   It was kind of out off to itself.

2   Q.  And you were working the job, and Mr. Stallings showed up?

3   A.  I think I had shorts on.  I can't remember the exact reason.

4   Darrell would have called earlier, and he had kind of been

5   heated at me.  At that time he didn't tell me anything.  He just

6   hung up on me.  And then Ron shows up.  I'm like, "What's going

7   on?"  He's like, "I'm here to relieve you."  I said, "I didn't

8   ask for relief."  He was like, "Darrell called and told me you

9   was fired and" --

10          MR. HALEY:  Could we approach?

11          THE COURT:  Yes.

12      (Bench conference on the record.)

13          MR. HALEY:  Ron said and came out and told me what

14   somebody else said and --

15          THE COURT:  We are pretty far afield with the hearsay.

16   I realize you've got Mr. Stallings on your list.  I think we can

17   cover what he said in his testimony.

18          MR. SHEPHERD:  I'll redirect, Judge.

19      (End of bench conference.)

20   Q.  Let me ask a better question.  I don't want to know about

21   what Mr. Stallings said.  On that occasion where Mr. Stallings

22   came out to the job site, did you ever speak to Darrell Spurgeon

23   that day?

24   A.  I had before that.  I don't recall if I did immediately

25   after that because Darrell was -- a lot of times if he didn't

1    want to talk, he just wouldn't answer the phone.  I did shortly

2    thereafter.  It would have been within a few days or a week.

3    Q.  And tell me this conversation with Mr. Spurgeon.

4    A.  I don't remember details.  That's been -- this would have

5    probably been somewheres in the ballpark of early '06 or

6    somewheres.  It was early on.  I didn't work for him very long

7    at this point.  I still had the initial Crown Vic.  I only had

8    it for a few years.  It had to be in that time frame.  But I'm

9    pretty sure it was for wearing shorts.  It was something to do

10   with the uniform.  I tried to call him and couldn't get ahold of

11   him, him being Darrell.  And then I finally got ahold of him and

12   just pretty much had to beg him for my job back.

13   Q.  Did he give you the job back?

14   A.  He did.

15   Q.  Okay.  Were you ever sent home from a job for wearing

16   shorts?

17   A.  Yes.

18   Q.  Okay.  How many times?

19   A.  One for sure.

20   Q.  Who was that that sent you home from the job site?

21   A.  It would have been Darrell.  It was over the phone.  The

22   crew wasn't even there yet.  He called me, and he's like, "What

23   are you doing wearing shorts?"  I didn't really say anything

24   either direction.  He's like, "Well, the crew called and said

25   you was wearing shorts."  I'm like, "That's funny because

1   they're not here yet."  I knew it was the other guy that I was

2   working with that called.  He's like, "Go on home.  I got

3   somebody else coming out there anyway."

4   Q.  This was Darrell Spurgeon you were speaking with?

5   A.  Yes.

6   Q.  Did you ever get in trouble for sitting on a stool at the

7   job site?

8   A.  Yes.

9   Q.  Okay.  Tell me about that.

10  A.  That would have been -- maybe that's what it was.  Maybe it

11  wasn't the shorts that time.  Maybe it was both.  I don't

12  remember.  I think that was the same time because he had said

13  something about sitting in a lawn chair.  I'm like, "No, it's a

14  little fold-up black stool."

15  Q.  Is this Mr. Spurgeon you were speaking with?

16  A.  Yes.

17  Q.  Did you ever work jobs with other ODPS workers?

18  A.  Pretty much everything we did was either by ourselves or

19  with another ODPS worker.

20  Q.  Can you recall any situations where those workers were sent

21  home from the job site?

22  A.  Yes, but I can't remember specifically who it was.  It seems

23  like one of them -- let me think for a second.  After working so

24  many of these jobs, everything kind of runs together.  I can't

25  remember off the top of my head.  I can't remember if it was

1    with my job or just something I was told.

2    Q.  Okay.  No problem.  After your second vehicle accident, did

3    you buy another car so that you could work at ODPS?

4    A.  No.  Actually, I had a Dodge Charger.  I was going to put

5    the lights over in it.  Initially, he told me I couldn't do

6    that, that it had to be a Crown Vic.

7    Q.  Is this Mr. Spurgeon?

8    A.  Yes.  We went back and forth for a couple of days or a week.

9    I told him, "I'm not buying another car.  It ain't going to

10   happen.  I'm going use this car, or I'm not going to work for

11   you."  Initially, he had always -- at the time I was a police

12   officer, at this time I had the Charger.  He would always tell

13   us before if you was a police officer, as long as you had blue

14   lights, if it was a police vehicle, like a Charger or whatever

15   that's used as a police car, we could use those, but the TCOs

16   had to use a Crown Vic.  He was like, "No, I never said that."

17   Eventually, he let me use the Charger.

18   Q.  Okay.  Before you came to work at ODPS, did you ever set up

19   a corporation or a limited liability company for yourself?

20   A.  No.

21   Q.  Did you ever go out and get a business license?

22   A.  Not for ODPS.  I did years later, but it had nothing to do

23   with ODPS.

24   Q.  Did it have anything to do with security or traffic

25   control?

