UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
*(Electronically Filed)*

| | |
|---|---|
| THOMAS E. PEREZ, Secretary of Labor,<br>United States Department of Labor,<br><br>Plaintiff,<br><br>v.<br><br>OFF DUTY POLICE SERVICES, INC.,<br>DARRELL SPURGEON, and BONNIE<br>SPURGEON,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO.  3:13-CV-00935-DJH<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

## I.    INTRODUCTION

This lawsuit stems from a complaint to the Department of Labor from a disgruntled former

contractor of Off Duty Police Services, Inc. ("ODPS"), Ronald Stallings ("Mr. Stallings"),

regarding the misclassification of its workers.  (Trial Transcript at p. 607 (hereafter "Tr. at p.__")).

Of the 1,500 contractors identified by Defendants during the course of the Department of Labor's

investigation, only 10 of these individuals were interviewed as a part of the Department's narrow

investigation.  (Tr. at pp. 599-600, 616).  Interestingly, of the 10 individuals, seven contractors

have either created a competing business or are now working for such business.  (Tr. at pp. 59, 84,

166-17, 185-86, 213, 259, 377, 383, 618, 624).  Despite the patently biased information provided

during the investigation, the Plaintiff filed a lawsuit against Defendants alleging a misclassification

of its workers and failure to pay overtime in violation of 29 U.S.C. § 201, *et seq.*  Plaintiff also

seeks liquidated damages and an injunction.

The investigation was built on highly partial information from individuals with a motive to damage Defendants' business, however, the Department of Labor did not thoroughly investigate the facts which, as testified to at trial, reveal that no employer-employee relationship exists between ODPS and its contractors.[1]  During the trial of this matter, the Court heard 11 of Plaintiff's witnesses testify regarding their experience providing services for ODPS.  Of this extensive testimony, not one of these witnesses was able to articulate facts to establish the necessary elements of an "employee-employer" relationship under the law.  To the contrary, the credible facts revealed at trial weigh predominately in favor of a finding of an independent contractor relationship.

## II.    FACTS

The following facts were testified to at the trial of this matter:

1.      Off Duty Police Services, Inc. is a business that provides traffic safety, security and other services to its clients in the Louisville, Kentucky area. (Tr. at pp. 475-76).  Defendant, Darrell Spurgeon ("Mr. Spurgeon") and his wife, Bonnie Gail Spurgeon ("Mrs. Spurgeon"), are the Vice President and President of ODPS, respectively.  (Tr. at pp. 430, 445).  ODPS contracts with various clients throughout the Louisville area to satisfy needs for a wide-array of services.  (Tr. at pp. 455, 477-78).  Customers contact ODPS requesting specific services from traffic safety, security patrol, security detail, background checks to EMT/Paramedic services.  (Tr. at pp. 455, 477-78).  As a part of these contracts or agreements, each customer sets out the rate of pay it is willing to pay for the service requested (*e.g.,* per hour or per project), the qualifications for the job (*e.g.,* sworn

---

[1]    Based on the testimony provided at trial, it is clear that Plaintiff's witnesses, including the Initiating Complainant, were part of a limited group that took issue with Defendants' business practices in order to promote their own competing businesses.  Indeed, faced with the prospect of perjury, the initiating Complainant, Mr. Stallings, admitted ODPS did not control him, discipline him or otherwise act in a manner sufficient to constitute an employer-employee relationship.  (Tr. at pp. 373, 378).  In fact, he testified at trial that with respect to his independent contractor relationship to ODPS, he "didn't have a problem with it." (Tr. at p. 375)

officer, marked car, armed, etc.), and instructions for the requested service.  (Tr. at pp. 477-78, 866, 869).  These contracts vary in terms of duration, continuity of services to be performed, and irregularity of the need for services.  (Tr. at pp. 871-73, 878, 880, 883, 892-895; Defendant's Exhibits 56, 57; Plaintiff's Exhibits 6, 7, 8).  In an effort to facilitate its customers' needs, ODPS contracts with numerous independent contractors, such as those listed in Exhibit A of the Complaint, to provide the requested services on an as-needed basis.  (Tr. at pp. 478, 866).  ODPS does not and has not employed any of the individuals listed in Exhibit A to the Complaint.  (Tr. at pp. 454, 485).

2.     When ODPS was first created in 1997, Mr. Spurgeon only placed sworn police officers that he worked with in the police department in touch with customers requiring services.  (Tr. at pp. 864-68, 871, 884).  As the business developed, and the Commonwealth of Kentucky required the certification of all individuals, including sworn officers who perform traffic safety and control services, ODPS began utilizing a handful of non-sworn traffic control officers on one of its largest contracts, LG&E.  (Tr. at pp. 877, 884).  Presently and during the relevant time period, nearly all of the contractors providing services for customers of ODPS, approximately 98%, are sworn police officers who work full-time in this capacity.  (Tr. at p. 39, 197, 220, 485, 652, 763, 791, 810-11, 828-30).  The remaining non-sworn contractors are certified traffic control officers ("TCOs") who are almost all employed in another position.  (Tr. at pp. 701, 913-915).  Indeed, of the 69 contractors listed on Exhibit A of the Complaint, 28 are active police officers, 16 are active corrections officers and six of which are active constables all with arrest powers in the Commonwealth of Kentucky.  (Tr. at pp. 627, 913-915).  At no point, however, has ODPS utilized more than 30 non-sworn officers of its database of 1,500 contractors.  (Tr. at p. 900).  Nearly all of the contractors providing services for ODPS' customers provide services on a part-time basis

for supplemental income.  (Tr. at p. 39, 197, 220, 485, 652, 763, 791, 810-11, 828-30).  A handful of these contractors have provided services for several years, however, much of that service has been on an intermittent basis depending on the individual contractor's availability and desire for supplemental income.  (Tr. at pp. 52, 111, 152, 363, 741, 782, 791, 902-03, 927).  Indeed, of the 10 individuals interviewed in the course of the Department of Labor's investigation, several of these individuals, including Mr. Stallings, Mr. Pittman, Mr. Brown and Mr. Petra approached Mr. Spurgeon seeking opportunities as they were struggling financially.  (Tr. at pp. 188-89, 901-05).  These individuals desired to work as much as possible in an effort to increase their income and took the initiative to do so.  (Tr. at pp. 901-05).

