# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  | 100 EAST FIFTH STREET, ROOM 540 |  |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed:  February 12, 2019

Mr. Raymond C. Haley III
Ms. Emily Nolan Litzinger
Fisher & Phillips
220 W. Main Street, Suite 1700
Louisville, KY 40202

Mr. Dean Romhilt
Department of Labor
200 Constitution Avenue, N.W.
Washington, DC 20210-0000

Re:  Case Nos. 17-5995/17-6071, *Acosta v. Off Duty Police Services, Inc., et al*
     Originating Case No. : 3:13-cv-00935

Dear Counsel,

The court today announced its decision in the above-styled cases.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Vanessa L. Armstrong

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0019p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

R. ALEXANDER ACOSTA, Secretary of Labor, United
States Department of Labor,

        *Plaintiff-Appellant/Cross-Appellee*,

    *v.*

OFF DUTY POLICE SERVICES, INC.; DARRELL
SPURGEON; BONNIE SPURGEON,

        *Defendants-Appellees/Cross-Appellants*.

Nos. 17-5995/6071

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:13-cv-00935—David J. Hale, District Judge.

Argued: October 18, 2018

Decided and Filed: February 12, 2019

Before: GUY, WHITE, and STRANCH, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Dean A. Romhilt, UNITED STATES DEPARTMENT LABOR, Washington, D.C.,
for Appellant/Cross-Appellee. Raymond C. Haley III, FISHER & PHILLIPS LLP, Louisville,
Kentucky, for Appellees/Cross-Appellants. **ON BRIEF:** Dean A. Romhilt, UNITED STATES
DEPARTMENT LABOR, Washington, D.C., for Appellant/Cross-Appellee. Raymond C. Haley
III, Emily N. Litzinger, FISHER & PHILLIPS LLP, Louisville, Kentucky, for Appellees/Cross-
Appellants.

---

### OPINION

---

JANE B. STRANCH, Circuit Judge.   The way we work in America is changing.   The relationships between companies and their workers are more fluid and varied than in decades past.   Our task in this appeal is to apply traditional legal protections to one such relationship.   In the proceedings below, the district court decided that some of the workers for Off Duty Police Services, Inc. (ODPS) were "employees" entitled to overtime wages under the Fair Labor Standards Act (FLSA) while others were "independent contractors" who fell outside the scope of the FLSA's protections.   Because our analysis leads us to conclude that all the workers were employees under the FLSA, we **AFFIRM** the district court's judgment in part, **REVERSE** in part, and **REMAND** for further proceedings.

## I.  BACKGROUND

### A.  Factual History

ODPS offers private security and traffic control services in the Louisville, Kentucky area. These services are simple—a typical day for an ODPS worker includes, for example, sitting in a car with the lights flashing or directing traffic around a construction zone.   Most of ODPS's workers are sworn officers, meaning they work for some law-enforcement entity in addition to working for ODPS.   Other workers are nonsworn, meaning they generally have no background in law enforcement.   Although ODPS pays sworn officers more per hour, the tasks performed by sworn and nonsworn workers are basically the same.   Many ODPS workers, both sworn and nonsworn, have routinely worked for ODPS for years, some for a decade or more.

Darrell Spurgeon, the founder and vice president of ODPS, collects assignments for ODPS's workers by contracting with businesses in and around Louisville.   Spurgeon uses "schedulers," whom ODPS also classifies as independent contractors,[1] to keep track of these customers' work requests.   The customers specify the services needed and the qualifications of

---

[1] The employment status of these schedulers is not at issue on appeal.

the requested workers.  Spurgeon or one of his schedulers then offers the assignments to workers who meet those qualifications.  Workers can choose to accept or reject a job, although multiple witnesses testified that Spurgeon would discipline them—for example, by withholding future assignments—if they declined work.  Some workers referred to this as being placed in "time out."

If workers accept a job, ODPS tells them where to report, when to show up, and whom to speak with when they arrive.  ODPS sometimes provides workers with supplies and equipment necessary for the assignment, including stop-and-go signs, reflective jackets, and badge-shaped patches.  But workers must pay for other equipment.  In certain cases, for example, the cost of an ODPS-branded shirt is deducted from workers' paychecks.  And all workers must own police-style vehicles.  While sworn police officers usually drive their police cruisers, nonsworn workers must buy a police-style vehicle—usually a Crown Victoria—with their own money.  Nonsworn workers testified that they drive these vehicles both on the job and for personal use.  In all, the cost of the nonsworn workers' investments ranges from roughly $3,000 to $5,000.