1    A.  I was trying to get some security contracts on my own

2    stuff.  This would have been probably 2013 or somewheres through

3    there.

4    Q.  Okay.  While you were working for ODPS, did you ever

5    advertise so you could try to get business from any other

6    companies besides ODPS?

7    A.  No.  He told us he didn't want us working for anyone else.

8    Q.  Is that Mr. Spurgeon?

9    A.  Yes.

10   Q.  Did you ever set a website up for yourself?

11   A.  No.

12   Q.  Did you ever have an office?

13   A.  No.

14   Q.  Did you ever maintain any type of staff?

15   A.  No.

16   Q.  Did you ever buy liability insurance for yourself?

17   A.  No.

18   Q.  Professional liability insurance?

19   A.  No.  He said he had insurance that covered all that.

20   Q.  Is that Mr. Spurgeon?

21   A.  Yes.

22   Q.  Did you ever purchase any type of worker's compensation

23   insurance?

24   A.  No.

25   Q.  I appreciate you answering my questions.

1          THE COURT:  Before you get up, Mr. Haley, I think we

2    are going to end here for the day, start your cross in the

3    morning.

4       Mr. Petra, you are going to have to return tomorrow for

5    Mr. Haley to conclude your testimony.  I would ask you to not

6    discuss your testimony with any of the lawyers here certainly.

7    When you return, you'll still be under oath.  I'm sure as a

8    police officer, you know that routine.

9          THE WITNESS:  Yes.

10          THE COURT:  So we will excuse you now.

11       Let me see counsel up at the bench.

12       (Bench conference on the record.)

13          THE COURT:  How long do you think you'll need with

14    Mr. Petra tomorrow?

15          MR. HALEY:  I don't know.  It depends on how he

16    answers the questions.  I've had the good fortune of trying to

17    get answers from him before.

18          THE COURT:  You've taken his deposition?

19          MR. HALEY:  We have taken -- in this case we have

20    taken his deposition, and we drilled down as best we could.

21          THE COURT:  I'm going to let you take those -- were

22    those two admitted?

23          MR. HALEY:  Yes.

24          THE COURT:  You can put them on the table down there.

25    If you all wouldn't mind, beginning tomorrow, it will go a

1    little easier to the extent you have them premarked.

2              MR. HALEY:  We shall do that.

3              THE COURT:  That would be great.

4              MR. HALEY:  We didn't know we were going to get to

5    this point.  I'm sorry.  I need to apologize to this gentleman,

6    too.  I was acting like it was an arbitration.  I know better.

7              MR. GROOMS:  The witness wanted to know what time.

8              THE COURT:  9 a.m.

9              MR. GROOMS:  I wanted to be sure.

10             THE COURT:  We will get a little bit of -- we were a

11   little slow this morning, but we picked up the pace a little

12   bit.  I appreciate you short-circuiting some of those questions

13   regarding the areas that we discussed earlier.

14       So we will just start at 9.  If you have any issues, I'll be

15   around about 8:45 in the morning, if there's anything that we

16   want to talk about in advance, unless you know of anything now.

17             MR. HALEY:  I can't think of a thing, Your Honor.

18             THE COURT:  All right.  We will see you in the

19   morning.

20       (End of bench conference.)

21       (Proceedings concluded at 4:57 p.m.)

22                  C E R T I F I C A T E

23       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM
     THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.
24
        *s/ Alan W. Wernecke*                    August 19, 2015
25   Alan W. Wernecke, RMR, CRR
     Official Court Reporter

1                                    INDEX

2       WITNESSES:

3       BOOKER POLIN
            Direct Examination By Mr. Shepherd          14
4           Cross-Examination By Mr. Haley              38
            Redirect Examination By Mr. Shepherd        59
5       GREGORY BROCK PITTMAN
            Direct Examination By Mr. Shepherd          60
6           Cross-Examination By Mr. Haley              80
            Redirect Examination By Mr. Shepherd        90
7           Recross-Examination By Mr. Haley            91
        JOHNNIE CRAIG PITTMAN
8           Direct Examination By Mr. Shepherd          93
            Cross-Examination By Mr. Haley             109
9           Redirect Examination By Mr. Shepherd       119
            Recross-Examination By Mr. Haley           119
10      STEPHEN NEWMAN
            Direct Examination By Mr. Shepherd         120
11          Cross-Examination By Mr. Haley             145
            Redirect Examination y Mr. Shepherd        159
12          Recross-Examination By Mr. Haley           162
        MERLE BROWN
13          Direct Examination By Mr. Shepherd         166
            Cross-Examination By Mr. Haley             180
14      JAMES W. ASHLEY
            Direct Examination By Mr. Shepherd         197
15          Cross-Examination By Mr. Haley             210
        JASON PETRA
16          Direct Examination By Mr. Shepherd         218

17

18                                 EXHIBITS

19      Plaintiff's 14 -- photographs                   25
        Plaintiff's 13 -- ODPS website screen shot      29
20      Plaintiff's 12 -- policies and procedures       71
        Defendants' 1 -- organization search           193
21      Defendants' 2 -- independent contractor agreement   211

22

23

24

25