3.      After receiving a request for services from a customer, ODPS contacts several contractors who meet the qualifications of the customer's needs (*i.e.*, sworn police officer, female, armed, marked car, etc.).  (Tr. at pp. 478, 866, 869).  These contractors respond either by accepting or rejecting the opportunity depending on their personal schedules, rate of pay, preference for the type of work or customer.  (Tr. at pp. 285, 309, 351, 481, 653, 684, 725, 801, 810, 816, 839-40 866, 895-96).  The rejection of any given opportunity to perform services in no way impacts their ability to obtain opportunities in the future.  (Tr. at pp.  34, 309, 351, 378, 539, 653, 688-89, 731, 766, 784).

4.      In the course of providing opportunities to contractors, Mr. Spurgeon on occasion subcontracted with contractors, including Frank Medeiros, Azell Jackson, Thomas David, Pete Allen, John Contrell, Roberto Grider, to contact contractors to have the customer's request for services fulfilled.[2]  (Tr. at pp. 391, 667, 831, 920-21).  These individuals contact contractors,

---

[2]    This practice was inartfully referred to as "scheduling" during the trial of this matter.  Despite this characterization, the record reflects these individuals were merely offering opportunities, not making assignments.

provide the job location, rate of pay, customer contact and type of job to contractors who met the customer's requests. (Tr. at pp. 392, 835). These individuals do not have any supervisory authority and work solely from either a list provided by Mr. Spurgeon or a list of their own contacts within the police department or similar agencies. (Tr. at pp. 392, 421). These individuals were compensated for this service approximately one dollar for every hour fulfilled, or alternatively, maintained a separate subcontract with ODPS and are compensated by the agreed upon contract price taking a profit off of the amount paid directly to the contractors. (Tr. at pp. 391, 667-669, 832, 920-21).

5.      If a contractor accepts the opportunity, ODPS provides the location of the site, a time to report as specified by the customer, and the customer's contact person. (Tr. at pp. 136, 157, 371, 725, 766, 835, 880, 896). Upon arrival to the site, the contractor approaches the customer representative about the customer's preference and need for the traffic patrol and safety setup, security setup or other needs. (Tr. at pp. 653, 686, 725-26, 767, 769, 797). Contractors are responsible for assessing the situation and use their experience and training to determine whether the requested setup is safe. (Tr. at pp. 657, 725-26, 767, 769-70, 836). No one from ODPS or acting on behalf of ODPS provides any guidance or instruction on how to perform the customer's requested job, rather the customer provided instruction. (Tr. at pp. 114, 334, 480, 653, 686, 726, 770, 836, 936-37). The customer representative directs the contractor on what services it has requested and if they disagree with the technical aspects of work, it is the responsibility of the contractor to resolve the issue with the customer. (Tr. at pp. 114, 334, 480, 653, 657, 686-87, 726-27, 769-70). Though Mr. Spurgeon has appeared on a job site on occasion while he was in the area, no one acting on behalf of OPDS appears at the site to review, evaluate and ensure that the independent contractors are adhering to the customer's requests. (Tr. at pp. 842-43, 936-37). On

several isolated occasions, pursuant to LG&E's request, Mr. Medeiros was required by the customer to appear on the job site approximately once a month.  (Tr. at pp. 405-06).  Other appearances by Mr. Medeiros were because he was providing services for the same customer or in the same geographic area.  (Tr. at pp. 405-06).  Mr. Medeiros does not or did not supervise, discipline or evaluate contractors on behalf of ODPS.  (Tr. at pp. 526-27, 918).[3]

   6. ODPS does not provide training to any of its contractors.  (Tr. at pp. 658, 669, 888). The Commonwealth of Kentucky requires all individuals who perform traffic safety and control to be certified which requires attendance in a four-hour training session and the successful completion of a written exam.  (Tr. at pp. 339, 884).  Most of ODPS' contractors have obtained traffic safety training and other necessary training on their own through their respective agencies. (Tr. at pp. 201-02, 300, 658, 769, 837).  A small number have attended traffic safety and control training conducted by Mr. Spurgeon and Mr. Medeiros, as trainers certified by the Commonwealth of Kentucky, who periodically offer the training as a public service free of charge.  (Tr. at pp. 400, 886-888).  Contractors were not required to attend these sessions and were free to obtain such training and certification elsewhere.  (Tr. at pp. 699, 741, 888).  These trainings lasted approximately four to five hours and were open to and attended by the public.  (Tr. at pp. 413-14, 741, 888-89).  On occasion, Mr. Medeiros worked on job opportunities with new contractors where they may have observed his performance, however, he did not have any official responsibilities or

---

[3] Though there is testimony regarding a personal dispute between Mr. Medeiros and Mr. Duerr wherein Mr. Medeiros did not offer Mr. Duerr opportunities for a week, this was an isolated circumstance where Mr. Medeiros overstepped his authority.  (Tr. at pp. 416-17, 918).  There is no evidence in the record that ODPS or Mr. Spurgeon knew of this situation, that this was an action taken on behalf of ODPS or that it occurred with any other contractor. (Tr. at pp. 418, 918).

title through ODPS to provide training, supervision or evaluate the contractors.  (Tr. at pp. 405, 413).