At the job site, workers follow the customer's instructions, comply with ODPS's standard policies, and occasionally submit to the supervision of other ODPS workers.  Sworn police officers wear their official police uniforms, and nonsworn workers wear police-style uniforms that bear ODPS-branded patches.  With few exceptions, all workers are to remain clean-shaven.  Spurgeon and Frank Medieros, who helps manage the business, sometimes visit job sites to inspect the setup and monitor workers' compliance with these policies.  In some instances, both sworn and nonsworn workers have been disciplined by Spurgeon or Medieros for failing to comply with ODPS's dress and grooming requirements.  Some sworn officers, however, testified that they were rarely or never supervised at job sites.

After completing an assignment, workers send Spurgeon an invoice with the number of hours they spent on the job.  That practice started only after the Department of Labor (DOL) began investigating ODPS's recordkeeping practices.  ODPS ordinarily uses these invoices to pay workers an hourly wage, although infrequently workers are paid per project.  At trial, Spurgeon admitted that the information in these invoices is sometimes inaccurate or incomplete, but he blamed any errors on his workers' failure to submit accurate records.

ODPS considers all these workers to be independent contractors, regardless of the compensation they receive, the work they perform, or their background in law enforcement.  All workers must sign "independent contractor agreements" that contain non-compete clauses prohibiting them from working for ODPS's customers for two years after their work with ODPS ends.  Because ODPS classifies its workers as independent contractors, it has never paid them overtime wages.

## B.  Proceedings Below

The DOL brought this suit against ODPS under the FLSA, alleging that (i) all of ODPS's workers are employees entitled to overtime wages and (ii) ODPS violated the FLSA's recordkeeping requirements by failing to maintain accurate employment records.  The district court held a four-day bench trial at which 19 current and former ODPS workers testified.  In its post-trial decision, the district court held that ODPS's nonsworn workers were employees entitled to overtime wages under the FLSA.  The court also determined that ODPS's sworn officers were independent contractors because they "simply were not economically dependent on ODPS and instead used ODPS to supplement their incomes."  In response to the DOL's claim that ODPS violated the FLSA's recordkeeping requirements, the court acknowledged that some of ODPS's records were "faulty" but found that these errors did not violate the FLSA because ODPS did not "*knowingly* fail[] to maintain accurate records."

After the parties briefed the issue of damages, the court entered a final judgment detailing the back wages owed by ODPS to its nonsworn workers.  Both parties filed notices of appeal.  In this consolidated appeal, the DOL challenges the district court's decision that (i) ODPS's sworn officers were independent contractors and (ii) ODPS did not violate the FLSA's recordkeeping requirements.  ODPS appeals the district court's (i) conclusion that the nonsworn workers were employees entitled to overtime wages under the FLSA and (ii) calculation of back wages.

## II. ANALYSIS

We review a district court's post-trial factual findings for clear error. *Sharpe v. Cureton*, 319 F.3d 259, 269 (6th Cir. 2003). We review de novo the district court's application of those factual findings to the relevant legal standards. *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011).

### A.  Employment Relationship

The FLSA is "a broadly remedial and humanitarian statute . . . designed to correct 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.'" *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984) (quoting *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 143 (6th Cir. 1977)). With that goal in mind, the FLSA requires employers to pay overtime wages to employees who work more than 40 hours in a week. 29 U.S.C. § 207(a)(1). The definition of "employee" in this context "is strikingly broad" and includes "some parties who might not qualify as such under a strict application of traditional agency law principles." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 804 (6th Cir. 2015) (internal quotation marks omitted) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)). To determine whether a worker fits within this expansive definition, "we must look to see whether [the] worker, even when labeled as an 'independent contractor,' is, as a matter of 'economic reality,' an employee." *Id.* (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947)).

This "economic reality" test considers six factors:

> 1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon his skill; . . . 5) the degree of the alleged employer's right to control the manner in which the work is performed . . .;" and 6) "whether the service rendered is an integral part of the alleged employer's business."

*Id.* at 807 (quoting *Brandel*, 736 F.2d at 1117 & n.5). None of these factors is determinative on its own, and each must be considered "with an eye toward the ultimate question—[the worker's] economic dependence on or independence from" the alleged employer. *Id.* We address each of

these factors below, beginning with the least difficult and then turning to those that require the most attention.

### 1. Integral Part of the Business

The first factor asks whether the services provided by the worker are integral to the company's business. "The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship." *Id.* at 815 (citation omitted). There is no doubt that the services offered by ODPS's workers are integral to the company. As its name implies, ODPS built its business around the security and traffic control services provided by its workers. ODPS responds generally that these services are not integral to its business because it is merely "an agent between its customers and independent sworn and nonsworn officers." But even if that characterization were true, ODPS could not function without the services its workers provide. *See, e.g.*, *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 309 (4th Cir. 2006) (finding security guards were integral to a business where company "was formed specifically for the purpose of supplying" private security). This factor cuts heavily in favor of finding an employment relationship between ODPS and all its workers.