7.     ODPS does not provide contractors with equipment.  (Tr. at pp. 695, 797, 811, 846, 929).  Contractors are also not required by ODPS to obtain any specific equipment.  (Tr. at pp. 492, 916).  In order to provide services for some of ODPS' customers, however, a contractor must meet the customer's qualifications which may include having a marked car (or a police-type vehicle), police-type uniform (or BDUs), appropriate warning lights or a stop and go sign.  (Tr. at pp. 490, 688, 811).  To this end, many of the contractors, sworn or unsworn, have purchased their own personal vehicles, typically a police-type car, lights, and other equipment to perform services for ODPS' customers investing an average range of $3,000 to $10,000 on the equipment.  (Tr. at pp. 21-22, 68, 98-99, 131-32, 170, 204, 304-05, 325, 348, 367, 490, 492, 695-96, 774, 777, 797, 805, 811, 917).  These contractors also purchase insurance for the vehicle, maintain the vehicle and other equipment, provide fuel at their own expense and deduct the cost as business expenses.  (Tr. at pp. 46-47, 114, 150, 192-93, 294, 333, 360, 663, 697, 739, 777, 805, 818, 826, 848).  ODPS does not provide insurance coverage for any contractors.  (Tr. at pp. 404-05, 545).

8.     ODPS does not discipline contractors or otherwise enforce any ODPS work rules.  (Tr. at pp. 35, 107, 307, 660, 688-89, 731, 772, 839, 930).  ODPS' customers dictate the requirements for any given opportunity, including the attire they would like the contractors to wear (*e.g.*, police uniform, BDUs, etc.), equipment to utilize (*e.g.,* marked vehicle, lights, etc.), instructions to follow (*e.g.,* close down lane of traffic, flag vehicles around site, patrol lot, provide reports of activity, etc.) and the end of the workday.  (Tr. at pp. 49, 304-05, 356, 404, 410-11, 482, 659, 687, 690-91, 710, 726, 730, 733, 866, 917; Defendants' Exhibit 56).  Indeed, customers have requested specific contractors as a part of their requests.  (Tr. at pp. 32, 407, 482, 894).  ODPS has

7

never maintained or otherwise enforced any work rules, grooming guidelines or uniform guidelines. (Tr. at pp. 710, 857, 891).  Any such instructions are dictated by ODPS' customers depending on the opportunity and were merely passed along by ODPS to its contractors.  (Tr. at pp. 456-57, 480, 707, 710, 857, 864, 891).  ODPS' customers direct all aspects of the services to be performed at a particular site the duration of those services and control whether or not a particular contractor remains on any particular site, or is allowed to return to perform future services.  (Tr. at pp. 114, 334, 353, 407-08, 480, 653, 686, 726, 836, 930).  Contractors are responsible for working out any lunch or other breaks directly with customers, ODPS does not determine or control such breaks.  (Tr. at pp. 115, 357, 659, 687, 729).

## III.  CONCLUSIONS OF LAW

### A.  THERE IS NO FLSA COVERAGE.

In order for the overtime provisions of the Fair Labor Standards Act (FLSA) to be applicable to Defendants, the individuals listed on Exhibit A of Plaintiff's Complaint must be employees as defined by law.  29 U.S.C. § 207(a)(1).  Furthermore, Defendant must qualify as an employer as defined by the FLSA.  29 U.S.C. § 203(d).  Given the fact that the individuals on Exhibit A of Plaintiff's Complaint have been properly classified as independent contractors, it is clear there is no FLSA coverage.

### B.  THE INDIVIDUALS ON EXHIBIT ARE INDEPENDENT CONTRACTORS

In considering the employment relationship in the context of the FLSA, the Sixth Circuit has considered the following factors:  (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the putative employee and employer; (3) the degree to which an employee's opportunity for profit and loss is determined by the putative employer; (4) the skill and initiative required in performing the job; (5) the permanency of the relationship; and

(6) whether the services rendered are an integral part of the Company's business. *United States v. Silk*, 331 U.S. 704 (1947); *see, e.g., Donovan v. Brandel*, 736 F.2d 1114 (6th Cir. 1984); *Fegley v. Higgins*, 19 F.3d 1126 (6th Cir. 1994); *see also Imars v. Contractors Mfg. Servs., Inc.*, 165 F.3d 27 (6th Cir. 1998).

Courts have made it clear the issue of employment relationship does not lend itself to a precise test, but is to be determined on a case-by-case basis upon the circumstances of the whole business activity. *Rutherford v. McComb*, 331 U.S. 722, 730 (1947). The presence of any individual factor is not dispositive of whether the employee/employer relationship exists. *Id.* Considering all of these factors on the totality of the circumstances, it is apparent from the record that the factors weigh in favor of an independent contractor relationship between ODPS and the individuals the Department of Labor claims to be employees of ODPS.

## 1.     DEGREE OF CONTROL.

Where an alleged employer does not direct the method and manner of performance, supervise day-to-day conduct or dictate the hours of performance, courts have found a lack of right to control on the part of the purported employer. *Donovan v. Brandel*, 736 F.2d 1114 (6th Cir. 1984). Addressing this factor, the Fifth Circuit has found there to be no employer-employee relationship where the purported employer did not control the manner or method of performance, but rather, the customer dictated the procedures and type of equipment required. *Carrell v. Sunland Construction, Inc.*, 998 F.2d 330 (5th Cir. 1993).

In *Carrell*, though the plaintiffs-welders were assigned a job by the purported employer, upon arrival to the job site the purported employer's customer dictated the specific welding procedures and the type of welding rods required for each construction project. *Id.* at 332-33. Furthermore, the customer (not the purported-employer) dictated the amount of time to be spent on the project. *Id.* Similarly, ODPS makes opportunities available to its contractors, and pursuant

9

to its contract with its customers, the customer dictates the equipment needed for the job, appropriate attire, instructs the contractors as to specific procedures to perform and decides what is the end of the workday.  (Tr. at pp. 49, 304-05, 356, 404, 410-11, 482, 659, 687, 690-91, 710, 726, 730, 733, 866, 917).

Also, in *Carrell*, the plaintiff-welders were required by a regulatory agency to be certified prior to performing any welding jobs.  *Carrell*, 998 F.2d at 332-33.  The purported employer did not make this requirement and was not involved in the testing.  *Id.*  Likewise, ODPS' sworn police officers and TCOs are all required by the Commonwealth of Kentucky (not ODPS) to be trained and certified in traffic safety prior to performing any such service.  (Tr. at pp. 339, 884).