### 2. Degree of Skill Required

The next factor considers the worker's skillset, which "must be evaluated with reference to the task[s] being performed." *Brandel*, 736 F.2d at 1118. The skills required to work for ODPS are far more limited than those of a typical independent contractor. *Cf. Werner v. Bell Family Med. Ctr.*, Inc., 529 F. App'x 541, 544 (6th Cir. 2013) (affirming jury's decision that worker was an independent contractor where he had "specialized" and "unique training . . . that no other worker could perform"). At trial, workers testified that the tasks they performed required little skill, initiative, or training. One worker described his responsibilities this way: "Well, sometimes we just had to sit in our cars with the lights flashing. Sometimes I would have to actually get out and stand and be seen, and other times I would have to flag traffic." In describing private security assignments, another worker said that he "would show up at a site and just make sure that everything was safe, locked up, or patrol the lots." And another worker with no experience in law enforcement said that he would simply "show[] up and watch for problems.

That was it."  He also testified that he felt like he could "do the job satisfactorily" because it required only "[c]ommon sense."

ODPS counters by pointing to the "high degree of skill and training required to become a licensed police officer."  But as the district court correctly recognized, this factor does not concern the skills *possessed* by a subset of ODPS's workers; rather, it considers "the degree of skill *required for the rendering of the services*."  *Keller*, 781 F.3d at 807 (emphasis added) (citation omitted).  The services provided by ODPS typically do not require the skill or training of a licensed police officer, as demonstrated by the fact that some of ODPS's workers have no background in law enforcement.  And as ODPS admits, its workers are required to attend only a four-hour training session before they begin work.  These facts favor employee status for all of ODPS's workers.  *See, e.g.*, *id.* at 809 ("[I]f the worker's training period is short . . . then that weighs in favor of finding that the worker is indistinguishable from an employee." (citation omitted)).

3. Investment in Specialized Equipment

The limited investment by ODPS workers in specialized equipment also supports employee status for sworn and nonsworn workers.  This factor requires comparison of the worker's total investment to "the company's total investment, including office rental space, advertising, software, phone systems, or insurance."  *Id.* at 810 (citation omitted).  "The capital investment factor is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered."  *Brandel*, 736 F.2d at 1118-19.

Here, ODPS periodically supplied workers with basic equipment necessary for the job, including stop-and-go signs, reflective jackets, and badge-shaped patches with the ODPS logo.  For sworn police officers, the remaining items—including a police uniform and cruiser—required little or no capital investment because the officers already had those items through their police work.  Some officers testified that they had to pay their police departments approximately $50 to $200 per month to use police-issued equipment, but otherwise no additional investment was necessary to work for ODPS.  Nonsworn workers, however, had to obtain police-style clothing and police-style vehicles.  While acquiring uniforms entailed little expense, obtaining a

police vehicle required some investment. In all, the district court estimated that nonsworn workers generally spent around $3,000 to $5,000 on necessary equipment, the majority of which they spent on the vehicle.

As the district court correctly noted, the $3,000 to $5,000 spent by nonsworn workers "pale[s] in comparison to the amount ODPS spent running its business per year," which Spurgeon estimated at around $200,000. And the vehicles purchased by nonsworn workers could be used for any purpose, not just on the job. In *Keller*, we found that while "investment of a vehicle is no small matter . . . that investment is somewhat diluted when one considers that the vehicle is also used by most drivers for personal purposes." *Id.* (citation and internal quotation marks omitted). At trial, multiple nonsworn workers testified that they used their vehicles for both professional and personal purposes.

Although the district court held that these investments supported employee status for the nonsworn workers, the court decided that the sworn officers' investments were a "non-factor." Presumably, these investments were considered a "non-factor" because sworn police officers already possessed the necessary equipment before they began working for ODPS. But these officers' negligible costs must still be measured against ODPS's significant annual costs. And the cost of the sworn officers' investment is relevant to another purpose of this inquiry: to determine whether the disputed work involves a "specialized service that requires a tool or application which [the worker] has mastered." *Brandel*, 736 F.2d at 1118-19. The vehicles used by sworn and nonsworn workers—which they simply parked and sat in for hours at a time— required no specialized mastery. This limited investment in specialized equipment favors employee status for sworn and nonsworn workers.

4. <u>Permanency of Relationship</u>

The remaining factors require more attention. The first of these is the permanency of the relationship between ODPS and its workers, which looks to the "length and regularity of the working relationship between the parties." *Keller*, 781 F.3d at 807 (citation omitted). Independent contractors "often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas employees usually work for only one employer

and such relationship is continuous and indefinite in duration." *Id.* (internal quotation marks omitted) (quoting *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998)). That a party works for more than one company, however, is only "one factor of many to consider in determining whether a worker is economically dependent upon the defendant company," and "employees may work for more than one employer without losing their benefits under the FLSA." *Id.* at 808 (citations omitted).