Further, the record establishes that the contractors are charged with the responsibility of assessing the requested setup of the customer, consider the potential safety risks based on their training and experience, and if they have disagreements, use their discretion to tell the customer. (Tr. at pp. 657, 725-26, 767, 769-70, 836).  If the contractors disagree, then they may leave.  (Tr. at pp. 657, 686-87, 726-27, 769-70).  Courts have found that instructions dictated by a customer and not the purported employer establish a lack of control.  *See Carrell, supra.*  Indeed, the fact that ODPS' customers dictate the equipment to use and methods for performing services demonstrates no more control by OPDS than a homeowner requesting a painter to use certain brushes or paint his house a certain style or color.  Customer control, in contrast to ODPS' control, weighs heavily in favor of independent contractor status.  *See Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F. Supp. 2d 667, 672-73 (D. Md. 2000), *aff'd sub nom. Chao v. Mid-Atlantic Installation Servs., Inc.*, 16 Fed. Appx. 104 (4th Cir. 2001) ("It is in the nature of a contract that the contractor promises to deliver the performance bargained for by the client.  For example, a builder will build a building according to the specifications of an architect.  That does not make

the builder an employee.  A painter will paint a house the colors dictated by the homeowner.  That does not make the painter an employee.  In short, requiring a contractor to meet the client's technical specifications is not the type of 'control' which bestows 'employee' status on the contractor.").

Additionally, the record establishes other factors undermining any purported control by Defendants.  Importantly, contractors control their schedule as they are free to accept or reject any given opportunity without fear of any negative consequence.  (Tr. at pp. 34, 285, 309, 351, 378, 481, 539, 653, 684, 688-89, 725, 731, 766, 784, 801, 810, 816, 839-40 866, 895-96).  Not a single witness in the trial of this matter was able to articulate with any reasonable particularity that he suffered any repercussion for turning down an opportunity, which some referred to as a "time-out."  (Tr. at pp. 147, 216-17, 262, 267-68, 295).[4]  Additionally, contractors control when, where, and how much they are going to provide services for ODPS' customers.  (Tr. at pp. 113, 176, 188, 207-08, 309, 335, 351, 373, 481, 653, 688, 766).  ODPS passes along the customer's specifications as to the location, time, rate of pay and necessary equipment.  (Tr. at pp. 392, 478, 835, 866, 869).  The contractor either accepts or rejects the opportunity.  (*Id.*)  The testimony in the record establishes that contractors consider the location, type of job, rate of pay, their availability, and desire to increase their income, among other things, when determining whether to accept or reject an opportunity.  (Tr. at pp. 673, 684-85, 721, 766, 816, 840).  Indeed, several witnesses testified that when they are on vacation from their regular employment or they need extra money, they seek more opportunities from ODPS' customers.  (Tr. at pp. 701, 782, 803, 850-51).

---

[4]    See *Supra*, Footnote 2.

Defendants also do not provide instruction to the independent contractors on how to perform services for ODPS customers, do not discipline the contractors, supervise or evaluate their performance.  (Tr. at pp. 35, 107, 307, 660, 688-89, 731, 772, 839, 930).  Neither Mr. Spurgeon nor anyone acting on behalf of ODPS appears at its customer sites to supervise or evaluate the contractors' performance. (Tr. at pp. 517, 842-43, 936-37).  Though there is testimony that Mr. Medeiros appeared on a job site at the customer's request, such appearances were sporadic and by no means rise to the level of day-to-day supervision.  (Tr. at pp. 405-06); *see Thibault v. Bellsouth Telecommunications, Inc.*, 612 F.3d 843 (5th Cir. 2010) (holding plaintiff was an independent contractor when his supervisor came by the worksite periodically and did not instruct the plaintiff in the performance of his job duties on a daily basis); *Cromwell v. Driftwood Elec. Contractors, Inc.*, 348 F. App'x 57, 61 (5th Cir. 2009) (finding absence of close supervision is indicative of independent contractor relationship); *Gate Guard Servs. L.P. v. Solis*, 2013 WL 593418, *6 (S.D. Tex. Feb. 13, 2013) (recognizing that purported employer did not exercise control where plaintiff gate attendants worked without day-to-day supervision); *Mack v. Talasek*, 2012 WL 1067398, at *2 (S.D. Tex. Mar. 28, 2012) (finding no indicia of instruction or supervision where the defendant "had no control over what Plaintiffs did on a daily basis 'outside of requiring [them] to be at the shift site,'" and "to the extent Plaintiffs were given any specific orders concerning their day-to-day duties, Plaintiffs were under the control of the [defendant's clients]") (alterations in original). Moreover, there is evidence in the record, that Mr. Medeiros was appearing on certain job sites at the request of the customer.  (Tr. at pp. 405-06).  Notably, Mr. Medeiros had no authority and never disciplined any contractors for failure to perform any duties.  (Tr. at pp. 526-27, 918).

ODPS also does not provide any training to the contractors.  (Tr. at pp. 658, 669, 888). Though a handful of contractors attended a voluntary training provided by Mr. Spurgeon and Mr.

Medeiros, this training was conducted on behalf of the Commonwealth of Kentucky to certify any interested members of the public in traffic safety. (Tr. at pp. 400, 886-888). The training was free of charge and open to and attended by the general public. (Tr. at pp. 699, 741, 888). There is no evidence that any contractors were required to attend any training conducted by Mr. Spurgeon, Mr. Medeiros or anyone on behalf of ODPS. (Tr. at pp. 699, 741, 785, 888).

Finally, there is no evidence that ODPS has ever instituted or enforced any work rules or other procedures. (Tr. at pp. 529, 891).[5] The record establishes that with regard to Plaintiff's Exhibits 11 and 12 introduced at trial, these were customer requirements ODPS merely passed along to its contractors. (Tr. at pp. 53, 295-96, 410 532, 690, 857, 891). As for the remaining "policies" and guidelines on ODPS' website testified to at trial, the record is clear that these were never instituted or enforced by ODPS. (Tr. at pp. 529, 535, 935). Accordingly, these have no bearing on the right to control analysis as the actual degree of control acted upon is controlling in the Court's analysis. *See Usery v. Pilgrim Equip. Co.,* 527 F.2d 1308, 1312 (5th Cir. 1976) ("The controlling economic realities are reflected by the way one actually acts."). There is also evidence that contractors can swap opportunities and find someone to fill in for them. (Tr. at pp. 105, 138, 527, 692, 731, 788, 799-00, 824). The contractors report directly to ODPS' customers on how to perform the job, and are required to deal directly with the customer if there is a dispute as to the technical aspect of the work performed. (Tr. at pp. 657, 686-87, 726-27, 769-70). Considering the facts in the record, this factor weighs in favor of an independent contractor relationship.