Although ODPS's workers accepted jobs intermittently, they often worked for ODPS for years—or, in some cases, decades—at a time. *Cf. Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1318 (11th Cir. 2013) (finding the permanence factor supported employee status where plaintiffs worked for a company "an average of more than five years"). And the length of these relationships did not depend on the worker's status as sworn or nonsworn. Multiple nonsworn workers testified that they had worked for ODPS for many years. Two sworn officers testified that they had worked for ODPS for almost two decades, and others testified that they had been with ODPS for close to a decade.

In addition to length, the regularity of the workers' relationship with ODPS also favors employee status. Once again, this consistency did not depend on the worker's status as sworn or nonsworn. Multiple nonsworn workers testified that ODPS had been their sole employer for years at a time. Even those workers who sometimes accepted other work reported that they spent the majority of their time working for ODPS. And while the sworn officers maintained day jobs in law enforcement, many reported working consistently for ODPS throughout the year. One officer testified, for example, that he had routinely worked at least 20 to 25 hours per week for ODPS for "five or six years." Another officer testified that he had often worked for ODPS "at least 50 hours a week or more," and that his periodic work for other companies was not "on a permanent basis like working for ODPS."

Despite the long, consistent relationship between ODPS and many of its sworn officers, the district court determined that the work performed by these officers lacked the permanence necessary to establish an employment relationship. Noting that the officers had "other employment and sources of income," it chose to "[f]ram[e] the issue in terms of whether the workers listed [by the DOL] were 'economically dependent upon ODPS.'" Thus framed, the

district court found that "the sworn officers were not economically dependent upon ODPS, but the eight [nonsworn workers] who testified to ODPS being their sole source of income were." On that basis, the district court decided that the permanence factor supported employee status for only the nonsworn workers.

This conclusion was mistaken for two reasons. First, the analysis merged the permanence factor with the ultimate question of the workers' economic dependence on ODPS. The test of a worker's economic dependence looks to all six of the factors discussed above and below. The permanence factor, which focuses on the length and consistency of the officers' work, is only one component of that test.

Second, whether a worker has more than one source of income says little about that worker's employment status. Many workers in the modern economy, including employees and independent contractors alike, must routinely seek out more than one source of income to make ends meet. An income-based rule would deny that economic reality. It would also suffer from problems of practical application. Such a test would, for example, lead to classification of the same worker as an independent contractor during the periods in which she had more than one source of income but then as an employee during the (often brief) periods in between. And as the Fifth Circuit noted in *Halferty v. Pulse Drug Co.*, 821 F.2d 261 (5th Cir. 1987), an income-based test would also mean that certain "wealthy persons could never be employees under the FLSA." *Id.* at 268. On the other end of the scale, such a rule would risk encouraging employers to "avoid liability to workers simply by paying them so low a wage that the workers are forced to live on other sources of income." *Id.* That outcome would frustrate the first principles of the FLSA, which is designed to ensure that workers earn a fair wage.

To the extent that a worker's source of income is relevant, it is only so because it speaks indirectly to the question of whether the individual works for more than one company. As we recognized in *Keller*, however, that an individual works for more than one company is only one consideration of many to make "in determining whether a worker is economically dependent upon the defendant company." 781 F.3d at 808. Further, this fact is most relevant when it suggests that a worker tends to "transfer from place to place as particular work is offered to [him]." *Id.* at 807 (citation omitted). In this case, the sworn officers did not bounce from one

company to another in search of new work.   Although some officers testified that they occasionally accepted jobs from other companies, the consistent theme throughout trial was that the officers had two primary sources of employment—their day jobs and their positions at ODPS.   That is not the kind of itinerant work that independent contractors ordinarily perform.   Given the length and consistency of the relationship between ODPS and its workers, the permanence factor supports employee status for both sworn and nonsworn workers.

### 5. Opportunity for Profit or Loss

The next factor asks whether the workers had "opportunities for profit or loss dependent on [their] managerial skill." *Schultz*, 466 F.3d at 307.  Courts evaluate this factor by asking if workers "could exercise or hone their managerial skill to increase their pay." *Id.* at 308.  This factor may favor independent contractor status if, for example, a worker uses his managerial skill to "improve his efficiency such that he c[an] complete more" jobs per day. *Keller*, 781 F.3d at 813.

The facts do not suggest that ODPS's workers could "exercise or hone" their managerial skills to increase their pay.   To begin, workers were not well-positioned to apply these skills because completion of ODPS's jobs required limited skill, experience, or initiative.   And to the extent some skill was required, workers earned a set hourly wage regardless of the skill they exercised.   In rare cases, ODPS would pay workers per project; but those, too, were flat payments that did not depend on the skill applied by the worker.