---

[5] There is testimony that Mr. Medeiros advised a few contractors that they should not have facial hair. The record establishes that this was not an ODPS rule nor did ODPS ever enforce it. (Tr. at p. 516). Mr. Medeiros had no authority to enforce such rules and was advised accordingly. (Tr. at pp. 516, 527).

2.     INVESTMENT IN EQUIPMENT AND MATERIALS.

In analyzing this factor, the Sixth Circuit has indicated that courts "must compare the workers' investment in the equipment to perform his job with the company's total investment, including office rental space, advertising, software, phone systems, or insurance." *Keller v. Miri Microsystems, LLC*, 781 F.3d 799, 810 (6th Cir. 2015). The key question is "whether that capital investment is evidence of economic independence." *Id*. In considering this factor, the court has considered investment in equipment that is not a common item most people use daily as a signal of greater economic independence. *Id*. (citing *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 304 (5th Cir. 1998)).

Also considering this factor, the Fifth Circuit in *Carrell* found significant investment in equipment where the plaintiff-welders supplied their own trucks, welding machines and tools averaging nearly $15,000. *Carrell*, 998 F.2d at 333. The plaintiff-welders also assumed all costs associated with operating, repairing and maintaining this equipment including insurance. *Id*. Though the purported employer supplied minor equipment, including blades for grinders and some equipment to assist in welding, it did not supply any essential equipment or tool to perform the welders' jobs, and thus, the court found that the relative investment of the workers outweighed the purported employers. *Id.*

Similar to *Carrell*, the record establishes that ODPS' contractors make significant investment in materials and equipment to enable them to provide services for ODPS' customers. (Tr. at pp. 21-22, 68, 98-99, 131-32, 170, 204, 304-05, 325, 348, 367,490, 492, 695-96, 774, 777, 797, 805, 811, 917). On average, each contractor spent $3,000 to $10,000 on the initial purchase of a vehicle, lights, uniforms, stop-signs and other essential equipment to perform services for ODPS' customers. *Id.* Contractors also continue to invest in such equipment and materials over the years by purchasing upgraded vehicles and equipment. (Tr. at pp. 313, 695, 736, 774, 796).

14

Contractors purchase their own insurance for their vehicles, pay for gas to and from job sites, are responsible for the upkeep and maintenance of their equipment and deduct such costs as business expenses.  (Tr. at pp. 46-47, 114, 150, 192-93, 294, 333, 360, 663, 697, 739, 777, 805, 818, 826, 848).  Though a vehicle is a common item, there is evidence that many of these contractors purchased a vehicle specifically to perform services for ODPS' customers and use it only for this purpose.  (Tr. at pp. 22-23, 99, 348-49, 736-37, 774, 796).  Items such as police-type lights, stop-signs, and similar equipment are not common items that most people use daily, if at all, other than providing traffic safety and security services.  Additionally, the record establishes that several contractors use this equipment to provide similar services for other organizations.  (Tr. at pp. 743, 813)  By comparison, ODPS maintains a small office in Mr. and Mrs. Spurgeon's home with two desks, a printer/copier/fax machine, a cell phone and two computers.  (Tr. at pp. 443, 890-91).  Mr. Spurgeon testified he began ODPS in the corner of his bedroom with merely a $5,000 investment.  (Tr. at p. 890).  ODPS' investment pales in comparison to the aggregate 1,500 contractors who invest an average of $5,000 in equipment.

Though the record clearly establishes that ODPS does not supply contractors with equipment essential to perform services for ODPS, it has provided a handful of contractors (primarily Plaintiffs' witnesses), with patches to adhere to their uniforms.  (Tr. at pp. 928-29).  ODPS provided patches as a result of a customer's request that the contractors, specifically TCOs, look professional and stand out from the general public.  (*Id.*)  ODPS complied with this request and provided a handful of TCOs with these patches while working on the requesting customer's job sites.  (*Id.*)  Thereafter, several contractors purchased them on their own based on their desire to wear the patches.  (*Id.*)  Akin to the *Carrell* plaintiffs' unsuccessful argument, providing some contractors with minor non-essential equipment does not outweigh the contractors' relative

15

investment compared to that of ODPS.  ODPS' contractors have made (and continue to make) significant investments in materials and equipment essential to perform services for ODPS' customers, and thus, this factor weighs in favor of an independent contractor status.

### 3.   OPPORTUNITY FOR PROFIT OR LOSS.

Where remuneration increases by successful performance of a job, courts have found this weighs in favor of an independent contractor relationship.  *See Donovan*, 736 F.2d at 1119. Equally, the independent contractor relationship has been found where there is a possibility of loss on the part of the contractor.  *Id.*  The Sixth Circuit has identified a worker's ability to request, accept, or decline additional assignments and control his schedule as indicative of an ability to maximize profit.  *Keller*, 781 F.3d at 813.  A worker's ability to control his own schedule provides the potential profit from other ventures by efficiently managing that schedule.  *Id.*

The record establishes that contractors, even the initiating Complainant and Plaintiff's witnesses, sought to maximize their profits by working as much as possible in order to supplement their income.  (Tr. at pp. 41, 105-06, 138, 176-77, 188, 244, 373).  Contractors requested additional opportunities while on vacation or time off from their other employment or when they were trying to increase their income for a certain reason.  (Tr. at pp. 670-71, 700, 782, 803, 850-51, 902-03). All of the witnesses who testified in the trial of this matter indicated that they could control how much or little they worked thereby maximizing their profits.  (Tr. at pp. 34, 89, 105-06, 138, 176, 188, 208, 285, 309, 351, 378, 481, 539, 653, 684, 688-89, 725, 731, 766, 784, 801, 810, 816, 839-40 866, 895-96).