ODPS maintains that because workers could accept or reject work, they effectively controlled their opportunities for profit or loss by managing their workload.   While the decision to accept or reject work is a type of managerial *action*, the relevant question is whether workers could increase profits through managerial *skill*. *See id.* at 812.  It requires little skill to determine whether one is available at a certain day and time or whether inclement weather or some other factor might make a job less desirable.   And while the ability to control one's schedule may, in some circumstances, allow more efficient workers to maximize profits, ODPS's workers had no such opportunity.   ODPS's assignments required workers to be present for set periods of time, regardless of what skills they exercised, so workers could not complete jobs more or less

efficiently than their counterparts.  On this basis, the court in *Schultz* found that workers could not increase profits through managerial skill because "[t]here was no way [workers] could finish a shift more efficiently or quickly in order to perform additional paid work."  466 F.3d at 308 (citation omitted).  Likewise, neither sworn nor non-sworn workers appear to have been at risk of a loss based on their decision to work or not.  Decreased pay from working fewer hours does not qualify as a loss.  *See Dole v. Snell*, 875 F.2d 802, 810 (10th Cir. 1989) ("A reduction in money earned by the [cake] decorators is not a 'loss' sufficient to satisfy the criteria for independent contractor status.").

In these respects, this case is materially different from *Karlson v. Action Process Serv. & Private Investigations, LLC*, 860 F.3d 1089 (8th Cir. 2017), on which ODPS relies.  In *Karlson*, the Eighth Circuit upheld a jury's conclusion that process servers were independent contractors on evidence that the process servers were paid a flat rate for each job, jobs could take anywhere from "a few minutes to several hours," and some jobs had "priority" status.  860 F.3d at 1094.  As a result, a process server could make a profit by being more efficient and managing different assignments.  In contrast, the officers here typically earned the same compensation per hour regardless of the project and could not make more profit by managing different commitments.

Because ODPS's workers earned set wages to perform low-skilled jobs for fixed periods of time, this factor supports employee status for sworn and nonsworn workers.

### 6. Right to Control

The last factor looks to the degree of control exercised by the company over the workers.  To guide this evaluation, we ask whether the company "retains the right to dictate the manner" of the worker's performance.  *Brandel*, 736 F.2d at 1119.

ODPS maintained a "policies and procedures" document stating that a worker's noncompliance with the policies would "result in immediate termination."  Those policies and procedures addressed: (1) the type and color of uniform that may be worn, (2) vehicle and light requirements, (3) rules for exchanging job assignments with other ODPS workers, and

(4) general rules on workplace presentation and conduct.  ODPS also represented to its customers that it would inspect the work sites and supervise its workers.

ODPS contends that, in practice, it never instituted or exercised such control.  It is true that ODPS left some aspects of the workers' performance to their discretion.  Workers had the right, for example, to accept or reject assignments.  Witnesses also testified that Spurgeon and Medieros did not regularly supervise workers' day-to-day performance.  Some sworn officers testified that ODPS rarely, if ever, supervised their work or disciplined them for violating company policies.  And in addition to ODPS's policies, the workers' performance depended in part on the on-site instructions they received from ODPS's customers, not just the directions they received from ODPS.

Several key facts, however, counterbalance this evidence.  Although workers could accept or reject assignments, multiple workers testified that Spurgeon would discipline them if they declined a job.  Workers referred to this as being placed in "time out."  One sworn officer testified that if he declined a job during a phone call with Spurgeon, "[t]he phone would just go dead."  These hang-ups signaled more than Spurgeon's frustration; witnesses testified that Spurgeon would then withhold new jobs from that worker for up to a week.  The same officer testified, for example, that he would not hear from Spurgeon "for at least three days to a week" if he declined a job.  Although he "would call and try to talk to him" during that period, he would "never get a response."  Another witness who worked both as a sworn officer and a nonsworn worker testified that "it was just pretty much implied" that workers would accept jobs "because, you know, if [they] turned a job down, [they] would get a time out most times."  A third worker gave similar testimony.  And although workers could choose to stop working for ODPS altogether, the non-compete clause in the agreements they signed with ODPS—which prevented them from working for ODPS's customers for two years after severing ties with ODPS—limited their ability to do so.  In fact, Spurgeon testified that he had sued to enforce these non-compete provisions in the past.

When workers did accept assignments, ODPS set the rate at which the workers were paid. ODPS would tell the workers where to go for the job, when to arrive, and whom they should contact when they got there.  And although the workers followed customers' instructions at the

job site, they were also periodically supervised by Spurgeon or Medieros. One sworn officer, for example, testified that Spurgeon and Medieros were his "supervisors." He recalled that Spurgeon visited his job site on "maybe three occasions," and Medieros would visit "once or twice, three times a month maybe, depending on what was going on." Another worker who identified Medieros as his "supervisor" said that Medieros would instruct him on "basic stuff," like "how [they were] going to set up" or "where to put [their] cars." Many other workers testified that Medieros would occasionally check on them. And Medieros admitted at trial that he told a DOL investigator that he was "a supervisor" who went to job sites to "make sure the guys [were] doing what they [were] supposed to do."**2**

In addition to inspecting job sites, ODPS also required workers to comply with certain dress and grooming policies. One sworn officer testified that Medieros visited a job site and "got on to" him and another officer after he discovered that they were both wearing shorts and that the other officer had a goatee. Spurgeon later called the chief of the police department where the two officers worked and "raised Cain" about the fact that they had arrived at the site wearing shorts. Another worker testified that he was told to "shave [his] beard or not come back." Many other witnesses, including Medieros, testified that ODPS did not allow workers to grow beards.