Although some opportunities resulted in compensation on an hourly rate, not all opportunities were compensated as such.  (Tr. at pp. 389, 484, 661, 693, 734, 772-73, 799, 809). Even then, hourly-rate opportunities were not always the same rate of pay.  (*Id.*)  Many contractors accepted opportunities on a flat-rate or project basis, meaning that depending on their efficiency

16

and the customer's needs, the contractor could make more money.  (Tr. at pp. 488, 502, 680-81, 921).  Being paid on an hourly basis is not a dispositive factor in this analysis.  *See Carrell*.  In *Carrell,* despite being paid hourly, the record reflected that the plaintiff-welders had the opportunity to make more profit if they were able to control their own costs.  *Carrell*, 998 F.2d at 334.  The plaintiff-welders treated themselves as independent contractors for tax purposes and deducted the costs of welding materials and equipment as business expenses.  *Id.*  Because the welders could impact their profits based on keeping their own costs down, the court found that here was the opportunity for profit or loss.  *Id.*

Similarly, ODPS' contractors have the opportunity to make more or less profit depending on the opportunities they accept.  Not all opportunities pay the same rate.  (Tr. at pp. 389, 484, 661, 693, 734, 772-73, 799, 809).  There are prevailing wage and peak opportunity times that offer a higher hourly rates and contractors sought these opportunities.  (Tr. at pp. 156, 230, 338, 360, 275-76, 661).  The testimony is clear that rate of pay and location were factors in considering whether to accept an opportunity.  (Tr. at pp. 661, 684, 809-10, 840).  Contractors were responsible for paying for their own equipment, vehicle, maintenance, fuel and other expenses and deduct these as business expenses.  (Tr. at pp. 46-47, 114, 150, 192-93, 294, 333, 360, 663, 697, 739, 777, 805, 818, 826, 848).  Therefore, the contractors' opportunity for profit or loss is dependent on their ability to obtain higher rate opportunities and keep the cost of equipment, travel and other expenses lower.  Indeed, there is evidence that contractors will drive across town to perform services on a site, and oftentimes, these opportunities get canceled as a result of inclement weather.  (Tr. at 513, 662, 693).  Contractors are not reimbursed for this or any other mileage expense.  (Tr. at pp. 278, 662, 694, 735, 776, 933).  These costs contribute to the contractors overall opportunity for profit. Based on the evidence in the record, this factor weighs in favor of an independent contractor status.

### 4.    DEGREE OF SKILL AND INITIATIVE.

When considering this factor, the courts have made clear that the skill required must be evaluated with reference to the task being performed.  *Donovan*, 736 F.2d at 1118.  The important inquiry into this factor is whether the workers' profits were increased due to "initiative, judgment, or foresight of the typical contractor" or whether their work "was more like piecework."  *Keller*, 781 F.3d 809 (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).

Though ODPS provides, in part, traffic safety services, this type of work is only a part of the services required by ODPS' customers.  (Tr. at pp. 455, 477-78).  ODPS' contractors provide a wide-variety of services, which require a broad range of skills.  (*Id*.).  There are numerous types of opportunities requiring different skills and credentials in order to provide services for ODPS' customers, included are, without limitation, being a sworn officer with jurisdiction in the Louisville/Jefferson County Metro area, or obtaining and maintaining a concealed carry license. (Tr. at pp. 669, 843).  Notwithstanding this high degree of skill required for these postings, even the opportunities for traffic control have a high level of requisite skill level and experience which enables contractors to work independently without ODPS' direction or training.  (Tr. at pp. 478-79, 517-19).  As previously established, ODPS does not provide training.  (Tr. at pp. 658, 669, 888).  All such training must be obtained prior to providing services for ODPS' customers.  (*Id*).

Furthermore, there is evidence in the record that each traffic safety officer, including sworn police officers, must be certified by the Commonwealth of Kentucky to provide these services. (Tr. at pp. 339, 884).  Similar to the plaintiff-welders in *Carrell*, a third-party evaluates and certifies the skills of ODPS' contractors with regard to becoming a certified traffic control officer. Additionally, the skills acquired by sworn police officers have been acquired through internal agency training and years of experience.  (Tr. at pp. 202, 658, 769, 837, 889).  The record clearly establishes that each contractors' varying experience and skill level is proportionate to the

available different services, and enhances one's qualifications to be able to select varying types of opportunities.  (Tr. at pp. 42, 230, 772-73, 932).  These facts demonstrate that specialized skills and training are required to perform services for ODPS' customers.

### 5.     PERMANENCY OF THE RELATIONSHIP.

"Generally, independent contractors have variable or impermanent working relationships with the principal company because they often have fixed employment periods and transfer from place-to-place as particular work is offered to them, whereas employees usually work for one employer and such relationship is continuous and indefinite in duration."  *Keller*, 781 F.3d at 807 (quoting *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998)).

The record establishes that most contractors provide services for ODPS on an intermittent basis.  (Tr. at pp. 52, 111, 152, 363, 741, 782, 791, 902-03, 927).  Several contractors have provided services for a while, left for other employment, and returned to provide services to ODPS' customers.  (Tr. at pp. 111, 151-52, 319, 379).  Indeed, the initiating Complainant, Mr. Stallings, left for four months to become a truck driver to only quit and return to ODPS.  (Tr. at pp. 363, 379).  Additionally, several others have indicated for personal reasons they ceased providing services to ODPS' customers for a length of time or found other employment.  (Tr. at pp. 52, 94, 741).  Other contractors work variable schedules depending on their other employment and need for supplemental income.  (Tr. at pp. 52, 111, 152, 363, 741, 782, 791, 902-03, 927).