Taking all this evidence into account, the district court correctly found that the control factor supported employee status for the nonsworn workers. But as to the sworn officers, the district court determined "that there was more scrutiny exerted over the nonsworn [workers] than the sworn officers" and that the testimony of the "sworn officers tended to indicate that they were not supervised closely and not reprimanded or disciplined." The five sworn officers called by ODPS testified that they were rarely if ever supervised or disciplined by ODPS; on the other hand, the three sworn officers called by the DOL testified that they *were* repeatedly supervised and/or disciplined. In what amounted to a credibility contest between the parties' witnesses, it was not clear error for the district court to conclude that the sworn officers received less supervision and discipline than the nonsworn workers or that the sworn officers on the whole were not supervised closely.

---

**2**Medieros additionally testified that calling himself a supervisor was "not a good choice of words" and that he had "self-generated" the title.

Even accepting that factual finding, however, this factor does not clearly support independent contractor status for ODPS's sworn officers. Although ODPS did not supervise the day-to-day performance of its workers, such close supervision is not necessary to establish control. *See, e.g.*, *Superior Care*, 840 F.2d at 1060 (finding employer exercised necessary control when it visited job sites "once or twice a month" and "unequivocally expressed the right to supervise" workers' performance and noting that "[a]n employer does not need to look over his workers' shoulders every day in order to exercise control" (citation omitted)). Further, the level of supervision necessary in a given case is in part a function of the skills required to complete the work at issue. The routine traffic and security work performed by ODPS's sworn officers, which often involved sitting in a car for hours at a time, did not require more than periodic supervision. As we noted in *Peno Trucking, Inc. v. Commissioner of Internal Revenue*, "[t]he absence of need to control should not be confused with the absence of right to control," and the actual exercise of control "requires only such supervision as the nature of the work requires."[3]  296 F. App'x 449, 456 (6th Cir. 2008) (internal quotation marks omitted) (quoting *McGuire v. United States*, 349 F.2d 644, 646 (9th Cir. 1965)); *see also Brandel*, 736 F.2d at 1119 (noting that the control test asks whether a company "*retains the right* to dictate the manner in which the" worker performs (emphasis added)); *Keller*, 781 F.3d at 815 (finding that a fact issue existed under the FLSA about whether a company "*had the power* to discipline and control" its workers (emphasis added)). In this case, ODPS had a limited need to exercise its power to supervise the sworn officers, who already had far more experience and training than necessary to perform the work assigned.

These facts do not break cleanly in favor of employee or independent contractor status for ODPS's sworn officers. Although routine supervision was unnecessary in this context, the testimony of some sworn officers indicated that ODPS's supervision fell short under even the most liberal interpretation of the control test. While some sworn officers testified that ODPS

---

[3]The court in *Peno Trucking* considered the control test in the context of the United States Tax Court's classification of workers as employees under provisions of the Internal Revenue Code. 296 Fed. App'x at 455. The test in this case calls for at least as expansive a definition of control. *Cf. Keller*, 781 F.3d at 804 (describing the definition of "employee" under the FLSA as "strikingly broad" (citation omitted)); *see also Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1382 (3d Cir. 1985) ("Congress and the courts have both recognized that, of all the acts of social legislation, the Fair Labor Standards Act has the broadest definition of 'employee.'" (citations omitted)).

periodically supervised and disciplined them, others said that supervision and discipline were rare and, in some cases, non-existent.  And while some sworn officers testified that they were punished for declining work, others said they were not.  In view of these inconsistencies, the evidence does not readily favor either party's position with respect to the sworn officers.

### 7. Balancing the Factors

For the reasons explained above, five of the six economic-reality factors support finding an employment relationship between ODPS and all its workers.  The record shows that ODPS's workers were an integral part of ODPS's business, that they performed low-skilled jobs at a set rate of pay for fixed periods of time, that they overall made limited investments in specialized equipment, and that they worked for ODPS consistently over the course of many years.  The remaining factor—ODPS's right to control its workers' performance—favors employee status for the nonsworn workers and, in the case of the sworn officers, is evenly balanced in support of both parties' positions.