Though several of the ODPS' contractors have provided services to ODPS' customers for several years, and on a fairly continuing basis, the existence of such continued service does not lend itself to an employee-employer relationship.  In *Donovan*, nearly 50% of migrant workers returned to the purported employer each year, however, several of them held full-time jobs elsewhere and considered their jobs as migrant workers to be opportunities for supplementing their income.  *Id*.  The Sixth Circuit found that the record supported the conclusion that the annual return

to the purported employer was a product of a "mutually satisfactory arrangement rather than a permanent relationship between them." *Id.* Moreover, in *Carrell*, the Fifth Circuit found a lack of permanency where none of the plaintiff-welders worked for the purported employer exclusively. *Carrell*, 998 F.2d at 332.

ODPS does not have an exclusive relationship with any of its contractors. (Tr. at pp. 39, 121, 194, 198-99, 297, 870). The record is replete with evidence that the majority, if not all, of the contractors worked in other capacities or jobs while providing services for ODPS' customers. (Tr. at p. 39, 88 197, 220, 334-35, 485, 652, 682, 719, 763, 791, 810-11, 828-30). Indeed there is testimony that contractors provided similar security and traffic safety services for other security and traffic safety organizations and have been compensated in a similar manner. (Tr. at pp. 121, 150, 198-99, 743, 813). Despite being subject to a non-solicitation covenant, the record establishes there were no restrictions as to contractors' ability to provide similar services to competing businesses, and indeed, some did without issue. (*Id.*). Finally, contractors executed an independent contractor agreement while providing services for ODPS' customers. (Tr. at pp. 20, 98, 130, 302, 366, 388, 463, 671, 702 743 783 794 847 905; Defendants' Exhibits 2, 10, 12, 27, 30, 33, 36, 39, 42, 48). This agreement outlined the nature of their relationship and contractors were made aware of the temporary, as-needed basis of the services they provided. (Tr. at pp. 485, 489, 871, 927); *see Carrell*, 998 F. 2d at 334 (plaintiff welders were independent contractors where their relationships with their alleged employer was on a project-by-project and job-by-job basis); *Talbert v. American Risk Ins. Co.*, 405 F. App'x 848, 856 (5th Cir. 2010) (finding as a matter of law that a licensed contract adjuster was an independent contractor based on the adjuster's express awareness of the temporary nature of the services provided); *Thibault*, 612 F.3d at 849 (recognizing that whether a job is a "temporary, project-by-project, on-again-off-again

relationship" is important to determining whether a worker is an independent contractor); *Gate Guard Servs. L.P.*, 2013 WL 593418 (holding the contractual designation of a worker as an independent contractor is "relevant" if it "mirrors economic realities"); *Mack*, 2012 WL 1067398, at *8 (noting as relevant to the classification of plaintiffs as independent contractors that "it is industry custom in this region for oilfield gate attendants to be treated as independent contractors. . . ."). Given the facts in the records, this factor weighs heavily in favor of an independent contractor status.

### 6.   INTEGRAL PART OF BUSINESS.

ODPS facilitates the needs of its customers, be it traffic safety, facility or personal security, background checks, safety patrol, etc. (Tr. at pp. 477-78). ODPS takes and applies the needs of its customers and finds someone with credentials/training and experience necessary to provide these services. (Tr. at pp. 478, 866). ODPS does not train, instruct or otherwise direct the performance of the contractors in their duties, it merely offers opportunities to qualified contractors to provide services to a requesting customer, according to that customer's specific, and widely variable needs. (Tr. at p. 480, 485, 881, 936). The essence of ODPS' business is facilitating the needs of its customers. ODPS provides a wide-range of services, and though the individuals listed in Exhibit A assist in this regard, by no means would their absence result in a loss of business to ODPS. Accordingly, this factor weighs in favor of independent contractor status.

### C.   THE ECONOMIC REALITY WEIGHS IN FAVOR OF AN INDEPENDENT CONTRACTOR STATUS.

In considering the direction in which the economic reality weighs in status cases, the Sixth Circuit has relied upon the central question of the workers' economic dependence upon the business for which he is laboring. *Donovan*, 736 F.2d at 1119. In *Donovan*, the Court considered the fact that the workers did not work exclusively for the purported employer and they could easily

perform similar work at other farms should the necessity arise. *Id.* Likewise, the Court in *Carrell* found the lack of exclusivity as key in considering the plaintiff-welders' status. *Carrell*, 998 F.2d at 334. Notably, the Court in *Carrell* also considered the fact that the workers were classified as independent contractors and acted accordingly. *Id.* The same is true here that all witnesses testified they were aware of their classification as independent contractors. (Tr. at pp. 20, 66, 98, 130, 170, 183, 204, 232, 302, 324, 347, 366, 388, 434, 783, 794, 817, 849). The record reflects testimony that many contractors believed they were independent contractors because of the control they exercised in their schedules, the manner of performance of duties, and their investment in their equipment. (Tr. at pp. 671-72, 702-03, 744, 783, 817, 849).

Though there are facts that point in both directions, as there are in all status cases, the record weighs heavily in favor of a lack of economic dependence in this matter. As in *Carrell* and *Donovan*, ODPS' contractors are not restricted to providing services solely for ODPS. (Tr. at pp. 39, 121, 194, 198-99, 297, 870). Indeed, most, if not all, at some point have worked for another business or maintained their own business. (Tr. at pp. 121, 150, 198-99, 664, 743, 813, 830). All of the contractors consider themselves as self-employed for tax purposes, invest in significant equipment, and make business deductions accordingly. (Tr. at pp. 22-23,114, 150, 192, 213, 294, 360, 679, 697, 739, 778, 793-94, 818, 848). Contractors work as little or as much as they want depending on their schedules, their need to supplement their income or even their preference for certain work or customers. (Tr. at pp. 34, 285, 309, 351, 378, 481, 539, 653, 673, 684-85, 688-89, 721, 725, 731, 766, 784, 801, 810, 816, 839-40 866, 895-96). It is clear, based on these facts and the facts outlined above, the individuals listed on Exhibit A are in business for themselves and have very little, if any, economic dependence on ODPS.