The weight of these factors must be balanced in light of the FLSA's "strikingly broad" definition of "employee."  *Keller*, 781 F.3d at 804 (citation omitted).  In this balancing, we remain mindful of the Supreme Court's instruction to avoid "a 'narrow, grudging' interpretation of the FLSA" and "to remember its 'remedial and humanitarian' purpose."  *Monroe v. FTS USA, LLC*, 860 F.3d 389, 403 (6th Cir. 2017) (citations omitted).  To accomplish that purpose, the test must account for the full range of factors relevant to a worker's employment status.  Taking all these factors into consideration with an eye on the ultimate question of economic dependence, ODPS's workers, both sworn and nonsworn, were employees entitled to overtime wages under the FLSA.

## B.  Recordkeeping Requirements

Next, the DOL appeals the district court's conclusion that ODPS did not violate the FLSA's recordkeeping requirements.  Under § 29 U.S.C. 211(c), employers must "make, keep, and preserve such records of the persons employed by [them] and of the wages, hours, and other conditions and practices of employment maintained by [them] . . . as necessary or appropriate for the enforcement of the provisions of" the FLSA.  At trial, the DOL's investigator testified that

many records of the hours worked by ODPS's employees were either missing, inaccurate, or incomplete. Spurgeon admitted that some of ODPS's records were inaccurate or incomplete.[4] And the district court agreed that ODPS had failed to maintain accurate and complete records. The post-trial decision, however, held that ODPS had not violated the FLSA's recordkeeping requirements because the evidence did not show that ODPS had "*knowingly* failed to maintain accurate records."

Section 211(c) does not contain a knowledge requirement. Another provision, 29 U.S.C. § 215(a)(5), does make it unlawful to:

> . . . violate any of the provisions of section 211(c) of this title, or any regulation or order made or continued in effect under the provisions of section 211(d) of this title, or to make any statement, report, or record filed or kept pursuant to the provisions of such section or of any regulation or order thereunder, knowing such statement, report, or record to be false in a material respect.

This provision does proscribe "knowing[ly]" making false statements in employment records. But that knowledge requirement applies only to an employer's material misrepresentation in a "statement, report, or record." To violate § 211(c), by contrast, an employer could (as ODPS did here) fail to maintain certain records at all or fail to preserve them properly. And by its plain terms, § 215(a)(5) makes it unlawful "to violate *any* of the provisions of section 211(c) . . . *or* to make any statement, report, or record . . . knowing such statement, report, or record to be false in a material respect." (emphasis added). The statute thus makes it unlawful *both* to fail to make, keep, or preserve records under § 211(c) *or* to make those records with the knowledge that they are false. That the statute expressly imposes a knowledge requirement for only the latter violation suggests that violations of the former do not carry the same requirement. *See, e.g.*, *S. Rehab. Grp., P.L.L.C. v. Burwell*, 683 F. App'x 354, 363 (6th Cir. 2017) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court

---

[4]On appeal, ODPS briefly argues (without citation) that "ODPS has met the recordkeeping requirement by maintaining time records in the form of the invoices that officers submitted in order to receive payment for services provided." Apart from this unsupported sentence, ODPS makes no effort to explain why these invoices were sufficient or to refute the trial testimony demonstrating that ODPS's records were often missing, inaccurate, or incomplete. Without more, this argument is forfeited. *See, e.g.*, *Hensley v. Gassman*, 693 F.3d 681, 688 (6th Cir. 2012) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited]." (citation omitted)).

assumes different meanings were intended." (internal quotation marks omitted) (quoting *DePierre v. United States*, 564 U.S. 70, 83 (2011)).[5] This is also consistent with the well-established principle that "it is the employer who has the duty under [the FLSA] to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). We therefore vacate the district court's determination that ODPS did not violate § 211(c) and remand for proceedings consistent with this opinion.[6] On remand, the district court shall reconsider the DOL's request for injunctive relief and, as necessary, exercise its discretion under 28 U.S.C. § 217.

## C. Back Wages Calculation

Finally, ODPS challenges the district court's calculation of back wages owed by ODPS to three workers. Due to ODPS's inadequate recordkeeping, these calculations were based in part on inaccurate or incomplete records. In cases where an "employer's records are inaccurate or inadequate . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *U.S. Dep't of Labor v. Cole Enterprises, Inc.*, 62 F.3d 775, 779 (6th Cir. 1995) (quoting *Mt. Clemens*, 328 U.S. at 687). Once the employee makes this showing, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.*

---

[5]District courts examining § 211(c) have also found that it does not carry a knowledge requirement. *See, e.g.*, *Perez v. Oak Grove Cinemas, Inc.*, 68 F. Supp. 3d 1234, 1246 (D. Or. 2014) (holding that lack of intent "is not a defense to a recordkeeping violation" under the FLSA (citation omitted)); *Nieddu v. Lifetime Fitness, Inc.*, 38 F. Supp. 3d 849, 864–65 (S.D. Tex. 2014) (rejecting claim that employees bear the burden of keeping accurate records and noting that "[t]he obligation [to pay overtime under the FLSA] is the employer's and it is absolute," and the employer "cannot discharge it by attempting to transfer his statutory burdens of accurate record keeping" (internal quotation marks omitted) (quoting *Caserta v. Home Lines Agency, Inc.*, 273 F.2d 943, 946 (2d Cir. 1959)); *Solis v. SCA Rest. Corp.*, 938 F. Supp. 2d 380, 398 (E.D.N.Y. 2013) (finding that a "failure to make, keep, and preserve adequate and accurate records" under the FLSA is "a *per se* violation of the Act").