### D.     THERE IS NO WILFULL VIOLATION.

First and foremost, as described-above, Defendants did not violate the FLSA. Even, assuming *arguendo*, this Court were to find liability on the part of Defendants, there is no basis for a finding of willfulness. The Supreme Court has established that a violation is willful if the defendant either knew his or her conduct violated the FLSA or showed reckless disregard for whether his or her actions complied with the act. *McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 133 (1988). This standard, however, requires more than mere negligence. *Id.* Courts have found willfulness where the employer was aware of specific FLSA requirements from earlier Department of Labor investigations or direct information from an administrative agency when it has either misclassified employees as exempt or failed to compensate them correctly. *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 967 (owner had actual knowledge of Act's requirements from earlier violation in which he previously agreed to pay back wages and promised future compliance). Reckless disregard or guilty knowledge has also been shown by repeated violations; the destruction, falsification or withholding of records. *Martin v. Deiriggi*, 985 F.2d 129, 136 (4th Cir. 1992). Conversely, Courts have held that violations were non-willful when employers made efforts to keep up with the requirements of the FLSA, but failed to do so because of mistaken interpretations of law. *Halferty v. Pulse Drug Co.*, 826 F.2d 2, 3-4 (5th Cir. 1987) (finding of willfulness not warranted where employer consulted with attorney and examined DOL bulletin).

There is no evidence that would lead this Court to a finding that Defendants' conduct was in willful violation of the FLSA. Defendants were not subject to a previous Department of Labor investigation where they were put on notice that they were in violation of the FLSA, promised compliance, and then continued to violate the statute. There is no evidence that Defendants knew or should have known their conduct was in violation of the FLSA.

### E.    DEFENDANTS ACTED IN GOOD FAITH.

Notwithstanding the lack of liability on the part of Defendants, assuming *arguendo*, that the Court finds the Defendants to be liable for the misclassification of the individuals listed on Exhibit A of the Complaint, there is no basis for liquidated damages as Defendants acted in good faith compliance with the FLSA.

The court may, at its discretion, refuse to award liquidated damages if the employer shows that he acted in good faith and that he had reasonable grounds for believing that he was not violating the Act. *Dole v. Elliot Travel & Tours, Inc.*, 942 F.2d 962, 967 (6th Cir. 1991). Courts have found good faith where the employer had reasonable grounds to believe his act or omission was not in violation of the FLSA. *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 312 (7th Cir. 1986). A decision made above board and justified in public is more likely to satisfy the test. *Id*. An employer's willingness to state and defend a ground suggests a colorable foundation for a good faith defense as double damages are designed to compensate for concealed violations. *Id*. Since its formation, ODPS has always characterized its contractors as independent contractors. (Tr. at p. 485). Mr. Spurgeon made the decision to do so based on advice and discussions with his CPA. (Tr. at pp. 471-72). In doing so, ODPS' contractors have executed independent contractor agreements outlining their roles. (Tr. at pp. 20, 98, 130, 302, 366, 388, 463, 671, 702 743 783 794 847 905; Defendants' Exhibits 2, 10, 12, 27, 30, 33, 36, 39, 42, 48). ODPS issues IRS Forms 1099 to the contractors and the contractors treat any income from ODPS as self-employment and taken business expense deductions accordingly. (Tr. at pp. 22-23,114, 150, 192, 213, 294, 360, 679, 697, 739, 778, 793-94, 818, 848). ODPS has never provided any insurance for any independent contractors. (Tr. at pp. 404-05, 545). The record is replete with evidence that Defendants acted in good faith to comply with the requirements of the FLSA.

Furthermore, there is no basis for injunctive relief.  Mr. Spurgeon and the undersigned counsel met with the DOL Investigator, Christopher Binda, at which time Mr. Binda asked Mr. Spurgeon to comply with the FLSA.  (Tr. at p. 541).  At the advice of counsel and as a result of Mr. Binda's threat to secure an injunction, Mr. Spurgeon agreed to no longer extend service opportunities for the contractors which would result in more than 40 hours worked in any given week.  (Tr. at pp. 541-42).  Also at this time, Mr. Binda requested that ODPS pay back wages to the individuals listed on Exhibit A based on his calculation, however, Defendants indicated their disagreement with Mr. Binda's assumption of liability and unsupported back pay calculations.  (Tr. at p. 574).  There is no evidence that any contractors have worked more than 40 hours in a given week since that time, and therefore, assuming they are employees, would be entitled to any overtime pay.  To the contrary, Mr. Spurgeon has indicated he has not given any contractors opportunities that would enable them to perform services for more than 40 hours a week.  (Tr. at pp. 541-42).

## IV.     CONCLUSION

Based on the foregoing, and the evidence presented at the trial of this matter, the Court should find in favor of Defendants, as the individuals listed on Exhibit A are not employees subject to the provisions of the Fair Labor Standards Act.

Respectfully submitted,

*/s/ Emily N. Litzinger*

Raymond C. Haley III
Emily N. Litzinger
Fisher & Phillips LLP
220 West Main Street, Suite 2000
Louisville, Kentucky  40202
Phone:  (502) 561-3990
Fax:  (502) 561-3991
E-mail:  rhaley@laborlawyers.com
E-mail:  elitzinger@laborlawyers.com

COUNSEL FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2015, I electronically filed the foregoing with the clerk of the court by using the CM/ECF System, which arranges for electronic service to the following:

M. Patricia Smith
Solicitor of Labor
BPR No. 371708

Stanley E. Keen
Regional Solicitor
BPR No. 410642

Theresa Ball
Associate Regional Solicitor
BPR No. 002526

Thomas A. Grooms
Attorney
BPR No. 005843

Matt S. Shepherd
Attorney

Neil A. Morholt
Attorney

Office of the Solicitor
U.S. Department of Labor
618 Church Street, Suite 230
Nashville, Tennessee 37219-2440
Phone:  (615) 781-5330 Ext. 223
Fax No.:  (615) 781-5321
Email:  nash.fedcourt@dol.gov
Email:  shepherd.matt@dol.gov

U.S. DEPARTMENT OF LABOR
ATTORNEYS FOR THE PLAINTIFF

*/s/ Emily N. Litzinger*
COUNSEL FOR DEFENDANTS