[6]We further note that the district court elsewhere properly considered ODPS's willfulness (or lack thereof) in violating the FLSA, concluding that the two-year rather than three-year statute of limitations applied because there was insufficient evidence that ODPS's violations were willful.

In this case, ODPS appeals the district court's calculation of back wages owed by ODPS to Frank Medieros, Steven Newman, and Jason Petra.  We address the damages owed to each worker in turn.

1. <u>Frank Medieros</u>

The district court calculated the back wages owed to Medieros in the same way it calculated the back wages owed to other nonsworn workers—by dividing the amount he was paid by his hourly rate.  ODPS argues that the district court should have used a different method to calculate Medieros's back wages because of the "unique factors regarding [his] varying services provided to ODPS customers, and the unique nature of his compensation."  In addition to working as a security guard and traffic controller, Medieros also helped ODPS schedule other workers' assignments and recruited new customers to the business.  For scheduling another worker on a job, Medieros received one dollar for every hour of service performed by the worker on that job; for recruiting a new customer, he received ten percent of the profits generated by that customer.

ODPS does not argue that Medieros's scheduling or recruiting work or additional forms of compensation are exempt from the FLSA's overtime requirements.  Instead, ODPS claims that the district court should have used some unspecified alternative method of calculating Medieros's total hours and compensation to account for his varied work responsibilities.  In its briefing in the district court, ODPS announced that "[b]ased on relevant records," Medieros "only had a single week in which he provided services to an ODPS customer for more than 40 hours in a week."  But ODPS provided no citation to these "relevant records," which in any event do not address Medieros's other work activities,[7] nor has it proposed any alternative method of calculating Medieros's back wages on appeal.

ODPS insists that it has no obligation "to 'adequately explain' its proposed damages calculations."  Citing *Mt. Clemens*, ODPS claims that its only burden is to "negate the reasonableness" of the DOL's proposed calculation, not to offer a reasonable alternative.  But

---

[7]In his interview with the DOL investigator, which was memorialized in a personal interview statement admitted into evidence, Medieros reported that he worked an average of 50 hours per week.

this argument misses the point.  The reasonableness of the DOL's proposed calculation depends in part on the availability of other, more reasonable alternatives to that proposal.  The fact that ODPS cannot identify any reasonable alternative to the DOL's calculation is highly probative of whether the DOL's proposed method is reasonable.  And more importantly, to the extent that the DOL's calculation provides only a rough estimate of the back wages owed to Medieros, that imprecision is a result of ODPS's failure to keep accurate and complete records.  Courts will not punish employees for their employer's failure to comply with the FLSA's recordkeeping requirements.  "Disapproving of an estimated-average approach simply due to lack of complete accuracy would ignore the central tenant of *Mt. Clemens*—an inaccuracy in damages should not bar recovery for violations of the FLSA or penalize employees for an employer's failure to keep adequate records."  *Monroe*, 860 F.3d at 412.  Although the calculation adopted by the district court may be imprecise, it is the best method available in light of ODPS's failure to maintain accurate and complete records.  We therefore affirm the district court's calculation.

2. <u>Steven Newman and Jason Petra</u>

ODPS also contends that Newman and Petra should not have received overtime wages for work performed during the periods in which they were sworn officers.  This argument depends on the conclusion that only ODPS's nonsworn workers were employees entitled to overtime wages.  Because we reject that premise, Newman's and Petra's status as sworn or nonsworn is irrelevant to the proper calculation of back wages.  The district court's calculation did not attempt to distinguish between the periods in which Newman and Petra were sworn or nonsworn, and we find no cause to disturb its original calculation.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's (1) conclusion that ODPS's nonsworn workers were employees under the FLSA and (2) calculation of back wages owed by ODPS to its nonsworn workers, and we **REVERSE** the district court's (3) decision that ODPS's sworn officers were independent contractors under the FLSA and (4) determination that ODPS did not violate the FLSA's recordkeeping requirements.  We **REMAND** for further proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 17-5995/6071

R. ALEXANDER ACOSTA, Secretary of Labor,
United States Department of Labor,

     Plaintiff - Appellant/Cross - Appellee,

     v.

OFF DUTY POLICE SERVICES, INC.;
DARRELL SPURGEON; BONNIE SPURGEON,

     Defendants - Appellees/Cross - Appellants.

> **FILED**
> Feb 12, 2019
> DEBORAH S. HUNT, Clerk

Before: GUY, WHITE, and STRANCH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Kentucky at Louisville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk